# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Alanna Dunn, *et al.*

               Plaintiffs

     *v.*

Cuyahoga County, *et al.*

             Defendants

Case No. 1:23-cv-00364

Judge Bridget Meehan Brennan

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

**PAGE**

I.    FACTUAL BACKGROUND ...........................................................................1

   A.   Since 2018, CCSD Has Known That It Routinely Overdetains People in the Jail .............1

   B.   CCSD's Manual Process for All Releases Is Prone to Errors Because
It Requires Records to Change Hands Numerous Times and Has No Routine Tracking
System ...........................................................................................................................1

   C.   CCSD Depends on Third Parties to Provide Critical Release Notifications ......................3

   D.   CCSD's Release Process Lacks Checks, Failsafe Measures, and
Policy Standards.............................................................................................................4

      *CCSD Release Policies Are Either Nonexistent or Deficient* .............................................4

      *CCSD Has Not Implemented Measures to Prevent or Timely Identify Errors* ...................5

   E.   CCSD Never Implemented a Comprehensive Plan to Resolve Overdetentions.................7

   F.   Employees are Rarely, and Supervisors are Never, Disciplined
for Overdetention ...........................................................................................................7

   G.   CCSD Should Release Detainees in the Putative Class Within 6 Hours ...........................8

   H.   CCSD Overdetained the Named Plaintiffs for 18 to 41 Hours ...........................................9

II.   ARGUMENT ........................................................................................................10

   A.   The Class Satisfies the Requirements of Rule 23(a)...........................................................10

      *Numerosity is Satisfied*.................................................................................................10

      *Commonality and Typicality are Satisfied* ......................................................................11

      *Adequacy is Satisfied* ...................................................................................................11

   B.   The Class Satisfies the Predominance and Superiority Requirements ..............................11

      *Common Questions Predominate* ......................................................................................11

      *Numerous systemic deficiencies in CCSD's release process caused
overdetentions* ...............................................................................................................12

*Individual issues are unlikely to explain releases taking over 12 hours* ...........................14

A Class Action is the Superior Method of Adjudication ....................................................14

C.    The Class Meets the Requirements for Issue Certification Under Rule 23(c)(4) ..............15

INDEX OF EXHIBITS ......................................................................................................... A-1

Cuyahoga County's Sheriff's Department ("CCSD") systemically overdetains people at the Cuyahoga County Jail ("Jail"). Resolution of this case turns on whether plainly deficient or altogether absent CCSD release policies and practices, to which putative Class Members were commonly subjected and which caused their overdetentions, constitute deliberate indifference.

## I. FACTUAL BACKGROUND

### A. Since 2018, CCSD Has Known That It Routinely Overdetains People in the Jail

In 2018, per a "revenue generating agreement" ("Contract"), CCSD started housing Cleveland Detainees[1] at the Jail ("Transition"). (Ex. 1) Cleveland soon began notifying CCSD of overdetentions (Ex. 2, 220:12-15; Ex. 3) and, from 2019 to 2023, sent a monthly report of detainees who were not released the day they were entitled ("OD Report").[2] (Ex. 2, 227:3-23) In 2021, a CCSD Supervisor began analyzing each OD Report custody session to determine "where the issue stemmed from." (Ex. 5, 169:18-171:15) But despite receiving monthly Cleveland OD Reports, CCSD never sought to determine whether it was also overdetaining County Detainees. (Ex. 6, 110:4-16) In January 2022, after reading about the OD Reports, a Clerk of Court ("COC") Criminal Manager for the County Common Pleas Court began sending CCSD a daily Bond Report as an "additional check and balance," listing County Detainees who were not released despite posting bond the previous day. (Ex. 7, 123:12-124:2, 130:1-18) The first Bond Report led CCSD to discover a County Detainee on her *17th day of overdetention.* (Ex. 8[3]) Still, CCSD made no effort to determine whether it was routinely overdetaining County Detainees. (Ex. 10, 43:19-22)

### B. CCSD's Manual Process for All Releases Is Prone to Errors Because It Requires Records to Change Hands Numerous Times and Has No Routine Tracking System

During business hours, staff in CCSD's Records Department process release records,

---

[1] "Cleveland Detainees" have cases arising out of Cleveland Municipal Court, as opposed to "County Detainees" who have cases arising out of the Cuyahoga County Court of Common Pleas.

[2] Cleveland stopped sending OD Reports 3 months after this suit was filed. (Ex. 2, 37:16-19)

[3] *See* entry on page 4 for Jennifer Heaston in email attachment titled "Bonds Posted – Common Pleas January 2021."

which CCSD receives via one of two streams: software system Queues (for County records) or the SHCMC email group (for Cleveland records).[4] (Ex. 9 ¶ 95; Ex. 10, 50:7-12) First, a Records Clerk prints any release record she is assigned to process[5] and checks CCSD computers to ensure the detainee can be released; she then passes the release paperwork on for a warrant check by the LEADS Clerk; next, a Records Supervisor retrieves the paperwork to conduct a "Second Check"; then the Supervisor gives the paperwork back to the original Records Clerk, who finally emails CHECKS[6] to notify the Jail's Release Desk that the detainee can be released. (Ex. 13, 63:7-64:18; Ex. 5, 80:7-82:7, 239:20-240:5, 241:12-16)

