# EXHIBIT 30

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ALANNA DUNN, *et al.* | Case No. 1:23-cv-00364 |
| Plaintiffs | Judge Bridget Meehan Brennan |
| *v.* | |
| CUYAHOGA COUNTY, *et al.* | |
| Defendants | |

---

**EXPERT REPORT: LACEY R. KELLER**
**SERVED: JANUARY 31, 2025**

---

## I.  Introduction

1.  I am the co-founder of MK Analytics, Inc., a consulting firm that assists non-profits, governments, and law firms in using data to implement initiatives and conduct investigations and analyses. Before founding MK Analytics, I founded the Research and Analytics Department at the New York State Office of the Attorney General, the first of its kind in the nation, leading a team that employed cutting-edge data analysis in high-profile cases. As an expert witness, I have been deposed over 20 times and have provided testimony in seven trials. I am an adjunct professor at Washburn University, where I co-teach the capstone project course and teach the introductory course on data information systems, analysis, and database management. In addition to over 15 years of experience in research and analytics, I have served as a guest lecturer at Washburn University School of Business, Brooklyn Law School, Columbia Law School, Yale Law School, and the University of Missouri School of Accountancy. I hold a Master of Economics from the New School and a Bachelor of Business Administration from Washburn University. The Qualifications and Remuneration (Section VIII) section of this report outlines my full professional history, prior depositions and trial testimonies, and compensation on this matter.

2.  In this report's Definitions (Section III) and Methodology (Section V) sections, I provide definitions for key terms, describe the different categories of data analyzed and how they were processed, and note additional information utilized in this analysis.

3.  In this report's Analysis (Section VI) section, I provide tables and analyses to identify and summarize Time to Release patterns and other release related event patterns for Custody Sessions falling within specified classifications.

4.  In the Conclusion (Section VII), I summarize my findings for this report.

5.  In Appendix A, I provide further details of the figures provided in the Analysis section (Section VI).

6.  My opinions are held to a reasonable degree of professional certainty and are based on my professional experience and training. They rely on

publicly available data and information, as well as documents produced in this litigation. This analysis reflects findings and opinions based on the data that I received and was able to process prior to the filing of this report. The staff that worked under my direction had full and complete access to the documents and data produced to me in this case. The methods used in my analysis are reliable, widely accepted within the industry, and verifiable. I reserve the right to amend or supplement the facts and opinions upon which I am expected to testify if additional relevant information is made available.

## II.  Assignment

7.  I was asked to standardize and merge 27 structured files and over 78,000 unstructured files produced in this litigation by the county of Cuyahoga, Ohio (the "**County**"), the city of Cleveland, Ohio (the "**City**"), Ohio Alcohol Monitoring Systems ("**Ohio AMS**"), and Oriana House, relevant to the detention events of individuals at the Cuyahoga County Corrections Center (the "**Jail**") with releases during the time period between February 23, 2021, through December 31, 2023, including datasets containing information on arrests/bookings, bonds, release orders GPS tracker installations, and releases. Additionally, I analyzed emails sent internally by the County, providing release notifications for individuals detained at the Jail between June 2019 and April 2024.

8.  With this information, I was asked to:

8.1.  identify discrete Custody Sessions in which individuals were detained

8.2.  identify individuals whose Custody Sessions followed specific release pattern characteristics as defined by Counsel

8.3.  calculate the time it took  the County to release the individual in each Custody Session after a Release Triggering Action

8.4.  calculate the time it took the County to release individuals after removing a Booking Hold

8.5.     calculate the time it took County employees to send release notification emails to the Jail's Release Desk after an individual's Release Triggering Action

8.6.     calculate the time it took the Jail to release an individual after a release notification email was sent to the Jail's Release Desk

8.7.     calculate the total number of people that were released within specific time intervals

## III.   Definitions

9.     **Action**: Any custody event with a date (and in some instances a time) recorded by the County or the City (e.g., Posted Bond, GPS Added, Release) or by Ohio AMS or Oriana House (e.g., GPS Installed). Each action is a data point in the data.

10.    **Custody Session**: The recorded interactions with the legal and correctional system for a specific individual for specific charges from entry through release from the Jail. Each Custody Session includes a Release Triggering Action and Release for each charge associated with the Custody Session.

11.    **Entry Action**: The event that marked the start of a Custody Session in the Jail, typically an arrest.

12.    Global Positioning System Hold ("**GPS Hold**"): A release hold placed for the installation of a a Global Positioning System device.

13.    **Hold Action**: A custody event in which the individual is subject to a release hold and is ineligible for release.

14.    IMIS Booking Related Hold ("**Booking Hold**") A release hold placed for the completion of an incomplete booking requirement (e.g., photos, DNA, fingerprints).

15.    **Non-Detention-Changing Action**: any Action that is not an Entry Action, Hold Action, Release Triggering Action, or Release Action that occurs during a Custody Session.

Page 4 of 66

16. **Release Action**: The Action that releases an individual from the Jail.

17. **Release Triggering Action**: The Action that entitles a detainee to be released from the Jail on a specific charge (e.g., posted bond, judicial release order).

18. **Time to Release**: The time between a detainee's Release Triggering Action and Release Action.

## IV. Limitations of the Produced Data

19. The analysis's limitations are driven by flaws and omissions in the County and City's recordkeeping. This section outlines the most notable recordkeeping issues and how I attempted to mitigate them while maintaining a conservative estimate of the affected detainees in each group. I reserve the right to amend or supplement the facts and opinions upon which I am expected to testify if additional relevant information is made available.

20. The following files produced by the County and City were missing timestamps, which is crucial to calculating the time lapsed between any Action during a Custody Session. If the County or City were to reproduce these datasets with timestamps, I reserve the right to update my analysis. As shown in the tables below, 14.2% (Table 1) of all Actions in the data were missing timestamps and approximately 6.6% (Table 2) of Release Triggerings Actions were missing timestamps. At the direction of Counsel, these missing time values were set to 11:59 PM Eastern Time. Setting the missing time to the last hour and minute of the day minimizes the time between the Release Triggering Action and the Release Action, resulting in the most conservative estimate of Time To Release.

