**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ALANNA DUNN, REGINALD HAYMON, ADAM DAY, ERIC ZEIDER, CAMERON LEONARD, AND JASON WILSON, on behalf of themselves and others similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>CUYAHOGA COUNTY; JOHN AND JANE DOES 1-25,<br><br>         Defendants. | Case No.: 1:23-cv-00364<br><br>Judge Bridget Meehan Brennan |

**EXPERT REPORT OF SEAN T. MALONE, PH.D.**
**ON BEHALF OF DEFENDANT CUYAHOGA COUNTY**

March 3, 2025

Table of Contents

Summary of Engagement and Conclusions............................................................................1

Professional Qualifications and Compensation.................................................................2

Overview of Jail Release Methods ........................................................................................3

Payment of Monetary Bonds ................................................................................................5

Keller's Methodology is Not an Appropriate Method for Determining   the Length of Time to Release each Inmate, or for Determining the Factors that may have Impacted the Time to Release an Inmate...................................................................................................................6

Circumstances Surrounding Releases Are Diverse.............................................................7

Keller's Methodology is Incapable of Evaluating All Potential Class Members ........... 10

Keller's Method is Based on Insufficient Facts and Draws Incorrect Conclusions ...................... 11

Keller Identified Incorrect Release Triggering Events ........................................................ 11

Keller Misunderstood when the Jail was Aware that a Bond was Executed..................... 14

Keller Misunderstood when the Jail was Aware of GPS Activation ....................... 16

Keller Ignored Information Available in Paper Files Relevant to RNFC Releases ........................ 17

Conclusion ........................................................................................................................ 18

## Summary of Engagement and Conclusions

1.      I have been retained by the Cuyahoga County Prosecutor's Office ("Counsel") who represents Cuyahoga County ("County") in the federal court action *Dunn, et al. v. Cuyahoga County*, Case No. 1:23-cv-00364 (N.D. Ohio).

2.      I was asked to review the Expert Report of Lacey R. Keller which was served on January 31, 2025 (the "Keller Report"), and prepare my own expert report that both responds to the Keller Report and sets forth any additional expert opinions that I am prepared to make in this case on behalf of Defendant Cuyahoga County.

3.      In preparing this report, I relied upon much of the information and documents relied upon by the Keller Report provided to me by Counsel. I also relied on additional resources. A list of these additional resources is provided in Exhibit 1.

4.      In her report, Keller conducts analysis to:

   a.   "identify discrete Custody Sessions in which individuals were detained;

   b.   identify individuals whose Custody Sessions followed specific release patterns characteristics as defined by Counsel;

   c.   calculate the time it took the County to release the individual in each Custody Session after a Release Triggering Action;

   d.   calculate the time it took the County to release individuals after removing a Booking Hold;

   e.   calculate the time it took County employees to send release notification emails to the Jail's Release Desk after an individual's Release Triggering Action;

   f.   calculate the time it took the Jail to release an individual after a release notification email was sent to the Jail's Release Desk; and

   g.   calculate the total number of people that were released within specific time intervals."[1]

5.      I have drawn several conclusions from my review of the Keller Report. Below is a summary of my expert conclusions.

---

[1] Keller report at paragraph 8.

- Keller's unreliable methodology is not appropriate for ascertaining the time that it actually took to release each inmate. Due to insufficient data and incomplete methods, it arrives at inaccurate conclusions about individual inmates.

- Keller's opinion is based on insufficient facts because it does not take into account the individualized facts and circumstances that may have impacted the timing of each inmate's release. Such an analysis is necessary to determine if any individual was overdetained.

- Keller's analysis wrongfully groups together categories of inmates whose individualized facts and circumstances may impact the time necessary to process each inmate's release.

- Keller's methods are inappropriate to calculate the number of people released in specific time intervals, as she disregards a large portion of inmates or computes an inaccurate time.

6.      This report describes my work, opinions, and conclusions. I reserve the right to amend or supplement this report as appropriate.


## Professional Qualifications and Compensation

7.      I am an Associate Director of Analytics at IMS Legal Strategies ("IMS"), which provides consulting services for numerous public and private entities on a wide range of topics. My role includes statistical, financial, and economic analysis to support expert testimony in litigation.

8.      As part of my responsibilities at IMS, I regularly conduct statistical and financial analysis involving large and complex data sets. I have consulted on a number of matters in litigation related data analysis, identification of potential class members, and measurement of aggregate class damages among others.

9.      Prior to joining IMS, I taught undergraduate courses in business finance; investments; money and banking; and financial case studies at the University of Texas at San Antonio. I also currently teach undergraduate finance and statistics courses at Trinity University in the Department of Finance and Decision Sciences.

10.     I received my Bachelor of Arts degree in Financial Economics from Capital University, my Master of Science degree in Finance from the University of Texas at San Antonio, and my doctorate in Finance from the University of Texas at San Antonio.

11.     My professional and academic experience, a list of my publications, and a list of previous testimony I have given, are included in my resume, a true and correct copy of which is attached as Exhibit 2.

12.     My firm is being compensated for my work on this engagement at the rate of $525 per hour for my time. The payment of these fees is not contingent on the opinions I express in connection with this engagement.

## Overview of Jail Release Methods

13.     Cuyahoga County Corrections Center ("Jail") releases inmates twenty-four hours a day, seven days a week. There are two primary inmate "types": misdemeanants who are arrested by Cleveland Police ("Cleveland Inmates"), and inmates who are facing felony charges in the Cuyahoga County Court of Common Pleas ("County Inmates").[2] An inmate could be arrested and booked as a Cleveland inmate, only to later be bound over to the Common Pleas Court on a felony charge. Inmates may also have cases pending in both Courts.

14.     Typically, civilian release clerks of the Cuyahoga County Sheriff's Department's Criminal Records Division ("Criminal Records") process releases from 8:30 a.m. – 5:00 p.m. Monday through Friday. After 5:00 p.m. on weekdays, and at all hours on weekends and holidays, Jail Corrections staff is responsible for the entire release process.

