UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ALANNA DUNN, REGINALD HAYMON, ADAM DAY, ERIC ZEIDER, CAMERON LEONARD, AND JASON WILSON, on behalf of themselves and others similarly situated,<br>          Plaintiffs,<br>v.<br>CUYAHOGA COUNTY; JOHN AND JANE DOES 1-25,<br>          Defendants. | Case No.: 1:23-cv-00364<br><br>Judge Bridget Meehan Brennan |

## SUPPLEMENTAL EXPERT REPORT OF SEAN T. MALONE, PH.D.

## ON BEHALF OF DEFENDANT CUYAHOGA COUNTY

March 19, 2025

Table of Contents

Summary of Engagement and Conclusions ................................................................................... 1

Professional Qualifications and Compensation ............................................................................. 2

Additional Examples Where Keller Failed to Examine the Individual Facts and Circumstances Surrounding Releases .................................................................................................... 2

    Keller's Method Fails to Differentiate between Releases and Releases into Home Detention ................................................................................................................................................. 2

    Keller's Method Does Not Consider Other Custody Sessions for the Same Individuals  5

    Keller Fails to Consider Paper Records Which May Contain Information That Explains Longer Times to Release ..................................................................................................................... 6

Keller's Own Files Expose Her Use of Overly Simplistic Assumptions....................................... 9

Conclusion .................................................................................................................................. 13

**Summary of Engagement and Conclusions**

1. I have been retained by the Cuyahoga County Prosecutor's Office ("Counsel") who represents Cuyahoga County ("County") in the federal court action *Dunn, et al. v. Cuyahoga County*, Case No. 1:23-cv-00364 (N.D. Ohio).

2. I was asked to review the Expert Report of Lacey R. Keller which was served on January 31, 2025 (the "Keller Report") and prepare my own expert report that both responds to the Keller Report and sets forth any additional expert opinions that I was prepared to make in this case on behalf of Defendant Cuyahoga County as of March 3rd, 2025. On that date, I issued my initial report (the "Malone Report"). Further, Counsel has asked that I prepare an additional report supplementing my opinions.

3. In preparing this report, I generally relied upon the same information and facts as my initial report. I relied on an additional document, the Cuyahoga County Court of Common Pleas Probation Department Electronic Monitoring / GPS Tracking Unit Rules. I located this document on at https://cp.cuyahogacounty.gov/media/1918/em-gps-rules.pdf. I also received two additional email files from Counsel.[1]

4. The findings from in my initial report were largely based on my review of records maintained for releases of individuals. I've continued to review these records since.

5. I have found additional reasons and examples that supplement my conclusions as to why Keller's method is inappropriate for 1) reliably measuring the time it took the County to release the individual in each Custody Session after a Release Triggering Action and 2) identifying which individuals were released within specific time intervals. A summary of these reasons is below:

- Keller fails to differentiate and identify Custody Sessions where individuals were released into Home Detention as opposed to being released without restrictions on their movement and activities.

---

[1] SHCMC – 2021-2022 Sample Mos..pst and SHCOURT – 2021-2022 Sample Mos..pst.

1

- Keller fails to consider the impact jail time credit may have on potential overdetention claims for the same individual's other Custody Sessions.
- Keller fails to consider paper records that may contain information that explain longer times to release, such as hand-written notes.
- Keller's overly simplistic coding assumptions cause major errors in her conclusions about time to release.

6. This report describes my work, opinions, and conclusions.

7. I reserve the right to amend or supplement this report as appropriate.

**Professional Qualifications and Compensation**

8. In the Malone Report, I described my qualifications, compensation related to this engagement, and included a copy of my resume. I incorporate those in this report by reference.

**Additional Examples Where Keller Failed to Examine the Individual Facts and Circumstances Surrounding Releases**

*Keller's Method Fails to Differentiate between Releases and Releases into Home Detention*

9. I understand that Home Detention can be both an alternative sentence and used as a condition of a bond release. In both situations, the ability for individuals to move and participate in activities is highly restricted.

