Lacey R. Keller  3/27/2025

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

ALANNA DUNN, on behalf of    )
herself and others similarly )
situated,                    )
                             )
        Plaintiffs,          )CASE NO. 1:23-CV-00364
                             )JUDGE BRIDGET MEEHAN BRENNAN
        VS.                  )
                             )
CUYAHOGA COUNTY, ET AL.,     )
                             )
        Defendants.          )

                    - - - - -

    THE TELECONFERENCE DEPOSITION OF LACEY R. KELLER

            THURSDAY, MARCH 27, 2025

                    - - - - -

The teleconference deposition of LACEY R. KELLER, herein, called for examination under the Federal Rules of Civil Procedure, before me, Mary C. Peck, a Stenographic Reporter and Notary Public within and for the State of Ohio, commencing at 10:35 a.m., the day and date above set forth.

                    - - - - -

Page 2

APPEARANCES:
On behalf of the Plaintiffs:
KATE SCHWARTZ, ESQUIRE
Hughes, Socol, Piers, Resnick & Dym
70 West Madison Street
Suite 400
Chicago, Illinois, 60602
kschwartz@hsplegal.com

A. DAMI ANIMASHAUN, ESQUIRE
The Lord Law Group, PLLC
355 S. Grand Avenue
Suite 2450
Los Angeles, California 90071
dami@animashaun.me
On behalf of the Defendants:
STEPHEN W. FUNK, ESQUIRE
Roetzel & Andress, LPA
222 South Main Street
Suite 400
Akron, Ohio  44308
sfunk@ralaw.com

JAKE A. ELLIOTT, ESQUIRE
BRIDGET DEVER, ESQUIRE
BRENDAN D. HEALY
Cuyahoga County Prosecutor's Office
1200 Ontario Street
8th Floor
Cleveland, Ohio  44113
jelliott@prosecutor.cuyahogacounty.us
bdever@prosecutor.cuyahogacounty.us
bhealy@prosecutor.cuyahogacounty.us
                - - - -

Page 3

INDEX
                                PAGE
EXAMINATION
By Mr. Funk                      5

OBJECTIONS
By Ms. Schwartz                 15
By Ms. Schwartz                 31
By Ms. Schwartz                 54
By Ms. Schwartz                 58
By Ms. Schwartz                 91
By Ms. Schwartz                113
By Ms. Schwartz                114
By Ms. Schwartz                119
By Ms. Schwartz                122
By Ms. Schwartz                126
By Ms. Schwartz                135
By Ms. Schwartz                143
By Ms. Schwartz                154
By Ms. Schwartz                170
By Ms. Schwartz                171

Page 4

EXHIBITS
                                PAGE
Exhibits were premarked off the record.

P&G Reporting, LLC
216.870.2218

Lacey R. Keller   3/27/2025

Page 5

----

LACEY R. KELLER

herein, called for the purpose of examination, as provided by the Federal Rules of Civil Procedure, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

----

EXAMINATION OF

LACEY R. KELLER

BY MR. FUNK:

Q   Good morning, Ms. Keller.  My name is Stephen Funk. I'm an attorney at Roetzel & Andress.  I've been retained to represent Cuyahoga County in the federal court action of Dunn versus Cuyahoga County pending here in the Northeastern District of Ohio.

You've been designated as an expert for the Plaintiff in this case, so the purpose of today is to take your deposition.

Can you please state your full name and address for the record?

A   Yes.  My name is Lacey, L-a-c-e-y, Keller, K-e-l-l-e-r.  My address at home is 2975 South Washington Street, Englewood, Colorado, 80113.

Q   Okay.

MR. FUNK:  And by agreement of the

Page 6

parties, we've agreed to conduct this deposition via Zoom.

I assume nobody has any objection to administering the oath via Zoom and having the testimony recorded -- actually, it's stenographic, and I think she's doing an audio.

But using that technology for the purpose of preparing the transcript, any objections to that?

MS. SCHWARTZ:  No objection.

Q   So I note from your resume that you've had your deposition taken before, so you understand the general approach here?

A   Yes.

Q   Okay.  So for the most part because this is by Zoom, it's going to be really important that we go a little bit slower than normal.  You may know where I'm going with a question, but let me finish the question before you answer, and then I'll try to make sure you've finished your answer before I ask my next question.

Is that fair?

A   Understood.

Page 7

Q   Okay.  And you are under oath, so you understand that your obligation is to answer the questions truthfully and to the best of your knowledge?

A   Yes.

Q   Okay.  And if you -- it's important to give verbal answers, like yes, rather than nods or shaking your head, as well as mm-hmm or uh-huh.  Yes or no is a better verbal answer.

If at any point you don't understand one of my questions, let me know, and I'll try to rephrase it. Otherwise, we'll just assume you understood the question as it was asked.

Is that fair?

A   Of course.

Q   And, you know, it's my intent to go through this as quickly as possible, but if at any time you want to take a break, just speak up and we'll take a break. We'd just ask if that there's a question pending that you answer the pending question before we take the break.

A   Yes.

Q   All right.  So when were you retained to serve as an expert witness for the Plaintiffs in this case?

A   Sometime early in the fall of 2024.  Or in the fall. I don't want to say early in the fall, but probably

Page 8

around, like, November -- late October, probably more like November 2024.

Q   Okay.  And did you enter into any kind of a retainer agreement or engagement agreement?

A   Yes.

Q   And are you compensated by the hour, or do you receive a flat fee or some other kind of financial remuneration?  Sorry.

A   Remuneration is always a tough one.

Yes.  My team is compensated by the hour, so we have different billable rates for different people. I have mine, and the people that work for me have their individual rates depending on their seniority.

Q   And your rate was $570 an hour in 2024 and $584 an hour in 2025?

A   That's correct.

Q   Okay.  Has that changed at all since your report?

A   No.

Q   And does your rates vary depending on the type of task, your personal rates?

A   No.

Q   So it's the same hourly rate for trial testimony as it would be for preparing the report?

A   That's correct.

Q   Any lower rate for travel, or anything like that?

Lacey R. Keller  3/27/2025

Page 9

A   It depends on the agreement.  Some agreements that we have -- and I'd have to consult this one.  I don't do the administrative work anymore -- we'll have a reduction in rate for travel, but I don't remember what this agreement has in it.

Q   Okay.  And I'm going to go ahead and identify for the record -- you've authored three reports in this case, and I just want to identify those, so I will share my screen, if that works.

A   Yes.

Q   Hopefully I can make this work.  The one thing I know how to do better on Zoom is share a screen.

So this one is an expert report served January 31, 2025.  It's got a cover page, and it's 66 pages long.  I'll just go to the last page -- the last two pages.

The last page is your CV, and then, you know, it does say Page 66 of 66.

Do you recognize this as being your report?

A   Yes.

Q   And do you have a hard copy of it with you?

A   No.

Q   That's fine.

A   I'm a big data person.  Always on electronic.

Q   We'll go through it on the screen.  That way we'll

Page 10

actually be able to focus on specific items that way.

Anyway, I'm going to set that aside for now.

Also with this report was an addendum.  Let me just bring that up.

Can you see this?

A   Yes.

Q   Let me just go to the top.  This is an Excel spreadsheet that was attached to the report as Addendum A, and as I understand it, there's a number of fields down here at the bottom, and these all -- each of these tabs correspond to essentially the Excel data that was used to put together the figures that are in your report.

Is that right?

A   Yes.  It's similar to that.  It shows either a more aggregated or -- so in the case of this one where you have up where it's showing the quartiles, it's a different presentation of the same underlying information.  So showing it at quartile level instead of decile, which is what's shown in the report, and then there should be another -- a similar table for this that has it at the individual percentile levels, so you'll see 100 different entries.

Q   Okay.

A   So that's a quartile.

Page 11

The no holds has a percentile.

Q   Okay.

A   There you go.

Q   Right.

A   So that just shows it at a more granular level.

Q   Okay.  So we might as well go ahead and identify each one.

So percentiles, no hold -- I think this may not be the first one.

So this is the key, first tab.  And then we've got quarters for no holds, quarter -- well, maybe you tell me.

What does this stand for?

A   Can you go back to the key, please?

That's quarter no holds.  It's what the TTR is, time to release.

Q   Okay.  So for the first tab --

A   So that's the time to release for the no holds at the quartile level.

Q   Okay.

A   And the next tab that you have corresponds, so it's, again, quartiles.  You know it's quartiles based -- that there's four.  And that shows the time to release to the email.  So there's a corresponding chart in the report that shows the time to release to

Page 12

the email for the no holds group.

And then ETR -- let's look at the key to make sure, but my guess is that would be email to release.  Yes.

Q   Okay.

A   So that also corresponds to an image in the report but at the quartile level for the no holds group.

Q   Okay.

A   And then that is decile, so that's just the underlying data that's shown -- this is the, like, Excel that would be used to show that image that's in the report.

Q   Okay.  And that's the fourth tab?

A   Yes.

Q   Okay.  So the fifth tab?

A   Fifth tab -- God.  How many tabs are there?

Q   There's a lot.

A   This is the downside of computer code is you can just spit things out as fast as you want.

So this is on -- we did the decile time to release no holds.  Now we're at the decile --

MS. SCHWARTZ:  I just want to clarify.  This is TRA, not TTR.  I think the key has a different indication of what TRA is.

Lacey R. Keller  3/27/2025

Page 13

A    Yeah.  We switched -- it's a different -- so it's time --

Q    I'm going back to the key.

A    Release triggering action to email notification.

Q    Okay.  So I'm not going to go through all these.  I think each of these by using the key, you can identify what they are intended to be.

A    Yeah.

Q    Some of them are quartiles.  Some of them are deciles.  Some of them are percentiles.

A    Yes.  That's the concept.

Q    Okay.

A    Essentially it's every combination of quartile, decile, percentile that correspond to charts in the report.

So you should be able to find a quartile version of the chart in the report, a decile version of the chart in the report, which is what's shown in the report, and the percentile version of the chart in the report just showing that underlying data.

The reason for the key is that there's a limit on tab size -- tab name size in Excel, so that's why they're like that.

Q    All right.  Thanks.  Let me go back to -- I'll stop share.

Page 14

And then I'm going to go ahead and just identify the other two reports.  This report is dated -- served March 19, 2025.  This is your -- we're going to mark this as Exhibit 2, and it's 1 of 9, Pages 1 of 9, and the first page is the cover page.  The second page is a two-paragraph summary of what the purpose of this supplemental report is, and then it follows with charts, revised figures -- and I'll get into this in more detail -- and then the last page is signed by you on March 19, 2025.

Do you recognize that as being your supplemental report dated March 19, 2025?

A    Yes.

Q    Okay.  And then we'll share Number 3.

MR. FUNK:  I'm not sharing anything yet, right?

A    No.

MR. FUNK:  Okay.  After bragging about how I can share so easily.

Q    Can you see this now then?

A    Yes.

Q    All right.  So this is Expert Report Supplement, Lacey R. Keller served March 24, 2025.

MR. FUNK:  We've marked this as Exhibit 3.

Page 15

Q    It is a 15-page report, the cover page being Page 1.  Page 2 is a description of the assignment and the purpose of the supplement, and the remaining pages are charts and tables -- figures, I guess is a better term -- and then the last page is Page 15 of 15 signed by you and dated March 24, 2025.

Is this your March 24th of 2025 report?

A    That's correct.

Q    Okay.

MR. FUNK:  So that will be marked as Exhibit 3.

Q    So when did you first begin working on your January 31st original report?

MS. SCHWARTZ:  Objection.  Vague.

Go ahead.

A    We began processing the data in November as soon as we received it.

Q    November 2024?

A    That's correct.

Q    Okay.  How much time -- how many hours do you think that you and your team worked on this matter -- worked on that through today?

A    Let me think here.  Hundreds.  I can pull up a calculator.

Q    Do you know how much you've billed to date?

Page 16

A    I do not.  I could get that information, but I don't have that in front of me.

Q    Have you issued an invoice yet?

A    Yes.

Q    Okay.  So there would be invoices that would show how much you've billed?

A    Yes.

Q    Okay.  I guess we'd ask for a copy of those invoices so we know how much compensation you've received.

So hundreds of hours at an hourly rate of -- well, I guess, who else on your team has worked on this matter?  Who are the members --

A    They're -- I'm sorry.  I interrupted your question.

Q    Yeah.  Who are the -- you said you worked with other people on this project.

Who are the other people that you worked with?

A    That would be Ava Hamilton and Hailey Utech.  They're both data scientists on my team.

Q    How do you spell their names?

A    A-v-a, H-a-m-i-l-t-o-n.

Q    Right.

A    Hailey is H-a-i-l-e-y, U-t-e-c-h.

Q    And where are they based at?

A    Ava is based in New York City and Hailey is based in Kansas City.

Lacey R. Keller 3/27/2025

Page 17

Q And were all -- I guess is it considered to be employees of MK Analytica, Inc.?

A That's correct.

Q Okay. And you are the -- it says in your resume you're the co-founder of MK Analytics, Inc.?

A That's right.

Q Are you then an owner, as well?

A Yes. That's co-founder/co-owner.

Q Who is the other co-owner?

A Meredith McCarron.

Q And when did you form MK Analytics, Inc.?

A In 2001.

Q Okay. And let me go to your CV. It's in the report.

Are you saying -- I think it's 2021, at least according to your CV.

A I'm sorry. I'm sorry. 2021, yes. Good lord. 2021.

Q Yeah. No problem.

What did you do prior to 2021? I guess it's in your CV. Did you work -- I guess I should ask the question did you do any work as an expert witness prior to 2021?

A Yes.

Q Okay. So tell me about that. You worked for a company called Gryphon Strategies?

A Yes. So prior to founding MK Analytics, I was a

Page 18

managing director for Gryphon Strategies, which is based in a suburb of New York City. I started working there in 2018, I believe is the time -- 2017. Gosh. I'm getting old. It's like time flies.

Q Yeah.

A So I started working there in 2017. And shortly thereafter, I was retained by the National Prescription Opiate Litigation as an expert in data mining and analytics.

So my first deposition in that case was somewhere around 2019, but I had been working on expert reports and worked for that litigation prior to that.

Q So that would have been, sort of, your first time you would have served in the role of being an expert witness for litigation purposes?

A That's correct.

Q And then sometime in 2021 -- I guess it was February of 2021 is when you decided to continue that work through your own company?

A That's right. We left Gryphon Strategies.

So Meredith and I were both employees of Gryphon and moved to founding our own company, MK Analytics.

Q And how many employees does MK Analytics have?

A We have close to ten now.

Q Okay. And are they -- like, I note you're in

Page 19

Colorado.

Are all the employees in New York, or are they all over the country?

A They're all over the country.

So we're fully remote. We have, I think, eight or nine employees. We just hired folks. And then we have a handful of contractors right now, too, that are working on a temporary basis, not on this matter, but for other matters. And yeah. Everybody is around the country.

Q Okay. Now, I'm looking at your CV. It indicates that you have a Bachelor's of Business Administration from Washburn University in Topeka, Kansas.

Is that correct?

A That's correct.

Q And then Master of Arts in economics from The New School for Social Research in New York, New York?

A That's right.

Q Okay. So tell me about that program. What does that involve?

A That was -- it's an economics program. Yeah. I wrote a thesis for that, studies of various economic theories, econometric courses. It's been a long time since I've taken those classes, but that was kind of the gist of it.

Page 20

Q Okay. What was your thesis in?

A I believe I wrote my thesis on the effect of pensions on local economies, on pension money on local economies.

Q Okay. And in terms of -- it says that you have a certificate in data science.

What is that?

A I took a -- so when I was -- after I had founded and was running the New York Attorney General's data mining and analytics program, I realized the skills of my employees were quickly out-stripping mine, and so I took that to understand the data science principles that they were employing.

Q Okay. So that was some course work that you took?

A That's correct.

Q And the course work was through what entity?

A It was called General Assembly. It's like a for-profit entity, so they offered night courses that I took while working.

Q Okay. So I'm going to go to your report again, Exhibit 1, okay?

Starting at Page 62, Paragraph 82, you have a listing of depositions in which you've been -- cases in which you've been deposed, and Paragraph 82, Subparagraphs 82.1 through 82.21, do you see that?

Lacey R. Keller  3/27/2025

Page 21

A   Yes.

Q   Okay.  And as I go through that list, it does appear that all of them involve the opioid litigation.  I think that's what you said you first got involved with.  And the only two that I see that are potentially not is 82.19 -- do you know what that relates to?  That's Patrick Feindt versus United States of America.

A   Yes.

Q   What does that relate to?

A   So that case relates to the fuel leak that was in the Red Hill -- that was out in Hawaii at the Pearl -- basically around Pearl Harbor, so I was asked to provide some data analysis for that case.

So my job, similar to the one here, was to combine structured datasets that were produced in a number of different locations, combine them all together, and create a dashboard, as well as analysis of the water testing data complaints and medical events that occurred around the time of that fuel leak.

Q   And was that on behalf of the plaintiff or on behalf of the United States?

A   On behalf of the Plaintiff.

Q   Okay.  Is that case still pending?

Page 22

A   We had -- I also gave trial testimony in that case just about a year ago, and I have not -- I don't think that they have received a ruling yet, but I haven't been following it closely.

Q   It was a bench trial?

A   Yes.

Q   And then we've got 82.20, Holwill versus AbbVie.

A   Yes.

Q   What did that case involve?

A   So that case, I was issued as a -- offered as a rebuttal witness for another expert's analysis in that case, so I was asked to review their report and issue findings.

Q   What was the substance of the claims in that case?

A   Goodness.

Q   What did it involve?

A   Let me think about that for a second.

It was about the use -- I have to think about the right way to phrase it.  But there was some marketing work that AbbVie -- or marketing tools that AbbVie was using, and that was kind of the general gist of the case.  We were much deeper into the weeds on specific data analysis.

Q   It doesn't have a court there.  Was that in federal court?

Page 23

A   I can check on that.  I think it was in federal court.

Q   Do you know which court?

A   I don't.  I can check on that if it's needed.  I'm sorry about that.

Q   So look at the list of depositions, 82.1 through 82.21 -- and I can scroll through this as quickly as you tell me.

Am I right -- I can do it page-by-page.  Am I right that 82.1 through 82.6 all relate to the opioid litigation?

A   82.1 to 82.6, yes.

Q   Opiate, I guess is the better word.  Or I guess it's both opiate or opioid.

A   Yeah.  Opioid, whatever.  It's different jurisdictions relating to the same overall type of litigation.

Q   As well as 82.7 through 82.16, all opioid litigation in various jurisdictions; is that correct?

A   Yes.

Q   And then other than the two that we just discussed, 82.17, 82.18, and 82.21 also relate to the opioid litigation, correct?

A   Correct.

Q   So tell me about what role you've been serving in

Page 24

these opioid litigation cases?