After receiving the CHECKS email, Release Desk staff complete the release: first, the Release Desk Officer compiles a release packet while another officer completes a checklist for the packet; then the Release Desk Officer prepares a copy of the packet for pickup by the Escort Officer who retrieves a batch of completed packets, picks up the detainees to be released, and brings them to a dress-out area where they change; then a Sergeant and OneTouch officer verifies the detainee can be released and the detainee retrieves their property and exits the Jail. (Ex: 14, 138:23-141:22, 147:4-17, 182:20-183:2, 188:13-22, 191:15-23, 192:19-193:4) Since Records staff work limited hours, Release Desk staff are responsible for the entire release process on weekends and from 5:00 p.m. to 8:30 a.m. on weekdays ("After Hours"). (Ex. 5, 64:20-65:2)

CCSD does not track the status of releases in progress. (Ex. 5, 247:23-248:6) So, when an error stalls a release, *see infra* I(D), CCSD cannot identify the breakdown.[7] (*E.g.*, *id.*, 248:19-249:2

---

[4] Email groups like SHCMC deliver emails sent to the group email address to the personal inboxes of all subscribers.

[5] Clerks are assigned to process records for detainees whose last names begin with certain letters. For a record in SHCMC, one Clerk prints it and may distribute it to another assigned to process it. (Ex. 9, ¶ 80; Ex. 11, 100:14-22)

[6] Release Desk staff are subscribers of the CHECKS email group. (Ex. 17, 48:19-21)

[7] Other jails avoid this problem by having the employee who processes a release see it through to completion. (*See* Ex. 42, 4 (discussing Franklin County Jail having two 24/7 Release Clerks who process and complete releases, with one being "the last contact the inmate has before exiting" the jail); Ex. 2, 65:17-66:15 (pre-Transition, Cleveland used one employee to complete the entire release process, which was a "check[] and balance[]"))

(no document used to track completion of each release step); Ex. 11, 120:12-121:15 (transmission of printed release records not documented)) Employees are not even required or expected to confirm with one another that a release record they sent for further processing was received and acted upon. (Ex. 5, 236:5-238:5; Ex. 12, 128:18-129:1, 198:23-199:07; Ex. 19, 21:7-10)

## C.  CCSD Depends on Third Parties to Provide Critical Release Notifications

CCSD relies on Cleveland COC and private monitoring companies to provide release notifications for Cleveland Detainees without having any written agreements outlining those duties. (Ex. 15, Rogs 21-22; Ex. 10, 293:5-8) Cleveland COC records bond and release order information on its online public docket (Ex. 16, 48:15-18, 121:18-22), as required by Ohio Rev. Code Ann. § 1907.20, but CCSD has never tried to automatically retrieve it. (Ex. 2, 111:21-112:8; Ex. 17, 299:14-16) After the Transition, Cleveland COC informally agreed to email release records to CCSD so CCSD could stop picking them up, but CCSD entered into no written agreement requiring this or memorializing how and when it should be done. (Ex. 16, 80:12-83:19; Ex. 9 ¶¶ 175-180) Relatedly, when law enforcement decides not to file charges against a Cleveland Detainee, the detainee is entitled to release if all Cleveland capiases or warrants they have are minor misdemeanors ("MM") or personal bond eligible ("PBE"), which Cleveland COC communicates to CCSD on a "Clerk Check" form.[8] (Ex. 12, 17:14-21; Ex. 17, 117:2-14) For most of the Class Period, CCSD knew that Cleveland COC expected it to request a personal bond for release when an individual was detained solely on a PBE charge, but CCSD never required its staff to do so. (Ex. 5, 255:16-256:23; Ex. 10, 250:17-22)

CCSD relies on two private monitoring companies to notify Records when they install monitoring devices on detainees *at the Jail* so the release process can be completed, even though

---

[8] This information is also published on Cleveland COC's online docket. (Ex. 2, 281:4-15; Ex. 16, 156:7-15).

the companies have no contractual duty to provide notice and have not been given any written instructions about how and when to do so. (Ex. 15, Rog. 22; Ex. 5, 282:15-20; Ex. 10, 293:5-8) Though CCSD officers are typically present at installations, they are not required to notify Records when one of the companies, Ohio AMS, completes an installation. (Ex. 18, 271:15-272:19) CCSD claims an unwritten rule requires officers to notify Records of installations by the other company, Oriana House (Ex. 43), but for most of the Class Period, not even an ad hoc procedure was in place for Records to get notice when Oriana House installed a monitor after 4:00 p.m. (Ex. 6, 223:12-15) Though the companies sometimes fail to notify CCSD of installations, CCSD has not enacted any policies to address this issue. (Ex. 6, 230:21-24, 233:15-19; Ex. 18, 272:20-274:3)

**D. CCSD's Release Process Lacks Checks, Failsafe Measures, and Policy Standards**

*CCSD Release Policies Are Either Nonexistent or Deficient.* As a prime example, the Release Desk Post Order neither details nor even *mentions* that officers are to process *all* releases After Hours. (Ex. 20; Ex. 5,117:15-118:15) Thus, County release orders put in a Queue after 5:00 p.m. almost never get processed until the next business day because no policy instructs the Release Desk to do it. (Ex. 13, 221:10-18; Ex. 4 ¶ 12). County bonds are also routinely not processed After Hours. (*Id.* ¶¶ 6.a, 13) As another example, no CCSD policy requires employees to effectuate the release of people detained solely on non-jailable MM charges through their execution of a plea form, even though the Contract *requires* CCSD to do so. (Ex. 17, 135:4-137:7; Ex. 21; Ex. 2, 298:7-11; Ex. 16, 190:6-191:15) CCSD employees, including supervisors, are not even familiar with this mandate (*e.g.*, Ex. 14, 108:20-119:24; Ex. 6, 217:7-220:6), and CCSD's representative did not know who was responsible for carrying it out. (*Compare* Ex. 17, 141:15-19 ("Jailer would initiate" it) *with* Ex. 12, 151:4-10 (seasoned Jailer unaware of who is responsible))