## Table 1: Number and Percentage of Records with Missing Timestamps (Shown by Filename)

| File | Source | Total Rows | Rows Missing Timestamp | Percent Of Rows Missing Timestamp |
|---|---|---|---|---|
| Ohio AMS Cleveland Muni GPS cleints 2019-2023 | Ohio AMS | 887.0 | 887.0 | 100 |
| clients Added Removed (VET court) | Ohio AMS | 36.0 | 36.0 | 100 |
| clients Added Removed muni court | Ohio AMS | 299.0 | 299.0 | 100 |
| Bond Posted w Times - CC0000385497-CC0000386133, Bonds Posted - CC0000103813-CC0000104453 | Cuyahoga | 32,931.0 | 32,931.0 | 100 |
| Bonds Posted - CC0000103813-CC0000104453 | Cuyahoga | 8,594.0 | 8,594.0 | 100 |
| CMC Defendants Detained - Bonds Settings - Bonds Posted or Processed 050119 - 123123 | Cleveland | 61,510.0 | 61,510.0 | 100 |
| Release Orders - CC0000111809-CC0000121911 | Cuyahoga | 371.0 | 184.0 | 49.6 |
| Release Orders - CC0000104454-CC0000111681 | Cuyahoga | 589.0 | 271.0 | 46.0 |
| Dunn v. Cuyahoga Cty - Cle Arrest Data | Cleveland | 162,742.0 | 73,191.0 | 45.0 |
| Release Orders w Times - CC0000372052-CC0000385496 | Cuyahoga | 48,869.0 | 5,177.0 | 10.6 |
| Bond Posted w Times - CC0000385497-CC0000386133 | Cuyahoga | 38,801.0 | 2,545.0 | 6.6 |
| 2024-07-14 Release Orders 2021 to 7.5.2024 | Cuyahoga | 2,915.0 | 67.0 | 2.3 |
| Copy of Cleveland Municipal EM - 5.1.2019 - 5.13.2024 | Oriana House | 4,471.0 | 7.0 | 0.2 |
| Dunn Et al. Updated Request 5-1-19 to 1-6-2025 AM and EM.XLSX | Oriana House | 608.0 | 1.0 | 0.2 |
| DiscoveryDataWithCases_2019 | Cuyahoga | 161,829.0 | 0.0 | 0.0 |
| DiscoveryDataWithCases_2020 | Cuyahoga | 121,399.0 | 0.0 | 0.0 |
| DiscoveryDataWithCases_2021 | Cuyahoga | 129,171.0 | 0.0 | 0.0 |
| DiscoveryDataWithCases_2022 | Cuyahoga | 122,738.0 | 0.0 | 0.0 |
| DiscoveryDataWithCases_2023 1 | Cuyahoga | 123,212.0 | 0.0 | 0.0 |
| Emails | Cuyahoga | 29,326.0 | 0.0 | 0.0 |
| CLE 002 - CMC Defendants Arrested or Detained 050119 - 123123 - GPS | Cleveland | 1,748.0 | 0.0 | 0.0 |
| CLE 003 - CMC Defendants Arrested or Detained 050119 - 123123 - Monetary Bonds | Cleveland | 24,367.0 | 0.0 | 0.0 |
| CLE 004 - CMC Defendants Arrested or Detained 050119 - 123123 - Municipal Release Orders | Cleveland | 52,617.0 | 0.0 | 0.0 |
| CLE 005 - CMC Defendants Arrested or Detained 050119 - 123123 - Personal Bonds | Cleveland | 50,082.0 | 0.0 | 0.0 |
| CLE 006 - CMC Defendants Arrested or Detained 050119 - 123123 | Cleveland | 101,660.0 | 0.0 | 0.0 |
| Updated Bond Posted or Processed Query Results 04-10-24 | Cleveland | 3.0 | 0.0 | 0.0 |
| Updated Bond Posted or Processed Query Results 05-15-24 | Cleveland | 23,644.0 | 0.0 | 0.0 |
| **Total** | | 1,305,419.0 | 185,700.0 | 14.2 |

## Table 2: Number and Percentage of Release Triggering Actions Missing Timestamp (Shown by Filename)

| File | Source | Total Rows | Release Triggering Actions Rows Missing Timestamp | Percent Of Rows Missing Timestamp |
|---|---|---|---|---|
| Ohio AMS Cleveland Muni GPS cleints 2019-2023 | Ohio AMS | 887.0 | 887.0 | 100 |
| clients Added Removed (VET court) | Ohio AMS | 36.0 | 36.0 | 100 |
| clients Added Removed muni court | Ohio AMS | 299.0 | 299.0 | 100 |
| Bonds Posted - CC0000103813-CC0000104453 | Cuyahoga | 6,780.0 | 6,780.0 | 100 |
| Release Orders - CC0000104454-CC0000111681 | Cuyahoga | 271.0 | 271.0 | 100 |
| Release Orders - CC0000111809-CC0000121911 | Cuyahoga | 145.0 | 145.0 | 100 |
| CMC Defendants Detained - Bonds Settings - Bonds Posted or Processed 050119 - 123123 | Cleveland | 255.0 | 255.0 | 100 |
| Dunn v. Cuyahoga Cty - Cle Arrest Data | Cleveland | 12,725.0 | 12,725.0 | 100 |
| Release Orders w Times - CC0000372052-CC0000385496 | Cuyahoga | 23,873.0 | 3,440.0 | 14.4 |
| 2024-07-14 Release Orders 2021 to 7.5.2024 | Cuyahoga | 464.0 | 46.0 | 9.9 |
| Copy of Cleveland Municipal EM - 5.1.2019 - 5.13.2024 | Oriana House | 4,471.0 | 7.0 | 0.2 |
| Dunn Et al. Updated Request 5-1-19 to 1-6-2025 AM and EM.XLSX | Oriana House | 608.0 | 1.0 | 0.2 |
| Bond Posted w Times - CC0000385497-CC0000386133 | Cuyahoga | 36,256.0 | 0.0 | 0.0 |
| DiscoveryDataWithCases_2019 | Cuyahoga | 29,910.0 | 0.0 | 0.0 |
| DiscoveryDataWithCases_2020 | Cuyahoga | 26,690.0 | 0.0 | 0.0 |
| DiscoveryDataWithCases_2021 | Cuyahoga | 30,467.0 | 0.0 | 0.0 |
| DiscoveryDataWithCases_2022 | Cuyahoga | 28,868.0 | 0.0 | 0.0 |
| DiscoveryDataWithCases_2023 1 | Cuyahoga | 29,164.0 | 0.0 | 0.0 |
| CLE 003 - CMC Defendants Arrested or Detained 050119 - 123123 - Monetary Bonds | Cleveland | 24,367.0 | 0.0 | 0.0 |
| CLE 004 - CMC Defendants Arrested or Detained 050119 - 123123 - Municipal Release Orders | Cleveland | 46,029.0 | 0.0 | 0.0 |
| CLE 005 - CMC Defendants Arrested or Detained 050119 - 123123 - Personal Bonds | Cleveland | 50,082.0 | 0.0 | 0.0 |
| Updated Bond Posted or Processed Query Results 04-10-24 | Cleveland | 3.0 | 0.0 | 0.0 |
| Updated Bond Posted or Processed Query Results 05-15-24 | Cleveland | 23,644.0 | 0.0 | 0.0 |
| Total | | 376,294.0 | 24,892.0 | 6.6 |

21. The arrest data file (Dunn v. Cuyahoga Cty - Cle Arrest Data) produced by the City, and the GPS installation file  ("Ohio AMS Cleveland Muni GPS cleints [sic] 2019-2023"), produced by Ohio AMS, were missing case identification numbers for individuals. This information is necessary to link a Release Action to a Release Triggering Action. Furthermore, different case numbers were used by the City and the County.

22. Across the Produced Data, detainee names were entered inconsistently by the County and City, even within their own systems. The inconsistencies in the County and City's entry of an individual's name made it unfeasible in many instances to match Actions to the correct individuals. This was partially due to missing inmate IDs in multiple files and case numbers not always being unique to a specific inmate ID. Due to the inconsistencies in the detainee names, my analysis is an undercounting of those who might fall into the various groupings, as not all Release Triggering Actions could be tied to Release Actions.

23. The example below underscores the data inconsistencies surrounding individual names and highlights the challenges in determining whether some names refer to the same person. For example, seven different names were associated with having the last name Abercrombie, as shown below. While some of these names likely belong to different individuals, the various spellings of "Jayshawn" in the first name (e.g., Jay Shawn, Jay'Shawn, Jayshawn) combined with additional first/middle name combinations (e.g., Raeshaun, Steven Rashawn) make it too difficult to know if these are the same or different persons. Individuals whose names could not be matched across the database were not included in my analysis, resulting in an undercounting of those individuals that fall into the various groupings.

Page 8 of 66

## Table 3: Example Of Inconsistent Detainee Name Entry Across Produced Data

| Name | Source Files |
|---|---|
| BRADON ABERCROMBIE | CMC Defendants Detained - Bonds Settings - Bonds Posted or Processed 050119 - 123123, Copy of Cleveland Municipal EM - 5.1.2019 - 5.13.2024, DiscoveryDataWithCases_2023 1, Dunn v. Cuyahoga Cty - Cle Arrest Data, Emails |
| JAMES ABERCROMBIE | DiscoveryDataWithCases_2019 |
| JAVON ABERCROMBIE | DiscoveryDataWithCases_2020 |
| JAY SHAWN ABERCROMBIE | Dunn v. Cuyahoga Cty - Cle Arrest Data |
| JAY'SHAWN LAMARR ABERCROMBIE | DiscoveryDataWithCases_2019 |
| JAYSHAWN ABERCROMBIE | Copy of Cleveland Municipal EM - 5.1.2019 - 5.13.2024 |
| RAESHAUN ABERCROMBIE | Bond Posted w Times - CC0000385497-CC0000386133, Bond Posted w Times - CC0000385497-CC0000386133, Bonds Posted - CC0000103813-CC0000104453, CLE 004 - CMC Defendants Arrested or Detained 050119 - 123123 - Municipal Release Orders, CLE 005 - CMC Defendants Arrested or Detained 050119 - 123123 - Personal Bonds, CLE 006 - CMC Defendants Arrested or Detained 050119 - 123123, CMC Defendants Detained - Bonds Settings - Bonds Posted or Processed 050119 - 123123, Dunn v. Cuyahoga Cty - Cle Arrest Data, Emails, Release Orders w Times - CC0000372052-CC0000385496, Updated Bond Posted or Processed Query Results 05-15-24 |
| RAESHAUN J ABERCROMBIE | DiscoveryDataWithCases_2022, DiscoveryDataWithCases_2023 1 |
| STEVEN RASHAWN ABERCROMBIE | DiscoveryDataWithCases_2019 |

## V.  Methodology

### a. Datasets Reviewed

24.  The following steps were taken to collate and organize the datasets into one table of all Actions for individuals represented in the datasets. There were two primary groups of data: structured data (e.g., CSV, XLSX) and unstructured data (e.g., emails, Word documents, PDFs), which are discussed respectively below.