15.     Every release requires the Criminal Records release clerk or Corrections Officer to verify that the inmate qualifies for release by ensuring 1) that there is release-confirming documentation for any and all cases against the inmate; 2) that all conditions of release set by a Cleveland Municipal or Cuyahoga County Common Pleas Court Judge have been met; and 3) that there are no outstanding warrants or other "holds" presenting legal barriers to the inmate's release.

16.     Once an inmate has been verified as eligible for release and all the necessary paperwork is collected, a Criminal Records Release Clerk sends an email to checks@cuyahogacounty.us ("Checks"), which is an email group that is specifically used to convey completed release

---

[2] There are other "types" of inmates that are booked into the Jail (inmates in transit to other facilities, inmates arrested and charged in other municipalities, etc.) They, however, make up just a fraction of the total number of inmates booked into the Jail each year. The processes for their releases (if applicable), are identical to those detailed in this report.

paperwork from Criminal Records to the Jail and notify the Jail that an inmate is ready to be released.[3] After hours and on weekends and holidays, completed release paperwork is not sent to Checks because Jail Corrections staff are responsible for the entire release process.

17.     Upon review of depositions and information provided to me by Counsel, an inmate may be entitled to release for any or all of the reasons detailed below.

*City of Cleveland Arrestees Released with No Formal Charges ("RNFC")*

    a.  Inmates arrested by the Cleveland Police Department are not formally charged at the time they are booked into the Jail. Inmates who Cleveland declines to formally charge are released as an "RNFC". Notification comes that an individual is to be released as an RNFC via email (as of 2024) or through RNFC paperwork (a "Green Slip") being collected by a County Corrections Officer "Jailor" or, in some instances, delivered by a City of Cleveland employee. Email notifications of RNFCs are sent by a City of Cleveland employee to a County email group dedicated to Cleveland inmates: shcmc@cuyahogacounty.us ("SHCMC"). The email contains the name of the person being released and either the inmate's birth date or the inmate's Sheriff's Office Number ("SO Number"), a unique identifier assigned to an inmate the first time they are booked into the Jail.

*Execution of Personal Bonds*

    b.  The Sheriff's Criminal Records division (or the Corrections Officers at the Jail's Release Desk, after 5:00pm M-F and on weekends) is notified that Cleveland Municipal Court personal bonds are executed via email to SHCMC. For County Inmates, the release clerk or corrections officer is notified through the "Sheriff's Records Bond Posted Queue,"[4] an auto-populated list generated by the Common Pleas Court software system, ProWare. Release Clerks in Criminal Records and Corrections Officer's at the Jail's Release Desk have ready access to the ProWare system.

---

[3] Amanda Brewer Deposition, pages 85–109.
[4] Criminal Records release clerks and corrections staff at the Jail's Release Desk have access to a number of "Queues" generated by the ProWare system to facilitate releases, bonds, and other Court Orders that affect inmates in the Jail.

c.  Upon receipt of an executed personal bond, the release clerk or corrections officers process all required forms and ensure that any conditions associated with the bond are met. Once complete, the Criminal Records Release Clerk assigned to handle "Cleveland Inmates," sends an email to "Checks" to alert Jail staff that the release is ready to go, except after hours, on weekends, and on holidays, when the Jail Release Desk processes all aspects of the release.

*Payment of Monetary Bonds*

d.  The release process for inmates who have posted a monetary bond begins when a Sheriff's Criminal Records release clerk (or Correction Officers at the Jail's Release Desk, after 5:00pm M-F and on weekends/holidays) receives notification that an inmate's bond has been posted. Criminal Records release clerks and corrections officers are notified of Cleveland Municipal Court bonds posted via SHCMC. Cuyahoga County Common Pleas bonds posted are automatically populated in ProWare's "Sheriff's Records Bond Posted Queue."

*GPS/Alcohol Monitoring*

e.  Inmates may be required to have a GPS or Alcohol Monitoring device installed as a condition of their bond or release ("GPS Condition"). Cleveland Inmates who have executed a personal bond or paid a monetary bond with a GPS Condition have the device installed by a third-party, Oriana House. In those instances, a City of Cleveland employee notifies its Pre-Trial Services division that a GPS or Alcohol Monitor is needed for the inmate. County Sheriff's Department Court Liaisons who are present at the time of the installation notify Criminal Records or Jail Corrections staff via SHCMC when an installation is complete. Oriana House also sends an email to SHCMC, usually at the end of the day. Another third-party, Ohio AMS, installs GPS and Alcohol Monitoring devices in other circumstances, and notifies Criminal Records or Jail Corrections staff via SHCMC when an installation is complete.

f.  GPS installations ordered by the Cuyahoga County Court of Common Pleas are installed through the County's Probation Department. Release clerks or corrections officers are notified of a GPS Condition through the Court's Journal Entry and receive

notification that an install is complete via the Common Pleas Court dedicated email group, shcourt@cuyahogacounty.us.

18.     There are a variety of different hold types that would prevent an inmate from being entitled to release from the Jail. These include holds for DNA, photo, fingerprint, GPS, holds by other agencies, among others.[5]  Releases that are contingent upon a time an inmate can be picked up are processed by staff via receipt of the release paperwork indicating that the inmate is eligible for release but must wait for pickup by, for example, an outside agency or authority. This information is entered into the system which notes the eligibility for release upon arrival of the designated person picking up inmate.[6]

19.     Keller's report, however, categorizes inmates into one of three categories: (1) releases with holds, (2) releases with booking holds, and (3) releases with GPS.[7]  Keller specifically uses the term "booking holds," defined on page 4 of the Keller Report as "a release hold placed for the completion of an incomplete booking requirement (e.g., photos, DNA, fingerprints)." Keller fails to consider other types of holds, such as administrative, medical, holds by outside agencies, etc. Each hold involves different variables, which can affect the timing and conditions of an inmate's release. These omissions are significant. By not accounting for these variations, Keller's classifications do not accurately reflect the complexities involved in the release process. Due to the different processes and diverse circumstances that occur for each different type of release, Keller's classifications are too simplified.