10. For example, consider some of the rules for those released and monitored by GPS in the Cuyahoga County Court of Common Pleas: "When you leave your residence, you shall report to your authorized activity, you shall return to your residence immediately. You shall not leave your residence until another activity is verified and approved by the Electronic Monitoring staff. You are not permitted to have contact with anyone outside your home other than those persons directly related to your authorized activity. […] You

2

may not […] consume alcohol while on GPS monitoring. You shall agree to submit alcohol and/or drug test immediately upon request. […] You are not permitted to go swimming."[2]

11. I understand from the restrictive covenants above that when an individual is released from the County Jail, the liberties returned to them may be related to whether they were simply released or released into a different type of custody, like Home Detention. In the event, the Court finds that some individuals should be in subclasses related to the type of release (and liberties regained), any method applied to potential class members should be able to reliably classify the type of release for each Custody Session as either a full release or a release into another type of custody.

12. Keller's method superficially appears to do this by having a group of custody sessions labeled "GPS Holds". However, this group does not encompass all individuals who were released into Home Detention. For example, see Table 1 below which contains examples of four individuals who were released into Home Detention, but not listed in Keller's "GPS Holds" Custody Sessions.

---

[2] Cuyahoga County Court of Common Pleas Probation Department Electronic Monitoring / GPS Tracking Unit Rules, available at https://cp.cuyahogacounty.gov/media/1918/em-gps-rules.pdf.

3

**Table 1: Examples of Individuals Released into Home Detention / GPS Monitoring but Not in Keller's "GPS Holds" Custody Sessions**

| Custody Session | Defendant Name | Docket Entry Excerpt | Keller's Label |
|---|---|---|---|
| 173829 | Mel'Vante Hays | "COURT ORDERS DEFENDANT TO BE SUPERVISED BY THE ELECTRONIC MONITORING GPS UNIT- THE DEFENDANT WILL BE ON GPS STANDARD HOUSE ARREST MONITORING.  NO MOVEMENT WITHOUT PRIOR APPROVAL FROM THE JUDGE.  EXCEPTIONS ARE MADE FOR MEDICAL EMERGENCIES AND COURT OBLIGATIONS.  ALL EXCLUSION ZONES WILL BE MONITORED AND ENFORCED." | Custody Sessions without Holds |
| 208691 | Robert Watson | "BOND CONDITIONS: COURT SUPERVISED RELEASE, GPS EXCLUSION/INCLUSION MONITORING"[3] | Custody Sessions with Booking Holds |
| 58532 | Darrell Strowder Jr. | "DEFENDANT IS ORDERED RELEASED AS SOON AS GPS CAN BE HOOKED BACK UP."[4] | Custody Sessions with Booking Holds |
| 124268 | Jesse Varner | "DEFENDANT WAS GIVEN A BOND WHICH INCLUDED GPS MONITORING. DEFENDANT MADE UNAUTHORIZED STOPS ON THE SAME DAY OF GPS INSTALLATION, AND DID NOT RESPOND TO THE SHERIFF'S AUDIBLE ALERTS. [..] COURT IS RELEASING DEFENDANT BACK ON GPS STANDARD MONITORING IN CASE 660586, AND EXCLUSION/INCLUSION MONITORING WITH NO-CONTACT WITH THE VICTIM IN CASE 662132." | Custody Sessions with Booking Holds |

13. My initial report demonstrated Keller ignored GPS installation confirmation emails. An additional example of this oversight is Erik Sanchez (Custody Session 90938) whose release was dependent upon GPS installation. Sanchez was released on 08/29/2022 at 20:01. While Keller's release triggering event occurred at 8/29/2022 at 10:36, the email notifying that GPS was installed was not sent until 8/29/22 at 15:36 as shown in Figure 1 below.[5]