A   A similar role to the one here.  I'm offered as an expert in data mining and analytics.  My job is to combine large and disparate data sources to provide analyses, various analyses or outlier detection.  In some of those litigations, I was also asked to apply red-flagging from other experts who identify diversion, so I was provided with a set of criteria to employ to the data to identify patterns that they were interested in analyzing.

Q   Is this testimony that you've been doing on behalf of the plaintiffs in these cases or the defendants?

A   The plaintiffs.

Q   Okay.  And so the plaintiffs, what is the data that they are compiling?  Is it, like, medical records, or what is really the source of the data that you're receiving?

A   So there's a lot of data that we analyze, and it depends on the case.

For the manufacturer cases, we relied on data that's called charge-back data, and that shows a type of an instrument that the manufacturers use that helped provide insight into their downstream customers.

So they may sell a product to a distributor to

Lacey R. Keller   3/27/2025

Page 25

bring it out into the market, but with that, they can -- the data basically shows the charge-back amount. So it's a financial record of some type from the pharmacy that that pill was sold at to the manufacturer. So it was a bit of a -- it allowed, you know, some downstream views into the opioid distribution network.

And then other datasets we would use was the ARCOS data, so that's the DEA's data that shows opioid shipments around the country. So that shows you not only shipments from the manufacturer to the distributor, but also distributer to the final pharmacy. It doesn't show beyond from pharmacy to individual. It just stops at the pharmacy level.

That data is now public as a result of the litigation, so you could peruse that at your own leisure.

There's also distributor data that we analyze that shows the distributions from the -- so for cases involving the Big 3, we would call them, McKesson, Cardinal, and AmerisourceBergen, they had datasets that showed their internal shipments -- or their shipment data to the pharmacies.

What else was there? There's also PMDP data, which is Prescription Monitoring Drug Program data

Page 26

that's generally held by the states. We also had suspicious order reports and stopped order reports which were maintained both by the DEA, as well as the distributers themselves.

So that's, like, a handful of them. I'm sure in other specific case, there were more specific datasets from the regulating entities in those areas, but -- and then the big dataset I would be remiss if I did not mention is the IQVIA data, which is a dataset that was purchased by one of the defendants for litigation. And IQVIA is -- you may also know it by IMS or Quintiles as a large data broker in the medical industry. So that was the largest dataset that we analyzed which showed prescribing practices of individual physicians.

Q   And when you're putting this dataset together, is this for purposes of determining and quantifying damages, or is it used for liability purposes?

A   How my stuff is used depends on the case and how the attorneys tend to use it. My job was to show just the volume. Often, I am the start of many other experts, so other experts will rely on me.

I'm working on a case right now where I'm basically creating the dataset that an exposure expert would rely upon.

Page 27

For the Red Hill case, for example, they had a couple -- at least one expert, that I know of, that relied on the dataset that I compiled. So similar to this litigation where there's dozens of spreadsheets that needed to be combined, that's not generally in the skill set of some of these exposure experts, so that's where I'm called upon to put everything together in a format that can be used by others.

So I'm not necessarily doing the damages calculations myself. Others may do that because there's some additional work that needs to be done using the data that we process.

Q   Okay. Just so I understand it, when you talk about data mining and analytics, essentially you're taking data, whether it's structured data or unstructured data, and you're attempting to consolidate it and then put it into some kind of spreadsheet by which somebody could -- maybe you could describe it.

A   Yeah. It's a new area of expertise, I would say, as far as the courts are concerned. I get a lot of questions early on in the process, because often people don't know where to put me. They're used to dealing with economists and damages experts, and things like that, or epidemiologists, and it's confusing because they're not sure, you know, what do

Page 28

you do.

My job is to aggregate, collate, organize, large disparate datasets, and this is something I've been doing since at the New York Attorney General's Office.

When I was there, we got our big break, if you will, with the case against Airbnb, and they had received a number of records from Airbnb on bookings, and I was able to connect those to the city's zoning data and provide some analysis of illegality that was happening there between zoning laws and the type of buildings that these rentals were happening in.

Before we were in existence or before I was in existence, they would have done sampling or anecdotes, and now because you have the power of data mining and analytics, I'm able to do that on a grand scale to analyze all of the data.

So in every matter that I'm retained in, I'm usually brought in because there's, for lack of a better term, a mess. There is a mess of data, a large amount of data, a lot of different types of spreadsheets that the attorneys see do have commonality and they can be combined together, but they need somebody to put them together to be able to be ready for further analysis.

P&G Reporting, LLC
216.870.2218

Lacey R. Keller   3/27/2025

Page 29

Q   I think --

A   Sometimes -- go ahead.

Q   Because I think in most litigation when people think about it, somebody being a liability expert or a damages expert, you're kind of neither. You're just putting data together. Others can maybe opine on liability or damages.

Is that fair?

A   That's typically the places -- I mean, in some ways, I get described as, like, a human calculator or human computer, which I try not to take offense at it, but that's a big area that I play is putting things that attorneys wouldn't be able to put together themselves. And even some of these experts that are relying on our data just don't have that expertise in combining the datasets in the way that we do. That is our core bread and butter is putting things together that are in different places.

Q   In any of the opioid litigation you've done, and I've seen you've done a lot of cases, have you ever written a report in which you've actually quantified the amount of damages or alleged damages?

A   I don't believe. I have not personally done any damages calculations. I'm not sure if my co-founder has because she's also an expert witness, but I have

Page 30

not.

Q   And what about in terms of actually writing an expert opinion on the liability issue, whether it be causation or negligence, or anything like that?

A   That's also typically not a place that I play. For the opiates litigation, I would not be the one to say there was overprescribing. I would say here was the volume of prescribing. Here is a table that shows a prescriber's prescribing amount. But someone else needs to point to that and say that is overprescribing. That would not be my area of expertise.

Q   Okay. So I have a couple other questions about the resume. We'll just go to that again. I'll share.

So we went through those cases in which you were deposed. From my review of these cases -- I don't need to go through them one-by-one unless you need me to -- it looks like in each of these cases, they're brought by either a state, county, or city government against an opioid manufacturer or distributor or somebody in the industry.

Is that -- are there any cases -- hold on. Do you agree with that?

A   For the opioid litigation, yes. They're generally brought by the cities, counties, or states against

Page 31

one of the parties in the opioid -- or in the pharmaceutical supply chain, whether it's a manufacturer, distributor, or the end pharmacies.

Q   So in each of those cases, the state or local government is suing to recover health benefits or Medicare or some governmental assistance that they -- or, I guess, damages incurred by the state or local government as a result. They're not suing on behalf of individuals. Is that your understanding?

MS. SCHWARTZ:  I'm going to object to foundation, but you can go ahead.

A   That, I'm not -- it's varied. Each case has its own set of claims.

Q   Okay.

A   And that really wasn't -- like, I mean, each case has its own set of claims.

Q   All right. Were any of the cases involving the opioid litigation -- were any of those cases involving class actions where a named plaintiff is suing on behalf of a class?

A   I don't know. I don't know.

Q   Okay.

A   The Patrick Feindt case was a class action.

Q   Okay. And that's on --

A   I believe it was a class action, because I believe

Page 32

those were basically the service members that were affected by that leak, if I recall.

Q   I see.

What about the Holwill versus AbbVie case?

A   I think that was a claims case, like a marketing claims case.

Q   Okay. And then moving ahead to the testimony for trial, it looks like all these correspond to cases that you've listed above where you had your deposition taken, as well.

Is that --

A   That's right. There's always -- yes. You have to have the deposition before going to trial, so they're a subset of the cases above.

Q   And then you have four listed under Paragraph 84 in which you filed a declaration, so 84.1 through 84.4.

Do you see that?

A   Yes.

Q   And I think some of these relate to cases we've already discussed except for these two. One is 84.2, Council, et al. versus Ivey.

A   Yes.

Q   What was that about?

A   That case was related to practices -- parole practices by the State of Alabama and how those

Lacey R. Keller   3/27/2025

Page 33

affected the incarcerated individuals in the state specifically regarding their work release program.

So one of the allegations -- I'm going to oversimply it -- was that individuals were being denied parole, and those denials also resulted in -- individuals were being denied parole when they normally wouldn't have been denied parole, and that parole rates were falling.  And related to that was those individuals were working out in the public, let's say at a McDonald's, and creating revenue for the State of Alabama.

Q   The ones who were paroled?

A   Were not paroled.

Q   Oh, that they would have been working generating --

A   No.

Q   Okay.  I'll --

A   It's actually -- well, I'll --

Q   Okay.

A   The people when they work -- I haven't been deposed in this case yet, so I'm trying to be very specific about what I'm -- what I was asked to do.

So people in the state, when you go out on work release, the state receives some portion of that as money that goes into their funds.  And so individuals who may have been paroled were not, so that kept them

Page 34

working for the state, and the state was able to receive money on behalf of those non-paroled individuals.

Q   So that case did not involve, sort of, what we have here in terms of release procedures.  It dealt more with whether somebody was or was not granted parole?

A   It involved parole records.  We also analyzed, like, movement records.  So the state maintained a database of, like, basically in and outs for the prison.  So when you were signed out of the prison, signing back into the prison because you went out on work release or you went to -- you had a healthcare issues that needed to be addressed, that kind of data.  There was also some financial records that were incorporated in that analyses, as well.

Q   And who were the attorneys that you were hired by in that case?

A   We were hired by the attorneys -- by Justice Catalyst.

Q   Is that the name of a firm?

A   That's the firm, yes.

Q   And they're based in Alabama?

A   They're based out of, I believe, New York City.

Q   Okay.

A   Actually, I know some of the individuals working for

Page 35

that firm are in New York City, and others are around the country.

Q   Okay.  And that's pending in -- that's currently pending in federal court in Alabama?

A   That's correct.

Q   And then what about the second one listed here, Cayce Collins Moore versus the State of Alabama?

A   That was a very specific case involving one person, the counsel that was requested -- so separate from Justice Catalyst, another counsel -- another attorney had requested that we do a very specific analysis of this person's history in that data.

Q   And that was somebody who was also denied parole?

A   I believe they were denied parole, yes.

Q   Okay.  And you haven't been deposed in either one of those cases yet?

A   No.  I have not filed an expert report.  I've just provided declarations.

Q   Okay.

A   And I should add, my report doesn't include this because it was still pending at the time.

I've been appointed by a court in Lackawanna County.  It's a federal court.  I don't have the court in front of me, but I was appointed by a federal court judge to assist defendants in providing

Page 36

a class list for a matter pending in front of the court.

So my job is to now work on behalf of the defendants to provide a list of members that were affected by -- I would say it's not work release.  It's community service, slash -- what is it when you -- so individuals were behind in their child support payments and they were put into a program to repay those child support payments, and so -- or similar types of payments.  My job was to combine all of the county's datasets, again, and analyze which members might be part of the class that were affected by the claims brought by the plaintiffs.

Q   So Lackawanna County, that's in Pennsylvania, right?

A   That's in Pennsylvania, yes.

Q   And that's the defendant, Lackawanna County?

A   The county is the defendant in that case.

Q   Okay.  That might be the Middle District of Pennsylvania.  Does that ring a bell at all, or you don't know?

A   I can look on the break, if you'd like.

Q   Okay.  And you don't know the case number of that case, do you?

A   No.  But if we take a break, I can get it for you so you have it.  I think that would be nice to have for

P&G Reporting, LLC
216.870.2218

Lacey R. Keller   3/27/2025

Page 37

the record.

Q   Okay.  So is that -- so that case, has the judge already certified the class?

A   That's what my job is is to create the class for them to review.  So they've had some back-and-forth between plaintiffs and defense, and my job is to help the defendants identify members -- produce the class list.

Q   Okay.  And then with regards to Council versus Ivey case, were you involved at all -- was that also a class action?

A   I believe that's a class action case.  I don't know that they've gotten to class certification.  My declaration was at the complaint stage.

Q   Oh, just at the complaint stage to kind of show the numbers or the trends with regard --

A   That's right.

Q   All right.  Let me stop.  I think we've gone through all the cases on your list.

In this case, you have been retained by the Plaintiffs.  Had you -- and their attorneys are Kate Schwartz and Dami Animashaun.

MR. FUNK:  Did I butcher your name, Dami?  I apologize.

Q   Have you worked with either one of them before this

Page 38

case?

A   No.

Q   What about any attorneys within their law firms, Hughes, Socol, Piers, Resnick & Dym or The Lord Law Group?

A   No.  I have not worked with them before.

Q   Okay.  Prior to this case, had you ever been involved in a case involving allegations of overdetention or cases relating to the time it takes to release a person from custody?

A   I have not worked on that time to release type of case before.  Again, we've worked with prison systems' data before, but not specifically with a claim on time to release.

Q   With respect to your expertise, data mining, would you put any kind of substantive limitation on the types of data that you could analyze, or is it just data no matter what it is?

A   What do you mean substantive limitation?  Like, is there -- what do you mean?

Q   When you're talking about data mining, would there be, like, a particular set of data that you would say would be outside your expertise, or you could pretty much work with any sets of data that's given to you regardless of where it comes from?

Page 39

A   Generally, we work with structured datasets, or if we're working -- so that's a CSV, a TXT.  Attorneys will just think of an Excel spreadsheet.  Structured datasets may also take the form of JSON files or HTML, so that will be a website, because that information is structured in some way to produce it on a website.

We also will be called to process unstructured data if it is structured -- if it has some sort of structure to it, so if it has a similar pattern that can be extracted.  Generally what that looks like is PDF reports of things that should have been an Excel spreadsheet or should have been -- or an export from a database.  So we'll be called to process those.

Q   Okay.  I wanted to go back to your list again.  Sorry.  I had one other question.

So with respect to the cases on your list, I saw one that was the Northern District of Ohio.  It's actually 82.16, Montgomery County Board of County Commissioners versus Cardinal Health, and I believe that's Judge Polster in the Northern District of Ohio.

Do you know if that's the case?

A   Yes.  Judge Polster, yes, I'm very familiar.  There's a couple cases.

Page 40

Q   There's a couple cases.  Judge Polster has handled opioid litigation, I think, through the MDL Master.

Are there any other cases, that you know of, assigned to him?

A   I'd have to go through.  I know there's a couple, but I'd have to look at them individually.

Q   Have you had to testify at all in any cases that are in the Northern District of Ohio as an expert witness in a trial?

A   So I don't think in front of Judge Polster, no.

Q   So the one that I pointed out was a deposition, right?

A   Yes.

Q   Other than that, do you recall any other prior experience in Ohio federal or state courts?

A   So one of our reports was on Summit and Cuyahoga Counties in West Virginia, but I don't think that's -- I have to think about the geography there, but I don't believe that --

Q   So Cuyahoga County did have an opioid case filed.  Were you involved in representing Cuyahoga County in that case?

A   Plaintiffs.

Q   Yeah.  Cuyahoga County would have been the plaintiff.

A   That might have been the Track one.  That is Summit

Lacey R. Keller  3/27/2025

Page 41

and Cuyahoga County, if I recall.

Q   So 82.1 on your resume?

A   Yeah.

Q   Or 82.1 of your expert report, June 13, 2019, Track One, so that would have been a Judge Polster MDL case.  I believe that he assigned Summit County and Cuyahoga County as being --

A   Bellwethers.

Q   Bellwethers, right.
    Do you recall that?

A   Yes.  That was the very first case.  There's over, I think, 12 different tracked cases in that litigation, and I was a part of several of them.

Q   All right.  And what would have been your report in 82.1 then for Cuyahoga --

A   So for that case, I would have -- it has been a long time since I've looked at that report.
    I would have analyzed the IQVIA data, so that's that IMS prescriber level data.  On top of that, it is possible we analyzed charge-back data.  I just have to look back to see if that was part of that report.  But every report that I issued for the opioid litigation relied upon the IQVIA physician level data.

Q   All right.  Let me go up to another part in your

Page 42

report at the very top.  I'm going to Page 3 of your expert report, Exhibit 1.
    Are you able to see this on the screen?

A   Yes.

Q   Okay.  And there's a Roman Numeral II that says, Assignment.  And then it's got Paragraphs 7 and 8 on Pages 3 and 4.
    Do you see that?

A   Yes.

Q   Okay.  So this is your description of the scope of your assignment?

A   Yes.

Q   All right.  And that's the assignment that the Plaintiffs' counsel provided to you; is that correct?

A   That's right.  Just like any other case, yes.

Q   And so I have a question.  So identify individuals whose custody sessions followed specific release pattern characteristics as defined by counsel, what was that related to?  What did as defined by counsel --

A   So we get into greater detail in the methodology section of that, of the report, but that refers to the types of events for the release triggering actions, the types of events that were considered release actions.  It is kind of a general phrase that

Page 43

we go into greater detail in the methodology section to effectuate the analysis.

Q   Okay.  So identify discrete custody sessions, we'll get into that, what is a custody session.  And then identify individuals whose custody sessions followed specific release pattern characteristics, and that is defined by counsel in the methodology section.
    Then the next ones are calculate the time.  8.3, 8.4, 8.5, 8.6, you're calculating the time; is that right?

A   That's right.

Q   And then the last one is calculate the total number of people that were released within specific time intervals.
    Do you see that?

A   Yes.

Q   Okay.  So it looks like what you're doing here is you're identifying sessions and then you're calculating times based upon data; is that right?

A   Yes.  So I'm combining the couple dozen structured datasets together so that they're in one big what we would call a summary table from that following instructions from counsel as to what individuals are in what type of -- what individuals meet the criteria to be part of the groups.  And then in addition to

Page 44

that, determining what are the custody sessions.  Because individuals can enter the data in a number -- enter the data a number of times.  So create unique custody sessions.  And then for a custody session, identify the release triggering event and then the release event, as well as -- and I think there was -- like we just mentioned in 8.5, 8.6 and 8.4, some additional times that are part of that process.  But generally calculating the time intervals at different points in that custody session.

Q   Okay.  And so this would be something that involves your expertise because it involves essentially data mining and analysis, right?

A   Yes.  The assignment that was provided to me was merging together datasets, especially structured datasets, and creating a dataset that could be then analyzed in that way.
    Because I'm an expert in data mining and analytics, I'm not an expert in jail -- I don't know.  I wouldn't even know what the field would be.  But what it takes to put someone in jail or what it would take to have someone released from jail, that's not part of my expertise or what that process looks like.  That's why that direction is provided by counsel.

Q   So you're not an expert in managing or running

Lacey R. Keller   3/27/2025

Page 45

prisons, jails, or other detention facilities, right?

A   That's correct.

Q   And then as part of this report, you're not offering -- or I guess in this case in general, you're not intending to offer any expert opinions on whether Cuyahoga County is properly running or managing the Cuyahoga County Correctional Center?

A   That's correct.  Very similar to the roles that I've played in the opiate litigation, I'm producing data that shows what happened as part of the datasets that I reviewed.  In the opiates litigation, I also showed, like, this is what was shipped.  But that is where my analysis ends and someone, whether it's an attorney or another expert, would pick up.