CCSD policies that do exist almost entirely fail to provide time requirements or expectations concerning releases. For instance, per the Warden, Cleveland's electronic database,

LERMS, "has to be monitored nonstop" by CCSD officers called Jailers, who must identify when Cleveland police enter Release No Formal Charge ("RNFC") dispositions on Cleveland Detainees' "fresh charges" (Ex. 10, 272:12-15; Ex. 12, 64:11-65:24), but Jailers are not required to check LERMS at specific intervals or any minimum number of times.[9] (Ex. 5,152:1-12; Ex. 9 ¶¶ 37, 38)

CCSD also has no policy or directive providing any amount of time by which: Jailers should send RNFC or other release paperwork to SHCMC for further processing (Ex. 22; Ex. 19, 78:9-16); Records Clerks should print release records from SHCMC or follow up about release paperwork still outstanding for LEADS and Second Checks (Ex. 11, 122:19-22; Ex. 13, 122:21-123:15); or, Release Desk staff should review CHECKS, pick up detainees whose release packets are done, complete other release steps, or ultimately release someone (Ex. 20; Ex. 14, 137:22-138:22, 175:22-176:2, 200:3-22). Only a single policy specifies any time expectation to complete a release step: Clerks "must print a bonds list out of [the Queue] *hourly or at earliest convenience.*" (Ex. 23, 23) (emphasis added), but neither a Records Clerk nor CCSD's representative was even aware of it. (Ex. 13, 65:4-66:24; Ex. 17, 22:2-6)

***CCSD Has Not Implemented Measures to Prevent or Timely Identify Errors.*** CCSD's release process is prone to known errors, like employees failing to identify RNFC dispositions in LERMS (Ex. 14, 68:7-13), failing to process RNFCs (*id.*, 82:8-17), overlooking or accidentally deleting SHCMC release emails (Ex. 6, 118:14-18; Ex. 11, 103:13-17), mistakenly crossing off names on a Bonds List[10] (*id.*, 151:3-7), marking Queue entries "processed" without ever

---

[9] Fresh charges are charges for which a Cleveland arrestee is under investigation. In addition to entering the RNFC of fresh charges in LERMS, Cleveland police write it on physical "Green Slips." Prior to 2024, when Cleveland began emailing the Green Slips, Jailers were supposed to periodically pick them up, but they were not required to do so with any particular frequency or at any specified times. (Ex. 12, 90:20-22, 193:12-194:9, 203:19-204:11; Ex. 9 ¶¶ 41-42)

[10] Records Clerks repeatedly print a Bonds List, which names all detainees who have posted a County bond that day, so Clerks must repeatedly identify bonds they have already processed as well as those assigned to other Clerks and cross those names off the Bonds List to determine what bonds still need to be processed. (Ex. 13, 71:22-72:4,75:4-17)

processing the records[11] (*id.*, 151:17-20), misplacing printed release records (*id.*, 169:2-9), failing to distribute printed release records to a colleague (*id.*, 173:3-16), forgetting to email processed release records to CHECKS (Ex. 13, 134:2-5), and failing to act on release notifications sent to CHECKS. (Ex. 6, 192:23-193:7)

Despite knowing these vulnerabilities, CCSD has not implemented checks to prevent the errors or to timely identify and remedy them. (*E.g.*, Ex. 10, 280:18-281:4; Ex. 11, 103:13-104:17 (no procedure to prevent or timely catch SHCMC release emails being overlooked or mistakenly deleted); Ex. 6, 128:20-129:1 (no requirement for Records Clerks to document what emails they printed, distributed, or processed); *id.*, 152:6-10, 158:6-21 (no internal mechanisms to prevent or timely catch overlooked bond and release order Queue entries); *id.*, 170:20-171:18; Ex. 5, 213:14-215:4 (no processes to prevent or promptly identify release records that get misplaced or otherwise fail to get fully processed); *id.*, 235:13-236:4 (no system to prevent or promptly identify Records Clerks forgetting to send processed release notifications to CHECKS))

CCSD also has no periodic fail-safe procedures to ensure it *received* and *processed* all release records. (Ex. 6, 138:17-141:10; Ex. 9 ¶¶ 89-90 (no request for daily list of Cleveland detainees who paid bond or were ordered released to cross-check); Ex. 10, 274:23-275:4; Ex. 14, 83:11-18 (same for RNFCs);[12] Ex. 17, 298:23-299:3 (same for MMs and PBE charges); Ex. 13, 190:6-194:18 (no person required cross-check list of release entries marked "processed" in Queues to confirm processing); *id.*, 70:9-12; Ex. 6, 160:5-161:2 (no person assigned to double check processing of all bonds on Bonds List); Ex. 5, 212:19-213:1, 214:23-215:4; Ex. 11, 107:4-8 (no person assigned to routinely double check that no SHCMC release emails got overlooked); Ex. 14,

---

[11] After Records Clerks print a County release order from a Queue, they mark the entry as processed, which removes the entry from the Queue. (Ex. 13, 182:18-184:18)

[12] CCSD's new (2024) process of having Cleveland email RNFCs (which has been feasible since at least 2021) has helped ensure RNFCs do not get overlooked. (Ex. 12, 193:12-194:22; Ex. 19, 18:23-19:6; Ex. 2, 149:2-8, 151:2-9)