### i.  Structured Data

25.  The data outlined below is listed by the producing party and then by the folder name within which it was contained.

25.1.  Source Cuyahoga County

25.1.1.  CUY Bond Data: This data contained information on the detainee and case number as well as bond details, including the date and time the bond was posted. The folder consisted of the following spreadsheets:

25.1.1.1.  2024-07-24 bonds with post date (all bonds posted, incl forefoeited[sic], dates only).xlsx

25.1.1.2.  Bond Posted w Times - CC0000385497-CC0000386133.xlsx

25.1.1.3.  Bonds Posted - CC0000103813-CC0000104453.xlsx

25.1.2.  CUY Jail Release Data/Jail Releases with Case Numbers: This data contained information on the detainee, case number, booking ID, date, time, and reason for entry, hold, hold removal, and release. The folder consisted of the following spreadsheets:

25.1.2.1.  DiscoveryDataWithCases_2019.xlsx

25.1.2.2.  DiscoveryDataWithCases_2020.xlsx

25.1.2.3.　　DiscoveryDataWithCases_2021.xlsx

25.1.2.4.　　DiscoveryDataWithCases_2022.xlsx

25.1.2.5.　　DiscoveryDataWithCases_2023 1.xlsx

25.2.　　CUY Common Pleas Release Order Data: This data contained information on the detainee, case number, and details of their release orders. The folder consisted of the following spreadsheets:

25.2.1.1.　　2024-07-14 Release Orders 2021 to 7.5.2024.xlsx

25.2.1.2.　　Release Orders - CC0000104454-CC0000111681.xlsx

25.2.1.3.　　Release Orders - CC0000111809-CC0000121911.xlsx

25.2.1.4.　　Release Orders w Times - CC0000372052-CC0000385496.xlsx

25.3.　　Source City of Cleveland

25.3.1.　　Cleveland Data: This data contained information on the detainee, case number, and details of their release/entry, release trigger, and bond status. All but the Dunn v Cuyahoga Cty - Cle Arrest Data.xlsx contained data on the case number. For the Dunn v Cuyahoga Cty - Cle Arrest Data.xlsx, StatInfo was used as a proxy for case number. This folder consisted of the following spreadsheets:

25.3.1.1.　　CMC Defendants Detained - Bonds Settings - Bonds Posted or Processed 050119 - 123123.xlsx

25.3.1.2.　　Dunn v. Cuyahoga Cty - Cle Arrest Data.xlsx

25.3.1.3.　　Updated Bond Posted or Processed Query Results 04-10-24.xlsx

25.3.1.4.　　Updated Bond Posted or Processed Query Results 05-15-24.xlsx

25.3.2.　　Cle August 2024 Production: This data contained information on the detainee, case number, arrests, GPS

install needs, monetary and personal bonds, release orders, and details of their release/entry. The folder consisted of the following spreadsheets:

25.3.2.1. CLE 002 - CMC Defendants Arrested or Detained 050119 - 123123 - GPS.xlsx

25.3.2.2. CLE 003 - CMC Defendants Arrested or Detained 050119 - 123123 - Monetary Bonds.xlsx

25.3.2.3. CLE 004 - CMC Defendants Arrested or Detained 050119 - 123123 - Municipal Release Orders.xlsx

25.3.2.4. CLE 005 - CMC Defendants Arrested or Detained 050119 - 123123 - Personal Bonds.xlsx

25.3.2.5. CLE 006 - CMC Defendants Arrested or Detained 050119 - 123123.xlsx

25.4. Source: Oriana House (GPS Data): This data contained information on the detainee, case number, and details of their GPS installation and removal for detainees in Cleveland Municipal Court. The folder consisted of the following spreadsheets:

25.4.1. Copy of Cleveland Municipal EM - 5.1.2019 - 5.13.2024.xlsx

25.4.2. Dunn Et al. Updated Request 5-1-19 to 1-6-2025 AM and EM.XLSX

25.5. Source: Ohio AMS (GPS Data): This data contained information on the detainee and details of their GPS installation and removal for detainees in Cleveland Municipal Court. Apart from the "Ohio AMS Cleveland Muni GPS cleints [sic] 2019-2023.xlsx" file, the case number is also included. The folder consisted of the following spreadsheets:

25.5.1. Clients Added Removed (VET court).xlsx

25.5.2. Clients Added Removed muni court.xlsx

25.5.3. Ohio AMS Cleveland Muni GPS cleints [sic] 2019-2023.xlsx

Page 12 of 66

### ii.  Unstructured Data

26.  Data was extracted from emails sent to the "CHECKS" email group, which I understand from Counsel is the method used by employees of the Cuyahoga County Sheriff's Office who process release information to inform the Cuyahoga County Jail's Release Desk that individuals should be released from the Jail. Per instructions from Counsel, I limited my analysis to the emails sent to checks@cuyahogacounty.us where the subject line did not contain the following keywords:

26.1.  sign

26.2.  trip

26.3.  not a release

26.4.  sign

26.5.  please disregard

26.6.  not a release

26.7.  trip

26.8.  cancelled release

27.  Then, I extracted the timestamp in Coordinated Universal Time ("UTC"), the "detainee's ID," and the name, where applicable, using regular expressions from the relevant email files and converting them to the America/New York time zone.

## b. Data Collection and Restructuring

28.  Each data source, including the structured and unstructured datasets, was loaded and transformed into a single file with eight columns, reflecting a single row for every Action occurring during an individual's Custody Session. This includes the date/time of the Action, a description of the Action taken, and other identifying information about the individual and their case (e.g., inmate ID, booking ID, case number, detainee name).

29.    Some of the Produced Data contained two or more date/time columns. I preserved the information in each relevant column as a row in the dataset. The tables below show how the data from the DiscoveryDataWithCases_2022.xlsx file was transformed into the database.

**Table 4: Example of Original Data[1] (DiscoveryDataWithCases_2022.xlsx)**

| InmateId | BookingId | InmateName | BookingDate | BookingTime | ReleaseDate | ReleaseTime | ReleaseReason | ArrestAgency | HoldDate | HoldTime | HoldDepartment | HoldComments | HoldRemovedDate | HoldRemovedTime | HoldRemovedBy | CaseNumber |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0332990 | 20220214042 | SCHMIDT, KAILEIGH SUE | 44606 | 0.962025463 | 44662 | 0.307210648 | TOT HALFWAY H./COMMUNITY | | 44607 | 0.184340278 | EMU | HOLD FOR EMU | 44659 | 0.377777778 | ND | 662010 |

**Table 5: Example of Restructured Data[2] (DiscoveryDataWithCases_2022.xlsx)**

| defendant_clean | case_number | inmate_id | booking_id | date_date | date_time | action | action_notes | source_file | source |
|---|---|---|---|---|---|---|---|---|---|
| KAILEIGH SUE SCHMIDT | 662010 | 332990 | 20220214042 | 2/14/22 | 11:05:19 PM | Booking | | DiscoveryDataWithCases_2022 | Cuyahoga |
| KAILEIGH SUE SCHMIDT | 662010 | 332990 | 20220214042 | 4/11/22 | 7:22:23 AM | Release | TOT HALFWAY H./COMMUNITY ASSESSMENT | DiscoveryDataWithCases_2022 | Cuyahoga |
| KAILEIGH SUE SCHMIDT | 662010 | 332990 | 20220214042 | 2/15/22 | 4:25:27 AM | Hold | EMU, HOLD FOR EMU | DiscoveryDataWithCases_2022 | Cuyahoga |
| KAILEIGH SUE SCHMIDT | 662010 | 332990 | 20220214042 | 4/8/22 | 9:04:00 AM | Hold Removed | EMU, HOLD FOR EMU | DiscoveryDataWithCases_2022 | Cuyahoga |