## Keller's Methodology is Not an Appropriate Method for Determining the Length of Time to Release each Inmate, or for Determining the Factors that may have Impacted the Time to Release an Inmate

20.     In attempting to draw conclusions about the length of time that it takes to release an inmate, Keller relies upon an incomplete information to reach inaccurate and flawed conclusion about the actual length of time that it took to release an inmate.  While Keller attempts to draw

---

[5] Kathleen Belle Deposition, pages 150–173, and 222–253.
[6] Kathleen Belle Deposition, pages 110–125.
[7] Keller Report at page 20.

conclusions from the data that she was provided, a review of the data confirms that she did not consider any information about the facts and circumstances that may have impacted the time that it took to release an inmate.  The facts and circumstances of each release, in fact, are different, and it is not possible to identify the facts and circumstances that may have caused a delay in the release of an inmate without examining the individual records and information about each inmate. Thus, it is my expert opinion that Keller's methodology fails to provide an appropriate method for determining both the length of time to release an inmate or for determining the facts and circumstances that may impact the length of time it takes to release an inmate.

*Circumstances Surrounding Releases Are Diverse*

21.     There are various factors that may influence what the Court may find to be a reasonable time to release an individual. For example, certain individuals may have arrangements at halfway houses, treatment centers, or other agencies. Some individuals have medical conditions requiring isolation. Sometimes Jail staff are unclear about whether an inmate should be released because of an unclear order or documentation. Sometimes these situations overlap with each other.  The facts and circumstances of each release are diverse and cannot be ascertained without examining the individual records of each inmate.

22.     For example, County Inmate Matthew Marecki (#171823)[8] was waiting for an available bed at a substance abuse treatment center before he contracted COVID-19. There were questions as to why he was still in custody after his original bed date passed. However, his bed date was changed due to him being COVID-positive. An email exchange documents these unique circumstances. [9]

23.     In the case of County Inmate Sunil Lallbachan (#227771), he was in medical isolation at the Jail when he was ordered released at a hearing where he was not physically present. After the release order, Jail staff had a question as to whether GPS was a condition for the continued bond.[10] Without confirmation, the Criminal Records release clerk could not complete the release

---

[8] Throughout the report I report the custody session ID from Keller's dataset.
[9] CC0000152599-CC0000152605.
[10] CC0000252653, CC0000252657, and CC0000252658.

paperwork, nor could the Jail reasonably release Lallbachan. Circumstances like Lallbachan's and Marecki's certainly impact the time it may take the Jail to complete an inmate's release.

24.      When a release triggering event occurs can also influence what may be considered a reasonable time to release an individual. For example, a release triggering event occurring outside (or near the end of) typical office hours may be expected to have different times to release than when the triggering event occurs during typical office hours due to differences in staffing. I conducted a simple analysis using Keller's dataset to demonstrate the impact of the timing of the release triggering events.

25.      The time between the release triggering event and the Checks email represents the time it takes to process the release checklist (the "release checklist processing time").[11] I compared the time spent processing the release checklist between two groups: "Normal Hours on Weekdays" and "Late Hours or Weekend". The first group includes inmates whose "release triggering event" occurred between 8:00AM and 3:59PM on weekdays and the latter when the release triggering event occurred outside of these hours. From Keller's data, I analyzed 3,563 release checklist processing times from the three groups identified in the Keller Report. Nearly 12% of the release triggering events occurred during the "Late Hours or Weekend" times. The comparison of the two groups is shown in Table 1 below.

**Table 1: Comparison of Release Checklist Processing Times by Time of Arrival**

| Time of Release Triggering Event | Count | Average Hours between Release Triggering Event and Checks Email |
|---|---|---|
| Normal Hours on Weekdays | 3,147 | 3.73 |
| Late Hours or Weekends | 416 | 8.27 |

26.      When the release trigger event occurred outside normal business hours (or at the end of the day) or on a weekend, the average time to process the release checklist was 2.2 times longer on average, than when the release triggering event occurred during normal hours. Further, from a Welch's t-test, this difference in average times is statistically significant and not due randomness in the data, as a test of means produces p-values less than 0.01%. As shown in the box plot

---

[11] While I do not accept Keller has identified the correct times for the actual release triggering events, I use her times as a proxy for the purpose of this analysis.

presented in Figure 1 below, the distributions of release processing times between these two groups are not the same.

**Figure 1: Comparison of Release Checklist Processing Times by Time of Arrival**



Note: In the box plot above, the line in the box represents the median observation, the bottom (top) of the box represents the 25th (75th) percentile, the bottom (top) whisker represents the minimum (maximum) of the 25th (75th) percentile minus (plus) 1.5 times the IQR (interquartile range) and the lowest (highest) observed value. Values that occur outside of the whiskers would be considered outliers according to the IQR method.

*27.*     In her analysis, Keller treats these two groups as one, which can be misleading because an outcome that is average or typical for one group is not average or typical for the other.

28.     Keller also fails to appreciate that human error can often also increase the difficulty of completing the release process in a specific time limit. For example, when Cleveland Inmate Jessica Priggins (#124695) was released, it became clear that an error was made that would increase the amount of paperwork related to the release. Even so, the County employees took the steps within their control to still release the individual in a timely manner. See the email below in Figure 2.

**Figure 2: Email from Jessica Priggins File[12]**

PRIGGINS,JESSICA #328197

Gerald H. Keil <gkeil@cuyahogacounty.us>
Mon 8/23/2021 9:17 AM

To: Valerie M. Gudger <vgudger@cuyahogacounty.us>
Cc: Rita N. Fabian <rfabian@cuyahogacounty.us>; Rebecca A. Moore <ramoore@cuyahogacounty.us>; Russell C. Jaenke <rjaenke@cuyahogacounty.us>

1 attachments (238 KB)
SSH_CENTRAL21082308530.pdf;

Gudger,

You put this female in LERMS twice under arrest numbers 784023 (Domestic Violence) and 784024 (Obstruction and Disorderly Conduct Intox).  The Obstruction and Disorderly charge was not for this subject Priggins, Jessica #328197, it was for a Takacs, Maxwell.

I spoke to Lisa and she said that you have to send a deletion request to TIU for them to remove the bad Record (784024).  I was able to get the paperwork cleared up with the RNFC and get her released, so she does not have to sit here until you return to work.