---

[3] CC0000129499
[4] CC0000236717
[5] CC0000327791

4

**Figure 1: Email Confirming GPS Installation for Erik Sanchez**

> Re: GPS READY
>
> Rodolfo Figueroa <rfigueroa@cuyahogacounty.us>
> Mon 8/29/2022 3:36 PM
> To: Amanda Brewer <abrewer01@cuyahogacounty.us>
>
> GPS was hooked.
>
> ---
>
> From: Amanda Brewer <abrewer01@cuyahogacounty.us>
> Sent: Monday, August 29, 2022 12:22 PM
> To: Monique Henderson <mhenderson@cuyahogacounty.us>; Keith Pipkins <kpipkins@cuyahogacounty.us>; Rodolfo Figueroa <rfigueroa@cuyahogacounty.us>; Cheryl M. Mott <cmott@cuyahogacounty.us>; Monique D. Perry <mdperry@cuyahogacounty.us>; Pretrial Services <cmcpretrial@cmcoh.org>; Ronald L. Williams <rlwilliams@cuyahogacounty.us>; Mark A. Hale <mhale@cuyahogacounty.us>
> Cc: Rebecca A. Moore <ramoore@cuyahogacounty.us>
> Subject: GPS READY
>
> SANCHEZ, ERIK #248139
>
> 22CRB005743
>
> **READY FOR HOOKUP**
>
> **\*\*PLEASE SEE ATTACHED BOND POSTED ON 8/27**
>
> Looking forward to hearing from you,
>
> Amanda Brewer 🖤

*Keller's Method Does Not Consider Other Custody Sessions for the Same Individuals*

14. Keller's method also fails to consider another complexity that ties some Custody Session results with other Custody Sessions. Consider an individual who was released on bond for a charge on Date 1 for Custody Session A, where Keller determines they were "overdetained." Later, on Date 2, the individual changes their plea on the same charge to guilty and then sentenced to time served after they are award jail time credit. This is relevant because the allegation that the individual was detained more than necessary in

5

Custody Session A no longer makes sense, because they were awarded time against their sentence for the time spent detained in Custody Session A.

15.  The scenario above is not just hypothetical. Consider David Jones (Custody Session 62001). Keller determined that Jones had an alleged "overdetention_time" of 28.10 hours when he was released on 8/4/2021 on case CR-19-640862-A. For demonstration purposes only, let's assume momentarily that Keller's conclusion is correct. One year later, on 8/4/2022, Jones changed his plea to guilty, and he was sentenced and received jail time credit for the same case, CR-19-640862-A.[6]

16.  A methodology designed to identify individuals who were overdetained, therefore, should consider whether or not that individual was later given jail time credit for the same period that was allegedly "overdetention_time". The Keller Report and associated materials, however, give no indication that other Custody Sessions for the same individuals are considered.

*Keller Fails to Consider Paper Records Which May Contain Information That Explains Longer Times to Release*

17.  In my initial report, I opined that the facts and circumstances of each release are diverse and cannot be ascertained without examining the individual records of each inmate.[7] As a supplement to this conclusion, I provide two additional examples of the diverse facts and circumstances around individual releases ignored by Keller.

18.  Antoinette Polk (Custody Session 17446) was released on 7/6/2022 at 18:31. Keller's analysis finds the release triggering event occurred on 7/2/2022 at 23:59 and concludes the inmate was held 90 hours after the release triggering event. However, an examination of the Cleveland Municipal Court Cash/Surety Release Agreement has a timestamp at the bottom of the document for 7/6/2022 at 16:04. Further, the body of the

---

[6] Release Orders w Times – CC00000372052-CC0000385496.xlsx at row 11764 in the "2021-2023" worksheet.
[7] Malone Report at ¶21.

agreement indicates that it was not effective until 7/6/2022.[8] The agreement is shown below in Figure 2 with the timestamp and effective date in red boxes.

**Figure 2: Release Agreement for Antoinette Polk**



19. These details for the Polk case were ignored by Keller because they can only be discovered by a thorough review of the individual's records preserved by Defendants.

20. According to Keller, Matthew Dingus (Custody Session 171293) allegedly had an "overdetention_time" of 124 hours. There is a Personal Bond Court Release Agreement in

---

[8] CC0000358321

7

his file dated 7/29/2022. This date matches the release triggering event date/time Keller found to be 7/29/2022 at 12:05. However, an important detail is missed in the automated process programmed by Keller. The same document, shown in Figure 3 below, contains a hand-written note that reads "never received in SHCMC on 7/29".

**Figure 3: Personal Bond Never Received in SHCMC Inbox on 7/29/2022**



21.     Recall from my initial report that SHCMC is an email inbox that receives personal bonds when they are posted.[9] Keller's method does not consider SHCMC emails even though she had cited materials that describe their importance in noticing the Jail of documents that may trigger the release process. Keller referenced the deposition of Michelle Henry in her report,[10] so she should be aware that the SHCMC email is used to

---

[9] Malone Report at ¶44.
[10] Keller Report at ¶51.