Q   Other than your review of the datasets, you don't have any experience or expertise on how the release of inmates should or should not be handled?

A   That's correct.  Should is not a word that I will almost ever use in my reports because that's outside of my expertise.  What did happen as part of the datasets that I looked at is what's in my expertise.

Q   And I'm just wanting to -- I know this seems repetitive, but I --

A   No.

Q   So you're not rendering any opinions on whether an

Page 46

individual's release or time to release was reasonable or not?

A   That's correct.  I show what I found in the datasets and the supplemental -- supplemental is not the right word, but in the data that I produced with my report, you can see what is going on with any individual based off of my analysis, but I don't say what should have been the case for that person.

Q   And you're not rendering opinions on the cause of any individual's -- or any alleged delay in any individual's release?

A   That's correct.

Q   And you're not rendering any opinions on the reasons for why there was a delay in any individual's release?

A   That's correct.  I show what the data shows.

Q   And you're not rendering any opinions on whether any of the reasons for delay were valid or legitimate?

A   That's outside of my report.  I show what the data shows.

Q   And you're not rendering any -- well, let me go to the -- oh, one other question on that.

You're not rendering opinions, either, on whether a particular policy or practice of the Cuyahoga County Correctional Center was the cause of any delay

Page 47

in the release of an inmate from the jail?

A   That's correct.

Q   Now, prior to this assignment, how did you come to have knowledge -- or actually, as part of this assignment, did you have any -- well, let me backtrack.

During the course of this assignment, what was the factual basis for your knowledge about how the Cuyahoga County Correctional Center actually handles the release of inmates?

A   So once I combined the datasets together -- and when I say combined them together, there's 20-some -- 27, I believe, structured datasets, so the name columns were always in the same place.  The date columns were aligned, et cetera.  And we can talk about that more later.

So once that was done, we then worked with counsel who provided me direction based off of their understanding of the system on how to process the data; how to identify release triggering events, how to identify releases, how to identify a booking event, or -- yeah.  I guess a booking event is the right term.

Q   So in terms of what is a release triggering event, that would have been given to you by counsel.  You

Page 48

didn't have your own independent understanding of what a release triggering event would be?

A   That's correct.  That would be outside of my expertise.

Q   Did you review -- I'm going to show you several exhibits.  I just want to ask you as part of your analysis whether you reviewed that document or not, so let me share my screen.

Actually, let me just bring them up first, and then I'll -- these are Exhibits 6, 7, 8, 9.

I'm showing you what's been marked as Exhibit 6.  This is a document entitled Cuyahoga County Corrections Center Policy and Procedures, and it's Bates Stamped CC9766 through CC9770.

Do you recognize this document?  Have you ever seen it before?

A   No.

Q   Okay.

A   I do not recognize it, nor have I ever seen it before.

Q   Okay.  So this would not have been a document that you would have consulted in doing your analysis?

A   That's correct.

Q   Okay.  Let me go to the next one.

Showing you a document that's marked Cuyahoga

Lacey R. Keller  3/27/2025

Page 49

County Sheriff's Department Release Clerk Duties and Responsibilities, it's another document produced in this case, CC97729.  It's 25 pages.

Do you recognize this document at all?

A   No.

Q   So you would have not have reviewed it as part of your analysis?

A   I did not review it.

Q   Okay.

MR. FUNK:  And that exhibit is going to be marked as Exhibit 7.

Q   Let me show you what's marked as Exhibit 8.  This is entitled Cleveland Municipal Operations.  This is another document produced in the case, Bates Stamp 97754.  It's five pages long.

Do you recognize it?

A   No.

Q   Okay.  And you would not have reviewed it as part of your analysis in this case, right?

A   I did not review it.

Q   Okay.  And then one last one, this is Cuyahoga County Corrections Center IMIS Jailer Post Orders.  It's a three-page document.

Do you recall seeing this?

A   Yes.  I have not seen this document.  Sorry.

Page 50

Q   Okay.  So this, also, would be something that you would not have reviewed as part of your analysis in this case?

A   I did not review that document.

Q   Okay.  So all four of these documents sort of talk -- set forth procedures and descriptions of what happens during the release process.

Would you have consulted any other documents that Cuyahoga County has authored to determine what the actual release process is?

A   All of the materials that I considered are in my report.

Q   Okay.  Do you recall -- and we'll kind of go through it, but in your report, you talk about the dataset, the structured files, and then the unstructured files, which are primarily emails.

Do you recall reviewing any documents that weren't data but were just factual background information to understand the process utilized by the Cuyahoga County Corrections Center for releasing --

A   My -- I'm sorry.

Q   -- inmates?

A   I thought you were done.

Q   I'm done.

A   My reliance was on the structured datasets, as well

Page 51

as the Checks emails, which were semi-structured emails.

Q   But in terms of understanding the factual process of how the release process works, there weren't any other documents that you reviewed to understand the facts?

A   The process and policy documents were not part of my reliance, and counsel provided me with the instruction and the background knowledge necessary to set the criteria and set the release triggering events.

Q   Okay.

A   Again, I haven't reviewed those documents, so I don't even know if I have the expertise as a data mining expert to review those documents because it looks like there was a lot of technical terms that someone with that expertise may understand the meaning of, but that's outside of my area of expertise.

Q   Okay.  So you relied solely on the directions of Plaintiffs' counsel as to what the process was and what the release triggering events were?

A   When it came to basically subject matter expertise, that came from counsel.  As to jail operations or release -- types of releases or release triggering events, my expertise was in putting the datasets

Page 52

together, cleaning them, and analyzing them.

Q   So all the information about the facts and how the release process works, what, in fact, was a release triggering event, is all information you were provided by counsel?

A   Because that's outside of my expertise area, yes, it was provided by counsel.

Q   Okay.  And prior to this case, you didn't have any knowledge of the Cuyahoga County Corrections Center?

A   That's correct.

Q   And as part of your work in this case, have you spoken with any employees of Cuyahoga County or the Cuyahoga County Court of Common Pleas or the Cuyahoga County Sheriff?

A   No.

Q   Any employees of the City of Cleveland or the City of Cleveland Municipal Court?

A   No.

Q   And let me go back to your report.

Going back to Exhibit 1, I want to draw your attention to Paragraph 51.  On Page 21 and 22, Paragraph 51, you have a description of deposition testimony with citations in the Footnotes 5 and 6 of the deposition of Michelle Henry and Krystal Lawyer.

Do you see that?

Lacey R. Keller  3/27/2025

Page 53

A  Yes.

Q  Is that description of what they testified to provided to you by Plaintiffs' counsel?

A  There was excerpts that were provided to me.

Q  Excerpts from the depositions?

A  The depositions, yes.

Q  But not the entire deposition?

A  I believe I just reviewed excerpts.

Q  Okay.  Specifically to make this point in Paragraph 51?

A  I think it was to provide context of the time to release calculations.

Q  But other than those two excerpts, was there any other deposition testimony that you reviewed?

A  No.

Q  And were you provided any other deposition transcripts other than those two excerpts?

A  Not that I can remember, no.

Q  Do you know what Krystal Lawyer's role is in the release process?

A  I just only know what the title is from her deposition.

Q  That she works for clerk of courts, right?

A  Yes.

Q  She's not personally involved in actually doing the

Page 54

release process work at the jail?

MS. SCHWARTZ: Objection.
Foundation.  Calls for speculation.
Go ahead.

Q  Do you know?

A  I don't know.  I just know what her title is.

Q  Okay.  And do you know whether Michelle Henry is involved personally in performing the release process function?

A  Again, I know what her title is, but, again, the release process, that is all outside of my expertise. I can just state what's here in that deposition.

Q  Okay.  So other than stating what they said in their deposition, you don't have any knowledge as to whether or not they have direct knowledge of how long the release process takes?

A  My understanding is listed there in those paragraphs.

Q  No other understanding other than what's listed in the paragraphs?

A  That's correct.

Q  Okay.

MR. FUNK: I think we're at a good point for a break.  It's 11:54 Eastern time.
I'm just fine with taking a

Page 55

quick five-minute break.
What do you guys want to do?
MS. SCHWARTZ: Lacey?
THE WITNESS:  Ten is usually good.
It gives me a second to let the dog out, and things.
MR. FUNK:  Okay.  Ten is fine.
- - - -
(Thereupon, a recess was had.)
- - - -

A  If you don't mind, I checked on a few things over the break that I said that I would.

Q  Okay.  Why don't we start with that?

A  Yeah.

Q  If you could answer some of the questions, go ahead.

A  Okay.  So for the AbbVie case, I think you asked me where that court was.  That's in the U.S. District Court, Northern District of Illinois.
And then Lackawanna, I have that.  Can I put it in the chat, the case number, so that's easier for the record?  But that's in the U.S. District Court for the Middle District of Pennsylvania.  And here's the case number as a chat, 3:14-CV-01891-RDM.

Q  All right.  Thank you.
Anything else?

Page 56

A  And then you had asked me about that Cleveland Municipal policy document.  I was thinking about that document, and I realized on Page 20 of my report in Footnote 4, I cite specifically to that document only to a very specific -- I don't know -- component just to understand that Cleveland's case numbers started with CP.  So very, very specific citation to that document, but just wanted to make that clear that I had, in fact, looked at that document but for a very specific use.

Q  That was Exhibit 8, I believe.  It was a five-page memorandum entitled Cleveland Municipal Operations?

A  Yes.  I have it cited as Cleveland Municipal Operations Policy Document, Cuyahoga County Prosecutor's Division 8/18/2013, and that's just to -- so that we know that the Cleveland data had case numbers that started with CP, so very, very specific application of that document.

MS. SCHWARTZ:  Just to clarify for the record, the citation says 8/18/2023. You said 8/18/2013, I believe.

THE WITNESS:  I have been off by a decade all day today.

Q  I want to go back to your report, and we're going to be basically on your report for most of the

Lacey R. Keller   3/27/2025

Page 57

deposition.

So I want to go to Methodology.  Starting on Page 10, there's a section that begins Roman Numeral V, Methodology, and then Sub a, Datasets Reviewed.

Do you see that?

A   Yes.

Q   And the first little i beginning at Paragraph 25 consists of structured data, which is essentially Excel spreadsheets or CSV files, right?

A   That's correct.

Q   And so just to go through this, I actually had marked as exhibits each of these Excel files, but I decided rather than going through them all one-by-one, I'm just going to identify them as needed in the deposition, but just to cover it, Paragraph 25, does that list -- and you can see it goes down to the bottom of Page 12.  Does that list all of the datasets that you utilized?

A   That lists all the structured data that we utilized.

Q   The structured data, right.

And all of this is coming from other sources.  It's not anything that you modified or changed in the data -- Excel spreadsheets itself.  I know you put together your own summary Excel spreadsheet, but this is the original source data that you utilized, right?

Page 58

A   Yes.  That's how they were produced.  Some had Bates numbers, and some were just a file name, as you can see, for example, in 25.1.1.1.

Q   Right.  So 25.1 is data that was produced by Cuyahoga County dealing with bonds, basically spreadsheets where bonds were posted or bonds were posted with times, right?

A   Yes.  Those three files were related to bond data.

Q   And then 25.1.2, it's CUY jail release data, jail releases with case numbers.  Was this also data that was produced by Cuyahoga County?

A   That's correct.

Q   And then 25.2 is data produced by the Cuyahoga County Court of Common Pleas, the actual -- relating to release orders?

A   That's correct.

MS. SCHWARTZ:  I'm just going to object to foundation as to who produced it.

MR. FUNK:  Well, that's what she says here.

Q   Do you know who produced the Cuyahoga County Common Pleas release order data?

A   It's in the section of the source city of -- or the Cuyahoga County, so I think that was our

Page 59

understanding of it.

Q   And then source City of Cleveland, that would be produced by the City of Cleveland?

A   As my understanding of that, yes.

Q   Okay.  Would you have relied on any information from the City of Cleveland or any deposition testimony of a City of Cleveland witness as to what this data is intended to be?

A   All the reliance is listed in my report, either through this list here or through the footnotes, as we've discussed.

Q   Okay.  And then 25.4, the source is Oriana House?

A   Yes.

Q   And there's two spreadsheets listed there?

A   Correct.

Q   And for Oriana House, it talks about GPS installation or removal for detainees in Cleveland Municipal Court.

Do you see that?

A   Yes.

Q   So that data wouldn't have information about installation of GPS for detainees from Cuyahoga County Court of Common Pleas?

A   That's my understanding of that data, yes.

Q   And then AMS is also -- Ohio AMS is also relating to

Page 60

GPS installation/removal of detainees in Cleveland Municipal Court, correct?

A   Yes.

Q   Okay.  Now, with that data then -- so I'm going to go to Page 14 of your report.  Let me just -- while we're here, let's talk about the unstructured data.

So the unstructured data essentially consists of emails sent to the Checks email group?

A   Yes.

Q   Is that correct?

A   Yes.  It was -- we had TXT files of those emails.

Q   So that dataset is only emails to the checks@cuyahogacounty.us?

A   That was my understanding of what was provided to me, yes.

Q   Okay.  It doesn't include any other emails?

A   No.  It's just emails sent to the Checks system.

Q   Okay.  Did you utilize any other emails in performing your analysis?

A   For my report, no.

As you'll see in the produced data, there was some other datasets that were sent, but I was not requested to analyze them, so just the Checks emails were used.

Q   For example in this case, there are potentially

Lacey R. Keller  3/27/2025

Page 61

emails sent from the City of Cleveland to Cuyahoga County.

You wouldn't have looked at any of those emails for purposes of your data analysis?

A   **Just the Checks emails.  And the Checks emails specifically because they were very, very structured in their format.  They were pretty limited in content and they followed a format that we were able to extract in a very -- in an automated way or in a computer fashion the information that was needed.**

Q   Okay.  And you indicated here that you limited my analysis to the emails sent to checks@cuyahogacounty.us where the subject line did not contain the following key words.

Do you see that in Paragraph 26?

A   **Yes.**

Q   How did you determine these words that are listed in the 26.1 through 26.8?

A   **So there are emails that are sent to Checks that are not about releases.  They're about other things.  And so based off of the review of the data, it was very clear that those were not release emails, and so those were removed.  And counsel approved that removal process with us.  So that's how we arrived at that list of words.**

Page 62

Q   And so if it didn't have the eight in the subject line, any of these eight categories of words in the subject line, then you would assume that it relates to a release?

A   **Generally, yes.  But there's additional processing that happens to extract information from those unstructured datasets.  It's just the first kind of cooling down of the datasets.**

Q   All right.  So then when you look at Paragraph 31, I understand you did data cleaning where you're attempting to match up names essentially, right?  Because there's different names listed in different datasets, you're trying to see where they might match?

A   **Yes.  It's common -- we see this a lot in databases in work that we've been doing for the past 15 years.  So one of the steps that was needed was to do some name normalization.**

Q   And once you did that name normalization, then you put -- you created your own Excel spreadsheet that in Paragraph 31 is called Summary Table?

A   **Yes.  All of those datasets above were combined into one table which would allow for programmatic analysis.**

Q   Okay.

Page 63

A   **It's just something we typically do with unstructured data -- I'm sorry -- with structured data of various types and formats.**

Q   I want to go to that.  I believe that I have that Excel spreadsheet, and I just want to have you identify that for me, so I'm going to stop the share.  It's actually a big file, so it might take a while to open.

A   **Usually our files are too big to open.**

Q   Actually, I had this one open already.

So we actually have -- if you see down here at the bottom, it's got Exhibit 31.  I put -- I labeled it Exhibit 31.  Actually, it's at the top.  Exhibit 31, Summary Table Sorted Normalize Names.

A   **Okay.**

Q   There's also a much larger dataset that I marked as Exhibit 32 that is Summary Table Sorted Full?

A   **Okay.**

Q   Can you explain to me the difference between the two?  And I can bring up Exhibit 32, if necessary.

A   **Can you highlight Column A, just so I could see the accounts in this file?**

Q   Okay.  Where do I --

A   **That's all.  I can see exactly what I need.  I can see it in the bottom.**

Page 64

Q   Where it is on the bottom?

A   **See how it's got accounts?**

Q   Yeah.

A   **And then the other one says full.  It must be a much larger summary table.**

Q   Let me see if I can pull that one up then just so we're all on the same page.

A   **Oh, Full Time Period.  That's what it says.  It's not just full.**

Q   Yeah.  Full Time Period.

A   **So one is limited to the time period and the other is all of the data.**

**So if you recall in the top of my assignment, I say that I limit the data to a specific time period, so this smaller one is limited to that time period, and the other is outside of that time period --**

Q   So is it fair to say --

A   **-- is all of the data -- I'm sorry.**

**I should say is all of the data inclusive of that time period.**

Q   Right.

A   **31 is a subset of the other one.**

Q   So 32 is all of the data.  31 is the data limited to the relevant time period, which in this case, the time period selected is -- actually, it's --

P&G Reporting, LLC
216.870.2218

Lacey R. Keller   3/27/2025

Page 65

A   I will be --

Q   -- February 23, 2021 through December 31, 2023.

A   That's correct.

Q   So what we have -- and the full document -- it's actually taking me a long time to open. It's almost done.

A   Yeah.

Q   The full document, which is Exhibit 32 -- well, let me say it differently.
    Exhibit 31 --

A   That's okay. It just says that we won't be able to know anything because it's more than a million records, probably.

Q   So Exhibit 31 is actually the dataset that you would have utilized in preparing the figures in your report, the analysis in your report. These are the custody sessions that are within the time period that was designated?

A   That's correct.

Q   So really Exhibit 31 is the one that I'm going to ultimately ask you about. That's the one that you ultimately used. 32 being -- including data that's outside the time period.
    Is the right?

A   That's correct. Yes. But it was data that we

Page 66

processed, so we uploaded it with the report.

Q   Right. I understand.
    So I want to go with Exhibit 1, and unfortunately because I tried to open Exhibit 2, I'm going to just stop the share and start over. And we'll go back to Exhibit 31 in a second. Well, I guess it doesn't matter, so let me go back. I got to share again. Sorry.

A   I once had an attorney print out the entire database for a deposition. I've never seen that before.

Q   Yeah. I'm stupid, but I'm not that stupid.

A   I did not say that, for the record.

Q   I understand.
    So we have -- this is the dataset, Exhibit 31. We've got -- it starts with A and goes all the way to CS in the categories of data, right?

A   It's really frozen.

Q   Oh, it is?

A   Yes.

Q   I'm at the end.

A   We still see, like, A22.

Q   Okay. Let me try again. Maybe it's because I'm doing 32.
    Okay. So this is Exhibit 31. This is the summary table for the time period in question. It

Page 67

starts with A and it goes all the way over to CS.
    Are you able to see that now?

A   Yes.

Q   And the letters are what? We have A, B, C, and then there's the sub-letters, so that's about 26 --

A   I think there's about 100-something columns, if that's --

Q   Yeah. 52 plus -- yeah. It's a little bit less than 100, but -- and then there are 494919 rows, right?