160:2-13 (no supervisor required to confirm CHECKS emails acted upon by Release Desk))

Thus, CCSD often only belatedly discovers its own errors and overdetentions when it is notified by third parties. (*See* Ex. 5, 55:12-16 (typically no prior CCSD knowledge of overdetentions in OD Reports), 60:4-8 (overdetentions discovered by attorney or family complaints), 61:21-62:24 (no CCSD system in place or employee assigned to routinely identify overdetentions); Ex. 6, 138:9-16 (external notice only way to identify Records Clerk overlooking release email), 171:7-18 (no way to identify misplacement of printed release record), 157:24-158:5 (no internal process to timely identify Records Clerk overlooking name on Bonds List))

### E. CCSD Never Implemented a Comprehensive Plan to Resolve Overdetentions

CCSD never routinely analyzed or sought to prevent County overdetentions. (Ex. 5, 58:23-60:3; Ex. 18, 115:3-6; Ex. 6, 110:4-16). And though CCSD routinely analyzed the cause of known Cleveland overdetentions, it never tracked their frequency or recurring patterns, or identified their root causes; so, it is oblivious as to how many overdetentions occurred and whether recurring issues or recurring errors by specific employees were the cause. (Ex. 5, 45:4-18; Ex. 6, 64:18-65:6; Ex. 10, 40:6-41:9, 246:22-247:15, 266:8-267:2, 268:16-22, 285:4-18) A comprehensive review of CCSD analyses and emails shows overdetentions *were* caused by recurring issues. (Ex. 4 ¶¶ 3-7, 14-23) CCSD also has never engaged a consultant or specialist to remedy overdetentions (Ex. 10, 145:17-146:1, 238:6-14) and did not do so itself: between October 2020 and January 2022, the Warden thrice instructed subordinates to prepare a corrective "plan" or "measures" to remedy the "release problem" but none materialized. (Ex. 24; Ex. 25; Ex. 26; Ex. 10, 164:17-21, 166:8-24)

### F. Employees are Rarely, and Supervisors are Never, Disciplined for Overdetention

CCSD's written discipline policy requires employees who are "negligent" or "careless[]" in their job duties to be issued, at minimum, a documented verbal reprimand for their first offense. (Ex. 27, CC[]406267 ¶¶ 22, 26; Ex. 10, 92:18-93:19; Ex. 9 ¶ 192) Yet, few employees whose

carelessness or negligence caused overdetentions were issued any discipline, or even documented coaching, which is not discipline (Ex. 10, 98:19-21) (together "Corrective Action"). (Ex. 9 ¶¶ 193, 194) Discipline is supposed to begin with an investigatory interview. (Ex. 10, 162:6-9) CCSD only conducted one investigatory interview and disciplined one employee during the Class Period, even though CCSD staff caused scores of overdetentions. (Ex. 4 ¶ 25) For example, CCSD leaders learned that an employee's negligence caused Jennifer Heaston's 17-day overdetention, *see supra* I(A), but no one was disciplined. (*Id.* ¶ 26; Ex. 18, 120:17-122:6, 124:17-126:1) Defendant's records also show employees received mere coaching even for causing *multiple* overdetentions in a short period (Ex. 4 ¶ 27), and often not even any documented coaching, though the Warden admitted coaching should at a minimum be issued when an employee causes an overdetention. (Ex. 10, 98:22-99:3, 245:13-246:4) CCSD also *never* issued Corrective Action to supervisors concerning overdetentions, even though they did not timely or adequately address external notices of overdetentions and their subordinates repeatedly caused overdetentions. (Ex. 4 ¶¶ 26-27*; Ex. 10, 107:2-108:5; Ex. 18, 286:1-287:14) By contrast, CCSD issued discipline for every erroneous release (Ex. 9 ¶ 195), including to supervisors (*e.g.*, Ex. 5, 202:9-203:2; Ex. 14, 316:3-319:13).

### G. CCSD Should Release Detainees in the Putative Class Within 6 Hours

CCSD has no policy identifying a timeframe within which detainees should be released (Ex. 17, 248:5-251:2), but in circumstances applicable here, its Warden "hopes [that] it wouldn't take more than six hours" (Ex. 10, 27:20-28:21) and witness testimony indicates that is ample time to complete the release process. Processing an RNFC release takes the Jailer "30 minutes, maybe less." (Ex.12, 108:18-24) The Records Department's processing can take as little as 40 minutes but up to 2-3 hours when releases aren't being prioritized (Ex. 5, 83:15-85:3; Ex.11, 131:9-13, 133:3-5, 141:19-142:18; 145:6-15; Ex. 13, 107:2-19, 122:5-10, 130:4-7). Another 2.5 to 3 hours is ample time for Release Desk staff to complete the release because their few steps generally each

take no more than 30 minutes to complete. (Ex. 28, 140:11-143:21, 146:9-22, 125:17-127:19, 148:19-149:15, 134:13-139:17) On weekends, when there are fewer releases, the *entire release process* (including record processing) takes about an hour-and-a-half. (*Id.*, 193:21-194:16)

Analysis by Plaintiffs' expert, Lacey Keller, who identified all discrete custody sessions discernable for a nearly two-year period, found that 60% of people with no holds were released within 6.35 hours, 50% of people with bookings holds[13] (which can be removed before release but do not "impede the flow" when done during (Ex. 14, 203:10-22, 214:7-17)) were released within 6.62 hours, and, despite CCSD's deficient notice process, 50% of people with a monitor hold were released within 7.15 hours of installation. (Ex. 29 at 3-5, 12-15; Ex. 30, at 20, 34-35)