### c. Data Cleaning

30.    The names of individuals were standardized across all entries in the data to follow the format of First Last to account for the many ways names were formatted throughout the Produced Data. Names appeared in the following formats across the data sources:

30.1.    Last, First

30.2.    Last, First Middle

30.3.    Last Suffix, First Middle

30.4.    Last/First/

30.5.    Last/First/Middle

31.    All structured data was merged into one table ("Summary Table").

32.    Names in the Structured Data were processed by first identifying the longest name associated with each detainee ID. This name was

---

[1] Example is reflective of full data received.
[2] Example is reflective of full data received.

retained only if the Levenshtein[3] distance indicated a match score of 75 or higher, allowing for minor discrepancies in the names recorded. Additionally, the names were normalized to include only the first and last names to facilitate matching against the unstructured email data, which does not include middle names.

**Table 6: Example of Matched Detainee Names Resulting from Levenstein Distance Calculation**

| Original Name | Matched Name |
| --- | --- |
| ERICKA MINTER | ERICA ANDREA MINTER |
| JUAN LOPEZ-RUIZ | JUAN RAMPON RUIZ |
| TREVONNE MARTIN | TRE VONNE DE SHAWN MARTIN |
| MICHAH SAMUEL | MICAH JAMES SAMUELS |
| MICHA SAMUELS | MICAH JAMES SAMUELS |

33. The rows from the processed email data (Unstructured Data) that contained both the detainee's name and ID were cleaned using the Levenshtein distance method. This method compared the names in the emails with the normalized names from the Structured Data. If the match score was greater than 77, the normalized name from the Structured Data was retained; otherwise, the name from the email was kept. These records were then added to the Summary Table.

34. If a detainee's name was not recorded but there was a detainee ID, I populated the detainee's name using the detainee ID.

35. Data related to a filed complaint or case, a warrant block release, and a GPS device removal was removed as superfluous because the filed complaint is not a meaningful event and removal of the device normally occurs outside of the Custody Session, as instructed by Counsel.

36. Per Counsel's direction, certain events were not considered when determining the Time To Release. A Non-Detainment Changing Action was assigned if an Action did not fit one of the following categories:

---

[3]"Levenshtein distance", https://rosettacode.org/wiki/Levenshtein_distance

36.1.        entry action

36.2.        release triggering action

36.3.        release action

### d. Custody Session Creation

37.    Once all the data was put into the Summary Table and cleaned following the steps above, I sorted the data by detainee name, date, Action (e.g., entry, release trigger, release), and datetime. I then created Custody Sessions to account for individuals with multiple detention occurrences over time (i.e., multiple separate Custody Sessions) and multiple charges for a single detention (i.e., multiple case numbers within a Custody Session).

38.    Counsel identified specific Actions and phrases from the notes fields in the collected data that signify the beginning of an individual's detention (i.e., Entry Action). The phrases identified by Counsel to denote the start of a Custody session are shown in the table below.

**Table 7. Entry Action Phrases Shown by Filename**

| Action | Source Files |
|---|---|
| Arrest | Dunn v. Cuyahoga Cty - Cle Arrest Data |
| Booking | DiscoveryDataWithCases_2021, DiscoveryDataWithCases_2022, DiscoveryDataWithCases_2023 1 |
| Defendant Held In Custody _____ Days Awaiting Indictment. | CLE 006 - CMC Defendants Arrested or Detained 050119 - 123123 |
| Defendant In County Jail | CLE 006 - CMC Defendants Arrested or Detained 050119 - 123123 |
| Defendant In Custody And Ordered To Appear. | CLE 006 - CMC Defendants Arrested or Detained 050119 - 123123 |
| Defendant in Jail | CLE 006 - CMC Defendants Arrested or Detained 050119 - 123123, CMC Defendants Detained - Bonds Settings - Bonds Posted or Processed 050119 - 123123 |
| Probable Cause Found - Defendant To Remain In Custody | CLE 006 - CMC Defendants Arrested or Detained 050119 - 123123 |

39.    I determined Custody Sessions by tracking case numbers and release records for each detainee by row. Before confirming a new Custody Session, the next row was checked to avoid an unnecessary Custody Session creation. A new Custody Session was created if there was a new Entry Action, the previous Custody Session ended in a Release, or some other type of Action occurred to indicate a new Custody Session.

### e. Identifying Release Triggering Actions

40.     Counsel identified specific Actions and phrases from the description fields in the Produced Data that signified Release Triggering Actions and Release Actions. Only a release designation from the CUY Jail Release Data/Jail Releases was considered a Release Action.

**Table 8. Release Triggering Action Phrases Shown by Filename**

| Action | Source Files |
|---|---|
| Bond Posted Date | Bond Posted w Times - CC0000385497-CC0000386133, Bonds Posted - CC0000103813-CC0000104453 |
| Disposition - RNFC | Dunn v. Cuyahoga Cty - Cle Arrest Data |
| Disposition - Station House Released | Dunn v. Cuyahoga Cty - Cle Arrest Data |
| GPS Added | Copy of Cleveland Municipal EM - 5.1.2019 - 5.13.2024, Dunn Et al. Updated Request 5-1-19 to 1-6-2025 AM and EM.XLSX, Ohio AMS Cleveland Muni GPS cleints 2019-2023, clients Added Removed muni court |
| Monetary Bond Created | CLE 003 - CMC Defendants Arrested or Detained 050119 - 123123 - Monetary Bonds, CMC Defendants Detained - Bonds Settings - Bonds Posted or Processed 050119 - 123123, Updated Bond Posted or Processed Query Results 05-15-24 |
| Municipal Release Order | CLE 004 - CMC Defendants Arrested or Detained 050119 - 123123 - Municipal Release Orders |
| Personal Bond Created | Updated Bond Posted or Processed Query Results 05-15-24 |
| Personal Bond Executed | CLE 005 - CMC Defendants Arrested or Detained 050119 - 123123 - Personal Bonds, CMC Defendants Detained - Bonds Settings - Bonds Posted or Processed 050119 - 123123 |
| Release Ordered | 2024-07-14 Release Orders 2021 to 7.5.2024, Release Orders - CC0000104454-CC0000111681, Release Orders - CC0000111809-CC0000121911, Release Orders w Times - CC0000372052-CC0000385496 |

41.     At instruction by Counsel, I identified detainees with GPS Holds and determined their Release Triggering Action using the Oriana House and Ohio AMS data. To do so, I identified detainees with a GPS hold/removed note in the Cuyahoga County release data and located these detainees within the Oriana House and Ohio AMS data. I then used the GPS installation date and time (where available) recorded in the Oriana House data or Ohio AMS data as the Release Triggering Action date and time, ignoring the GPS hold and removal date and times in the County release dataset. I then excluded detainees who had other holds removed after the GPS installation time, as the later non-GPS Action would be the Release Triggering Action and would mean that the GPS installation did not entitle the individual to be released from the Jail.

42.     At instruction by Counsel, I interpreted descriptions that included one of the following phrases as Booking Holds:

42.1.      photo

Page 17 of 66

42.2.      picture

42.3.      print

42.4.      DNA

42.5.      scan

42.6.      one touch

42.7.      prescreen

42.8.      pre-screen

42.9.      booking process

42.10.     book process

42.11.     process book

42.12.     class screening

42.13.     class screen

42.14.     screen class

42.15.     secondary process

42.16.     secondary

42.17.     identification

42.18.     morph

### f.  Time Based Calculations

43.     To find the Time To Release (the time between the Release Triggering Action and the Release Action) for each session, I first identified the latest date and time of the Release Triggering Action ("Max Release Triggering Action"). I excluded cases where a Booking Hold or a GPS Hold was removed.