If you could please fill out a deletion request for 784024 and email it to TIU, I would greatly appreciate it.


Respectfully,

*Gerald H. Keil*

*Keller's Methodology is Incapable of Evaluating All Potential Class Members*

29.     As described in the introductory section of this report, two of Keller's objectives were to: 1) calculate the time it took the County to release the individual in each Custody Session after a Release Triggering Action and 2) calculate the total number of people that were released within specific time intervals.

30.     Keller calculates the time to release for only a fraction of <u>all</u> custody sessions in the relevant class period. Without reliable estimates for all custody sessions, it is not possible to identify all or even most of the individuals that were released within specific time intervals from their release triggering events.

31.     In Keller's dataset where the "in_class_period_flag" is present there are 58,097 unique Custody Sessions with a release event. If there were 58,097 releases during the class period, Keller's method should be able to find reliable estimates of time to release for approximately the same.

---

[12] CC0000127253.

Unfortunately, Keller presented "overdetention times" and drew her conclusions from only 5,343 Custody Sessions, or for only 9.2% of all releases in the same time period. This demonstrates this method simply cannot identify all individuals released during specific time intervals because it is incapable of measuring the time to release for more than 90% of all identified releases.

## Keller's Method is Based on Insufficient Facts and Draws Incorrect Conclusions

32.     Keller's methodology also leads to inaccurate conclusions about length of time to release because it relies on an insufficient set of facts.  Keller ignored relevant records kept by Defendants and made available to Plaintiffs' counsel. These records provide numerous examples where Keller relied on incomplete information or made unreasonable conclusions from the limited datasets she relied on. These flaws mean that estimates of time to release or conclusions about class membership based on time to release measurements are unreliable.

33.     Defendant has maintained records that would allow measurement of time to release for most cases, however, the automated batch method advocated by Keller is inappropriate to evaluate these claims.

34.     Specifically, Keller identified incorrect Release Triggering Events, misunderstood when the Jail was aware of bond execution, misunderstood when the Jail was Aware of GPS activation, and ignored information available in paper files relevant to RNFC releases.

*Keller Identified Incorrect Release Triggering Events*

35.     The custody session (#8797) for Cleveland Inmate Taye Amneh was not included in Keller's analysis. Keller excluded this individual from her analysis because the "overdetention_time" measured was negative (-1,838 hours). Taye Amneh was released at 19:47 on 8/12/2021 after a hold was removed at 17:30 on the same date.  The personal bond was logged on 08/12/2021 at 14:41[13] and the Checks email inbox received notification of the release at 16:00 that day.[14] However, Keller identified the release triggering event to be a hold removal that occurred more

---

[13] CC0000147149. As discussed later in this report, the Jail would be notified of this bond by email sometime after the bond was executed.

[14] Exchange-5.pst Email from rfabian@cuyahogacounty.us to checks@cuyahogacounty.us sent 8/12/2021 at 17:00.

than 76 days after the release. This custody session is just a single example of Keller's method failing to correctly identify a release triggering event. Keller decided not to present the findings where an individual had an "overdetention time"[15] less than zero. In this sense, she accepted that her methodology is unable to reliably measure the elapsed time from the *actual* release triggering event to release. Any methodology purported to have the ability to identify class members should be able to evaluate all potential class members. Keller's cannot..

36.     In this instance, Keller's methodology is unable to measure the time to release and the question of whether Amneh was overdetained is unanswerable by Keller's method because it fails to identify the time of the actual release triggering event which could have been determined through an evaluation of other records provided to Plaintiff's counsel by Defendant. What Keller defines as a "conservative approach"[16] is really an approach incapable of identifying the size of the potential class.

37.     The above example demonstrates that Keller's method does not produce reliable release triggering event times for all potential class members. And while Keller conveniently removed these custody sessions from her reporting, her method does not even produce correct release triggering event times for the custody sessions she does report. Consider the case of Devonte Seals below.

38.     The custody session (#76305) for Devonte Seals[17] was included in Keller's "without holds" group. Keller's analysis concluded that Devonte Seals was detained 155.55 hours after the release triggering event. Specifically, Keller's method identified three release triggering events, the last of which (a "municipal release order") occurred on 8/17/2022 at 8:44. He was not released until 08/23/2022 at 20:17.

39.     Keller's automated method missed critical information about Seals' custody session that could have been gleaned from review of Seals' complete paper file, which has been maintained by the Defendant and made available to Plaintiff's counsel.

---

[15] Keller labelled the entire duration of time between the release triggering event and the release as "overdetention_time". I do not accept this labeling as correct, but I am adopting the terminology to discuss her results.
[16] Keller Report at paragraph 19.
[17] Seals was both a Cleveland and County Inmate, with cases in both the Common Pleas and Cleveland Municipal Court.

40.     Devonte Seals' inmate records reveal a letter of "Mittimus on Continuance" filed on 8/16/2022 (see excerpt in Figure 3). This letter contained a court order for Seals to be held until his 8/23/2022 hearing at 14:00, or post a monetary bond.

**Figure 3: Mittimus on Continuance filed on August 16, 2022**[18]

To the keeper of the Jail of Cuyahoga County
GREETINGS:
WHEREAS, Devonte R Seals       Date of Birth: **12/06/1995**
Late of said County, has been arrested on oath of complainant charging him/her with:

| | |
|---|---|
| 4511.19(A)(1)(a) | DRIV UNDER INFLUENCE ALC/DRUG OR COMBINATION OF THEM |
| 4511.194(B)(1) | HAVING PHYSICAL CONTROL OF VEHICLE WHILE UNDER THE INFLUENCE ALCOHOL, DRUG |

Contrary to the form of the Statue Ordinance in such cases made and provided, and has been brought before the Judge of Cleveland Municipal Court for Trial, which trial had necessarily been postponed by reason of the absence of testimony on the part of the State/City to 8/23/2022 at 2:00 PM before the Charles L. Patton, Jr..

And the said defendant has been required by the Court to give bail in the sum of: **$ 1,000.00 Dollars 10% PERCENT Bond** for his/her appearance before said Court at that time, to answer said charge which requisition he/she failed to comply with.