8

communicate all Cleveland release paperwork.[11] Without these emails, the facts that Keller relies upon in her report are incomplete. Further, without a manual review of the individual's paper records, a potential explanatory reason for a longer release duration would not be known. A detailed investigation into the individual facts and circumstances for Dingus' release, therefore, might conclude that that the alleged "overdetention" might have been caused by actions outside the Defendant's control.

**Keller's Own Files Expose Her Use of Overly Simplistic Assumptions**

22.     Keller has written computer code to "standardize and merge the Produced Data into one Summary Table that [she] could use for further analysis." With that method she concluded that "using the Produced Data, it was possible to calculate the Time to Release for each Custody Session after a Release Triggering Action."

23.     For this model to reliably do what it claims, it must identify the correct release triggering event and the correct date and time the event took place. Such determinations require, at minimum, the same type of individual care and review that clerks in the Sheriff's Office provide. These clerks read documents and understand context, unlike Keller's method.

24.     For example, when Keller finds a release order (and no other holds) she considers the time of the release triggering event to be the same as the filing of that order. In other words, Keller always assumes that a release order means an immediate release. So, what is the method Keller uses to determine if a docket journal entry contains an order for immediate release? It's shown in an excerpt of her code below.

```
release_orders_docket_df['action']=np.where(release_orders_docket_df['docket_text'].str.lower().str.contains('ordered release', case=False), 'Release Ordered', 'non-release order docket')
```

---

[11] Deposition of Michelle Henry, 10/16/2024 at 50-7:12.

9

25. This code excerpt reads the text of the journal entry and has two possible outcomes: it contains the words "ordered released" or it doesn't. Those that contain the words, according to Keller, are orders to release the individual, and as long as there are no other holds, she assumes they should be released immediately.

26. A clerk would not have such a simplistic method for determining when to release an individual. They would read the docket journal entry.

27. Reading the journal entry can, unsurprisingly, lead to different outcomes, compared to jumping to a conclusion based on the presence of keywords as part of a computerized search. Keller's method is completely blind to the additional release instructions or conditions that a judge may often provide.

28. For example, Keller's summary file contains a Custody Session (241627) for Trevon Cummings. Keller identified the release triggering event to be a release order from 11:21 on 5/19/2021. In her own summary file, she has the text from the docket entry for the release triggering event; it reads, in part, "DEFENDANT TO SERVE 3 DAYS, STARTING TODAY, IN COUNTY JAIL.  DEFENDANT TO BE RELEASED AFTER 3 DAYS. DEFENDANT'S PROBATION TO TERMINATE AFTER RELEASE FROM JAIL. *** DEFENDANT ORDERED RELEASED AFTER 3 DAYS SERVED IN COUNTY JAIL ***"

29. Cummings was released on 5/21/2021 at 14:21 after serving 3 calendar days in jail. Keller came to the conclusion Cummings had an alleged "overdetention_time" of 51 hours because she ignored the fact that he was not to be released for 3 days after her miscalculated release triggering event. Had Keller taken the time to read the records, available for Cummings, as Sheriff's Office clerks would have done and I did, she likely would not have made such a grievous error.

30. Similarly, Charmaine Martin (Custody Session 40457) had an alleged "overdetention_time" of 19.35 hours according to Keller. Martin was supposedly ordered to be released at 13:50 on 7/27/2023. Again, Keller just searched for the phrase "ordered released" and ignored the rest of the docket journal entry even though it stated,

10

"DEFENDANT TO BE RELEASED 07/28/23". In contrast to Keller's findings, Martin was released the exact day the court ordered, 7/28/2023 at 9:11.

31.    According to Keller, Elizabeth Glover (Custody Session 87368) had an alleged "overdetention_time" of 8.83 hours. The release order that Keller identified as the release triggering event, however, only had a date of 1/18/2022, so Keller assumed that the release triggering event occurred at 11:59 PM on the same date. Again, Keller assumed this was a conservative assumption, but it was far from conservative.[12] She could have simply read the docket entry, which stated "DEFENDANT TO BE RELEASED 01/19/2022 AT 8:30 AM."  Thus, since the records show that Glover was released at 8:48 AM on 1/19/2022, there was no overdetention at all, given that she was released within minutes of the court-prescribed time.