A   Yes.

Q   Now, in your datasets -- let me go back to the beginning -- you have a category AE that is custody sessions. No. It's not AE. Where is it at?

A   Can you scroll to the top so we see the column headers, please?

Q   That's why I couldn't find it. Thank you. It is AE.
    AE, Session ID.

A   Yes.

Q   Do you see that?

A   Yes.

Q   Session ID, what is that describing?

A   So that allows us to identify a particular session for an individual. Because people can enter and exit the jail system multiple times, the session ID helps account for that.

Page 68

Q   Okay. So, for example, here we have session ID. You've got 5, 5, 10, 10. There's lots of 28s, for example. Those are all basically duplicates -- or, I guess, there's only one session for this particular person, Number 28, right?

A   That is the unique identifier for that session for that person.

Q   Right.

A   So a person might have dozens of rows and they may have three sessions. A person may have two sessions. They may have one session. They may have ten sessions. That ID allows us to group that particular event, that session event, as one.

Q   Okay. So in order to determine how many custody sessions you've analyzed, we could do that by just filtering this to eliminate duplicates?

A   It would be a unique count of those numbers, which is, I think, what you're saying.

Q   Okay. So I think if I click on this -- did I do that right?

A   Do you want to take those -- what would you like to do?

Q   Put filters on.

A   So an easier way to do this -- I teach Excel for undergraduates, so this is getting good use -- is

P&G Reporting, LLC
216.870.2218

Lacey R. Keller  3/27/2025

Page 69

highlight Column Q.

Q   Highlight Column Q, okay.

A   Yep.  Copy, Control C.  And then at the bottom of the Excel spreadsheet, you can create a new tab, so the plus sign next to the tab where it says Exhibit 31 --

Q   Yeah.  But I don't want to create any new -- I think I was on AE.  All I really want to do is -- I was told yesterday that if I click on -- if I just click on -- I don't want to do that.
    If I just click on the top row, it will bring up the tabs.  Shoot.  It looks like when I do that, I click on the whole thing.

A   If you want to create a filter, you can go to data up in the ribbon.

Q   Okay.  Let me get out of it.
    I'm going back to AE.  So go to data?

A   Yes.  There's your filters.  Or I'm not sure what they're trying to tell you to do, but that's where your filters can be.

Q   Gosh darn it.  They did something yesterday that actually allows you to bring down a drop menu on each of these categories.  Do you know what I'm talking about?

A   Yeah.  So if you push filter now -- just push it.  Yes.

Page 70

Q   But now it highlighted everything.

A   Scroll back up to the top where you can see your column headers.

Q   Okay.

A   You want the whole thing highlighted, otherwise -- there it is.

Q   I wasn't at the top.  Never mind.  I got it.
    So now what we want to do is -- all I want to do is eliminate duplication.

A   So to eliminate the duplicates, you'll have to -- you're going to either delete a bunch of the data that's on the spreadsheet or we can create a new tab to count the unique records or --

Q   Oh, I see.

A   -- we can create a pivot table that counts the unique records.  There's a couple options.

Q   Okay.  So walk me through how to do it then.

A   So highlight that whole column.  We'll do it the easiest way.
    I think what you're asking is, like, what's the unique sessions?

Q   Yeah.  I'm trying to determine the number of unique sessions.

A   In this dataset?

Q   Yeah.

Page 71

A   So highlight that whole column, Control C.

Q   Okay.

A   And then push the plus sign next to the tab that says Exhibit 31 Summary Table Sorted down at the bottom.

Q   Right here?

A   Yes.  Paste, Control V.

Q   Okay.

A   And then you're going to go up to the data tab off to the right next to -- so you saw where we went filter.  There's then text to columns, and next to that, there's two little signs with an X.  That's a remove duplicates right there in the middle.  You found it.  Push that bottom and that's okay, and that removed your duplicates.

Q   And that way you don't effect the underlying data?

A   Correct.  Exactly.

Q   So in terms of the count on that, it's 58098?

A   That's correct.  That's the number of unique session IDs in that dataset.

Q   Okay.  So explain to me -- so you got 58,000 unique sessions, but there were 494 rows in the -- I'm going to go back to the original sheet, 494919 rows.  So that means that for each custody session, there may be multiple events that are recorded on this data sheet.  Is that it?

Page 72

A   Yes.  There's typically multiple events.  There's a booking event, some other court occurrences, the release triggering event, and then the release.

Q   Okay.  So in terms of -- I think in your report -- I'm going to go back -- you indicated that for purposes of your datasets, you were analyzing situations in which there was both a release triggering event and a release.

A   Yes.  For the analysis that counsel wanted us to do, we were calculating time to release, which required a release triggering event and a release.

Q   And so if you look at Column G, you have action, right?  So these are all --

A   Yes.

Q   -- the actions that are associated with a custody session, right?

A   Yes.  For different types of things.

Q   How many of the custody sessions resulted in a release, you would do the same -- you see the subcategories here?

A   Yes.

Q   Would we click -- would that cover all of the ones in which there was actual release?

A   That would be a release.  But some sessions have multiple releases because you can come in on multiple

Lacey R. Keller  3/27/2025

Page 73

charges. So we would see multiple case numbers or multiple CP numbers associated. So that would show you the releases. There's other columns -- if you un-click that and we go to the release event, that column, if you filter for that, would also show the releases --

Q   Okay.

A   -- that we considered in our report.

Q   So let's do this one first.
So this is just the releases, and that shows -- and then if we -- if I go over here to AE -- oh, yeah. So is there a way for me -- I just want to duplicate again.

A   It would be the same process that we did before, so copying that into a new column.

Q   So would I be able to -- how would I do that while also preserving -- keeping the release? Oh, just because I've already done it -- I already took it out?

A   Exactly. And good data hygiene, you'd probably rename Sheet 1 to say total and put a new tab here, so you'll Control C. That's the shortcut. And then you'll add a new tab pushing the plus sign down down at the bottom.

Q   I got it. See. I appreciate the education. I'm

Page 74

picking it up.
Then I want to go back up here and duplicate?

A   Excellent. Yes. You've done it.

Q   Okay. Now so that's still the 58098. Is that -- because I think of these sessions, not all of these involve releases. Oh, I see. Because these are still there even though they have the number signs. So how do I -- I just want to --

A   It's just too small. If you go to the right -- or I'm sorry, expand that Column Z. You get the dollar signs when it's too small.

Q   I know. But the column I was using before was G. These are all releases. Oh, I see. I get it now. Never mind.
So am I correct that based upon -- let me go back to exhibit -- this sheet -- that based upon this sorting, it's 58,098 are custody sessions that resulted in a release?

A   So that's the 58,000. And then you said we filtered -- I'm just going to do this separate if you don't mind. I've got that exact exhibit up here in mine.

Q   Okay. 58,098 custody sessions have resulted in release during the relevant time period.

A   Yes. Those two are the same. And I believe that's

Page 75

explained in my methodology, as well, is to create a session, there has to be -- a valid session has to have essentially an entry or booking or a release. And if we don't have the entry, like the booking information or arrest because we don't have every single arrest record of -- due to the datasets that were produced, like, there had to be some sort of other event that indicated a new session was present.

Q   Yeah. So let me say it a simpler way. I'm going to go back to your report.
Are you able to see your report?

A   Still on Excel spreadsheet.

Q   Okay. I got to stop sharing and share it again. Okay. So if you look at Page 4 of your definitions, a custody session -- and we just kind of went through. The spreadsheet lists all these custody session, right?

A   Yes.

Q   But for purposes of your analysis, the charts and the figures that you ultimately did, you only analyzed the custody sessions that include both a release triggering action and a release for each charge associated with a custody session, right?

A   Yes. Because those two data points were necessary to calculate time to release.

Page 76

Q   Right. And that's 58,098 sessions?

A   At a release. That's what we just looked at was just release. But this is saying that there needs both a release triggering action and a release.

Q   Okay. I got you.
Let me go back to the spreadsheet then. So how do I -- so we've minimized out everything that wasn't a release. How do we minimize out -- is Column H where you have --

A   Yes. But then it's -- a release triggering action happens before the release, so those -- we have to filter where they're both true. Let me think about how to do that in this format. We don't typically work in Excel. We usually use Python.

Q   Let me go to another question about that, because that might help answer.
I wanted to draw your attention to -- let's see here. Never mind. Go ahead.
What would be the release triggering event?

A   So the release triggering event has a column. There's several columns that are associated with the release triggering event.

Q   Okay.

A   So there's either Column G -- hang on. Sorry. Mine is being slow. So Column V or Column T or -- sorry.

Lacey R. Keller  3/27/2025

Page 77

**No. Column V. But we have to make sure that it's both release and a release triggering event, and the way that the data is here, it's hard to do in Excel.**

Q   That's all right. Let me move on then.

A   **Yeah.**

Q   So we know that there's 58,098 custody sessions that resulted in a release.

A   **That's correct.**

Q   So in terms of -- let me go back to your report. Let's see here. Okay.
Paragraph E, it starts on Page 17.
MS. SCHWARTZ: We don't see the report, Steve.
MR. FUNK: Okay. I've got to re-share every time.

Q   So are you seeing it now, Page 17 of your report?

A   **Yes.**

Q   I'm going to try to make it easier to read.

A   **Thank you.**

Q   And this is identifying release triggering actions, and Table 8 is the source of the files that were utilized to identify a release triggering action, right?

A   **That's right.**

Q   Okay. So this might be a little tedious, but what I

Page 78

want to do is I want to understand how you utilized the data to determine the information you relied on to determine release triggering actions for each of these events.
So these are all action -- listed here on the side are all action items that you would consider to be a release triggering event?

A   **That counsel instructed me were release triggering events.**

Q   Bond posted date, disposition RNFC -- do you know what RNFC stands for?

A   **Yeah. I think it's release no formal charge.**

Q   And then disposition station house release, do you know what that relates to?

A   **I don't know what it means. I just know that that's what it says.**

Q   It's an event -- a release triggering event. GPS added?

A   **Yes. That's what it says.**

Q   What is that?

A   **It was a category in the data that we used to identify as a release triggering event.**

Q   And then monetary bond created, do you know what that relates to?

A   **Again, it's an action that we recorded as a release**

Page 79

triggering event at the direction of counsel.

Q   So let's start with the bond posted data. And there's two spreadsheets listed here, bond posted with times and bond posted, and the document bond posted with times, I've marked as Exhibit 11, so let me just pull that up.
Are you guys seeing this exhibit?

A   **Yes.**

Q   So Exhibit 11 is bonds posted with times, CC000385497 through 386133.
So can you describe for me how you utilized this spreadsheet to identify the bond posted date and time?

A   **So this spreadsheet would have been pulled into the main summary table where that defendant would be mapped to the name. The case number appears in the case number. The bond set date becomes the action date -- well, I think we call it just the date time or date date. There's also, I think, an action date. Column, the bond amount, I don't believe is brought in. And then the description and status are part -- so the description would be brought in as the action note, and the status is brought in, I believe, as the action, and then that post date is also brought in. But to think when they look at one of these in the**

Page 80

**summary table to -- that would make this a little bit easier to understand.**

Q   Okay. So the post date -- I'm just going to -- I'll leave this and go back to the table here.
So looking back at -- so which column?

A   **One second, just to make sure I have everything. Just like that table, there's multiple columns of dates, so I want to make sure I've got that. I know I talked about this in the methodology.
So you've got the defendant name. You can see that.**

Q   Okay.

A   **So to know where the data came from, we keep a column that says source file.**

Q   Got it.

A   **So you can filter that for the correct source file or the relevant source file, I should say.**

Q   Yeah.

A   **So this is all filtered for something else, so you might want to clear that filter, and you can filter it for the bonds posted with times or just bonds posted.**

Q   I think I just got the discovery data with --

A   **I don't think so. It's because you're filtered for releases, I think, right now, which the source of**

P&G Reporting, LLC
216.870.2218

Lacey R. Keller  3/27/2025

Page 81

that is a different source.

Q   Let me just go back and maybe you have an easy answer to the question.

Let me go back to Exhibit 11.  Exhibit 11, there's a column that's got post date and time.

A   Yes.

Q   Do you know what that -- that's the time you utilized for determining your bond posted date and time, correct?

A   The posted date would be from that column, and the bond set date is from Column C, both are included.

Q   And do you know the source of this information?

A   Beyond what's in this spreadsheet?

Q   Right.

A   I just know that this is the spreadsheet.

Q   Okay.  So do you know whether this is the time in which the bond was actually posted?

A   So in the spreadsheet, it says posted date.  That's what I used in the summary table for the posted date.  And in the spreadsheet, it says, bond set date, and so that date is what I put in as the bond set date.

Q   Okay.

A   Because that's what the data says.

Q   Right.

You don't know when the release desk would have

Page 82

been notified or been able to know the time that the bond was posted?

A   I know it was recorded -- I know what information was recorded in the spreadsheet, and that's what I used.

Q   Okay.  Other than that, you don't have any independent knowledge of when bonds were posted or how it was communicated to the release desk?

A   The source of my knowledge is from this spreadsheet for this particular type of action.

Q   Okay.  What about instances in which it says personal; do you know what the date and time relates to when it's personal?

A   So how this data was brought into the dataset is whether it's personal -- so that description appears in the action notes, and no matter whether it says cash or personal, the post date is brought in as the post date, so you'll see that post date appear as a line in the data.  It will say bond posted date.  And then the description will say cash/surety.  And then if there's an entry like the one below that cash/surety, that line would be brought in the data as personal, bond post date 18-May-21 10:11 because that's what the data says.

Q   And Column G would then be the date and time utilized as the release triggering event for purposes of the

Page 83

analysis?

A   One second.  So if bond posted date was a release triggering event, and so that bond posted date time would have been utilized, yes.

Q   And then Exhibit 12 -- I'm going to pull that up here.

MR. FUNK:  Are you guys seeing Exhibit 12, or do I have to stop sharing and re-share?

MS. SCHWARTZ:  We can see it.

A   I see it, yes.

Q   Exhibit 12 is bonds posted.  This one is, I think, the same spreadsheet but without dates -- I mean without the times.

A   It's slightly different.  We found in our processing that there were cases in one dataset that weren't in the other, and vice-versa, so both were considered.

Q   Okay.  So if there was one in Exhibit 12 but not in Exhibit 11, you would not have had the time --

A   That's correct, yes, because it wasn't produced in that file.  I don't think that happened very often, but because we knew that those cases existed in that file and those records did exist, we kept them in the summary table.

Q   Okay.  All right.  Going back to the report --

Page 84

MR. FUNK:  Are you guys able to see this?

A   Yes.

Q   All right.  So the next category is disposition RNFC and disposition station house released, the next two categories.

Do you see that?

A   Yes.

Q   And the source for both of those is Dunn versus Cuyahoga County-Cle arrest data, correct?

A   Yes.

Q   Okay.  And that I have marked as Exhibit 18.  We'll just go to that.

MR. FUNK:  Are you guys seeing Exhibit 18?

A   Yes.

Q   Okay.  Exhibit 18 is Dunn versus Cuyahoga County, dash, Cle arrest data XLSX which matches the description in your expert report, right?

A   Yes.

Q   Okay.  And this would be another release triggering action, or I guess -- yeah, release triggering action.

How did you determine the time and date of the release triggering action for purposes of utilizing

Lacey R. Keller  3/27/2025

Page 85

this spreadsheet?

A   So if you don't mind, will you --

Q   Tell me what you want to do.

A   I just want to see all the columns here.

Q   I could bring up a PDF of this if you want.

A   This is fine.

Q   Okay.

A   So let me just make sure.
So the disposition -- I'm looking away because I'm looking at Exhibit 31 and how this information looks in there so you know what I'm looking at.

Q   Okay.

A   So these dates would have been brought into the summary table, both the disposition date and the arrest dates, and mapped under the date and date time columns.
The arrest type is going to show up in -- so that arrest type column is going to show up in the action notes column.  So I think that was off to the left.

Q   So if I look at Column G, it's got charge dispo. This is telling us for that particular arrest, they were either charged as a misdemeanor or released no formal charges.  There's a category for each of -- some of them are blank, but there's a category associated with that, right?

Page 86

A   Yes.

Q   Okay.  And then if somebody was released no formal charges, you'd utilize the disposition date listed on this spreadsheet to determine the time or the date of that disposition?

A   Let me triple check that just because I want to make sure that's right, but I believe that's the case.  I just want to look at one of these examples in the summary table.

Q   I can go to the summary table if you want.

A   Yeah.  So let's look at that first -- well, is that first person even in the right time period?
So I want to look at an example from that exhibit in the summary table, that exhibit you just had up.

Q   I'll go back to Exhibit 18.

A   Yes.  Please.  And then let's make sure we have somebody within the time period.  It looks like we do.

Q   And a release, too?

A   Let's look at Brandon Hicks, probably, or Whitley Babett.  Any of those would be fine.

Q   Which line is Whitley Babett?

A   I think we went too far.  So you want that release no formal charges, so let's scroll down until we find somebody with that.  There's one, Babett, Whitley, so

Page 87

we'll go into the summary table.

Q   Line 33 of Exhibit 18, okay.

A   And then you'll need to un-filter the data, because I think we're on a different dataset right now, because this is currently filtered for the discovery data, so at the top, push clear filter.

Q   Okay.

A   Next to the big filter button, push the X.

Q   Okay.

A   Perfect.
And then in Column A, I would use your filter option.  So scroll up to the top of Column A, please, and there would be a little arrow.  Push the filter back on.  Push that arrow, and we'll -- what was the name again, Babett?

MR. FUNK:  Did I spell that right, guys?  I don't think so.  It's one b.

A   They may not have had the right time period.  Sorry.
So the times -- if there are multiple time columns, we would have brought in both time columns. So just like with the bond, date of bond set, and bond posted, that would have been the same with this type of table.

Q   And, I guess, ultimately my question is that -- like, going back to Exhibit 18, when we're looking at

Page 88

disposition dates, this is the only date that we have to go by as to when -- well, I guess, actually, you have charge date, too, but that charge wouldn't matter.  It's only the released ones that matter.

A   That's right, yes.

Q   But the disposition date is the date you go by.  You don't know what time that that disposition was made. It's just the date?

A   Let me double check that.  We've got a table that shows the release.

Q   So Table 2 of your report --

A   That's for release triggering events, yes.

Q   So on this particular one, none of the rows have Dunn versus Cuyahoga County-Cle arrest data.  A hundred percent of the rows are missing a timestamp.

A   Yes.

Q   Okay.  And since this was the sole source of the information for determining the time of an RNFC or a station house release, we don't know the actual time that that occurred, right?

A   That's not recorded in the spreadsheet.  That time is not recorded in the spreadsheet.

Q   Right.
And the spreadsheet does not reflect when the Cleveland Police would have told the Cuyahoga County

Lacey R. Keller  3/27/2025

Page 89

Correctional Center that no formal charges were going to be filed?