### H. CCSD Overdetained the Named Plaintiffs for 18 to 41 Hours

**Plaintiff Dunn** was booked into Jail with a booking hold on March 30, 2021 (Ex. 31). Cleveland RNFC'd Dunn's charges in LERMS before 11:59 p.m. on the same day (Ex. 32, 2-3), but Dunn was not released until April 1, at 2:37 p.m. (38.6 hours later). (Ex.9 ¶ 6) **Plaintiff Day** was booked into Jail on February 10, 2022, on one charge, and issued a personal bond the same day at 10:17 p.m., but Day was not released until 7:57 p.m. the next day (21.6 hours later) after a family member alerted the Jail that he was overdetained. (Ex. 9 ¶¶ 11-12, 14; Ex. 33; Ex. 34; Ex. 35) **Plaintiff Wilson** was booked into Jail on May 7, 2022, on one jailable fresh charge and 3 contempt charges (which were all PBE, as Cleveland COC informed CCSD). (Ex. 36, CC[]392911, 916-917, 919) Wilson became entitled to release by 11:59 p.m. on May 9, after Cleveland RNFC'd his fresh charge (*id.*, 920), but the Jailer did not request a personal bond and he was not released until May 10, at 6:43 p.m. (18.7 hours later). (Ex. 37) **Plaintiff Leonard** was booked into Jail on July 15, 2022, on one fresh charge, for which Cleveland entered an RNFC

---

[13] Booking holds do not prevent release; they indicate that a booking step did not get completed. (Ex. 17, 15:10-16:7)

disposition by at least 11:59 p.m. on the same date, and one contempt of court charge, which the COC identified to CCSD as a MM on the same date. (Ex. 38, CC[]392949-950, 953) Wilson continued to be detained on the non-jailable MM until 5:09 p.m. on July 17 (41 hours later), because CCSD did not facilitate his execution of a MM plea form. (Ex. 39) **Plaintiff Zeider** was booked into Jail on a fresh charge on April 13, 2022. (Ex. 40) The next day, he was ordered released upon payment of a $7,500 bond and installation of a SCRAM monitor by the Cleveland Municipal Court. (*Id.*) Zeider immediately posted bond and his monitor was installed at 3:11 p.m., but he was not released until April 15, at 4:36 p.m. (25.4 hours later). (Ex. 40; Ex. 41; Ex. 9 ¶ 26)

## II. ARGUMENT

To be certified, a class must satisfy the Rule 23(a) prerequisites and fall within a class action type in Rule 23(b). *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012). The class definition must also be sufficiently definite to be ascertainable. *Id.* at 538-539. The Class proposed here, *see* Pls.' Mtn. ¶ 5, satisfies that threshold requirement. It is defined by objective criteria, *id.*, and, as shown by Keller's analyses (Ex. 29; Ex. 30) membership can easily be determined from data and records CCSD and third parties maintain in the regular course of business. *See Young,* 693 F. 3d at 538-539. While there will be minimal, if any, need to review paper files, any need (even if extensive) is not a basis to deny certification. *Id.* at 540 (rejecting argument that need for substantial file review made class administratively infeasible). Also, as required, Plaintiffs are each members of the putative Class. *Peterson v. Cleveland Inst. of Art*, No. 1:08 CV 1217, 2011 WL 1297097, at *5 (N.D. Ohio Mar. 31, 2011). *See supra* I(H).

### A. The Class Satisfies the Requirements of Rule 23(a)

*Numerosity is Satisfied.* "[I]t is generally accepted that a class of 40 or more members is sufficient to meet the numerosity requirement." *Krieger v. Gast*, 197 F.R.D. 310, 314 (W.D. Mich. 2000) (citation omitted). Here, joinder is "impracticable," Fed. R. Civ. P. 23(a)(1), as Keller's

underinclusive analysis, which was limited to only a fraction of the Class Period, shows there are *at least* 277 custody sessions in the Class. (Ex. 45 ¶¶ 4-5)

**Commonality and Typicality are Satisfied.** Plaintiffs satisfy these requirements, which "tend to merge." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013) (internal quotations omitted). Their claims are sufficiently typical because they "fairly encompass[]" class members' claims. *Id.* at 852. All assert CCSD's inadequate release policies constitute deliberate indifference and caused them to be overdetained. Plaintiffs and class members also all suffered the same injury—hours or days deprived of their liberty—as required for commonality. *Id*. And though only one common contention capable of classwide resolution is required, *id.* at 853, Plaintiffs and class members' claims turn on several, including whether CCSD: (1) maintained adequate policies and procedures to ensure that staff timely *received* and timely *processed* release information and paperwork: (2) implemented sufficient check and failsafe measures to prevent overdetentions after becoming aware that its deficient policies were causing overdetentions; and (3) failed to discipline staff who made errors that caused overdetentions.