   43.1.     If the Max Release Triggering Action was a Booking Hold Removal, I used the date and time from the previous recorded Release Triggering Action as the Max Release Triggering Action.

   43.2.     If the Max Release Triggering Action was GPS Hold Removal, I used the date and time from the GPS Installation as the Max Release Triggering Action.

44.     For each Custody Session, I calculated the time to release by taking the difference in hours between the last Release Action date and time and the Max Release Triggering Action date and time.

45.     As separate calculations, for sessions where a Booking Hold was removed, I calculated the time from the Booking Hold Removal to the Release Action.

46.     The time between the Max Release Triggering Action and the release notification email sent to checks@cuyahogacounty.us for each session with a release notification email record was calculated by subtracting the date and time of the Max Release Triggering Action from the date and time of the latest release notification email for the session.

47.     The time between the release notification email sent to checks@cuyahogacounty.us and the Release Action for each session containing a release notification email record was calculated by subtracting the date and time of the release notification email from the latest Release Action.

Page 19 of 66

## VI.   Analysis

48.      Counsel asked me to group detainee Custody Sessions into specific classifications for further analysis if they met one of the following parameters:

   48.1.       **No Holds:** The Custody Session contains no Hold Actions or has no hold pending at the time of the Max Release Triggering Action.

   48.2.       **Booking Holds:** The Custody Session contains a Booking Hold removed Action after the Max Release Triggering Action and no other type of Hold Action after the Max Release Triggering Action.

   48.3.       **GPS Holds:** The session contains a GPS Hold-Removed Action and no other type of Hold-Removed Action after the GPS Hold-Removed Action.

49.      Additionally, I was instructed by Counsel that Custody Sessions needed to fulfill the following criteria to be included in any  of the above categorizations:

   49.1.       Case numbers had to be matched between Release Triggering Actions and Release Actions, or, in the case of the Cleveland data, the number of unique case numbers with Release Triggering Actions from the Cleveland data had to be equal to the number of unique case numbers with release Actions starting with "CP."[4]

---

[4] Source: Cleveland Municipal Operations Policy Document - Cuyahoga County Prosecutor's Office Civil Division - 08/18/2023

**Table 9: Example of Cleveland Case Numbers for Release Triggering Actions matched to CP Case Numbers for Releases**

| defendant_clean | case_number | action |
|---|---|---|
| DESIREE R JONES | 2020CRB013806 | Monetary Bond Created |
| DESIREE R JONES | 2020CRB008217 | Monetary Bond Created |
| DESIREE R JONES | CP0001 | Release |
| DESIREE R JONES | CP0002 | Release |

49.2. The term "arraignment" must not be included in any Action note throughout the session.

49.3. The detainee cannot have a release Action with an Action note that includes "tot," "returned to," "return to," or "sent to."

49.4. The detainee should not have a "TIME-UP" in the Action, which I understood from Counsel to mean that the individual completed a sentence at the Jail and, therefore, was not entitled to immediate release from the Jail when the relevant Action occurred in the source file.

49.5. Time to release must be greater than 0 hours.

49.6. All dates, including Release dates, must fall between February 23, 2021, and December 31, 2023.

### a. Time to Release Analysis

50. The following tables and figures show the results of calculations for the Time to Release for the various Custody Session classifications. Please consult Appendix A to view additional analyses similar to that provided in this section but in table form and at the percentile, decile, and quartile levels for every year and all years combined. Slight differences in rounding and decimal precision may cause minor differences between the figures below and the tables in Appendix A.

### b. "No Holds" Custody Sessions

51. Two Cuyahoga County employees, Michelle Henry, Warden at the Cuyahoga County Jail, and Krystal Lawyer, Criminal Manager at the

Cuyahoga County Clerk of Courts, testified that the Time to Release process should generally take under six hours for individuals with no holds or warrants. Warden Michelle Henry testified that she "would hope it wouldn't take more than 6 hours" to complete the release process steps for someone with no holds or warrants[5] and Krystal Lawyer testified that, per information the Sheriff's Office historically provided to the Clerk of Court's Office a detainee will be released "typically four to six hours after posting [bond]; unless there is GPS included, then it could be a day or two."[6]

52.     The Produced Data supports the County employees' sense of the time needed to complete the release process for detainees without holds. Half of the unique No Holds Custody Sessions occurring between February 23, 2021, and December 31, 2023, entailed a detainee being released within six hours of their Max Release Triggering Action. While one-quarter (over 1,000) of these No Holds Custody Sessions entailed detainees being released in under four hours. There were another 1,000 Custody Sessions (the upper quartile) where individuals had release times ranging from seven to 272 hours after a Max Release Triggering Action. The same data show that 90% of unique Custody Sessions for this group during the same time period entailed detainees being released within 10 hours, leaving a few hundred detainees with Time to Release values in excess of 10 hours and with some having release times of hundreds of hours. Please consult Appendix A to view additional analyses similar to that provided in this section but in table form and at the percentile, decile, and quartile levels for every year and all years combined.

---

[5] Henry, M. (2024, October 16). Deposition transcript. Dunn v. Cuyahoga County, No. 1:23-cv-00364 (United States District Court for the Northern District of Ohio).
[6] Lawyer, K. (2024, December 17). Deposition transcript. Dunn v. Cuyahoga County, No. 1:23-cv-00364 (United States District Court for the Northern District of Ohio).

**Figure 1: 50% of Custody Sessions with No Holds Have a Maximum Time to Release Below 5.66 Hours**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 2: More than 4,000 Custody Sessions with No Holds Have a Time to Release of Under 10 Hours**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 3: Hundreds of Custody Sessions with No Holds Have a Time to Release Ranging from Ten Hours to Hundreds of Hours**
**(Date Range: 02/23/2021 - 12/31/2023)**



### c. "Booking Holds" Custody Sessions

53.     The Produced Data also shows that half of the approximately 300 unique Booking Holds Custody Sessions occurring between February 23, 2021, through December 31, 2023 had a Time to Release under seven hours. In 90% of custody sessions with a Booking Hold, the Booking Hold was removed within 90 minutes of the detainee's release. In other words, for the vast majority of cases, the Booking Hold adds less than 90 minutes to the Time to Release. For 90% of Custody Sessions with Booking Holds, the Time to Release was less than 12 hours. While one-quarter (nearly 100 Custody Sessions ) of the Booking Holds were released in under 4.5 hours, another nearly 100 Custody Sessions had release times ranging from 8.6 to 90 hours. Please consult Appendix A to view additional analyses similar to that provided in this section but in table form and at the percentile, decile, and quartile levels for every year and all years combined.

**Figure 4: 50% of Custody Sessions with Booking Holds Have a Maximum Time to Release Below 6.6 Hours**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 5: Approximately 300 Custody Sessions with Booking Holds Have a Time to Release of Under 10 Hours
(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 6: A Dozen Custody Sessions with Booking Holds Have a Time to Release Ranging from Ten Hours to Hundreds of Hours
(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 7: 50% of Custody Sessions with Booking Holds Take Under Two Minutes to be Released After the Booking Hold is Removed (Date Range: 02/23/2021 - 12/31/2023)**



**Figure 8: Approximately 88% of Custody Sessions with Booking Holds Take Less than One Hour to be Released After the Booking Hold is Removed**
**(Date Range: 02/23/2021 - 12/31/2023)**



### d. "GPS Holds" Custody Sessions

54.    The "GPS Holds" Custody Session classification included nearly 400 unique Custody Sessions from February 23, 2021 through December 31, 2023. The Produced Data for detainees with GPS Holds show that half of the Custody Sessions entailed detainees being released in just over seven hours after their GPS installation. While approximately 80 unique Custody Sessions with GPS Holds entailed detainees being released within 4.7 hours of their GPS installation, another approximately 165 unique Custody Sessions had release times after GPS installation ranging from eight hours to more than 200 hours. The same data shows that 90% of the unique Custody Sessions for this group resulted in detainees being released over 11 hours after their GPS installation. Please consult Appendix A to view additional analyses similar to that provided in this section but in table form and at the percentile, decile, and quartile levels for every year and all years combined.