Therefore, in the name of the State of Ohio you are commanded to receive the said defendant in your custody, in the jail of the county aforesaid, there to remain until he/she shall be discharged by due course of law.

**GIVEN UNDER MY HAND**, and the seal of said court, this date: **August 16, 2022.**

41.     Despite this information being available to Plaintiffs' counsel, Keller's methodology recognized the relevant release triggering event to be when Seals' warrant was withdrawn. The warrant was withdrawn because Seals had been arrested according to it. This event did not signify Seals should be released. Again, Keller's method is unable to accurately identify the events and times at which the release process begins.

42.     Seals had his court hearing scheduled for 8/23/2022 at 14:00; where he was granted a personal bond.[19] Only then might it make sense to begin measuring the time to release. Seals was

---

[18] CC0000313993.
[19] CC000313997.

released at 20:17 the same day. In summary, Keller's methodology chose an event that does not trigger release as a release triggering event. She does not incorporate critical relevant facts found in records maintained by Defendant. This compounded error resulted in a gross overestimation his time to release at 155.55 hours. The reality is Seals was released the same day after being granted personal bond, not six days later as her report suggests.

*Keller Misunderstood when the Jail was Aware that a Bond was Executed*

43.     Even when Keller likely identified the correct reason for release, she utilized a release triggering event time, that according to deposition testimony, is before the release process begins.

44.     When an individual is going to be released because they executed a personal bond, the staff processes the necessary paperwork once they receive an email to SHCMC[20] regarding the inmate's bond or are notified through Cuyahoga County's Common Pleas Court software. The staff then processes all required forms and ensures that any conditions associated with the bond are met. Once complete, an email is sent to Checks alerting Jail staff that the release is ready to go (except in the case of after-hours and weekends/holidays, when Jail staff is responsible for the entire process).

45.     For example, a condition of Anthony Hicks' (#14613) personal bond was the installation of a GPS device.

---

[20] Amanda Brewer Deposition, pages 85-90 and 153–179.

**Figure 4: Personal Bond for Anthony Hicks**

---

**PERSONAL BOND**
COURT RELEASE AGREEMENT
IN THE CLEVELAND MUNICIPAL COURT

CUYAHOGA COUNTY
CITY OF CLEVELAND

**REL NO. PB: 21MIS12050776**

| **CASE NUMBER:** | 2021 CRB 013024 | **BAIL AMOUNT: PB** | ☒ JUDGE |
|---|---|---|---|
| **COURT DATE:** | December 08, 2021 at 8:30 am | DEFENDANT: | ☐ CLERK |
| | 15th Floor Courtroom C | **ANTHONY C HICKS** | ☐ BAIL SCHEDULE |

**JUDGE:** Pinkey S. Carr

1291925   DOMESTIC VIOLENCE
2

**ATTORNEY:**

ON **December 6, 2021**, The above DEFENDANT and the surety listed below agree to abide by the following RELEASE AGREEMENT pursuant to Criminal Rule 46. The DEFENDANT is to be released by the following method of bail and any condition the Court may impose to reasonably assure the appearance of the DEFENDANT for trial.

☒ **PERSONAL RECOGNIZANCE**: SIGNATURE OF THE DEFENDANT ACKNOWLEDGING THE RELEASE CONDITIONS.

☒ **$ 50,000.00 UNSECURED APPEARANCE BOND**: On default of the conditions of release, Judgment may be taken against the Defendant's goods, chattels, land and tenements.

☐ **COURT SUPERVISED RELEASE PROGRAM**: Pursuant to Criminal Rule 46, Section C, and appearing to the Court that the defendant herein qualifies for the Court Supervised Release Program. It is therefore considered and ordered that the defendant be released from custody subject to the conditions listed in the Court of Common Pleas Supervised Release Form

☒ **OTHER:** CSR. NO CONTACT ORDER, GPS DETAIN UNTIL INSTALLED. CONDITIONS.

In lieu of, or in addition to the above, place the DEFENDANT IN CUSTODY OF: _____

ADDRESS _____ PHONE _____ SS# _____
The conditions of release are such: that the above bonded DEFENDANT shall personally appear before the **CLEVELAND MUNICIPAL COURT**, Justice Center, 1200 Ontario Street in said city on **December 08, 2021** AND SHALL FURTHER APPEAR BEFORE SAID Court of Common Pleas of Cuyahoga County, from time to time, on such days as may be required, until the case shall be finally disposed of and abide the judgment of the Municipal and Common Pleas Courts and depart without leave, then this RELEASE AGREEMENT shall be void, otherwise it shall be and remain in full force and virtue in law.

TAKEN, SIGNED, AND ACKNOWLEDGED BEFORE ME ON THE DATE WRITTEN ABOVE,

EARLE B. TURNER, Clerk of Cleveland Municipal Court
December 6, 2021

_____
Unsecured Release Requestee's Signature

_____
Deputy Clerk of Cleveland Municipal Court

_____
Defendant's Signature

_____
Defendant's Address

12/6/2021 11:16:31 AM

CRCSBOND

---

15

*Keller Misunderstood when the Jail was Aware of GPS Activation*

46.　　Inmates can be held on a monetary or personal bond that requires GPS installation. In the case of a Cleveland Municipal Court personal bond, pretrial services (pretrialservices@cmcoh.org) is notified upon receipt of email regarding the personal bond to install the GPS. In the case of a monetary bond, staff wait until the bond has been paid.[21] The inmate files produced to Plaintiff's counsel contained additional email records not considered by Keller. These emails inform the Jail that the GPS device has been activated.

47.　　For example, a condition of Cleveland Inmate Anthony Hicks' (#14613) personal bond was that he be detained until a GPS device was installed. The email notifying the Jail this action was complete arrived at 14:02 on 12/06/21.[22] However, the email containing Hick's personal bond paperwork was not sent until 15:54 the same day.[23] Keller's release triggering event was at 13:13, both before the GPS install was confirmed and before the bond paperwork was emailed to SHCMC from a Cleveland Municipal Courts email.

48.　　This is not the sole example of an email confirming GPS device installation arriving after Keller's identified release triggering event.