32.    Keller found an alleged "overdetention_time" for Shawn Jordan (Custody Session 221891) of 23.57 hours. Jordan was supposedly ordered to be released at 17:22 on 6/16/2022, according to Keller's flawed programming logic. However, if Keller had taken the time to read the relevant records saved in her own file, she would have seen that Jordan was to be "RELEASED ON FRIDAY 06/17/22 AT 5P.M."  Thus, a review of the records confirm that Jordan was released on time at 4:46 PM on 6/17/2022, and was not overdetained for nearly an entire day, as Keller erroneously suggests.

33.    Keller concluded Cody Guido (Custody Session 47185) had an alleged "overdetention_time" of more than 2 days (51.71 hours). Keller's method determined he was ordered released at 13:31 on 4/7/2023. This date and time was based upon the journal entry official date/time for the court order that contained the phrase "ordered released". Again, Keller's method was oblivious, however, to the following explicit instructions from the judge: "DEFENDANT TO SERVE 10 WEEKENDS IN COUNTY JAIL STARTING AT 5PM ON 4-7-2023. DEFENDANT IS TO BE RELEASED BY 4PM ON SUNDAYS."  Thus, Guido was  not

---

[12] Malone Report at ¶¶53-55.

11

overdetained, as alleged by Keller, but was released at the conclusion of his first weekend served at 5:13 PM on 4/9/2023.

34. One last example of Keller's crude assumption creating massive errors is in the file for Daniel Hale (Custody Session 54779). Keller found Hale had an alleged "overdetention_time" of 104.30 hours, which would be more than 4 days. Her basis for this allegation was that Hale was ordered released on 7/14/2022 at 13:50. However, claim is factually incorrect. While the journal entry that contained the order for his release was time-stamped at 13:50 on 7/14/2022, Keller failed to recognize the judge instructed that the "DEFENDANT TO BE RELEASED ON 7/18/2022." Thus, contrary to Keller's allegation, Hale was not "over-detained" for 4 days, but was released the same day that the judge prescribed, 7/18/2022 at 22:08.

35. When reviewing files that contain scans of paper records, additional flaws in Keller's method, like those described above, are apparent. Had Keller taken any time to review her work, she should have noticed the highly abnormal results that were likely caused by some of these flaws. For example, in the case of Daniel Hale, where the overdetention_time was more than 104 hours, Keller should have recognized this value as an outlier and explored its cause. As shown below in Figure 4, anyone reading the scanned records would understand the intent of the court order. A computer program is unnecessary and even counterproductive when it fails catastrophically.[13]

---

[13] CC0000294332

**Figure 4: Court Order for Daniel Hale**

```
IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

THE STATE OF OHIO              Case No: CR-21-658674-A
    Plaintiff
                               Judge: EMILY HAGAN

DANIEL HALE                    INDICT: 2911.02 ROBBERY
    Defendant
                               JOURNAL ENTRY

PROBATION TO TERMINATE ON 7/18/2022.
DEFENDANT TO BE RELEASED ON 7/18/2022.
DEFENDANT ORDERED RELEASED.

07/14/2022
CPJM2 07/14/2022 13:36:55

                               Judge Signature      07/14/2022
```

36. For all of these reasons, therefore, Keller's method of using an automated approach to determine the time to release an inmate is flawed because it makes simplistic assumptions that are not robust to the realities of the behavior it is designed to measure. In contrast, people familiar with the release process would understand the complete instructions embedded in a court order, and would conduct a more reliable job when reviewing individual records manually.

**Conclusion**

37. I have continued reviewing records related to releases from the Jail and comparing my findings regarding the circumstances of those releases to the assumptions and conclusions made by Lacey R. Keller in her Expert Report dated January 31, 2021. This supplemental report provides additional facts and examples to support my opinions in my initial report that 1) major discrepancies exist between the paper records preserved for each individual and the automated method proffered by Keller, 2) her method ignores data available in the individual records that would have been helpful measuring the time to release, and 3) her method lacks a thorough examination of inmate records which

causes her analysis to ignore individualized facts and circumstances that may have impacted the time necessary to process each inmate's release.

*Sean T. Malone*

Sean T. Malone, Ph.D.

March 19, 2025

San Antonio, TX

14