A  **Whatever is in the spreadsheet is what's used in the analysis.**

Q  Are you aware of how the City of Cleveland Police communicated with the Cuyahoga County Correction Center about when charges were not going to be filed for a detainee?

A  **No.**

Q  Okay.  And you didn't look at any information to determine the time and date when the Cuyahoga County Correctional Center would have learned that charges were not going to be filed or would have been --

A  **I'm not even -- if that's not in this spreadsheet or the spreadsheets that I analyzed, I would not be aware of that, no.**

Q  Okay.

A  **I did not analyze data outside of these spreadsheets, as listed in my report and the Checks emails.**

Q  Okay.  I'm going to exit out of this document.
So back to your report, we're still on Paragraph 40 going through the Table 8.  So we've done the disposition.
Now I just want to go to the GPS added, and there are a number of spreadsheets listed here.

Page 90

The first two, I think, relate to Oriana House that we've talked about before, and then there's also one for Ohio AMS.

A  **That's right.**

Q  Paragraph 41 talks about that you identified detainees with GPS holds and determined their release triggering action using the Oriana House and Ohio AMS data.
Do you see that?

A  **Yes.**

Q  And to do so, identified detainees with a GPS hold/removed note in the Cuyahoga County release data and then located these detainees within the Oriana House and Ohio AMS data, right?

A  **Yes.  That's what it says.**

Q  You utilized the Cuyahoga County release data just for the purposes of identifying the names of people, but you utilized the Oriana House and Ohio AMS data for determining the date and time when the release triggering action occurred?

A  **Yes.  So they needed both.  To be part of that group, you had to have that hold/removed in the Cuyahoga data plus that release triggering action date from the Ohio AMS or Oriana House data, which was all at counsel's direction.**

Page 91

Q  So the Oriana House and Ohio AMS data is the sole source of the data utilized for determining the date and time of the detainees who had a GPS hold/removed note in the Cuyahoga County release data?

A  **So I would say for the --**
MS. SCHWARTZ:  I'm going to object that that question was vague.
Go ahead.

A  **I would say --**

Q  Let me ask -- go ahead.  How would you describe it?

A  **So for the GPS group that is defined in the report, there was the GPS -- the release triggering action for that GPS group was requested by counsel to be the GPS added, but they also had to have a hold/removed note in the release data, as well, to be part of that group.**

Q  Okay.  My point is is that the source of the information for determining the date and time of the release triggering action is the Oriana House and Ohio AMS data?

A  **Yes.  At counsel's direction, that was the date and times to be used because that was the source of that information.**

Q  Okay.  And let's just go to the Oriana House first.  It's Exhibit 27.

Page 92

A  **Okay.**

Q  This is Exhibit 27.  It's titled Dunn, et al. Updated Request 5-1-19 to 1-6-2025.
That's actually the second item listed in Paragraph 40 for GPS added data sheets.
Do you recognize this as being the data you utilized for purposes of --

A  **Yes.**

Q  Okay.  And if you look at the categories -- I'll go to the top here -- we can see all this on one screen, but this data has start date, end date, scheduled end date.
Do you know what dates you utilized for determining what the release triggering action date and time was?

A  **One second.  So can you look for Goodson in the data?**

Q  In this particular set?

A  **Mm-hmm.**

Q  Okay.

A  **I think you can do just a Control F.**

Q  Control F?

A  **Yes.  That should be find, yes.  Then G-o-o-d-s-o-n.**

Q  Not in this one.

A  **Are there -- 5/1/19.**
This one looks like it might be filtered.  Can

Lacey R. Keller  3/27/2025

Page 93

you make sure that the filter is off?

Q  How do I turn off the filters?

A  It's okay.  I'll look for --

Q  I don't think I turned on any filters.

A  No.  But it's green on -- it looks green to me on the left, which sometimes is an indicator of the filter.

Q  It could be, because I think this shows the time.

A  Yeah.

Q  This version shows the time.

A  Yes.

Q  There's date filters.  I think there's a way it doesn't show the time.  Maybe that's why.

A  Yeah.

Q  All right.  I don't want to mess with it.

A  That's okay.  I'll look at a different one.

Q  Let me ask you this:  Do you know what -- for purposes of this data, do you know what scheduled end date is?

A  No.  I don't know what scheduled end date means.  I just know these were the date and time columns recorded in the dataset.

Q  Okay.  Do you know how -- maybe this is where -- do you know how the process works in which Oriana House puts GPS on a detainee?

A  No.  And it's not necessary for my analysis.  I had

Page 94

to analyze just what's in the dataset.

Q  Okay.  So you don't know if there was any -- whether this is the time in which the GPS was installed or the time in which the installation was communicated to the release desk or to the jailer?  Do you know?

A  I know what we used was the dates that were included in this dataset, and those were communicated to me as GPS added.  That's the extent, to my knowledge.

Q  So that's one.  Exhibit 26 is the other spreadsheet.  This is entitled Cleveland -- Copy of Cleveland Municipal EM - 5.1.2019 - 5.13.2024.  That is also listed as being the data relied on in determining GPS added release action.

Same table, just different time frame, I guess the same questions.  You don't know what these actual start date, end date, or scheduled end date signify?

A  We brought them into the table, and then counsel communicated with us after reviewing the output as to how to process those.

Q  All right.  Let me go to the two listed -- actually, the one listed that is Ohio AMS Cleveland Muni GPS Clients.

So Exhibit 30 is Ohio AMS Cleveland Muni GPS Clients 2019 to 2023.

Do you recognize this as being the data utilized

Page 95

for determining the GPS added?

A  Yes.

Q  And the same thing here, do you know what this end date category is intending to represent?

A  No.  I just brought those pieces of information into the summary table to align with the other date and time columns that I extracted from other datasets.

Q  And with respect to this particular dataset -- let me go to your report.

The top line, this is a table of number and percentage of release triggering actions missing timestamp, Ohio AMS, Cleveland Muni, GPS client 2019 to 2023?

A  Yes.

Q  That's the Exhibit 30 that we just looked at, 887 rows, and they're all missing a timestamp, right?

A  Yes.  That data did not come with a timestamp.

Q  So you utilized the date without the time, right?

A  It was brought in as that, yes.  And I think we discussed later in the report some additional processing that was -- to account for that.

Q  You assumed the time was 11:59 p.m.?

A  For places where there was no time, counsel instructed us to use 11:59, as that would be the most -- the latest possible date and time on a day.

Page 96

So we have the release date.  That will be the latest possible date and time that could be -- that could exist, and so they asked me to use that as the release triggering time when the data came in with no date -- time data.

Q  Okay.  I'm going to go back to Table 8, Paragraph 40.

So the next category is Monetary Bond Created.  So this is the datasets utilized for determining when a monetary bond was created?

A  Yes.

Q  So let's bring up the first one, CLE 003, and that is Exhibit 22.

Exhibit 22 is CLE 003-CMC Defendants Arrested or Detained 05/01/19 through 12/31/23.  And the category over on the left, it does say -- it talks about monetary bonds.

Do you see that in Column 4 or Row 4?

A  Yes.

Q  And with respect to the date and time -- do you understand, first of all, what this data sheet is intending to show?

A  I mean, I know generally that it's bond data, but beyond that, that's outside of my expertise.

Q  Okay.  So you don't know whether this is the time in which the bond was posted or set?  Do you know?

Lacey R. Keller  3/27/2025

Page 97

A   I only know what's shown in the spreadsheet. So that date column would have been brought in as a date. And then that event code in the comments would have been brought in under the action type.

Q   Okay. So on the -- with respect to this, you have one column that has a date -- or it's Column H, Monetary Bond Event Date.
    Do you see that?

A   Yes.

Q   Do you know what that monetary bond event date is signifying?

A   All I know is what's shown in the spreadsheet.

Q   Okay. You don't know if it's the date that the bond was set or the date the bond was posted, or anything like that?

A   What I needed to know was shown in the spreadsheet. I brought that into my summary table, and then counsel instructed me after seeing that how to interpret that information.

Q   Okay. So really -- and with respect to each of these datasets that are set forth in Table 8 -- I'm going to get out of this. I'm trying to see if there may be a way to short-circuit our questioning.
    Back to Table 8, if I go through each one of these, this is the source of the data that you

Page 98

inputted into the summary sheet, right?

A   Yes.

Q   You didn't do any sort of evaluation to see -- other than the categories in the summary sheet, you didn't do any independent evaluation to understand what the data was trying to show?

A   My expertise would be in collating that data together. I'm not an expert, as we've established, in jail procedures and systems, so that would be -- that separate investigative exercise would be outside of my expertise.

Q   Okay.

A   So that's where counsel provided direction.

Q   Mm-hmm.
    So if we go to the spreadsheet -- the summary table -- so ultimately if it's a summary table that you -- after you've inputted all the data into the summary table, this is the table that ultimately you utilized for making your figures in your report?

A   Yes. All of that information.
    So this is the bulk of my work is putting all of those little spreadsheets together into one big table that can be analyzed, because it puts all the puzzle pieces from the structured data into one place.

Q   Okay.

Page 99

A   And we keep track of the source so you can see exactly that source, Column I, where the spreadsheet came from. We do that in every case.

Q   So with respect to Column F -- let me just stretch this out a little bit bigger -- Date and Time, this is the date and time in which this particular action took place?

A   That's correct.

Q   And Column G.
    And then if I look at Column H -- F, how do I know the source of the data? Is there a way to determine that, or is that --

A   That's in Column I. I believe if you expand that, that should give you the source, just to make it a bit wider. Yes.

Q   All right. Now, this in this particular file -- well, I guess this does have all the files. Okay. Got it.
    So that's what we were looking at before?

A   Yes. Exactly.

Q   Okay. So if we go to -- so instead of going to the underlying spreadsheets, we could just go to this column to see how it was utilized in this table?

A   Exactly.

Q   Okay. So going back to where we were under monetary

Page 100

bond created, the second spreadsheet was 050 -- sorry -- CMC Defendants Detained-Bonds Settings-Bonds Posted or Processed 05/01/19 to 12/31/23, and that is that -- that I've marked as Exhibit 17, but I'm just going to only select the one that lists that.
    Let's see here.

A   CMC, right?

Q   Yes.
    Okay. So here we have Action, Personal Action, and then you have the date and time. And you said if it was too big, you just need to expand this out?

A   Exactly.

Q   Okay. That's date and time.

A   Yes. That's right. Exactly.

Q   For this one, you just had dates. You didn't have times.

A   That's right. So you can see that as it's reflected there as there's nothing in that date/time column.

Q   And this would have been -- this would be the date utilized as being the release triggering action?

A   If it was deemed a release triggering event by counsel, which is another column in the data, then that would have been the date.
    The time, as we discussed, was inferred, so there's another column that has that 11:59 timestamp

Lacey R. Keller  3/27/2025

Page 101

included. So that would be in column -- yes. It's called date/time inferred.

So we preserved the original record so that we can always verify to the originals, and then there's the data as it goes through the validation and cleaning processes.

Q   Okay. This is going to make the rest of this easier. Sorry. I did it more the tedious way before.

A   Okay.

Q   So if I'm going -- if you have -- I don't know if you have Paragraph 40 in front of you, but I can just go through it.

So we have Updated Bond Posted or Process Query Results 05-15-24, and that is -- that's marked as Exhibit 20, but I'm going to just bring it up here.

A   Yes. So you'd filter the source file.

For each of these that are in that table, you would filter that source file through that table.

Q   Right. And it's updated bond 5/15/24, okay.

So the date -- there is a date and date and time, but you don't know what the date and time reflects, whether it was the bond paid or whether it was the bond created?

A   So once it was brought into the summary table, counsel -- we would review with counsel, and they

Page 102

told me how to interpret that information.

Q   And how did they tell you to interpret this information?

A   So if it was a release triggering event, that would be flagged as such. So there's, I believe, a column that says release -- I believe Column T, Release Triggering Event, so those would be the events that they deemed as a release triggering event.

Q   Okay.

A   And then the time would be the date/time for those.

Q   Okay. But you don't know if this is the date and time in which it was actually posted or whether it was the date and time where it was actually created?

A   All I know is what was reflected on those spreadsheets.

Q   Okay. And you don't know then the actual time in which the release desk would have been notified or learned about that bond had been posted?

A   I only reported what's in those spreadsheets.

Q   Okay. The next category in Table 8 is Municipal Release Order, and it refers to CLE 004 as the source of that information, so I'm going to just go back to Column I of Exhibit 31 and select that one. And I'm going to expand this one, too.

So this is the action notes that list the action

Page 103

that occurred in Column H?

A   That's right. So if there was additional columns that were in the original dataset that specified the type of action that was occurring or some additional details, they were brought under the action notes column.

Q   So I'm looking at Column Y. This is the column that sets release triggering event. And the dropdown menu hides it, but --

A   Yes.

Q   So Column Y would be the column that you utilized for purposes of determining the date and time of the release triggering event assuming that it's a release triggering event as listed in Exhibit 10 -- I mean, Column 10 -- I'm sorry -- Column T?

Let me try that again.

Column Y is the date and time you utilized for a release triggering event for a -- if a release triggering event is signified as such in Column T?

A   So Column S, it shows the time from the release triggering event. And then because certain cases have multiple triggering events, Column Y is the maximum release triggering event time.

So in these instances, they're looking the same for, looks like, most of them, but that is the

Page 104

maximum date and time.

Q   So what do you mean by maximum? What is maximum?

A   Hang on. I have that backwards.

There's also columns that have the max release triggering time per session. Disregard what I said about Column Y.

So if it's a release triggering event, that's the date/time associated with it. So for these, because they're all release triggering events, as we can see in Column V, Column Y reflects the same date/time as the date/time in date/time inferred.

Q   Okay. And is there a column that has the max triggering event?

A   Yes. So you can see up there, those --

Q   So that's Column BD?

A   Yeah. I think that's right.

That's the entry time. That's in the max release triggering date/time, and there should be a release date/time, as well. Yes.

So each of those, those go into calculating the time to release. It takes the latest triggering event for that max release triggering event, because there could be multiple triggering events based off of the direction provided by counsel.

Q   Okay. So Column BD is the date and time of the max

Page 105

release triggering event?

A  Across the session.

Q  So how do you determine -- so within the session, there's multiple release triggering events. What would be the max? What's the difference?

A  The latest.

Q  Whatever the latest is?

A  The latest in the day, yeah. Because that would be the last -- they may be released on other events, but as I understood it from counsel, they're not able to be released until the latest one -- the last hold is lifted, or something to that effect, so that's why it's the latest one.

Q  Okay. And then -- go ahead. What were you going to say?

A  And that's across a session, right?
So it's kind of multi-dimensional because there's multiple people, multiple sessions. So within a session, you have multiple events, and for those events, we take the latest triggering release event, and that's for calculating the time to release.

Q  Okay. And so with respect to a triggering event in this case, municipal release order, is that the time in which the release order is actually issued?

A  That's the time that is associated with that

Page 106

triggering event, so --

Q  You don't --

A  -- we brought the data -- go ahead.

Q  No, no. Finish your answer.

A  So we brought the data into the spreadsheet from the other spreadsheets. We recorded the date/times. Counsel instructed us to say -- instructed us as to what was the release triggering event, and then we took the latest one. That was the triggering event that was associated with the latest date/time on that day -- or in that session, I should say, not in that day.

Q  And, again, you don't know if that's the date the order was issued or whether that is the date and time in which the release desk was notified of the order?

A  All I know is what was recorded in the spreadsheets that I analyzed.

Q  All right. Let's go to the next category, which is Personal Bond Created, and the source of that information is Updated Bond Posted or Processed Query Results 05-15-24, and that is Exhibit 20. I'm just going to go to Exhibit 20 because I want to --

A  I assume you're going to do this for the other three, and maybe we should take a break after that.

Q  Okay. That sounds good.

Page 107

So this is Exhibit 20, which is Updated Bond Posted or Processed Query Results 5/15/24.
This is the dataset you utilized for determining, according to your report, personal bond created?

A  That's right.

Q  And when you talk about personal bond created, do you know what that means?

A  No. I just know what's recorded in this spreadsheet.

Q  Okay.

A  And how counsel told me to analyze that once it was in the summary table.

Q  You don't know if it was the date the bond was created or the date the bond was posted, or what?

A  All I know is what's recorded in the spreadsheet and then how counsel instructed me to interpret that information.

Q  Okay. And then we'll go to the next one, Personal Bond Executed is CLE 005, and that is Exhibit 24.
Exhibit 24 is a spreadsheet that's marked CLE 005-CMC Defendants Arrested or Detained 05/01/19 through 12/31/23 Personal Bonds, and there is a category that says Personal Bond Event Date?

A  Yes.

Q  Do you know what that is?

A  The same for all these other spreadsheets is I

Page 108

brought the data into the summary table. I brought in the additional information about that event, such as the description and comment and the timestamps. All of that information was brought into the summary table.

Q  Okay. What about the Columns M and N, you don't know what that personal bond event created timestamp is signifying?

A  No. Not outside of what's recorded in the spreadsheet. Counsel was the ones to instruct me how to interpret the meaning of these columns.

Q  And what was the instruction about the interpreting this column?

A  I would have to have each one in front of me and the code in front of me, but it was my methodology to bring all the date and timestamps in as individual rows into the data.

Q  Okay. And so if this date and time was used as your date and time of the release triggering action, that was done at the instruction of counsel?

A  Correct.

Q  Okay. And then the last one is Release Ordered, and that is -- I'm going to go to the document that says Release Orders with Times, because I think that's Exhibit 16.

Lacey R. Keller  3/27/2025

Page 109

So Exhibit 16 is a spreadsheet. I'm on the tab that's marked 2021 to 2023.

A  Yes.

Q  It names the defendant, case number, sheriff number, JE official date and time, and then description.

A  Yes. I see that.

Q  Did you utilize -- in Column E, did you utilize Column E at all?

A  I do have some recollection that there is a dataset that we had to extract some times out of. I don't remember if it was this one. I'd have to consult the code. But I do recall that there was a need to pull some date and times out of some of the descriptions.

Q  Okay. Is that part of one of the supplemental reports?

A  Separate from that, that was related to a very specific subset of the data.

Again, I'd have to consult the code, but I do think that there was some date/times that we were instructed to take from the comments because they were prevalent in every entry.

Q  Okay. So other than --

A  It might have been this one, but I'm not sure without consulting the code.

Q  Okay. Other than the date and time, you didn't

Page 110

independently look at these entries to see whether there was something substantive in the entry that affected what would be the release triggering event?

A  Not unless directed by counsel.

Q  Okay. And do you recall any instances in which you did do that at the direction of counsel?

A  For all of the instances that -- so there's a lot of instructions about what type of individuals are in each group, and some criteria that were used -- it's all in Paragraph 49, I believe -- that took different types of cases or entries out of the data. So you can see that methodology listed in 49.