**Adequacy is Satisfied.** Plaintiffs have no claims antagonistic to those of class members and have fully participated in discovery by responding to document requests, answering interrogatories, and sitting for depositions, showing they "will vigorously prosecute" the Class interests as adequate representatives. *Peterson*, 2011 WL 1297097, at *9. Their adequate counsel have ample experience representing plaintiffs in class actions and litigating overdetention and other civil rights cases, and have spent considerable time and resources on this case. (Gr. Ex. 46)

## B. The Class Satisfies the Predominance and Superiority Requirements

**Common Questions Predominate.** To prevail here, Plaintiffs and class members must prove that CCSD's deficient policies or practices caused their injuries. *Shorts v. Bartholomew*, 255 F. App'x 46, 51 (6th Cir. 2007). The right to timely release after the basis for detention ends "is

beyond dispute" *id.*, and the jailer's duty to satisfy such right includes a duty to secure release records, *id.* at 59; *Sampson v. City of Xenia,* 108 F. Supp. 2d 821, 831 (S.D. Ohio 1999) ("Nothing in [Ohio law] imposes upon the clerk a statutory duty to guarantee that a copy of the . . . judge's order reaches the affected party [or jail].") While a jailer must be given reasonable time to complete administrative release steps, "the great weight of precedent suggests that release must occur within a matter of hours after the right to it accrues . . . not days[,]" otherwise a "presumption of [] unconstitutionality, will set in." *Barnes v. D.C.,* 242 F.R.D. 113, 117 (D.D.C. 2007).

A municipality's "policy or custom of deliberate indifference to [] timely release" can be established by the defendant's failure to "correct the situation in view of [] numerous similar incidents" or repeated failure to discipline employees responsible for causing the harms. *Shorts*, 255 F. App'x at 57, 58 (citation omitted). Accordingly, predominance is satisfied when plaintiffs: (a) sufficiently "allege[] a systemic issue—which impacts all inmates—with the municipality's release process" that caused them to be overdetained, and (b) identify a point at which it becomes more than likely that the systemic release process issue, rather than individual issues affecting particular releases, caused most of the overdetentions. *Healey v. Louisville Metro Gov't*, No. 3:17-CV-00071-RGJ-RSE, 2021 WL 149859, at *17, *19 (W.D. Ky. Jan. 15, 2021).

***Numerous systemic deficiencies in CCSD's release process caused overdetentions****. First*, CCSD relies on third parties, with whom it has no written agreements, to provide it release notice for Cleveland arrestees, even when its own employees can do so. And despite knowing such reliance has routinely caused overdetentions by third parties failing to provide timely notice, CCSD has made virtually no effort to remedy such issues. (Ex. 4 ¶¶ 20.a, 23.a) *See supra* I(C).

*Second*, CCSD's release policies and practices are either non-existent (MM plea releases, PBE charge releases, and After Hours County release order releases), devoid of written instruction

(After Hours releases generally), or inadequate (*e.g.*, lacking any specific time expectations for time-sensitive release steps) and not even always provided to release staff. *See supra* I(D).

*Third*, as in *Healey*, CCSD relies on a "manual workflow system" in which release records are transmitted multiple times, but it does not "track and monitor [such paperwork] from the time of receipt through completed processing" to ensure "all [release records] that [it] received were processed." 2021 WL 149859, at *2, *4. *See supra* I(B). It has no system to identify where release paperwork is in the process as it changes hands as many as seven times,[14] and employees are not required to confirm receipt of release paperwork or the completion of any release step. Thus, detainees are routinely overdetained because paperwork gets overlooked, misplaced, or stalled in the release process. (Ex. 4 ¶¶ 6.b, 19.b, 20.b; Ex. 6, 118:14-24)

*Fourth*, CCSD has no routine procedures to "check on clerical errors" that cause overdetentions and has instead relied on "protestation by the prisoner, his family, [] his lawyer," or outside entities to discover that a person should have been released. *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1476 (9th Cir. 1992). CCSD does not require staff to periodically undertake specified steps to ensure that all release information was processed and detainees were released, though this would prevent most overdetentions,[15] nor has it retained any person or entity to help fix its overdetention problem. *See supra* I(D), I(E).

*Fifth*, CCSD admittedly has not always issued discipline to employees who committed errors that caused overdetentions, even though its written disciplinary policy requires such action.

---

[14] For instance, Employee 1 prints a Cleveland bond from SHCMC and passes it to Employee 2, who is assigned to processes the release. Employee 2 does so and then drops it off for Employee 3, a LEADS officer, to complete a warrant check. Employee 4, a supervisor, then picks up the release paperwork to perform a Second Check before returning the paperwork to Employee 2. Employee 2 then sends a release notification email to CHECKS, which is received by Employee 5, who finalizes the release and leaves a copy of the release packet for Employee 6, the Escort Officer, who retrieves the detainee to be released. Finally, a Sergeant, Employee 7, reviews the release paperwork and verifies the release before the detainee is free to go.

[15] In contrast, supervisors must Second Check every release to prevent erroneous releases. (Ex. 9 ¶¶ 134-135)

(Ex. 9 ¶¶ 192-194) Indeed, it *almost never* investigates or issues any Corrective Action to employees for causing overdetentions, and never disciplines supervisors, *see supra* I(F).[16] Rather than discipline employees, CCSD leadership indifferently claims that "human error" is inevitable because it "can't hire perfect people." (Ex. 10, 48:1-12)

These five types of deficiencies and failures evince deliberate indifference and are the central, predominating issues in this case.