**Figure 9: 50% of Custody Sessions with GPS Holds Have a Maximum Time to Release Below 7.14 Hours After GPS Installation (Date Range: 02/23/2021 - 12/31/2023)**



**Figure 10: More than 300 Custody Sessions with GPS Holds Have a Time to Release of Under 10 Hours**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 11: Dozens of Custody Sessions with GPS Holds Have a Time to Release Ranging from Ten Hours to Hundreds of Hours
(Date Range: 02/23/2021 - 12/31/2023)**



### e. Release Triggering Action to Release Notification Email

55.     The Produced Data show that in half of the No Holds Custody Sessions between February 23, 2021, and December 31, 2023,  it took up to 2.6 hours between the Releasee Triggering Action and the release notification email to be sent to the Jail. The process generally took three hours or less for 50% of the Custody Sessions with Booking or GPS Holds. Please consult Appendix A to view additional analyses similar to that provided in this section but in table form and at the percentile, decile, and quartile levels for every year and all years combined.

### f. "No Holds" Custody Sessions

**Figure 12: For 50% of the No Hold Custody Sessions, it Took the County below 2.63 Hours From the Release Triggering Action to Send Release Notification Emails to the Jail**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 13: The County Sent Release Notification Emails to the Jail within Approximately Four Hours of the Release Triggering Action for Nearly 2,400 No Hold Custody Sessions**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 14: Over 150 Custody Sessions With No Holds Took the County More Than Seven Hours From the Release Triggering Action to Send Release Notification Emails to the Jail**
**(Date Range: 02/23/2021 - 12/31/2023)**



### g.  "Booking Holds" Custody Sessions

**Figure 15: For 50% of the Booking Hold Custody Sessions, it Took the County below 2.81 Hours From the Release Triggering Action to Send Release Notification Emails to the Jail**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 16: The County Sent Release Notification Emails to the Jail within Approximately Four Hours of the Release Triggering Action for Nearly 160 of Booking Hold Custody Sessions**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 17: Nearly 30 Custody Sessions With Booking Holds Took the County More Than Seven Hours From the Release Triggering Action to Send Release Notification Emails to the Jail**

**(Date Range: 02/23/2021 - 12/31/2023)**



### h.  "GPS Holds" Custody Sessions

**Figure 18: For 50% of GPS Hold Custody Sessions, it Took the County below 3.17 Hours From the Release Triggering Action to Send Release Notification Emails to the Jail**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure  19: The County Sent Release Notification Emails to the Jail within Approximately Four Hours of the Release Triggering Action for Nearly 160 of GPS Hold Custody Sessions**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 20: Nearly 20 Custody Sessions With GPS Holds Took the County More Than Seven Hours From the Release Triggering Action to Send Release Notification Emails to the Jail**

**(Date Range: 02/23/2021 - 12/31/2023)**



### i.  Email Release Notification to Release

56.    The produced data shows that the time between release notification emails being sent to checks@cuyahogacounty.us and the Jail releasing a detainee was typically under four hours for the No Holds, Booking Hold, and GPS Hold Custody Session classifications. Please consult Appendix A to view additional analyses similar to that provided in this section but in table form and at the percentile, decile, and quartile levels for every year and all years combined.

### j.  "No Holds" Custody Sessions

**Figure 21: For 50% of the No Hold Custody Sessions, it Took the County Less Than 3.06 Hours to Release Detainees from the Jail After Receiving a Release Notification Email**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 22: After Receiving a Release Notification Email, it Took the Jail Under Four Hours to Release the Detainee in Over 2,000 No Hold Custody Sessions**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 23: Some Detainees With No Holds Waited Up to Several Days to Be Released After the Jail Received a Release Notification Email**
**(Date Range: 02/23/2021 - 12/31/2023)**



### k.  "Booking Holds" Custody Sessions

**Figure 24: For 50% of the Booking Holds Custody Sessions, it Took the County Less Than 3.62 Hours to Release Detainees from the Jail After Receiving a Release Notification Email**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 25: After Receiving a Release Notification Email, it Took the Jail Under Four Hours to Release the Detainee in Over 130 Booking Hold Custody Sessions**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 26: Some Detainees With Booking Holds Waited Nearly a Day to Be Released After the Jail Received a Release Notification Email (Date Range: 02/23/2021 - 12/31/2023)**



### I.  "GPS Holds" Custody Sessions

**Figure 27: For 50% of the GPS Hold Custody Sessions, it Took the County Less Than 2.92 Hours to Release Detainees from the Jail After Receiving a Release Notification Email**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 28: After Receiving a Release Notification Email, it Took the Jail Under Four Hours to Release the Detainee in nearly 200 GPS Hold Custody Sessions**
**(Date Range: 02/23/2021 - 12/31/2023)**



**Figure 29: Some Detainees With GPS Holds Waited Up to Approximately 10 Hours to Be Released After the Jail Received a Release Notification Email**
**(Date Range: 02/23/2021 - 12/31/2023)**



## VII.    Conclusion

57.    I conclude that it was possible to standardize and merge the Produced Data into one Summary Table that I could use for further analysis. Within that table, I could identify distinct Custody Sessions for individuals detained at the Jail based on their individual charges and the timeline of interactions with the various legal and correctional systems that appeared in the Produced Data.

58.    I further conclude that I was able to use the Produced Data to identify specific release patterns among classifications identified by Counsel. Using this data, I showed patterns in the Time to Release process that the County could have gleaned if it chose to analyze the data in this way.

59.    I further conclude that using the Produced Data, it was possible to calculate the Time to Release for each Custody Session after a Release Triggering Action.

60.    I further conclude from February 23, 2021, through December 31, 2023, half of the No Hold Custody Sessions were released within six hours, which aligns with testimony from two Cuyahoga County employees: Michelle Henry, Warden at Cuyahoga County and Krystal Lawyer, Criminal Manager at the Cuyahoga County Clerk of Courts. I further conclude that while one-quarter of the No Holds Custody Sessions were released in under four hours, another quarter of the Custody Sessions had release times ranging between seven and nearly 300 hours.

61.    Furthermore, I conclude that half of the "GPS Holds" and the "Booking Hold" Custody Sessions had a Time to Release of under seven hours, and specifically, the time that elapsed between a Booking Hold Removal and the Release Action was under one hour for nearly 90% of Custody Sessions.

62.    I further conclude that it typically took the County less than three hours from the time of a detainee's Release Triggering Action to send a release notification email to checks@cuyahogacounty.us. Relatedly, the Produced Data shows that the time between an email notification

being sent to checks@cuyahogacounty.us and a detainee's release was typically under four hours for the No Holds, Booking Hold, and GPS Hold Custody Session classifications.

*Lacey Keller*
_____

Signed: Lacey R. Keller

Dated: 01/31/2025

## VIII.  Qualifications & Testimony History

63.  I am the co-owner of MK Analytics, Inc. (MKA), a firm I co-founded with Meredith McCarron in 2021. MKA specializes in creating tailored platforms and reports that integrate disparate data and provide actionable insights for clients in the not-for-profit, government, and private sectors. MKA has established itself as a trusted partner for nationally known non-profit organizations, the United States federal government, several state attorneys general, local government, and some of the country's largest plaintiffs' law firms.

64.  I am an Adjunct Professor at Washburn University School of Business in the data science department, where I co-teach the capstone project course and an introductory course to data information systems, analysis, and database management.

65.  Prior to founding MK Analytics, I was the Managing Director for Data Mining & Analytics with Gryphon Strategies, Inc. I was hired to create and direct their data mining and analytics division. This division advised financial and law firms on leveraging data for investments and investigations.

66.  Prior to founding Gryphon Strategies' Data Mining & Analytics division, I founded and directed the Research and Analytics Department for the New York State Office of the Attorney General (NYS OAG) from 2013 to 2017. As a result of my leadership, the NYS OAG became the first state office attorney general to hire a data scientist. I grew my staff from one research assistant to seven full-time staff.