- Cleveland Inmate Lorenzo Wilkins (#161019): Keller's release triggering event occurs at 11:22 on 2/22/2022 while the GPS installation is confirmed at 14:47 on 2/22/2022.[24]

- Cleveland inmate Ralph Walker (#196731): Keller's release triggering event occurs at 10:29 on 12/21/2021 while the GPS installation is confirmed at 15:50 on 12/21/2021.[25]

- County inmate Lawrence Parrot (#156620): Keller's triggering occurs at 9:15 on 12/01/21 while the GPS installation is confirmed at 11:36 on 12/01/21.[26]

- Cleveland inmate Charles Mouzaya (#39621): Keller's release triggering event occurs at 13:17 on 08/21/21 while the GPS installation is confirmed at 16:29 on 08/27/21.[27]

---

[21] Amanda Brewer Deposition, pages 179–182.
[22] CC0000244686.
[23] 2021.12 – SHCMC.pst Email from fieldsmo@cmcoh.org to shcmc@cuyahogacounty.us sent 12/6/2021 at 15:54.
[24] CC0000266678.
[25] CC0000241375.
[26] CC0000249541.
[27] CC0000143408.

- Cleveland inmate Randy Ingram (#197688); Keller's triggering event occurs at 10:09 on 08/02/21 while the GPS activation is confirmed at 14:45 on 08/02/21.[28]
- Cleveland inmate Joshua Harris (#135492): Keller's triggering event occurs at 11:36 on 07/07/21 while GPS activation is confirmed at 15:09 on 07/07/21.[29]

49.     Below is an example of one of the emails contained in the email records. As can be seen they contain a timestamp with a clear description that GPS was activated and the inmate it concerns. Keller ignored these records.

**Figure 5: Example of Email Confirming GPS Device Installation**

*Keller Ignored Information Available in Paper Files Relevant to RNFC Releases*

50.     Cleveland Inmates that are released without any formal charges are released as an RNFC. Notification comes that a Cleveland Inmate is to be released as an RNFC via email (as of 2024) or by being walked over by an officer. Emails concerning RNFC are sent to SHCMC. The email contains the name of the person being released and either the birth date or the Sheriff's Office number.  Once release paperwork is processed, the email is sent to Checks.[30]

51.     When Keller believed that a timestamp was not available in Defendants' records, Keller assumed these missing times were 11:59 PM Eastern Time. However, it's not the case that the Defendants did not maintain any record of timestamps of when the records staff would have been informed of the RNFC events. Rather, Keller has not examined all the relevant information and relies only on a subset of conveniently obtainable information.

---

[28] CC0000130338.
[29] CC0000216674.
[30] Amanda Brewer Deposition, pages 85–109.

52.     By reviewing inmates' individual paper records, I have identified timestamps that indicate when the records staff received notification of the RNFCs. Ink stamps containing the date and time on paper inmate records provide an indication of when documents were received.

53.     Keller asserts her assumption (using 11:59 PM) yields the most conservative estimates;[31] however, this is not always true. Consider the case of Shimira Brantley (#223421).

54.     Keller assumed the RNFC event occurred at 23:59 on 2/21/2022. However, there is additional information in the paper file for Brantley as shown in Figure 6:

- The scan of the RNFC green slip shows "1130" on 2/21/2022.[32]
- The Sheriff's Office received and stamped the RNFC Green Slip at 9:06 on 2/22/2022.[33]

**Figure 6**



55.     If the Sheriff's Office didn't receive the RNFC notice until 9:06 on 2/22/2022, assuming the event triggering release occurred at 23:59 the day before is not conservative.

## Conclusion

56.     I have reviewed the Expert Report of Lacey R. Keller dated January 31, 2024, and I have several findings. First, major discrepancies exist between the paper records preserved for each individual and the automated method put forth by Keller. Second, Keller's method ignored data available in the individual paper records that would have been helpful measuring the time to

---

[31] Keller Report at page 5.
[32] CC0000276723.
[33] CC0000276731.

release. Third, her analysis of the distribution of times to release is based on a small, non-random, subset of the potential class because her methodology is incapable of estimating time to release for the vast majority. Finally, her analysis fails to consider individualized facts and circumstances that may have impacted the time necessary to process each inmate's release. Circumstances surrounding releases are diverse and so a more thorough examination of paper inmate files is required for each individual in order to reliably determine if they were overdetained. Together, these findings lead me to conclude Keller's method is incapable of reliably identifying all or even most individuals who may have been overdetained.

57.     I reserve the right to amend or supplement this report as appropriate.


*Sean T. Malone*

Sean T. Malone, Ph.D.