So I can't just say generally, like, was there anything we didn't look at. Like, that's reflected in Paragraph 49 where there was direction from counsel to exclude time up in the action, and so because Column E would have been recorded in the action descriptions or the actions -- the action note or the action descriptions, that methodology is reflected in 49.

Q  Yeah. I guess my question -- so when I look at Paragraph 49, it doesn't reflect that the -- maybe I'm wrong. We should bring up 49 just so we can see that.

So Paragraph 49, you were instructed by counsel

Page 111

that custody sessions needed to fulfill the following criteria to be included in any of the above categories, which is no holds, booking holds, and GPS holds.

So when I look at Paragraph 49, I don't see anything in which you would have excluded anything -- or, I guess, there's nothing in here that reflects that you modified the date and time of the release action based upon the text of the court's order.

A  So I think we're maybe talking past each other.

So there was a dataset that I recall that I'd have to consult my code to know for sure that we had to programmatically extract date and times from. I remember some conversations about that.

But generally, this Paragraph 49 and its subsections refer to key words and phrases that occurred in the action notes that eliminated a session from the analysis because they did not meet that criteria as set by counsel.

And in addition to these, there was also the supplemental report that had some additional criteria in there set by counsel.

Q  Okay.

MR. FUNK: Why don't we take a break then?

Page 112

- - - -

(Thereupon, a recess was had.)

- - - -

MR. FUNK: We're back on the record at 2:19 p.m.

Q  Going back to your report, I want to go back to Page 4, and this is the definitions section, and we talked about custody session already.

A  Yes.

Q  I want to talk about the Paragraphs 12, 13, and 14.

So there were -- Paragraph 13 talks about a hold action. It's a custody event in which the individual is subject to release hold is still ineligible for release.

Do you see that?

A  On Paragraph 13?

Q  I'm sorry. I put in the word still.

Is subject to release hold and is ineligible for release.

A  Yes.

Q  And the two types of hold actions that you focused on in your report is GPS holds and booking holds, and those are defined in Paragraphs 12 and 14, correct?

A  Yes.

Q  Okay. So those two holds, I take it, were given to

Lacey R. Keller  3/27/2025

Page 113

you as being hold actions by counsel?

A   Yes.

Q   Okay.  And there were not any other types of holds that you would have taken into account other than GPS hold and booking hold?

MS. SCHWARTZ:  Objection.  Vague as to taking into account.

Q   Did you take into account any other types of holds besides booking holds and GPS holds?

A   I was asked to analyze those individuals with GPS holds and booking holds specifically.

As part of creating the no holds group, I had to look to make sure that there were no pending holds at the time of their release triggering event.

Q   Okay.  But in terms of -- what would you define as -- or how did you determine whether or not there was a hold?

A   That was, again, instructions by counsel.

So to be part of the GPS hold, that is described in the report.  The booking holds are described in the report in detail a little bit lower.  And then the no holds released group is also -- you'd have to have no hold pending -- or no hold that occurs after the release triggering event for that group.

Q   And with respect to no holds, that would be no GPS

Page 114

hold or no booking hold?

MS. SCHWARTZ:  Objection.

Mischaracterizes.

Go ahead.

A   They are separate groups.  So the GPS group is a separate group from the no holds group, for example.

Q   Okay.  Other than a GPS and a booking hold, are you aware of any other types of holds utilized by the jail?

A   One second.

So to analyze the no holds group, counsel directed me to identify that it -- so this is in 48.1.  The custody session contains no hold actions or has no hold pending at the time of the max release triggering action.

Q   Okay.  So how do you determine whether there's no hold pending?

A   So counsel identified which were the types of holds that -- the different types of holds, and if there was no hold that occurred after that -- or if there was no holds that were pending, then they were included in that group.

Q   That's my question.

What holds besides booking holds and GPS holds did counsel instruct you to treat as a hold?

Page 115

A   We can open the summary table and look at the different no holds groups.

Q   Okay.  Let's do that.

Returning to Exhibit 31, where is no holds?  Is there a column?

MS. SCHWARTZ:  I don't know if you mean to be sharing your screen, Steve, but you are not.

MR. FUNK:  I'm not?  Okay.  I thought I was sharing it with the supplemental report -- with the extra report, but let me share it with the table.

Q   So where is the -- it looks like I'm in the right area.

Showing you Exhibit 31 --

A   One second.  There should be a -- there's so many flagging columns.  There should be, like, a no holds group column.

Q   Okay.  Just direct me where to go.

A   They're usually off to the right in, like, the Column C, et cetera.  I'm sorry.  Like, C-something, like super far to the right.

Q   Far left, sorry.

A   Yeah.

Page 116

Q   Okay.

A   So what is CP, does that say only no holds or --

Q   So you do a 1 or a 0 if there's a no hold?

A   I believe that's the no holds flag.  I don't see any other flag with that.

Q   So a 1 says there's a hold.  Zero says there's no hold?

A   Yeah.  So if you filter for 1 that's in the no holds group --

Q   That's CP, right?

A   Yes.  Let's filter that for 1.

Q   Okay.  And then if there's a 1, how do you know what type of hold it is?

A   So it's whether they're part of the group.  And then off to the left, there's the different actions that occurred for those groups.  So if you scroll to the left, you can see all the different things that are happening along the event for that person.  And so --

Q   Is there something that has a hold that --

A   Yeah.  There would be, like -- I mean, just like there's any other actions, like, the entry action or the booking release action, like counsel -- I don't think I've got the right flag applied because this doesn't look right.  I think I've told you the wrong one.

Lacey R. Keller 3/27/2025

Page 117

**I'd have to consult the code to see which one is the right one, but you can see all of these different types of actions that occur in the data that we have received from the County and the City. And so counsel told us which were the types of holds that would occur.**

Q Okay. That's what I'm asking.

What are the types of holds -- actually, I just cleared the filters which would maybe make it easier.

What types of holds would occur other than -- what kinds of holds did counsel tell you to take into account other than GPS and --

MS. SCHWARTZ: I think as to housekeeping, I think if you filter the opposite, the same column to zero, it's going to show the ones that have --

**A Here. Okay. I've got a better way of doing it.**

**So there's an action. There's an action column, and it just has -- so filter for just hold. You see one right there at the top. So if you filter for hold --**

Q Okay.

**A -- there's the holds.**

Q Okay. But that doesn't tell me what type of hold, right?

Page 118

MS. SCHWARTZ: Can you go back to the top so she can see the column headers because there's more information in the next column?

**A Yes. The action notes tell what type -- like, more information about that hold and then the source file.**

Q Okay. And the source file is for discovery data with case?

**A It's any number of sources. So for the holds -- let's see -- it looks like they're all the discovery data with cases.**

Q Okay. So this is from discovery data with cases. I'm just going to go to that document version, and there's five different years.

I'm going to go to 2023, which is the most recent one, Exhibit 16 -- not Exhibit 16 -- I'm sorry -- Exhibit 13. So let me go back so I can share.

We're looking at -- this is Exhibit 13, Discovery Data with Cases 2023, and we have in the columns Hold Date, Hold Time, Hold Department.

Is this the source of the data that's in the spreadsheet we were just looking at?

**A That spreadsheet is all of the different holds and the hold removes, and there's a booking time. All of that is put into the summary table.**

Page 119

Q Okay. So this is the source of the -- of that data, Exhibit 13? Or at least for 2023?

There's a different one for each year.

**A So the --**

MS. SCHWARTZ: I'm going to object to vagueness as to that data, exactly what you're referring to.

**A The data that -- go ahead.**

Q I'm going to -- I'll be more specific.

So we see here the hold times and the hold department and hold comments.

Do you see that?

**A Yes.**

Q That data then is included into your summary sheet, which is -- are we still looking at Exhibit 31 now, the summary sheet?

**A Yes.**

Q That's Column H? That's the notes --

**A Not -- like, I would say -- if you don't mind going to my report on Paragraph 29, that explains how that discovery data -- it's for a different year, but they all follow similar formats -- are utilized.**

**Because there's different columns reflecting different dates, all of that information is brought into the summary table.**

Page 120

Q Right.

So looking at Paragraph 29, the action notes is -- it's restructured. It's put in to the action notes, which is Column H, right, but the source of the data is the discovery data with cases tables depending on the year that's shown in Exhibit I, right?

**A So, like, there's the booking date and time. You see that comes in as an action of booking.**

Q Right.

**A There's a release date and time in Table 4. That comes into the structured data as a release action with the relevant date and time.**

**The hold date comes in from the -- from 2022, the discovery data with cases, as a line in the data with the hold time that's associated there. And then there's also the hold removed time.**

**So all four of those columns get brought into the data with their appropriate date -- date, time, and action corresponding --**

Q Right. I understand.

My focus is on the action notes.

**A Right.**

Q That source of that -- the information in the action notes column, Column H of Exhibit 31, is from the

Lacey R. Keller  3/27/2025

Page 121

notes that are in the discovery data with cases files depending on the year?

A   Yes.  There's various note fields according to the type of data that's being presented.

Q   Right.

So if we go back to Exhibit 13, which is the discovery data with cases for 2023, there's this column called Hold Comments and Hold Department. That's the source of the data in the comments section of Exhibit 31, Row H -- I mean, Column H?

A   Yes.  Both of those would have been brought together, if I recall.

Q   Okay.  Now, going back to your report --

MR. FUNK:  Are you guys seeing the report again, the definitions on Page 4?

A   Yes.

Q   So going back to the report, you talk about each custody session includes release triggering -- I'm sorry -- release triggering action and release.

Is there -- with the release -- when you're looking at the releases -- and we kind of went through and filtered it down to just releases, if you recall earlier -- does that include releases where somebody is being released after service of a sentence as opposed to a pretrial detention?

Page 122

A   We'd have to look at the data for the specifics.

Q   You don't know?

A   I don't know what the words mean because that's not my area of expertise, so you'd have to point to an example in the data for me to show you how it's calculated.

Q   Okay.  Let's go back to then the same thing with entry action.  It's the event that marked the start of a custody session in the jail, typically an arrest.

What were the other entry actions besides arrest?

A   It's a booking.

Q   Any others?

A   We'd have to open the spreadsheet.

Q   Okay.  A booking would be -- anybody entering the jail would be booked when they enter, right?

I guess my question is did the entry action include people who were coming to the jail to serve a sentence?

MS. SCHWARTZ:  I'm going to object to foundation.

Go ahead.

MR. FUNK:  I'm asking her if she knows.

A   Again, this is like -- if it starts the -- like,

Page 123

these are the -- there's logic that creates the custody session, and so that is created generally because someone has exited the system before or it's their first time into the system, and that comes through either with an arrest or booking event.

Q   Okay.  So let's look at the booking hold definition, Paragraph 14.

A   Yes.

Q   IMIS booking related hold, a release hold placed for the completion of an incomplete booking requirement, do you see that?

A   Yes.

Q   And in order to determine whether there was a booking hold -- actually, where is that at?  It's in a different part of the report.  I'll get to that in a second.

That was -- in order to determine whether there was a booking hold -- let me look.

Paragraph 42, at the instruction of counsel, I interpreted descriptions that included the following phrases as booking holds:  42.1, photo, picture, print, DNA, scan, one touch, pre-screen, booking process, process book, class screening -- I'm not going to read them all, but there's a list there going down to 42.18.

Page 124

Do you see that?

A   Yes.

Q   So those were all terms that you were given by counsel?

A   Yes.

Q   And what were you searching to see if those phrases appeared?  Is that the discovery with data sheet that we were looking at before, Exhibit 13?

A   That would be the -- yeah.  31, which does have that other data in it.

But our analysis all -- once -- because there's all these different tables, our analysis is completed on that summary table.

Q   Okay.  So when you're searching for those terms, you're searching Column H?

A   The action description column or action notes, something like that.  What is it called?  Yeah.  Action notes.

Q   Column H?

A   Yes.

Q   So you're searching that column.  So that is dependent on that information actually being in the column?

A   Which is taken from the underlying dataset.

Q   Okay.  Which we've gone through it as part of the

Lacey R. Keller  3/27/2025

Page 125

discovery with data cases notes?

A   Yes.

Q   Okay. Is --

A   Or -- I mean, let me make sure. It might be from others. It's filtered, again, from where we were before, so I don't know if that type of information appears in other datasets, but the methodology would be to search the action notes for those phrases as outlined in the report.

Q   Yeah. I don't -- all right. I don't see any other -- at least as far as Column I is showing, they're all discovery data with cases.

A   Because you have it filtered.

        MS. SCHWARTZ: We're talking about holds.

        MR. FUNK: That's right. Okay. Let me make sure I clear the filters.

Q   All right. GPS holds -- and we've already kind of gone through this -- those GPS holds, those are based upon the Oriana House and -- what is it? Is it OAS spreadsheets?

    Are there any other kinds of tracking devices that would be taken into account besides GPS, like installation of an alcohol monitoring device or some other type of device?

Page 126

        MS. SCHWARTZ: Objection.
        Foundation.

A   I was asked to analyze the GPS holds as instructed by counsel in the way that I've described in my report.

Q   So no other tracking devices besides GPS?

        MS. SCHWARTZ: Objection.
        Mischaracterizes testimony.

A   Counsel did not ask me to do that analysis or provide me with that direction.

Q   Okay. So let's go back to your report. If I go back to the definitions on Page 4 -- I'm sorry -- Page 4, Paragraph 15, non-detention-changing action, any action that is not an entry action, hold action, release triggering action or release action that occurs during a custody session, is there a field -- first off, what is your understanding of what a non-detention-changing action is? I guess I see what the definition says.

    Are you able to give me an example of what that might be besides what's in the definition?

A   We could look at that in the data.

Q   Okay. Where in the data would that be?

A   So that's going to be in the action column.

Q   Okay.

A   And you can see if it's not one of the different

Page 127

actions that we filtered -- or that are stated there, those are the different types -- those are -- so if it's not an arrest action, if it's not a release action, if it's not a GPS, you can see those actions there. That's just what's in the data.

Q   So it's all these actions are the universe of actions that were inputted, and then some of these actions might be considered non-detention-changing action because they don't meet one of the other definitions?

A   Exactly. It's everything else that's not met by one of the previous types of actions we've discussed.

Q   So those are really just excluded because ultimately when you're doing your figures, you're just looking at custody sessions where there was, in fact, a release triggering action?

A   To calculate time to release --

Q   Yes.

A   -- we needed the release triggering event and the release event.

Q   Right. So these other events, non-detention-changing actions, would not have been utilized for purposes of determining time to release?

A   Time to release was just the release triggering event and the release itself.

Q   Right.

Page 128

    So the answer is yes, the other ones aren't taken into account?

A   We're saying the same thing.

Q   Okay. All right. So then we go back to the release triggering actions, and we kind of went through those when we went through Table 8, so I'm not going to go through those again.

    And then the time to release, that's -- the actual time to release is based upon the discovery data spreadsheets. Let me go back to Exhibit 13.

    There's a release date and release time. This is one for -- Exhibit 13 is for 2023, but there's one for each year.

    Is that the source of your data for the release date and time?

A   The releases, we can look at that in the summary spreadsheet, and the releases all come from the discovery data with cases.

Q   Okay.

A   Yes. All four of those.

Q   Let's go back to -- I'm going to stop share and we're going to go to Exhibit 31 again. Exhibit 31 is the summary table.

    If I could, I'm going to go over to Column BS, and there is -- this is the top, but there's a column

Lacey R. Keller  3/27/2025

Page 129

that says Overdetention Time. And then next to that, BT, is Overdetention Time Hour.

Do you see that?

A  Yes.

Q  What is -- first of all, where did you get the term overdetention time?

A  That's -- it's a -- it should be called time to release. That's what it represents, because it's the calculation, as you can see, the time between the max triggering -- or the release triggering event and the release.

Q  Okay. So you're not stating whether or not the amount of time shown here is overdetention or not.

A  No. That's not my testimony and it's not in my report. No.

Q  And you're not stating whether the amount of time listed under Column BS is unreasonable?

A  No. It's a calculation of time to release.

Q  Okay. So what's the difference between the BS column and BT column? Do you know?

A  I'm looking. So it appears the overdetention time hour is the -- if you -- maybe if you filter for overdetention time when it's not dull, we can see it more clearly. So let's filter that.

Q  Okay. Let me maybe ask the question differently.

Page 130

I'm going to sort this. Is that telling me it's going to take too long to sort it?

A  Yeah. It says it's not a good idea is what it says, but it's doing it.

Q  Okay. So we have BS. This is sorted with the negative entries first, and then if you keep going down, it goes down eventually to positive.

Can you explain to me how the time to release could be negative?

A  It's just how the data works out.

So the time to release if the max triggering -- I'm sorry -- the release triggering event is for some reason after or due to the 11:59 p.m. assumption from attorneys is after the release event, then that would be negative.

Q  Okay. And in this particular -- so when we look at this number, 31982, what does that signify? Is that minutes, or what is that?

A  It's the minutes between the two. So it is just the difference between the release time and the release triggering event time. It's just one minus the other. So it's minutes and seconds -- hours, minutes seconds all in one calculation.

Q  So this is negative 31982 minutes, and the point 30389 is seconds?

Page 131

A  Let's filter to one that's a little bit easier to understand. Can you go down to -- we need to see the date and time columns next to it, as well, but it's literally the computer-calculated difference between the two. And then --

Q  The difference between the triggering event date and time and the release date and time?

A  Yes. And that data --

Q  So you've got the triggering event -- the max triggering event of November 9, 2024, and then your release date/time is March 17, 2021?

A  No. That's what the release time in the data would have shown given the instructions from counsel. So that is what the mathematical calculation between those two columns, the release date and time and the max release triggering event, was.

Q  All right. Going back to -- so anyways, in terms of the negative time entries, it actually -- hold on one second. Have I cleared all of it? I guess I re-sorted it, but there's nothing filtered, right?

A  That's right.

Q  So BS -- actually, the negatives go down to Row -- there's no easy way to do this -- 49 -- 4919 -- no, no. I'm sorry. 49989. That's taking me longer than I thought.

Page 132

Anyway, at some point, this row becomes positive. And other than just this is how the data turns out, you don't have any explanation for why there are negatives?

A  So a large percentage -- so just to be clear, these are appearing multiple times because that is the time to release for that whole session, right? So each one of those, especially where you're seeing multiple rows, that's likely a whole session that you're seeing repeated over and over and over again.

Q  Right. But the time is still the release triggering event compared to the release event?

A  That's right.

And so a lot of those are due to the 11:59 assumption from attorneys. That happens to become -- that makes that calculation negative because that 11:59 occurs after the release.

Q  Okay. What about other ones that would be greater than, say, 24 hours?

A  So those are just indicators, and that's why these sessions were removed from the analysis. Those are indicators that data is missing somewhere, and so those were removed from the analysis.

Q  Or it's just that you're -- the release triggering event in the table is not the release triggering

Lacey R. Keller  3/27/2025

Page 133

event for that particular release?