***Individual issues are unlikely to explain releases taking over 12 hours***. Where, as here, there is strong evidence that systemic deficiencies caused overdetentions, common questions predominate at the number of hours where it is more than likely that the deficiencies, not individual issues, caused the overdetentions. *See Driver v. Marion Cnty. Sheriff*, 859 F.3d 489, 492 (7th Cir. 2017). Although CCSD does not aspire to release detainees within any amount of time (Ex. 17, 251:11-15), *cf Healey*, 2021 WL 149859, at *7 (2-4 hour goal), its Warden testified that releasing people without warrants should take 6 hours. Doubling that time (which equals or exceeds the full length of a shift for all employees with release duties (Ex. 17, 251:8-252:3)) gives CCSD ample time to release people, even accounting for individual issues that might legitimately delay a release. Indeed, Plaintiff's expert's data analysis shows that CCSD released detainees in ***under*** 12 hours in 95% of No Holds custody sessions (over 4,000 total) and 90% of Booking Hold and GPS Hold custody sessions (317 and 352, respectively). (Ex. 29, 3-4, 12-13; Ex. 30, 33-34). *See also Driver*, 859 F.3d at 491 (recognizing overdetention could start 12 hours after entitlement to release); *Healey*, 2021 WL 149859, at *26 (certifying 12-hour overdetention class).

***A Class Action is the Superior Method of Adjudication.*** The Rule23(b)(3) superiority factors are satisfied. First, class members' interest in controlling the litigation is minimal since the

---

[16] In contrast, CCSD disciplines every employee known to have caused an erroneous release. (Ex. 9 ¶ 195)

monetary damages they each suffered would be dwarfed by litigation costs. *In re Whirlpool Corp.*, 722 F.3d at 861. Second, there is no indication that any class member is already litigating their overdetention claims, likely because of the financial barriers of individual litigation. Third, concentrating claims in this forum is desirable, as this suit is brought by Ohio residents against an Ohio municipality for injuries arising in that municipality's Jail. Finally, a class action does not present insurmountable difficulties in management. Indeed, requiring separate individual suits would result in far greater manageability problems, such as duplicative discovery, repeated adjudication of similar controversies, and excessive costs. *See Healy*, 2021 WL 149859, at *24.

### C. The Class Meets the Requirements for Issue Certification Under Rule 23(c)(4)

If the Court holds Rule 23(b)(3) predominance is not satisfied, it should alternatively certify the core issue of deliberate indifference under Rule 23(c)(4). Issue certification is appropriate "to retain a case's class character where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution." *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018). All Plaintiffs' and class members' overdetention claims are "capable of resolution with generalized, class-wide proof," *id.* at 414, since they turn on whether CCSD's release policies and practices constitute deliberate indifference. *Shorts*, 255 F. App'x at 57. Thus, even if Defendant could show there is *no time* after which a substantial number of overdetentions are caused by its deliberate indifference,[17] "deciding whether [CCSD] had an inadequate process for timely releasing inmates [in one fell swoop] would both reduce the range of issues and promote judicial economy," *Healey*, 2021 WL 149859, at *24 (internal quotations and citation omitted).

---

[17] If the Court finds that a substantial number of overdetentions are likely to be caused by CCSD's deliberate indifference but only after some number of hours greater than 12 hours to release, Plaintiffs respectfully request that the Court grant Rule 23(b)(3) certification with a modified definition increasing the criteria regarding the number of hours within which CCSD failed to release detainees. They seek Rule 23(c)(4) certification only as a final alternative.

Dated: April 17, 2025

Respectfully submitted,

/s/ *Kate Schwartz*

Drew Legando (0084209)
MERRIMAN LEGANDO WILLIAMS & KLANG, LLC
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
(216) 522-9000
drew@merrimanlegal.com

Kate Schwartz
Caryn Lederer
Emily Brown
HUGHES SOCOL PIERS RESNICK & DYM LTD.
70 W. Madison Street, Suite 4000
Chicago, Illinois 60602
T. (312) 580-0100
kschwartz@hsplegal.com
clederer@hsplegal.com
ebrown@hsplegal.com

Janet Herold
JUSTICE CATALYST LAW
40 Rector Street, Floor 9
New York, New York 10006
(518) 732-6703
jherold@justicecatalyst.org

Akeeb Dami Animashaun
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
(929) 266-3971
dami@animashaun.me

*Counsel for Plaintiffs & Proposed Class*

# INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | Agreement Between the City of Cleveland and Cuyahoga County, Ohio for the Cuyahoga County Sheriff's Department to House and Provide Services for City Prisoners (CC0000371929-977) |
| Exhibit 2 | Deposition of **Lisa Scafidi – *Cleveland Jail Liaison*** |
| Exhibit 3 | August 15, 2018, email from Cleveland (David Carroll) to CCSD (Kenneth Mills) providing notice re: 52-day overdetention |
| Exhibit 4 | Declaration of A. Dami Animashaun Regarding Defendant's Discovery Productions |
| Exhibit A (*to Exhibit 4*) | Compilation of referenced Bond Report Emails from Cleveland Common Pleas COC (Krystal Lawyer) to CCSD (Leah Palagyi) |
| Exhibit B (*to Exhibit 4*) | Plaintiffs' Counsel's Queue Sample Analysis |
| Exhibit C (*to Exhibit 4*) | Plaintiffs' Counsel's Categorized Summary of CCSD's 2021-2022 OD Analyses |
| Exhibit D (*to Exhibit 4*) | CCSD's 2021-2022 OD Analyses |
| Exhibit E (*to Exhibit 4*) | Investigatory Interview Re: "Amanda Brewer missed bond" |
| Exhibit F (*to Exhibit 4*) | Verbal Reprimand Issued to Amanda Brewer |
| Exhibit G (*to Exhibit 4*) | Compilation of all produced "Record of Coaching Session" documents issued during Class Period |
| Exhibit 5 | Deposition of **Russell Jaenke – *CCSD Jail Lieutenant*** |
| Exhibit 6 | Deposition of **Leah Palagyi – *CCSD Records Department Supervisor* (*a.k.a. Administrative Support Superviso*r)** |
| Exhibit 7 | Deposition of **Krystal Lawyer – *Cuyahoga County Common Pleas Clerk of Court, Criminal Manager*** |
| Exhibit 8 | January 21, 2022, email from County COC (Nailah Byrd) to CCSD (Ronda Gibson) re: Bond Report and attachment re: CCSD (Leah Palagyi) Bond Report Analysis |
| Exhibit 9 | Defendant's Supplemental Responses to Plaintiff's First Set of Requests for Admission |