67.  I have also worked in various research and analytical positions, including the research department of the Service Employees International Union (SEIU) 32BJ, the largest property services union in the country. I was also a researcher for the Global Clearinghouse and a Teaching Assistant at the New School for Social Research. As a consultant, I have been hired by and have provided pro-bono assistance to many state and federal agencies as well as nonprofits on the use of data mining and analytics in investigations.

Page 58 of 66

68. The work I have done throughout my career relates directly to the analysis undertaken in this report. For over a decade, I have employed a data-driven approach to identifying suspicious, and sometimes illegal, conduct. I have developed a specialty in compiling and analyzing disorganized and disparate data. Since 2014, I have been immersed in issues and investigations related to the opioid crisis. This analysis drew upon my unique and specialized skill set that has been developed over a decade of research and analytical experience.

69. I was often tasked with identifying instances of wrongdoing by companies. For example, while at SEIU 32BJ, I reviewed public records for data to identify wrongdoing by cleaning companies and cleaning contractors around the country. Through thorough research and documentation, I was able to identify a cleaning company that was creating shell companies to keep a small business cleaning contract at the Walter Reed Medical Center. SEIU 32BJ submitted this information to the General Services Administration. To the best of my knowledge, that company or its subsidiaries/affiliates lost the contract for that site.

70. My primary directive when the NYS OAG hired me was to help the office identify areas for investigation using data. I often would use public data to assist with these investigations. For instance, I combined publicly available tax assessor, mortgage records, and real estate listings to identify hundreds of landowners potentially out of compliance with the city's 421-a tax benefit program that the NYS OAG investigated resulting in hundreds of thousands of dollars in settlements with landlords.

71. My work over the past 15 years has required me to extract, process, clean, merge, and analyze both public and confidential data, which often comes poorly formatted and from disparate locations. From these convoluted datasets, I have identified trends and outliers that have furthered investigations or prosecutions.

72. While at the NYS OAG, I developed and managed the Community Overdose Prevention (COP) Program to use data analytics to determine how best to deploy life-saving naloxone across law enforcement officers statewide. Under that program, I oversaw the collection of information related to naloxone disbursements, which jumpstarted tracking opioid

overdoses more efficiently throughout the state. I used the data I collected, as well as external datasets, to deepen my understanding of opioid usage in New York State.

73.     I have written or co-authored numerous public-facing reports using my data analysis to advance a variety of investigations into illegal activity, many of which have been covered by national media outlets. For instance, my analysis published in a report issued by the NYS OAG helped reveal AirBnB's illegal activity in New York City. In addition, while at SEIU 32BJ, I authored two papers about the physical building conditions of New York City public school facilities, the second of which was widely covered by local news and prompted a city council oversight hearing to address the issues raised.

74.     In my work, I have frequently received productions of data in a format not initially conducive to analysis, such as productions containing PDF versions of spreadsheets or thousands of files of various formats. In a case that settled for hundreds of millions of dollars, I supervised the team that identified and extracted information about shipments from the distributors' production in that case. Because of this analysis, my team and I were able to detect millions of improper shipments made in New York State that were then used by NYS OAG attorneys in court and ultimately led to the judge ordering the defendant in that case to pay almost $250 million in damages.

75.     My experience also includes processing very disorganized data produced by defendants in various cases for investigations and prosecution. For a wage theft case brought by the NYS OAG, I was asked to identify instances of an employer "stealing time" from employees. To complete this analysis, I had to extract information from thousands of PDF employee timecards to extrapolate and identify instances of missing time. Based on my analysis, I determined that over $500,000 was owed to employees.

76.     In my work, I supervise complicated data management and analysis. For an NYS OAG investigation into posting fake trades in emerging market foreign exchange currency options, I used scripts to extract relevant trade information from two years of instant message, email,

Page 60 of 66

and voice communications between brokers. Working with my team, I then compared the relevant information from postings to the trade confirmations of completed trades brokered to determine which trades were real and which were fabricated. This analysis was relied upon to generate a criminal complaint filed by the NYS OAG. The firms ultimately pled guilty to one count of securities fraud.

77. I am also experienced in working with vast amounts of sensitive information. In developing the interactive dashboard on illegal gun trafficking in New York, the NYS OAG obtained the anonymized and highly confidential firearms tracing data from the Bureau of Alcohol, Tobacco, Firearms and Explosives. My team and I were authorized by dozens of police departments to access their firearms trace data. I transformed that data into an interactive tool used by New York State law enforcement agencies to identify potential firearms trafficking based on relevant analytics. This data required considerable cleaning and analysis, including geocoding and entity resolution to identify the same firearm purchaser that relied on different aliases, addresses, and other biographical information to avoid detection. The publication of the dashboard and report "Target on Trafficking: New York Crime Gun Analysis" earned a front-page feature in the New York Daily News and was later cited by the Journal of Urban Health, Data-Smart City Solutions, the American Medical Association, and the Rockefeller Institute.

78. I am frequently called upon to analyze very large data. While working on investigations of broadband internet investigations at the NYS OAG, I collected public speed test data and submissions to the Office made by the general public about the download speed. This preliminary analysis was the basis for opening an investigation into the practices of the largest broadband providers regarding the internet speeds of their customers. As part of this investigation, I drafted the data request to broadband providers for the account and other relevant information that would impact a customer's internet speed. I connected several datasets totaling hundreds of millions of records, including the customer account data (what internet tier they were provisioned), the internet speed test results, as well as information about the

Page 61 of 66

modem/router configuration. The results of my analysis and the analysis that I supervised were used in the complaint the NYS OAG filed against Time Warner Cable. The case ultimately settled for $174.2 million.

79. I received the NYS OAG's Innovation in Law Enforcement Award for my work on gun trafficking and twice received the NYS OAG's Superior Service Award.

80. I was a member of the 28th Class of Coro's Leadership New York and was part of City and State's 40 Under 40 Rising Stars in 2016.

81. I hold a Master of Arts in Economics from the New School and a Bachelor of Business Administration from Washburn University.

82. I have been deposed in the following matters:

82.1. June 13, 2019, after filing an expert analysis with the Track One MDL 2804 Opiate Litigation.

82.2. January 23, 2020, after filing an expert analysis for the Opioid Litigation, 400000/2017 Relating to Case Nos. County of Suffolk, 400001/2017; County of Nassau, 400008/2017; and New York State, 400016/2018.

82.3. March 6, 2020, after filing an expert analysis for Staubus, et al, v. Purdue Pharma, L.P., et al, Case No. C-41916.

82.4. September 18, 2020, after filing an expert analysis for the Opioid Litigation, No. 3:17-cv-1362 (S.D.W.Va.) and No. 3:17-cv-1665 (S.D.W.Va.).

82.5. February 23, 2021, after filing an expert analysis for The People of the State of California v. Purdue Pharma L.P., et al. Case No. 30-2014-00725287-CU-BT-CXC.

82.6. May 27, 2021, after filing an expert analysis for State of New Hampshire v. Johnson & Johnson, et al. Docket No. 217-2018-CV-0067.

Page 62 of 66

82.7.    June 23, 2021, after filing an expert analysis for State of Washington v. McKesson Corporation, Cardinal Health Inc., and AmerisourceBergen Drug Corporation, Case #19-2-06975-9 SEA.

82.8.    August 18, 2021, after filing an expert analysis for State of Rhode Island vs. Purdue Pharma L.P., et al, PC No. 2018-4555.

82.9.    August 31, 2021, after filing an expert analysis for Re: Texas Opioid Litigation, No. 2018-63587.

82.10.   December 29, 2021, as a 30(b)(6) witness in the State of Rhode Island vs. Purdue Pharma L.P., et al, PC No. 2018-4555.

82.11.   January 6, 2022, after filing an expert analysis for The City and County of San Francisco, California vs. Purdue Pharma L.P., et al, PC No. 3:18-cv-07591-CRB.

82.12.   February 16, 2022, after filing an expert analysis for In the Circuit Court of Kanawha County, West Virginia, in re: Opioid Litigation, Civil Action No. 21-C-9000 MFR State of West Virginia Opioid Manufacturer Proceedings.