March 3, 2025

San Antonio, TX

**Materials Relied On**

File Name

Credit for Time Served Cases - Cleveland.xlsx

Cleveland Contract for Fresh Arrests.pdf

CC0000407302-CC0000407546.pdf

Amanda Brewer - Cuy. Criminal Records Clerk - Cleveland (Civilian).pdf

Janiese Cage - Cuy. Criminal Records Clerk - Common Pleas (Civilian).pdf

Kathleen Belle - Jail Release Desk Officer (Corrections).pdf

Leah Palagyi 12-19-2024 MINI.pdf

Krystal Lawyer 12-17-2024 MINI.pdf

cleveland_data.csv

CLE_August_2024_Data.csv

CLE_August_2024_Release_Orders.csv

CUY_Bond_Data.csv

CUY_Jail_Release_Data.pkl

cuy_pleas_data.csv

email_txt_processed.csv

GPS_Ohio_AMS_Data.csv

GPS_Oriana_Data.csv

manual_checks_txt_files.csv

summary_table_sorted_normalize_names.csv

summary_table_sorted_normalize_names_full_time_period.csv

txt_files.csv

email_parsing.ipynb

Report_included_Analysis.ipynb

summary_table.ipynb

Clients Added Removed (VET court).xlsx

Clients Added Removed muni court.xlsx

Ohio AMS Cleveland Muni GPS cleints 2019-2023.xlsx

Exchange.pst

Exchange-2.pst

Exchange-3.pst

Exchange-4.pst

Exchange-5.pst

Exchange-6.pst

Exchange-7.pst

Exchange-8.pst

Exchange_unsearchable.pst

2021.12 - SHCOURT.pst

**Materials Relied On**

<u>File Name</u>

2021.12 - SHCMC.pst

Cleveland HBR Reports and Follow up (FAC P. 100) (Addl).pdf

Cleveland HBR Reports and Follow up (FAC P. 100).pdf

Jail Release Desk Checklist.pdf

Sheriff's Office Records Clerk Duties - Cleveland Specific.pdf

Sheriff's Office Records Clerk Duties - General.pdf

2024-02-27- Dunn v Cuyahoga - Settlement Letter.pdf

Common Pleas Bond Release with Holds + Bond Posted.xlsx

Common Pleas Bond Release with Holds.xlsx

Common Pleas Bond Release without Holds + Bond Posted.xlsx

Common Pleas Bond Release without Holds.xlsx

Common Pleas Court Release with Holds.xlsx

Common Pleas Court Release without Holds.xlsx

CC0000351088-CC0000354862.pdf

CC0000354863-CC0000358925.pdf

CC0000358926-CC0000363052.pdf

CC0000363053-CC0000366446.pdf

CC0000366447-CC0000371882.pdf

CC0000097709.pdf

CC0000097710.pdf

CC0000097711.pdf

CC0000097712.pdf

CC0000097713-CC0000097714.pdf

CC0000097715-CC0000097716.pdf

CC0000097717.pdf

CC0000392910-CC0000392966.pdf

CC0000390185-CC0000390328.pdf

CC0000390329-CC0000391742.pdf

CC0000391743-CC0000392072.pdf

CC0000392073-CC0000392316.pdf

CC0000392317-CC0000392852.pdf

CC0000332813-CC0000337357.pdf

CC0000337358-CC0000341659.pdf

CC0000341660-CC0000344493.pdf

CC0000344494-CC0000351085.pdf

CC0000310240-CC0000315020.pdf

CC0000315021-CC0000321186.pdf

**Materials Relied On**

File Name

CC0000321187-CC0000327579.pdf
CC0000327580-CC0000332812.pdf
CC0000288213-CC0000293582.pdf
CC0000293583-CC0000300296.pdf
CC0000300297-CC0000305409.pdf
CC0000305410-CC0000310239.pdf
CC0000263144-CC0000273990.pdf
CC0000273991-CC0000282260.pdf
CC0000282261-CC0000288212.pdf
CC0000232419-CC0000234885.pdf
CC0000234886-CC0000244837.pdf
CC0000244838-CC0000254274.pdf
CC0000254275-CC0000257213.pdf
CC0000121912-CC0000130488.pdf
CC0000130489-CC0000139151.pdf
CC0000139152-CC0000140796.pdf
CC0000140797-CC0000141669.pdf
CC0000141670-CC0000142353.pdf
CC0000142354-CC0000143050.pdf
CC0000143051-CC0000144051.pdf
CC0000144052-CC0000147783.pdf
CC0000147784-CC0000156376.pdf
CC0000156377-CC0000163876.pdf
CC0000163877-CC0000171367.pdf
CC0000171368-CC0000178867.pdf
CC0000178868-CC0000186364.pdf
CC0000186365-CC0000190887.pdf
CC0000190888-CC0000204987.pdf
CC0000204988-CC0000208673.pdf
CC0000208674-CC0000218650.pdf
CC0000218651-CC0000224951.pdf
CC0000224952-CC0000228706.pdf
CC0000228707-CC0000232418.pdf
CC0000000001-CC0000008896.pdf
CC0000008897-CC0000016620.pdf
CC0000016621-CC0000022156.pdf
CC0000022157-CC0000027658.pdf

**Materials Relied On**

<u>File Name</u>

CC0000027659-CC0000029044.pdf

CC0000029045-CC0000033121.pdf

CC0000033122-CC0000036923.pdf

CC0000036924-CC0000039701.pdf

CC0000039702-CC0000044447.pdf

CC0000044448-CC0000048301.pdf

CC0000048302-CC0000052055.pdf

CC0000052056-CC0000054961.pdf

CC0000054962-CC0000059905.pdf

CC0000059906-CC0000064419.pdf

CC0000064420-CC0000066799.pdf

CC0000066800-CC0000070609.pdf

CC0000070610-CC0000074792.pdf

CC0000074793-CC0000077078.pdf

CC0000077079-CC0000080185.pdf

CC0000080186-CC0000084772.pdf

CC0000084773-CC0000089476.pdf

CC0000089477-CC0000091854.pdf

CC0000091855-CC0000094516.pdf

CC0000094517-CC0000097708.pdf

P1269.xlsx

Copy of Cleveland Municipal EM - 5.1.2019 - 5.13.2024.xlsx

Dunn Et al. Updated Request 5-1-19 to 1-6-2025 AM and EM.XLSX

061224 Standard Event Code Table Report.pdf

CLE 001 - Record Selection Criteria.pdf

CMC Defendants Detained - Bonds Settings - Bonds Posted or Processed 050119 - 123123.xlsx

CLE 002 - CMC Defendants Arrested or Detained 050119 - 123123 - GPS.xlsx

CLE 003 - CMC Defendants Arrested or Detained 050119 - 123123 - Monetary Bonds.xlsx

CLE 004 - CMC Defendants Arrested or Detained 050119 - 123123 - Municipal Release Orders.xlsx

CLE 005 - CMC Defendants Arrested or Detained 050119 - 123123 - Personal Bonds.xlsx

CLE 006 - CMC Defendants Arrested or Detained 050119 - 123123.xlsx

Dunn v. Cuyahoga Cty - CLE Arrest Data.xlsx

Updated Bond Posted or Processed Query Results 4-10-24.xlsx

Updated Bond Posted or Processed Query Results 5-15-24.xlsx

2024-07-14 Release Orders 2021 to 7.5.2024.xlsx

Release Orders - CC0000111809-CC0000121911.xlsx

Release Orders w Times - CC00000372052-CC0000385496.xlsx

**Materials Relied On**

File Name

CC0000393587.xlsx

CC0000393588.xlsx

CC0000393589.xlsx

DiscoveryDataWithCases_2019.xlsx

DiscoveryDataWithCases_2020.xlsx

DiscoveryDataWithCases_2021.xlsx

DiscoveryDataWithCases_2022.xlsx

DiscoveryDataWithCases__2023 1.xlsx

2024-07-24 bonds with post date (all bonds posted, incl forefoeited, dates only).xlsx