A  Again, so, like, counsel's reviewed all the steps along the way, how we've created the sessions.  In some cases, there's data missing or there's -- for some reason, that release triggering event came after the release action, and so those were removed because that negative was an indicator that something wasn't correct from the underlying data or something wasn't present in the underlying data.

Q  Okay.  So the breaking point where negative becomes positive is at Row 49988, and it becomes positive at Row 49989.

Do you see that?

A  Yes.

Q  So there's 49,988 rows that are negative.

A  There are -- there's 49,000 rows that are negative, but each row represents an action in a session, so there are fewer sessions than that that have negative time to release.

Q  Right.

And all these ones that are negative, you did not include in the calculation?

A  The session was not included.  So the session number is far fewer than the number of rows that you see because a session includes multiple actions.

Page 134

Q  So, for example, you said one of the reasons why a negative -- I'm going to stop the share for a second.

MS. SCHWARTZ:  Steve, after this question, can we take a break for a minute for a bathroom?  Like a two-minute?

MR. FUNK:  Yeah.  Let me just finish this thought about the negative, and then I'll --

Q  So earlier, you indicated that if a time session was -- I'm sorry -- if an event didn't have a time associated with it, you assumed 11:59, right, a.m.?

So one of the primary reasons for why it would be negative time is because the triggering event happened earlier in the day and the person was released that same day?

A  That's incorrect.  Counsel directed me to make the triggering event time 11:59 p.m.  That's the, like, last possible point in time in the day.

Q  Right.

So that can result in -- but if somebody was released earlier in the day and the last release triggering event is 11:59 p.m. because there's no time, the release, in fact, could have occurred earlier in that same day, so that's why there would

Page 135

be a negative time?

A  Exactly.  And that's what I was trying to say earlier.  A lot of those are from that assumption.  Counsel was trying to be conservative, if I understand them, by picking the last possible second in that day.  But if the release was on that same day likely because it's the last possible minute of that day occurred earlier in the day, it caused those to be negative.

Q  So as a result of that then, there would be all of those custody sessions where the person was released on the same day as the release triggering event would have been excluded as part of your analysis?

MS. SCHWARTZ:  I'm just going to object to mischaracterizing.  I think there's some confusion, but --

MR. FUNK:  Okay.

Q  Could you answer the question?

A  Could you ask it again?

Q  So if the release triggering event does not have a time associated with it, you assumed 11:59 p.m., right?

A  At the direction of counsel.

Q  And one of the reasons there was a negative time entry is because the release occurred prior to 11:59

Page 136

on that same day?

A  Yes.

Q  Okay.  So by not counting any of those then, you're excluding every custody session in which the release would have occurred in that scenario, the release occurring on the same day as the release triggering event, but due to the fact that there was no time associated with the release triggering event, the assumption was 11:59 p.m.  All of those sessions are excluded.

A  The session counts are under-represented because those individuals were dropped from the data because there was no time in the underlying data.

Another option could have been dropping all sessions with no times associated with them, but that was not the direction that was provided by counsel.

Q  Okay.

MR. FUNK:  So you want to take a quick five-minute break?

MS. SCHWARTZ:  Yes.  Thank you.

MR. FUNK:  No problem.

- - - -

(Thereupon, a recess was had.)

- - - -

Q  So I want to go back then to Exhibit 31, and going

Lacey R. Keller  3/27/2025

Page 137

back to the --

MR. FUNK: Am I sharing my screen or not? I got to share my screen. Sorry.

Q   Okay. So looking at the BS column, which is labeled Overdetention Time, if I go down to Row 355392 -- let me see if I can do a better job at this.

A   **Can you hear me now? If you were speaking, I didn't hear anything.**

Q   You didn't hear anything, okay.

A   **No.**

Q   I'm trying to go to Row 355392.

A   **So while you're doing that, I just want to remind us all that this dataset is -- the only filter on this dataset right now is to the relevant time period, so that's the difference between this table and the other table.**

Q   Right.

A   **In my report, there are other criteria that counsel instructed me to apply to the data that made people even eligible to be included in sessions, and that's in Paragraph 49.**

  **So there is additional criteria before even -- I calculate the time to release for everyone because that's just how the Python code worked is it applied it to the entire dataset. But to be even included in**

Page 138

**the -- to be even considered for analysis, there was an additional criteria. So the criteria that's outlined and cancels, like, the term arraignment must not be included, the times-up action, which counsel told me was -- that they completed a sentence at the jail, and et cetera, et cetera, that's all -- the times to releases are calculated for those individuals, as well, so that's also maybe some of the variation or the reasons why you're seeing those negative time to releases.**

  **When I was saying the 11:59 is the majority cause for some of them, that's for within the groups that were analyzed and after applying the criteria in 49.**

Q   Okay. But there are -- that's one of the explanations, as you testified earlier, for why there would be a negative time?

A   **And I don't know the specifics for those groups, because when doing the analysis -- for those groups that are kind of excluded as part of 49, Paragraph 49 and all the subsections of that paragraph, I don't know the specifics of those.**

  **What I do know is the specifics for those that met that criteria and made it to the next level of analysis, the next step in the analysis.**

Q   And if it made it to the next level or step in the

Page 139

analysis but the time to release was still less than zero, then it would be excluded?

A   **That's right. And for most of those, it was due to the assumption -- from that 11:59 p.m. assumption.**

Q   Okay. So let's look at -- I started to go to Row 355392 on Exhibit 31.

  Starting at that point, the Column BS, overdetention time is blank, and that's -- that goes all the way to the end, which is -- I think I need to make sure I cleared all my filters.

  Do you know why they would be blank, why that's blank?

A   **We need to look at that there's something with the time to release or the -- I'm sorry. There's something with the release triggering time or time to release.**

Q   Okay.

A   **Gosh. Release triggering time -- the release triggering event time or the release time.**

Q   Okay. And the -- let me go up to the column and make sure I got the columns right.

  Release triggering event is Column -- I'm sorry.

  The release triggering time is Column Y. I guess the max one that you utilized, which one is that?

A   **I think it's max release triggering event.**

Page 140

Q   Well, like, Y is release triggering date and triggering event date and time and Z is release date and time.

  Do you see that?

A   **Yes. One is the release triggering event, so that's Y, and Z is the release date/time.**

Q   So if we go down to where they're blank, which is down toward the end, is this -- is it because one of these two are not -- there's not a corresponding -- or how does that work?

A   **Right. Because there's nothing to do the math on. There's to release triggering event date/time for that row. So, like, for Row 441592, there's no release triggering event date/time, but there is a release date/time, so there is no time to release that can be calculated there.**

Q   Okay. And did you look into why that was?

A   **We'd have to look to see what group this is in, because, like we were talking about, there's 59,000 records in here because they all met the time period.**

  **But within that time period, there's additional criteria as described in 49 that are applied, so that may be one of the -- there may be any number of reasons because people have fallen into that group that that might be an explanation. There might be**

P&G Reporting, LLC
216.870.2218

Lacey R. Keller  3/27/2025

Page 141

other underlying things.

Q   Okay.

A   It's hard to say without going into a specific example and following it through.

Q   But if it's a blank, then that was -- that custody session wouldn't have been included, either, because there was nothing there to determine what the time was, right?

A   So I was asked to analyze the data for those three groups, and if they did not have a negative time to release, I analyzed them.

Q   Okay.  So let's go to the three groups then, and I'm going to go back to your report, okay?

After we go through the methodology and you ultimately come to the figures which are basically reporting on the custody sessions that you did ultimately analyze after making your exclusions in Paragraph 49 -- right -- these are all custody sessions that have both the release triggering event and a release and were not otherwise excluded based upon Paragraph 49?

A   So the figures are for the three groups.  So one is no holds group.  One is the GPS group.  One is the IMIS group.  And there's a series of figures for each group.

Page 142

Q   And so let's talk about the no holds group.

So Figure 3 talks about the no holds group, and this number here is 4590.  That's the number of custody sessions that were analyzed that are included as part of the no holds group?  Is that fair?

A   Figure 3, because it says the 100th percentile, that lists the total number of sessions.

Q   So 4,590 custody sessions were included as part of the no holds group?

A   They met the criteria to be part of that group as defined by counsel.

Q   And go to Figure 6.  Figure 6 is on Page 29 of your report, this is the 100th percentile for the booking holds group, right?

A   Yes.

Q   361 custody sessions were part of that group?

A   Met that criteria as defined by counsel.

Q   And then Figure 11, this is the GPS holds group.  The total number is 392 sessions.

A   That met the criteria as defined by counsel.

Q   Okay.  So when you add those three numbers up, the 4590, 361, 392, that totals up to 5,343.

Do you agree with that?

A   I can check with a calculator if you want.

Q   So 4590 and 361 and 392?

Page 143

A   5,343.

Q   And we talked about before that there were 58,098 custody sessions that had a release, so you're really looking at --

MS. SCHWARTZ:  I'm going to -- go ahead.  Finish your question.

Q   You're examining 5,343 of those of that 58,000 number?

MS. SCHWARTZ:  Object to the characterization as custody sessions, but go ahead.

Q   Go ahead.

A   The 58,000 -- go ahead.

Q   Let me ask the question again.

We already talked about 58,098 custody sessions that resulted in a release, right?

A   Yes.

Q   We already established that.

So of that, after doing the exclusion of, again, Paragraph 49, you're ultimately coming down to analyzing 5,343 custody sessions.

A   I think you're misunderstanding.

So there's -- we start with the 59,000.  That's the time limited group.  Then there is a set of exclusions in Paragraph 49 that exclude other

Page 144

sessions due to the requirements outlined there.  That drops the number considerably.  I believe down to like 10,000 or even less than that.  I don't have it in front of me.  Then that is the first two criteria.  So are you in the date/timeframe and are you meeting the criteria in 49?  And, again, there's a second supplement that basically appends some criteria.  Once that session has passed those two barriers, then they can be sorted into the appropriate groups, and so that would be the GPS group or the no holds group or the booking holds group.

Q   Right.  So that's ultimately 5,343 custody sessions that would fit into one of those three groups?

A   But that is not the whole universe that was eligible for consideration after applying Paragraph 49.  Those two numbers are not the same.

Q   Okay.  The 5,343 custody sessions are the sessions that are set forth in your figures.

A   Yes.  Those are the three sessions -- the three classes -- not classes -- groupings, or however you want to define them.  I have a phrasing for them.  But there's three different distinct groups from one another that were defined by counsel.

Q   So we're looking at Figure 1.  Let's start with that

Lacey R. Keller  3/27/2025

Page 145

one.  That is -- when you say 50 percent of custody sessions with no holds have a maximum time to release below 5.66 hours, these percentages are percentages of the 4,590 custody sessions that fit into that category, correct?

A   Correct.  That section starts at around Page 21, the no holds custody session analysis.  So the tables that follow all pertain to that group.  So this Figure 1 is a breakdown of the release time -- time to release for that group.

Q   And that is based upon -- those are based upon the total number of sessions which is 4,590.

A   That met the criteria as defined by counsel to be in that group.

Q   Okay.  Right.  So in putting this chart together, why did -- you got percentiles above 50 percent, but you don't have any below 50 percent.  Why did you do that?

A   The appendix, also as we saw, I think, at the very top of the call we went through, and there's the deciles, as well as the individual percentiles and the quartiles.  So all of that analysis is included.

Q   I mean, in this particular chart, why did you decide to do the chart where you've got a different percentage, but your bottom one is 50 percent?  Why

Page 146

did you pick 50 percent as being your bottom --

A   It's just a way of visualizing the information.  All of the underlying data, including the individual percentiles, is in the appendix, which is why I included it.

Q   Okay.  I understand that it's in the appendix.  I'm trying to understand why you chose to select this particular description of the data, Figure 1.  What was your purpose of showing that?

A   All three of these images are different ways of showing the data.  That was just how I was asked to display it.  And the underlying data is included in the appendix.

Q   Okay.  So I guess the answer is is that you didn't decide to pick this method of display.  This is something that counsel asked you to put together, Figure 1?

A   We had already had a pie chart, yes, but counsel had asked that it be presented in that fashion with the 50 percent.

Q   Okay.  Was there something about the 50 percent that was intended to have significance, from your perspective?

A   That, I don't know.  I don't know if there was any significance, no.

Page 147

Q   Okay.  You're not making any opinions about the -- what time it should take to release an inmate from custody when there's no holds?

A   This is just what the data shows, and the appendix has that information, as well.

Q   So your answer to my question is no, you're not rendering any opinion as to -- based upon this data as to how long it should take to release somebody with no holds?

A   That's correct.  As we discussed at the top of the call, I will not use the word should.

Q   Okay.  And same thing with Figure 2, this display of data is essentially showing what's in Exhibit 1, except it's in a bar graph?

A   It's a histogram, but it's a --

Q   Yeah.

A   So at each different time to release, each bar represents the number of custody sessions instead of the percentage.  But ultimately, it's showing the same thing just a slightly different way.

Q   Okay.  And then Figure 3, this is instances in which the hours were ten to hundreds of hours.
Do you see that?

A   Yes.

Q   Okay.  And when you look at the chart -- and I don't

Page 148

know if this is big enough that you could see it -- you have --

MS. SCHWARTZ:  You're not sharing your screen, Steve.

MR. FUNK:  I have to do what?

MS. SCHWARTZ:  You're not sharing your screen.

MR. FUNK:  Oh, I'm not?  I thought I was sharing my screen the whole time.  Sorry.

Q   So you had the report in front of you when I was asking --

A   I did, yes.  I've had it up.

Q   Okay.  So I asked you about Figure 1 and Figure 2.

A   Yes.  I've been following along no problem.

Q   Figure 3, so when you look at the number of custody sessions, you see it down here at the bottom.  Below the 95th percentile, it goes out --

A   Yes.

Q   But these ones that are -- for example, this one that is just under the 200 bar, is that -- can you tell me, is that one instance that's at that level, or are you able to tell me if it's more than one?

A   I couldn't tell you if it's more than one.  The appendix would have that information, I believe.

Lacey R. Keller  3/27/2025

Page 149

Q   Okay.  And so this one at the top at the 100th percentile, that's one.  That's 272.41 hours?

A   It's probably one.  I'm not sure.  You'd have to look at Appendix A to know for sure.

Q   Okay.  So there are -- these custody sessions, did you look to see whether or not -- what the reason why it was 272.41 hours?

A   Again, that's what the data shows.  Counsel reviewed all of the data, especially the high end of the spectrum, to ensure that that was accurate as -- that it was accurate how they understood the system to work.

Again, I'm not an expert in the prison system, so I can only present the data as it was reported in the datasets.

Q   Just so I'm clear, you did not -- you, yourself, did not look to see whether or not the 272.41 hours was correct, factually correct?

A   It was factually correct given the data that we had.  If there were other circumstances that were leading that data to appear in the dataset that counsel thought was inappropriate -- there was some sort of type of hold action, or something -- they would have given us direction to exclude it.

But as far as our calculations of the data, that

Page 150

is correct.

Q   Were there any outliers -- I mean, would you consider this to be -- the one that's 272.41 to be an outlier?

A   I haven't done an outlier analysis for the data.  I've been asked to do that in other cases, but I wasn't asked to do that here, so I don't know what the range would be to define that.

Q   What is an outlier analysis, or what would you do to determine if something is an outlier?

A   So one of the tests that I've used in the past is Tukey's outlier test, and that takes the consideration of the interquartile range and then applies a multiplier to it to get some fences for a regular outlier and an extreme outlier.

Q   And so in this case, you did not perform that test?

A   That was not asked of me.  I was not asked to identify outliers.

In other cases, I've been asked that, but that was not my assignment here.

Q   Okay.  Were there any particular outliers that you recall in any of these figures that you were asked to exclude?

A   I was not asked to exclude outliers.  If there was criteria that wasn't correctly, I would say, described to us by counsel, then adjustments would

Page 151

need to be made.  For example, the criteria that were part of 49, that criteria --

Q   Figures 1, 2, and 3 are all post 49 exclusions.

A   That's correct.

Q   So my question is once you created, say, for example, Figure 3, were there any adjustments made to Figure 3 to exclude any of the ones in the 95th percentile?

A   No.

Q   Okay.  And then I'm going to -- just to skip ahead, I'm going to ask the same question of Figure 6.  Figure 6 is a dozen custody sessions with booking holds have a time release ranging from ten hours to hundreds of hours.  This is for booking holds.

The 100 percentile one is 90.55 hours.

Did you look into why that particular custody session was 90.55 hours?

A   Again, for each of these groups, for the highest values for the time to release, counsel reviewed those to make sure that there wasn't any additional criteria that needed to be communicated to us, but we ensured that the math was correct, because it's the same calculation no matter who you are.  It's the same mathematical calculation for time to release.

Q   Right.

My question to you, though, is you didn't do any

Page 152

investigation to see whether any of these 95th percentile custody sessions should be excluded from this chart, right?

A   The math was correct.  There was no exclusions made because the math was correct and the criteria was applied correctly.

Q   Okay.  And counsel didn't tell you to remove any of the items shown on Figure 6?

A   No.

MS. SCHWARTZ:  I just want to interject as to the time period because you're not being specific as to whether we're talking before or after supplements.

Can you be specific about the time period you're asking about, Steve?

MR. FUNK:  Well, I'll get to the supplements in a second.

Q   But in terms of this particular report, there weren't any items that you were excluding.  Because I know that there was exclusions taken in the second supplement, and I'll get to that in a second.

But prior to that, there was nothing else excluded -- no outliers excluded, right?  None of the

Lacey R. Keller  3/27/2025

Page 153

ones in the 95th percentile were excluded in Figure 6?

A  **The charts represent the data that was included in that group.**

Q  Okay.  And then Figure 11, again, I think in this one we have dozens of custody sessions with GPS holds at a time release ranging from ten hours to hundreds of hours.

Did you exclude any -- did you look at the circumstances surrounding any of the individual sessions, or did you just rely on counsel to do that?

A  **Again, our implementation of the groups and the logic and criteria to make it into the group and the calculation for time to release is correct.  If adjustments needed to be made to that criteria, counsel communicated that to us.**

Q  Okay.  And then you said here dozens.

How do you get to dozens for this particular one?

A  **It's hard to see because of the lines overlapping, but the backup documentation or the backup data for this chart is in Appendix A, so that's how you would know.**

Q  All right.  And in terms of selecting this particular description, Figure 11, is this something that you decided to pick, this numbers of ten to hundreds, or

Page 154

is that something that counsel directed you to do?

MS. SCHWARTZ:  Objection.

That goes to the drafting process and communications between counsel and the expert in the drafting process.

MR. FUNK:  I'll ask it differently.

Q  Why did you pick ten hours to hundreds of hours as your --

MS. SCHWARTZ:  And I'm just going to instruct Ms. Keller not to answer to the extent that she would have to disclose communications with counsel in order to do so.