| | |
|---|---|
| Exhibit 10 | Deposition of **Michelle Henry – *CCSD Jail Warden*** |
| Exhibit 11 | Deposition of **Amanda Brewer – *CCSD Records Cler*k** |
| Exhibit 12 | Deposition of **Kevin Boll** (Part 1, dated August 28, 2024) **– *CCSD Jailer*** |
| Exhibit 13 | Deposition of **Janiese Cage – *CCSD Records Clerk*** |
| Exhibit 14 | Deposition of **Steven Boardman – *CCSD Jail Sergeant*** |
| Exhibit 15 | Defendant's Response to Plaintiff Dunn's Third Set of Interrogatories |
| Exhibit 16 | Deposition of **Ronald Tabor – *Cleveland Municipal Court, Director, Criminal Division*** |
| Exhibit 17 | Deposition of County's Rule 30(b)(6) Representative, Kevin O'Donnell |
| Exhibit 18 | Deposition of **Kevin O'Donnell** (Individual Capacity) **– *CCSD Jail Associate Warden*** |
| Exhibit 19 | Deposition of Kevin Boll (Part 2, dated October 7, 2024) - CCSD Jailer |
| Exhibit 20 | Cuyahoga County Corrections Center Release Desk Post Orders |
| Exhibit 21 | Cleveland Municipal Court Administrative Order No. 2011-003 In Re: The Disposition of Minor Misdemeanor Cases Where the Defendant Has Been Arrested |
| Exhibit 22 | Cuyahoga County Corrections Center IMIS Jailer Post Orders (CC0000392877-879) |
| Exhibit 23 | Cuyahoga County Sheriff's Department Release Clerk Duties and Responsibilities |
| Exhibit 24 | October 29, 2020, email from Michelle Henry to Kevin O'Donnell and Russell Jaenke stating: "need to come up with an action plan [for] recent release problems" |
| Exhibit 25 | January 5, 2021, email from Michelle Henry to Kevin O'Donnell and Russell Jaenke stating: "Draft up a corrective plan" in response to Cleveland OD Report |
| Exhibit 26 | January 10, 2022, email from Michelle Henry to Kevin O'Donnell and Russell Jaenke stating: "document corrective measures imposed to fix." |
| Exhibit 27 | Standard Schedule of Disciplinary Offenses and Penalties for Employees of the Cuyahoga County Sheriff's Department (CC0000406248-303) |
| Exhibit 28 | Deposition of **Kathleen Belle – *CCSD Jail Release Desk LEADS Officer*** |
| Exhibit 29 | Supplemental Expert Report of Lacey R. Keller, dated March 24, 2025 |
| Exhibit 30 | Expert Report of Lacey R. Keller, dated January 31, 2025 |
| Exhibit 31 | Excerpt from CCSD IMACS Data Production - Entry for Plaintiff Dunn (CC0000102616) |
| Exhibit 32 | CCSD Paper Booking/Release File for Plaintiff Alanna Dunn |

| | |
|---|---|
| Exhibit 33 | Excerpt of CCSD Analysis of February 2022 Cleveland OD Report (Entry for Plaintiff Adam Day Highlighted) |
| Exhibit 34 | February 11, 2022, email to Russell Jaenke re: Adam Day |
| Exhibit 35 | Excerpt from Cleveland Data Production "Cleveland Municipal Updated Bond Posted with Times" - Entry for Plaintiff Adam Day |
| Exhibit 36 | CCSD Paper Booking/Release File for Plaintiff Jason Wilson (CC0000392911-926) |
| Exhibit 37 | Excerpt of CCSD Analysis of May 2022 Cleveland OD Report (Entry for Plaintiff Jason Wilson Highlighted) |
| Exhibit 38 | CCSD Paper Booking/Release File for Plaintiff Cameron Leonard (CC0000392949-957) |
| Exhibit 39 | Excerpt of CCSD Analysis of July 2022 Cleveland OD Report (Entry for Plaintiff Cameron Leonard Highlighted) |
| Exhibit 40 | Excerpt of CCSD Analysis of April 2022 Cleveland OD Report (Entry for Plaintiff Eric Zeider Highlighted) |
| Exhibit 41 | June 2, 2022, email from Lisa Scafidi attaching April 2022 Cleveland OD Report (Entry for Plaintiff Eric Zeider Highlighted) |
| Exhibit 42 | December 20, 2022 email from Joseph Greiner and attached Franklin County Jail Operations Review (CC0000407231-CC0000407235) |
| Exhibit 43 | Defendant's Supplemental Response to Plaintiff Dunn's Interrogatory 23 |
| Exhibit 44 | Cuyahoga County Corrections Center Policy and Procedures, Release of Inmate |
| Exhibit 45 | Declaration of Lacey R. Keller |
| Group Exhibit 46 | Plaintiffs' Counsel's Declarations Regarding Adequacy |