82.13.   April 25, 2022, after filing an expert analysis for In the Circuit Court of Kanawha County, West Virginia, in re: Opioid Litigation, Civil Action No. 21-C-9000 MFR State of West Virginia Opioid Manufacturer Proceedings.

82.14.   May 9, 2022, after filing an expert analysis for State of New Mexico vs. Purdue Pharma L.P., et al No. D-101-CV-2017-02541.

82.15.   September 7, 2022, after filing an expert analysis for In the Circuit Court of Kanawha County, West Virginia in re: Opioid Litigation, Civil Action #21-C-9000 PHARM.

82.16.   November 16, 2022, after filing an expert analysis for The Montgomery County Board of County Commissioners, et al. v Cardinal Health Inc. et al., Case No 1:18-op-46326-DAP.

82.17.    December 13, 2022, after filing an expert analysis for the State of Michigan in the Circuit Court for the County of Wayne in re: Opioid Litigation, 19-016896-NZ.

82.18.    April 10, 2023, after filing an expert analysis in The Circuit Court of Kanawha County, West Virginia in re: Opioid Litigation Civil Action No.21-C-9000 Pharm.

82.19.    October 18, 2023, after filing an expert analysis in Patrick Feindt, Jr et al. v. The United States of America, Civil No. 1:22-cv-397-LEK-KJM (D. Haw.) (Federal Tort Claims Act).

82.20.    April 8, 2024, after filing an expert analysis in Holwill v. AbbVie Inc. et al 1:18-cv-06790.

82.21.    May 23, 2024, after filing expert analyses in re: National Prescription Opiate Litigation "Track Eight Cases" Case No. 17-md-2804 and in re: National Prescription Opiate Litigation No. 17-md-2804 PHARM in the Circuit Court of Tarrant County, Texas.

83.    I have provided the following testimony for trial:

83.1.    May 4 and May 5, 2021, after filing an expert analysis for The People of the State of California v. Purdue Pharma L.P., et al. Case No. 30-2014-00725287-CU-BT-CXC.

83.2.    June 15, 2021, after filing an expert analysis for the Opioid Litigation, No. 3:17-cv-1362 (S.D.W.Va.) and No. 3:17-cv-1665 (S.D.W.Va.).

83.3.    December 7-9, 2021, after filing an expert analysis for State of Washington v. McKesson Corporation, Cardinal Health Inc., and AmerisourceBergen Drug Corporation, Case #19-2-06975-9 SEA.

83.4.    April 21 and April 27, 2022, after filing an expert analysis in the Circuit Court of Kanawha County, West Virginia, in re: Opioid Litigation, Civil Action No. 21-C-9000 MFR State of West Virginia Opioid Manufacturer Proceedings.

83.5.    June 1, 2022, after filing an expert analysis for The City and County of San Francisco, California vs. Purdue Pharma L.P., et al., PC No. 3:18-cv-07591-CRB.

83.6.    September 13, 2022, after filing an expert analysis in the State of New Mexico vs. Purdue Pharma L.P., et al. No. D-101-CV-2017-02541.

83.7.    April 29, 2024, after filing an expert analysis in Patrick Feindt, Jr et al. v. The United States of America, Civil No. 1:22-cv-397-LEK-KJM (D. Haw.) (Federal Tort Claims Act).

84.    I have filed a declaration in the following matters:

84.1.    May 27, 2022, after filing an expert analysis for The City and County of San Francisco, California vs. Purdue Pharma L.P., et al, PC No. 3:18-cv-07591-CRB.

84.2.    December 21, 2023, in Council et al v. Ivey et al Case No. 2:2023cv00712.

84.3.    April 8, 2024, after filing an expert analysis in Patrick Feindt, Jr et al. v. The United States of America, Civil No. 1:22-cv-397-LEK-KJM (D. Haw.) (Federal Tort Claims Act).

84.4.    April 25, 2024, in Cayce Collins Moore v. State of Alabama Case No. CC-1986-000003.64.

85.    My company MK-Analytics billed my time at $570 per hour in 2024 and $584 per hour in 2025. Other personnel working on this matter, including staff and subcontractors, have effective billing rates of $400 to $584 per hour. My fee is not contingent upon the outcome of this case.

a.  Resume

Page 65 of 66

# LACEY R.KELLER

New York | Colorado  laceykeller.com
(917) 238-0599  lacey@mk-analytics.com

## EXPERIENCE

### Co-Owner and Founder
**MK Analytics, Inc.**
New York, NY (Feb. 2021 – Present)

### Managing Director
**Gryphon Strategies**
New York, NY (Nov. 2017 – Feb. 2021)
- Led the development of Gryphon Strategies' newest business offering - Data Mining & Analytics to support due diligence cases, fraud investigations, and litigation engagements.

### Director of Research & Analytics
**New York State Office of the Attorney General**
New York, NY (Oct. 2013 – Nov. 2017)
- Built the Attorney General's Research & Analytics department – growing from one research assistant to seven full-time staff – including making the New York Attorney General the first in the country to employ a data scientist. This team supports the office's major initiatives and investigations through open source intelligence research, big data analysis, and data science techniques.
- Managed the redesign and relaunch of the Attorney General's open data and transparency website, NYOpengovernment.com.
- Co-developed the first-of-its-kind report and interactive dashboard on illegal gun trafficking in New York, which was the cover story of the Daily News.
- Provided analysis for the lawsuit against Spectrum-Time Warner Cable and Charter Communications for allegedly defrauding New Yorkers over internet speeds and performance, which was the cover story of the Daily News.
- Co-authored and provided the analysis for the report on illegal Airbnb rental activity in New York City, which was a cover story in the New York Times.
- Developed and managed two multi-million dollar programs that provided naloxone and bulletproof vests for New York State law enforcement.
- Presented at national conferences, local events, and office-wide trainings on using open source intelligence and data to support investigations.
- Cultivated partnerships with universities and technology start-ups to enhance the office's technological capacity, including projects to identify illegal drug dealers on social media, developing metrics to identify bad-actor landlords, and finding social media posts about consumer fraud by training a model based on complaints submitted to the office.

### Lead Researcher
**Previous Positions: Research Analyst, Researcher, and Intern**
**Service Employees International Union 32BJ**
New York, NY (Jun. 2010 - Oct. 2013)
- Led a team of researchers that supported the union's collective bargaining and new member organizing efforts in several major East Coast markets.
- Developed and executed strategic corporate campaigns by identifying appropriate tactics, relevant research, and necessary resources; significant wins include defeating Delaware's largest non-union janitorial contractor and unionizing janitorial companies at the National Naval Medical Center.
- Authored and managed the release of two papers about the conditions of New York City public school facilities, the second of which was widely covered by local news and prompted a city council oversight hearing.
- Developed union density analysis, market research, contract cost scenarios, and dossiers that included financial, legal, political, and other public information.

## EDUCATION

### Masters of Arts– Economics
**The New School for Social Research**
New York, NY (2010)

### Bachelor of Business Administration– Economics
**Washburn University**
Topeka, KS (2008)
Summa Cum Laude; University and School of Business Honors; Leadership Studies Certificate

### Certificate in Data Science
**General Assembly**
New York, NY (2015)

## HONORS

- Coro Leadership New York (2017)
- City & State's 40 Under 40 (2016)
- New York State Office of the Attorney General's Innovation in Law Enforcement Award (2016)
- New York State Office of the Attorney General's Superior Service Award (2014, 2015)

## SKILLS

Adobe Creative Suite; Amazon Web Services (S3, Redshift); Git; Python; SQL; Tableau; Qlik

## OTHER EXPERIENCE

### Senior Researcher
**The Global Clearinghouse**
New York, NY (Feb. 2009 - Apr. 2010)

### Teaching Assistant
**The New School for Social Research**
New York, NY (Aug. 2009 - Dec. 2009)

### Assistant to Operations Director
**Kathleen Sebelius for Kansas Governor**
Topeka, KS (Jan. 2006 - Dec. 2006)

### Assistant Campaign Manager
**Tiffany Muller for Topeka City Council**
Topeka, KS (Feb. 2005 - Apr. 2005)

### Field Area Organizer
**Nancy Boyda for U.S. Congress**
Topeka, KS (May 2004 - Aug. 2004)