Bonds Posted - CC0000103813-CC0000104453.xlsx

Bonds Posted w Times - CC0000385497-CC0000386133.xlsx

59435 AS EA.pdf

Keller Expert Report.pdf

Keller Report - Appendix A.xlsx

US_DIS_OHND_1_23cv364_d149010819e4103_First_Amended_complaint_with_jury_demand_against_A.pdf





## Sean T. Malone, Ph.D.
### Associate Director of Analytics

smalone@imslegal.com

### Key Qualifications

Sean T. Malone is an Associate Director of Analytics at IMS Legal Strategies Advisory division. IMS Legal Strategies provides consulting services for numerous public and private entities on a wide range of topics. Dr. Malone's experience includes supporting expert testimony for litigation topics such as securities, breach of contract, real estate valuation, business valuation, construction defects, discriminatory mortgage lending, civil rights, and housing violations.

Dr. Malone teaches finance and statistics at Trinity University and prior to joining Analytic Focus, he taught undergraduate courses in business finance, investments, money and banking, and financial case studies at The University of Texas at San Antonio.

Dr. Malone's strong finance, data analysis, and econometrics skills stem from his background in empirical corporate finance and econometrics research. With these skills and experience, he provides insight to clients on matters of statistical analyses, complex damages modeling, valuation of damages, market analysis, and more.

### Education

Ph.D., Finance, The University of Texas at San Antonio, 2019
M.S., Finance, The University of Texas at San Antonio, 2015
B.A., Financial Economics, Capital University, 2012

### Professional Experience

Associate Director of Analytics, IMS Legal Strategies, 2022 - Present
Senior Research Associate, Analytic Focus, LLC, 2019 - 2022

### Academic Experience

Adjunct, Department of Finance and Decision Sciences, Trinity University, 2023 - Present
Lecturer / Instructor, The University of Texas at San Antonio, 2015 - 2018
Research and Teaching Assistant, The University of Texas at San Antonio, 2012 - 2015

## Publications

Malone, S., Kittiakarasakun, J., & Vidaurre, M. *3 Approaches for Measuring Short Squeeze Trading Damages*, Law360 (June 2, 2021), https://www.law360.com/articles/1390079/3-approachesfor-measuring-short-squeeze-trading-damages.

Cowan, A., Seguin, P., & Malone, S. T., "Event Studies in Securities Litigation," in <u>Comprehensive Guide to Economic Damages, Sixth Edition</u>, Business Valuation Resources, LLC, Portland, ME, 2020. (Updated in <u>Comprehensive Guide to Economic Damages, Seventh Edition</u>, 2023)

Malone, S. T. (2019). *Innovations in Financial Risk* (Doctoral dissertation, The University of Texas at San Antonio).

Roychoudhury, S., & Malone, S. T. "Were Bank CEOs Overpaid?" Journal of Business and Policy Research, 2012, 7(4), 30-39.

## Previous Testimony

GRANDE VISTA OF ORLANDO CONDOMINIUM ASSOCIATION, INC. and MARRIOTT RESORTS HOSPITALITY CORPORATION vs. RICK SINGH (2018-CA-13570-O) in the Ninth Judicial Circuit in and for Orange County Florida. For Defendant Orange County Property Appraiser. Testified by deposition on March 10 and 15, 2023. Testified at trial on April 11, 2023.

MARK HANSEN and JASON BUFFER, individually and on behalf of all others similarly situated vs. UNITED AIRLINES, INC. (1:20-CV-02142) in the United States District Court Northern District of Illinois Eastern Division. For Plaintiffs. Testified by deposition on June 6, 2023.

## Selected Litigation Consulting Experience

**Economic analysis in a fraud and deceptive practices case.** Authored a report summarizing opinions from my analysis of the economic assumptions underlying a model used by a credit rating agency to assess the risk of loans underlying Private Label mortgage-backed securities.

**Identification of class members and estimating class size in a consumer fraud class action.** Authored a report describing an objective methodology to identify members of a proposed class and a preliminary estimate of the number of class members.

**Estimation of aggregate class damages in a property damage product liability class action.** Estimated the number of existing and future properties damaged using survival analysis methods and the corresponding costs to replace the defective products.

**Statistical methods and economic analysis in an ad-valorum property tax case.** Authored a rebuttal report based on statistical methodology and an economic comparative analysis of relevant markets.

**Estimation of damages in a product liability personal injury case.** Assisted in conducting an economic valuation of lost earning capacity for an individual by projecting earnings, estimating work-life probability, and determining appropriate discount factors.

**Estimation of restitution for tenants in housing violations case.** Assisted developing an economic model and drafting a report summarizing the estimated restitution due to tenants in a building with repeated violations of housing code.

**Statistical testing in civil rights cases.** Assisted in conducting statistical tests for discriminatory lending in mortgage origination data. Authored a declaration on statistical bias due to sample selection issues.

**Statistical sampling in a class action concerning violations of fiduciary duties.** Determined an appropriate sample size for accounts to review given uncertainties about the class criteria in the population.

**Statistical sampling in a construction defect case.** Assisted in drafting rebuttal report on sampling post-tensioning anchors in condominium towers. Used sampling theory and a review of architectural plans to demonstrate the sample was biased and did not follow the purported sampling method.

**Evaluation of whether an allocation plan was equitable to creditors in a Chapter 11 bankruptcy.** Coauthored report summarizing opinions based on analysis of public health data to determine if creditors would receive allocations equitable in relation to needs of Creditors to accomplish the objectives of the trust being created under the reorganization plan.

**Monte Carlo simulation methods in a land tort case.** Assisted a rebuttal expert in conducting review of methods applied in a Monte Carlo simulation analysis used by an expert in toxicology to opine on health risks resulting from environmental contamination.