A  **So this chart shows -- because the chart above it to make it more readable ends at the 95th percentile, the chart below starts at the 95th percentile -- or it shows the whole percentile, but what I'm describing is what's not shown in Figure 10 in describing what's there.**

Q  Okay.  And I'm just going to jump ahead to -- actually, where is that?  We just did Figure 11.  This is the GPS holds.  We just went through that, okay.

So, again, for each of these figures, this is

Page 155

just a way of displaying the data.  You're not rendering any opinions about the significance or the meaning of any of this data other than what the data itself reports?

A  **That's correct.**

Q  And that will avoid me asking you about each one of these charts.

A  **We're both happy about that, I'm sure.**

Q  Yeah.

Let me go to your supplemental report, which we marked previously as Exhibit 2.  I'm going to stop sharing.

Going back to Exhibit 2, I started on the last page where it's got your signature.  Is this the March 19, 2025 report?

A  **Yes.**

Q  Okay.  And now we're looking at the cover page, March 19, 2025.

And Paragraph 1 is just a repeat of the original assignment -- or, actually, I guess it isn't, but the main thing that this supplemental report does is described in Paragraph 2, right?

A  **Yes.**

Q  Okay.  So tell me what -- so, I mean, I guess it reads for itself.  You're taking your no holds group

Page 156

and you're separating it into two different charts, one where the max release triggering action came from the City and the second where the max release triggering action came from the County.

Is that right?  Did I describe that accurately?

A  **It's the implementation of the no holds group as defined by counsel.  It's not my groupings.  But in short, yes.  We're splitting that analysis into those where the last action was in the City data and one where the last action was in the County data and running those exact same images for those subsets.**

Q  Okay.  And so for those, how did you determine what max release triggering event came from the City versus the County?

A  **So that's based off of the data source.  As we discussed at the top of the call, each data source had its source -- origination source.  So if the max triggering event action was that of the City's sources, that's what determined that action -- or that grouping.**

Q  So the City of Cleveland data that we went through, would that also include the Cleveland Municipal Court?

A  **I'll have to look.  So we'd have to look in the Cleveland data, and if the max triggering -- the max**

Lacey R. Keller  3/27/2025

Page 157

release triggering action -- that's that group.

So, like, filter for source Cleveland, not data source, but -- not source file, but source, and then the release triggering action.

Q   So basically all the data that's in Paragraph 25.3 of the original report, which is labeled Source City of Cleveland --

A   Yes. And that source just in the data, the summary table is carried through as Column J. So that's how I'm filtering it.

Q   And so previously, I think, the number was 4,590 custody sessions that were in the no holds category, so with this breakdown, you have 1,902 that are where the max triggering action was from the City that's shown on Figure 3; is that right?

A   Yes.

Q   And then when we go down to the County ones shown on Figure 6, it's 2,688, right?

A   Yes.

Q   And that adds up to 4,590.

So nothing was excluded in creating these charts, right?

A   It's just a split.

Q   Okay. So this is -- this supplemental report here is just performing that split and then showing the

Page 158

figures as to what the split shows?

A   Yes. That's it. Very simple.

Q   All right. I'm going to exit out of that and we'll go to Report Number 3 -- actually it's the supplemental report dated March 24, 2025, Exhibit 3.

And, again, I'm at the last page. It's got your signature, and up at the top, this is served on March 24, 2025.

And the explanation for this report is on Page 2 of 15, Paragraph 2. You've got Subparagraphs 2.1 and 2.2.

For 2.1, it says, I removed sessions from my analysis in which the release triggering event was a common pleas release order and the associated docket text contained information that specified a future release date or time.

Do you see that?

A   Yes.

Q   So how would you determine if it specified a future release date or time?

A   It was -- I think there was only, like, around a dozen sessions that met this criteria, but this would be, in effect, adding to Paragraph 49 from the main report, and looking for that information was in the description of that release order, and it said, like,

Page 159

should be released X days from now or three days from now. So we searched through that data following a set of patterns that identified that future release date and time.

Q   Okay. So did you write code for this particular search?

A   Yes.

Q   And is that something that -- I think that we've received your code for the original report, but I don't believe we've received the code for this.

Is that something that you're able to produce?

A   We can.

Q   Okay. So how does the next, 2.2, relate to that code or to what you were trying to accomplish in 2.1?

A   2.2 is a separate set of criteria.

Q   Okay.

A   They're not related.

Q   So for 2.1, you wrote codes so that you could search the release orders that were shown on the spreadsheets, right?

A   Correct.

Q   Okay. So you didn't go through line-by-line each entry to see whether or not there was a future date and time?

A   The code scanned for a series of patterns that would

Page 160

indicate a future release date or time.

Q   Okay. So what would be the series of patterns?

A   I think one of them was, like, released in three days or set -- I don't remember exactly the phrasing, but there was a pretty specific pattern that we helped narrow down the data and counsel identified as saying, like, that's the correct pattern to utilize to identify those future dates and times.

Q   So you essentially came up with search terms, and then you used that as your method of excluding future dates?

A   Fancy search terms.

Q   Yeah.

And let me go back to the supplemental report. And so custody sessions without holds --

A   You're not sharing again.

Q   I'm not sharing, okay. Sorry.

So this is from your supplemental report 2025/03/24, Figure 3. So as a result of that -- actually, I guess you did two types of exclusions, right? I should go back.

A   One was an exclusion. 2.1 -- I can't remember the paragraph number -- was a full exclusion of that custody session, so that would be akin to the criteria outlined in Paragraph 49. The second

Lacey R. Keller  3/27/2025

Page 161

paragraph, if you don't mind scrolling up to that --

Q   Yeah.

A   -- that is not an exclusion, but instead a different categorization or direction as to what constitutes a release triggering action from counsel.

So they said, exclude release triggering actions -- they're something else.  They're not a release triggering action -- that aren't any of those phrases.

Q   So if those phrases were there, would those have been excluded then from the custody sessions that would form the charts?

A   So they would not be considered the release triggering event.  That doesn't necessarily exclude that person from being included in the chart.  Their release triggering event changes.

Q   I got you.

A   Okay.  Good.

Q   So the 2.2, did that -- implementing 2.2 criteria, did that remove any of the events from the data?

A   Let's look.

So if we go to the no holds group -- could you look at the -- exactly.

So there's 4,450, and before we had 4,590, so the first -- if I recall the criteria from the first

Page 162

paragraph, it removed about a dozen people.  And then the second criteria ended up through whatever reason -- they don't have a triggering event anymore or the max triggering event becomes negative -- they have fallen out, and now that group is at 4,450.

Q   Okay.  So of the 140 -- so the difference between 4,590 and 4,450 is 140.  Of that 140, about a dozen were due to 2.1.  The remaining were due to 2.2?

A   That's correct.  Or downstream impacts from 2.2, because it's not a strict exclusion.  There's a lot more going on there.

Q   So 2.2 is not a strict exclusion, so would that also impact the calculations of these hours, the hours that --

A   It would because it changes what the max triggering event was, but it doesn't change -- but, in effect, it didn't change them very much because you don't see much of a difference in them.  So the max triggering event was no longer set to those -- those were not qualifiers for a max triggering event, which is a predicate for calculating time to release.  But in reality, the difference is pretty negligible if you compare the two charts.

Q   So, I guess, as a result of the additional criteria given to you by counsel, the figures in this

Page 163

supplemental report dated March 24, 2025 are intended to replace the figures' similar category -- similar description in the original report?

A   I'm not sure how -- I'm not intending them to be replaced.  Counsel may choose to refer to one set or another, but they're a supplement, not a replacement.

Q   Okay.  And then you also -- as part of this, you kept the breakdown between the City and -- hold on.  Let me just go back.  We'll go through it one-by-one.

So Figure 1 is custody sessions with no holds, all, both County and City triggering events, right?

A   That's no holds County and City together.

Q   1, 2, and 3 all fall in that category?

A   Yes.

Q   All right.  And then Figures 4, 5, and 6 are a breakdown of that 1, 2, and 3 where the max release event triggering action was from the County?

A   Correct.

Q   Okay.  I'm sorry.  That's -- so 4 is -- 4, 5, and 6.

And then Figures 7, 8, and 9 are a breakdown of 1, 2, and 3 where the max release triggering action was from the City?

A   The release triggering event was from -- yes.  Exactly.  Yes.

Q   Okay.  And that takes us through 9.

Page 164

And then Figures 10, 11, and 12 are doing the booking holds, right?

A   Yes.

Q   And so I believe previously, the booking holds were 361 sessions, and then that gets reduced to 353?

A   I'm just pulling up booking holds.

Q   I'm looking at Figure --

A   353.  You got the supplement -- let's look at the -- 361 from the original Figure 6 in the booking holds.

Q   So it went from 361 to 353.

A   335.  Hang on.  Scroll down a little more.

Yeah.  353.  It's tough when the numbers are really close to one another.

Q   So eight were excluded?

A   Yes.  As a result of the different criteria.

Q   Okay.  So let me ask you this then, you didn't do another chart for the GPS holds.

Do you know why that would be?

A   I don't know why.  I just wasn't asked to run it.

Q   Okay.  I want to ask you a couple questions.

You have reviewed Sean Malone's report?

A   Yes.

Q   I want to pull up that report real quick and ask you a couple questions about that.  I'll stop share.

So in his report, if I go to -- this is Exhibit

Lacey R. Keller  3/27/2025

Page 165

4. It's a copy of his report. I want to go to Paragraph 22.

MS. SCHWARTZ: We're not seeing it on the screen.

MR. FUNK: You're not seeing it yet, okay. So maybe I'll just make this a little bit smaller.

Q  In his report, he's got a heading that says Circumstances Surrounding Releases are Diverse.

Do you see that?

A  Yes. I see that.

Q  And then he offers a couple of examples of situations involving two inmates, one being Matthew Marecki, M-a-r-e-c-k-i, and then Sunil Lallbachan.

Have you done any investigation into their particular records?

A  No. I don't know what you mean by investigation, but their data is in our dataset, but that's the extent to my analysis of them.

Q  Okay. So you haven't done anything to see whether what he's stating here in Paragraphs 22 and 23 is correct or not correct?

A  I have not validated his claims, no.

Q  Okay. Is that also true with respect to the other example on Paragraph 28 dealing with Jessica

Page 166

Priggins's file?

A  In what specifically?

Q  You also did not look into the facts or the records surrounding her release, Jessica Priggins?

A  When you say records, are you talking about paper records?

Q  Any records. Did you do any investigation or inquiry into whether -- to see whether or not what he was saying about Paragraph 28 was true or not true?

A  All I can speak to is what's in the summary table for that individual or the records that I did analyze.

Q  Okay. Did you do any analysis to see whether what he was stating in this report about normal hours on weekdays versus late hours or weekend is true or not true?

A  I did not verify that. I wasn't asked to do it.

Q  Were you asked to verify anything in his report?

A  No. The only rebuttal to his report is in Supplement 2. I don't even know if we characterize it as a rebuttal.

Q  Exhibit 2?

A  Yes.

Q  Okay.

A  Not Exhibit -- the second supplement. I don't know which --

Page 167

Q  Exhibit 3. Thank you.

And is that also true with respect to Mr. Malone's supplemental report dated March 19th; you have not done any analysis of that report to see whether or not what he stated is correct or not correct?

A  The only opinions that I was asked to offer relating to Dr. Malone or Mr. Malone was in the second supplement, and it's characterized as such. But I was not asked to validate any additional claims of his.

Q  All right. Let me -- I'm going to stop the share.

MR. FUNK: I think I'm going to be done. Let me just review my notes and consult with my colleagues. Let's take about a five-minute break, and then if there's more I have, I'll let you know.

MS. SCHWARTZ: Okay.

- - - -

(Thereupon, a recess was had.)

- - - -

Q  I want to go back to your report, Exhibit 1. This is the original report.

I didn't yet ask you about -- we went through the first set of charts that actually run from -- are you

Page 168

guys seeing this or I'm not sharing yet?

A  Not sharing.

Q  Okay. So Figures 1 through 11 are looking at the difference between the max release triggering action and the release time for the custodies in the three categories, the GPS holds, booking holds, and no holds, right?

A  Yes. There's charts in my report for those groups.

Q  Right.

So then after you've done that -- and that's, again, all you're showing for those charts, 1 through 11, is the amount of time that the data shows from the max release triggering action date and time in your summary table and the release time in your summary table?

A  Yes.

Q  Okay. So after you've done that, then you've got Paragraph 55, which is on Page 36, where you are now performing a new set of tables based upon the amount of time between the release triggering action and the release notification email, right?

A  The Checks -- yes. The Checks emails.

Q  So what's your understanding of what the purpose of the releasee notification email is?

A  I have really no details on it. I just know that

Lacey R. Keller  3/27/2025

Page 169

it's something that happens between those two events, so that's why I was asked to calculate the time calculation on either side of that email event.

Q  Okay.  And do you understand that that email is sent from the release desk to the jailer?

A  My understanding is what is in my report.

Q  Okay.  And in determining the time for when the email was sent, you're just relying on the times that's shown on emails, the unstructured data that you looked at?

A  The emails came in in these TXT files, and they had a timestamp associated with them, and so that was the time that was extracted from those semi-structured emails.

Q  Okay.  And so charts -- after paragraph -- as part of Paragraph 55, you have Figures 12, and I think it actually goes through 20, essentially Figure 20, in which you have sort of the three charts for each of the three categories, no holds, GPS holds, and booking holds; is that right?

A  Let me just get there.  So there's -- yes.  There's charts for each one, yes.

Q  And that's -- again, all those charts are based upon the time shown by your data between the release triggering action and the notification emails, the

Page 170

release notification emails?

A  It's the time between the release triggering event and the email that was in the summary table data, which is from all the underlying datasets, and then the date from the email as we were able to extract it.

Q  Okay.  And then Figure -- starting on Paragraph 56, then you have another subset of data in which you are measuring the time between email release notification to the time of release, right?

A  Yes.

Q  And the email release notification, of course, is the time of the release that's sent from the checks@cuyahogacounty.us to the jailer that we talked about, the unstructured data that we talked about just a second ago.

MS. SCHWARTZ:  Objection.
It misstates -- I think you're saying jailer when you mean jail, Steve.  If you're trying to read the titles, you're reading it incorrectly.  I just want to clarify.

Q  You're saying it's the time shown on the email when the email is sent to the checks@cuyahogacounty.us.  Maybe that's a better way of saying it, right?

Page 171

MS. SCHWARTZ:  I'm just going to object that the titles speak for themselves.
Go ahead.

A  The time is the time that's extracted from the email.

Q  Right.  So Figures 21 through 29 then are your displaying of -- again, there's nine figures here, 21 through 29, in which you have three for each category; no holds, booking holds, and then GPS holds.  But all nine relate to the time it took -- the time measured by the data between the email notification and the actual release; is that right?

A  All my charts show for the different groups in that same format that we've shown above that time from the email to release.

Q  Right.
So when we look at all these charts -- we have 29 figures in the report and then the supplemental charts, as well -- they're all intended to show time based upon two pieces of data.
So for the first set, it's the max release triggering action and the release time, right?  That's figures 1 through 11.

MS. SCHWARTZ:  Objection.
The titles of the charts speak

Page 172

for themselves.

Q  You can answer.

A  Yes.  I'm just making sure that that's the right numbering.
Yes.  1 through 11 is max release triggering events time to release.

Q  Okay.  And so those are the two pieces of data that you're ultimately using to come up with what that time is?

A  It is a simple mathematical calculation, the time built up between those two times.

Q  Okay.  And for the next one is they're also the difference between the time of the max release triggering action and the time of the email, right?

A  Correct.

Q  Okay.  And then the last one is the time of the email and then the time of the release?

A  That's right.

Q  Okay.  So other than measuring that time -- and I think I've asked this, but I want to make it clear for the record.
Other than measuring that time, you didn't do any examination or you're not rendering any opinions about the individual facts and circumstances of each custody session to determine the reasons for that

Lacey R. Keller   3/27/2025

Page 173

length of time?

A   I show what -- the datasets that I've analyzed what all compiled, they have led that -- how all those datasets have -- like, how all those datasets combined given the criteria and assumptions by counsel, what the time calculations would be for each individual group.

I don't provide any additional judgment or what should be or how that should have gone about. I just say that's given how I processed the data the assumptions and criteria from counsel how it lays out for those three groups.

Q   And so you're not rendering any opinion as to whether any particular inmate was overdetained by the County?

A   Correct.

Q   All right.

MR. FUNK: That's all I have.

THE WITNESS: I just have one thing.

At the top of our deposition, you had asked me about my time and remuneration, and I alerted our admin that you guys might be requesting those invoices.

She told me that the client that's paying for this is Justice

Page 174

Catalyst, and they're a nonprofit client, which means that the rate is lower. It's 325 per hour instead of 580. And that's a flat rate for deposition testimony, trial testimony, travel, and if it's me or my staff. So I was misinformed on that on the outset, and I wanted to make sure that that was clear when you received those records.

MR. FUNK: Okay. Thank you.

MS. SCHWARTZ: We will read, please, and we will take a copy, please.

- - - -

(Deposition concluded.)

- - - -

Page 175

State of Ohio,          )
                         )SS:   CERTIFICATE
County of Cuyahoga,      )

I, Mary C. Peck, a Notary Public within and for the State aforesaid, duly commissioned and qualified, do hereby certify that the above-named LACEY R. KELLER was by me, before the giving of her deposition, first duly sworn to testify the truth, the whole truth, and nothing but the truth;

That the deposition as above set forth was reduced to writing by me by means of stenotypy, and was later transcribed upon a computer by me;

That the said deposition was taken in all respects pursuant to the stipulations of counsel herein contained; that the foregoing is the deposition given at said time and place by said LACEY R. KELLER;

That I am not a relative or attorney of either party or otherwise interested in the event of this action.

That I am not nor is the court reporting firm with which I am affiliated under a contract as defined by Civil Rule 28(D).

IN WITNESS WHEREOF, I hereunto set my hand and seal of office, at Cleveland, Ohio this 14th day of April, A.D. 2025.

_____
Mary C. Peck, Notary Public

My commission expires December 30, 2026

Page 176

CASE NAME:  ALANNA DUNN, ET AL. V. CUYAHOGA COUNTY, ET AL.

DEPOSITION OF:  LACEY R. KELLER

DATE TAKEN:  3/27/25

WITNESS SIGNATURE

I have read the forgoing transcript. Any corrections that feel necessary will be made on a separate sheet and attached to the transcript.

_____
LACEY R. KELLER

Subscribed and sworn to me this _____day of _____ 2025.

_____
My Commission Expires

Lacey R. Keller   3/27/2025

Page 177

CASE NAME:  ALANNA DUNN, ET AL. V. CUYAHOGA COUNTY, ET AL.

DEPOSITION OF:  LACEY R. KELLER

DATE TAKEN:  3/27/25

ERRATA SHEET

PAGE          LINE NO.       CORRECTION

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____