# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| Alanna Dunn, *et al.* | Case No. 1:23-cv-00364 |
| Plaintiffs | Judge Bridget Meehan Brennan |
| v. | |
| Cuyahoga County, *et al.* | |
| Defendants | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION IN LIMINE TO PRECLUDE
<u>USE OF LACEY R. KELLER'S EXPERT REPORTS AND DECLARATION</u>**

# INTRODUCTION

Lacey Keller, a data scientist, utilized her expertise to merge and standardize voluminous spreadsheets into a single collated data set, from which she calculated the time it took for the Cuyahoga County Sheriff's Department ("CCSD") to release detainees meeting specified criteria from the Cuyahoga County Jail ("Jail"). Defendant does not contest the reliability of the *data science methods* she employed in conducting her analysis or how she applied those methods. Rather, Defendant complains that Keller should have conducted an altogether different analysis than the one she was retained to perform. Specifically, in seeking to exclude Keller's expert reports and declaration (collectively, "Keller's testimony"), Defendant contends that her analysis is based on insufficient facts and data because she did not perform a subjective analysis that considered the facts and circumstances of each release and instead performed an objective analysis calculating the time between a detainee's release trigger and release. Additionally, Defendant argues that her calculations are not reliable because she relied on counsel to understand the contents of the spreadsheets she analyzed. These are not bases upon which to exclude an expert's testimony. Keller calculated the Time to Release for *all* detainees whose available data met criteria defined by counsel, thereby providing a reliable and comprehensive analysis of how long it historically took CCSD to release relevant pretrial detainees from custody. This Court should deny Defendant's motion to exclude her testimony.

# BACKGROUND

Plaintiffs' counsel engaged Lacey Keller ("Keller"), co-founder of MK Analytics, Inc., to utilize her data science expertise to standardize and merge several voluminous spreadsheets produced during discovery by Defendant and non-parties. (ECF 45-30 ¶¶ 7-8, 63-85)[1] Keller's

---

[1] Herein, all ECF pincites to page numbers refer to the ECF page numbers stamped at the **top** of the filed document. Plaintiffs cite to new exhibits first filed with this Reply as "Ex." and to previously filed exhibits by their ECF Number.

1

task was to calculate certain time information available from the data—primarily the time between a detainee's Release Triggering Action (*e.g.*, posting bond or being ordered released (*see* ECF 45-30 ¶ 17)) and their actual release from the Jail ("Time to Release")—for detainees meeting criteria specified by counsel. (*Id.* ¶¶ 7-8, 18) The criteria specified by Plaintiffs' counsel omitted detainees as to whom counsel did not intend to seek class certification (for instance, detainees with most types of holds). Keller was not retained to provide, and did not provide, any opinions regarding the circumstances of any particular release.

Counsel provided Keller with two types of spreadsheets. The first set, produced by the Defendant, contained information including the detainee's: booking date and time, charges, release date and time, and holds (if any) preventing release, in which case the hold removal date and time was also included. (*See* ECF 49-1 ¶ 9) The second set of spreadsheets were produced by a combination of Defendant and non-parties and reflected release-triggering information, specifically:

1. <u>County Bond Spreadsheets</u>. These spreadsheets showed the date and time that detainees' bonds were posted or issued in Common Pleas Court. (ECF 50-8 ¶¶ 19-21)

2. <u>County Release Order Spreadsheets</u>. These spreadsheets showed the date and time that Common Pleas Court release orders were entered. (*Id.* ¶¶ 22-24)

3. <u>Cleveland Bond Spreadsheets</u>. These spreadsheets showed the date and time that detainees' bonds were posted or issued in Cleveland Municipal Court. Specifically, it shows when the bonds were docketed and made public in Cleveland's online docketing system, Odyssey, and not when the Jail received the bond. (Ex. 1 ¶ 4; ECF 45-16, 120:20-121:22)

4. <u>Cleveland Release Order Spreadsheets</u>. These spreadsheets show the date and time the Cleveland Municipal Court issued Release Orders. Like the Cleveland Bond Spreadsheets, they show when the release orders were docketed and made publicly available.[2] (Ex. 1 ¶ 4; *see also* ECF 30)

---

[2] Unlike County release orders, which include a "defendant ordered released" notation in every release order, Cleveland release orders are not standardized. Consequently, at the Court's direction, counsel for Plaintiffs and Cleveland worked together to identify which Odyssey Codes potentially indicated release orders, and Cleveland produced those in the spreadsheet. (*See* ECF 30)

2

5. <u>Cleveland RNFC Spreadsheets</u>. These Spreadsheets show the date (but not the time)[3] that release with no formal charge ("RNFC") dispositions were entered into Cleveland's Law Enforcement Records Management System ("LERMS") database. (Ex. 1 ¶ 4)

6. <u>Ohio AMS Monitoring Device Spreadsheets</u>. These spreadsheets show the date (but not the time) that Ohio AMS installed monitoring devices on detainees at the Jail. (*Id.* ¶ 5)

7. <u>Oriana House Monitoring Device Spreadsheets</u>. These Spreadsheets show the date and time Oriana House installed monitoring devices on detainees at the Jail. (*Id.* ¶ 6)

Collectively, the two sets of above-referenced spreadsheets provided the necessary data for Keller to determine the Time to Release for detainees whose release and release-triggering information was provided and met the criteria specified by counsel. As explained below, Keller was tasked with using her data science expertise to create Custody Sessions[4] across the merged and standardized spreadsheets, which could then be used to calculate Time to Release.

The Methodology section of Keller's report details her process. (ECF 45-30 ¶¶ 24-42) First, Keller merged and structured the data by combining all the spreadsheets into a single file that reflected a row for every event in the spreadsheets. (*Id.* ¶ 28) Second, Keller cleaned the data to, among other things, standardize the names of detainees, which were written in various ways across the different spreadsheets. (*Id.* ¶¶ 30-36) Third, Keller created Custody Sessions, which essentially sorted the merged data to show, in a sequential pattern, when a detainee was booked into the Jail, released from the Jail, and all the events that occurred in between, including Release Triggering Actions. (*Id.* ¶¶ 37-42). Fourth, for each Custody Session, Keller calculated the time difference between the final Release Triggering Action and the detainee's release date and time to determine the Time to Release. (*Id.* ¶¶ 43-47) Because Keller is a data scientist, not a subject matter expert,

---

[3] Where release triggering events did not include a time stamp, Keller used 11:59 p.m. as the release triggering time, the latest time the release triggering event could have occurred. This, however, only affected 6.6 percent of all release triggering actions in the seven spreadsheets. (ECF 45-30 ¶ 20)

[4] Custody Sessions, as defined in Keller's report, means: "The recorded interactions with the legal and correctional system for a specific individual for specific charges from entry through release from the Jail. Each Custody Session includes a Release Triggering Action and Release for each charge associated with the Custody Session." (ECF 45-30 ¶ 10)

3

she appropriately relied on counsel to determine which events in the data were considered Release Triggering Actions. (ECF 45-30 ¶ 40)

Keller identified 58,091 unique Custody Sessions. (Ex. 2 ¶ 5) Among those, counsel instructed her to calculate the Time to Release only for Custody Sessions matching specific criteria primarily because counsel only sought that calculation for pretrial detainees who were being held at the Jail solely for Cleveland or County cases and who did not have any holds, other than Booking or Monitoring Device holds, pending at the time of their final Release Triggering Action. As explained in her initial report, Keller implemented counsel's instructions by excluding the following from her analysis:

*Exclusion 1*: Custody Sessions that did not have a Release Triggering Action associated with each County or Cleveland charge in the Custody Session before release. (ECF 45-30 ¶ 49.1) This criterion excluded Custody Sessions for individuals who were detained at the Jail on cases other than Cleveland and County cases, or for which a County or Cleveland Release Triggering Action was not included in the spreadsheets provided to Keller. Exclusion 1 reduced the total number of Custody Sessions that were to be analyzed from 58,091 to 20,504. (Ex. 2 ¶ 5.a)

*Exclusion 2*: Custody Sessions that resulted in an individual being released to another facility or agency. (ECF 45-30 ¶ 49.3). Exclusion 2 reduced the total number of Custody Sessions that were to be analyzed from 20,504 to 18,885 (Ex. 2 ¶ 5.b)

*Exclusion 3*: Custody Sessions that included the term "arraignment" in the action notes.[5] (ECF 45-30 ¶ 49.2) Exclusion 3 reduced the total number of Custody Sessions that were to be analyzed from 18,885 to 12,908. (Ex. 2 ¶ 5.c)

---

[5] Plaintiffs' counsel excluded these Custody Sessions because detainees who pay "arraignment bonds" are often released without being fully processed into the Jail, which can result in a very short Time to Release. (*See* ECF 45-17, 63:6-64:18) Including this group in Keller's analysis would have *reduced* the median Time to Release.

4

*Exclusion 4*: Custody Sessions that involved an individual completing a jail sentence. (ECF 45-30 ¶ 49.4) Exclusion 4 reduced the total number of Custody Sessions that were to be analyzed from 12,908 to 12,782 (Ex. 2 ¶ 5.d)

*Exclusion 5*: Custody Sessions in which individuals had holds other than Booking Holds or Monitoring Device Holds after their final Release Triggering Action. (ECF 45-30 ¶ 48) Exclusion 5 reduced the total number of Custody Sessions that were to be analyzed from 12,782 to 8,438. (Ex. 2 ¶ 5.e)

Thus, of the 58,091 total Custody Sessions Keller created, only 8,438 met the criteria specified by counsel for calculating the Time to Release. After calculating the Time to Release for these 8,438 Custody Sessions, Keller identified 3,275 Custody Sessions with a negative Time to Release. These sessions were excluded at counsel's instruction, leaving 5,163 Custody Sessions for analysis of how long it has historically taken CCSD to release detainees. (*Id.* ¶ 5.f) The vast majority of Custody Sessions that were excluded due to a negative Time to Release had a final Release Triggering Action for which, at counsel's instruction, Keller used 11:59 p.m. as the assumed release time because no time was included in the underlying data. (*Id.* ¶ 5.f.i) Notably, only 205 of the 5,163 Custody Session in Keller's analysis (less than 1 percent) included a final Release Triggering Action with the assumed time of 11:59 p.m. (*Id.* ¶ 6)

Keller dedicated hundreds of hours over several months to her analysis. (ECF 50-1, 15:12-24) During this time, and after the analysis was completed, Plaintiffs' counsel conducted numerous reviews of the Custody Sessions in Keller's analysis and compared them with other records produced during this litigation to verify the results. (Ex. 1 ¶ 7) Notably, Keller concluded that the median time it took to release detainees with no holds was roughly six hours, which aligns with

5

Warden Henry's testimony that she would expect such detainees to be released within that timeframe. (ECF 45-10, 27:20-28:21; ECF 45-29 at 3-5, 12-15; ECF 45-30, at 20, 34-35)

## ARGUMENT

Expert testimony is admissible if the proponent demonstrates by a preponderance of the evidence that (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1224-25 (6th Cir. 2025) (citing Fed. R. Evid. 702). Defendant does not dispute two of these Rule 702 requirements. Specifically, it does not contest that Keller's report is based on scientific, technical, or specialized knowledge that will help the trier of fact, nor does it contest that Keller's testimony is premised on reliable principles and methods, which entailed merging and structuring voluminous data sets, cleaning the data, sorting the data into Custody Sessions, and then calculating the Time to Release for all Custody Sessions fitting specified criteria. *See supra* at 3. As explained below, Defendant's arguments concerning the two other Rule 702 factors are meritless.

### I. Keller's Testimony Is Based on Sufficient Facts and Data

Defendant's first contention as to why Keller's testimony should be excluded is that Keller's analysis "relies upon a limited set of data that does not take into account all of the facts and circumstances surrounding each release." (ECF 50 at 9-10) This baseless argument is premised on the faulty assertion that "there are a whole host of factors that may impact the time to release that are not reflected in the databases used by Keller." (*Id.* at 10) What Defendant is really arguing is that factors beyond the data may impact the subjective question as to *whether the time it took*

6

CCSD to release a detainee *was reasonable*—not the objective calculation of a detainee's Time to Release. But Keller was only retained to provide, and only provided, analysis and conclusions as to the latter objective fact. Thus, Defendant's argument that Keller lacked sufficient facts or data must necessarily be rejected because it is premised on a misunderstanding of the limited scope of her report and applies only to hypothetical conclusions that she never made or sought to make.[6]

O'Donnell's Declaration and Malone's Expert Reports, which Defendant cites for support, illustrate that the Defendant's argument regarding inadequate facts and data pertains to hypothetical conclusions about *overdetention*, rather than Keller's actual findings about objective *Time to Release*. (*See* ECF 50 at 10, citing *e.g.*, ECF 49-1, ¶ 11 (listing circumstances "that may *delay* the release of an inmate"), ¶ 12 (providing an example of "other issues that arise during the release process itself that will cause a *delay*"), ¶ 13 ("To determine whether the release of an inmate . . . was *delayed* due to other facts and circumstances . . . .") (emphases added); ECF 50-3 ¶ 21 ("There are various factors that may influence what the Court may find to be a *reasonable time to release* an individual.") (emphasis added); ECF 50-4 ¶ 16 ("A methodology designed to identify individuals who were *overdetained*, therefore, should consider whether or not that individual was later given jail time credit . . . .") (emphasis added)) Making legal arguments about how the length of an overdetention should be calculated in an effort to challenge the foundation of Keller's Time to Release conclusions is non-sensical. The two concepts are distinct. Defendant fails to address the actual analysis Keller conducted.

---

[6] While Defendant appears to misunderstand it, Keller's report makes clear that her calculations and opinions are about Time to Release, not overdetention—indeed, the word "overdetention" is not included anywhere in it. (*See generally* ECF 45-30) That distinction was further reiterated in Keller's deposition. (*See* ECF 50-1, 129:7-18 ("**A.** [I]t should be called time to release. That's what it represents, because it's the calculation, as you can see, the time between the max triggering -- or the release triggering event and the release. **Q.** Okay. So you're not stating whether or not the amount of time shown here is overdetention or not? **A.** No. That's not my testimony and it's not in my report. No. **Q**. And you're not stating whether the amount of time listed under Column BS is unreasonable? **A**. No**.** It's a calculation of time to release.))

Defendant's fundamental misunderstanding of Keller's report similarly deflates its assertion that there is some "analytical gap" between the underlying data Keller used and her opinions. (ECF 50 at 10) The cases Defendant cites bear no resemblance to this one. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997) (finding analytical gap where expert drew a conclusion about the cause of cancer in a single case based on four unrelated studies); *Hamilton Cnty. Emergency Commc'ns Dist. v. Level 3 Commc'ns, LLC*, 845 F. App'x 376, 381, 384 (6th Cir. 2021) (same where "the available evidence show[ed] the opposite" of what the expert assumed); *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) (same where expert purported to extrapolate future lost profits during years 2013 to 2022 from marketing plan covering years 1998 to 2003 "without explaining his method or assumptions"). Unlike the cited cases, the fit between Keller's Time to Release conclusions and the underlying data, which included the necessary elements to reach those conclusions, is airtight.

Even if Defendant's argument had any legs, it would constitute an attack on "the factual basis of an expert witness' opinion [which] bear on the weight of the evidence rather than on its admissibility." *Stephenson v. Family Sols. of Ohio, Inc.*, 645 F. Supp. 3d 755, 771-772 (N.D. Ohio 2022) (internal quotation marks and citation omitted). Here, as in *Stephenson*, Defendant does not attack the data science methods Keller used in conducting her analysis, but rather "question[s] [her] failure to consider certain factual information . . . in making [her] calculations." *Id.* at 771. As the *Stephenson* court explained: Defendant's "arguments, however, go to the factual sufficiency of [Keller's] analysis and not to the reliability of [her] underlying methodology." *Id.*

In any event, such a factual attack strains credulity. Defendant does not actually dispute that Keller had sufficient data (*i.e.*, release triggers and release dates) to make objective Time to

8

Release calculations.[7] The only exceptions are arguments Defendant makes in the background section of its Motion in Limine that reflect a *legal dispute* between the parties, not flaws in Keller's analysis. Specifically, Defendant complains that the dates and (as applicable) times in the GPS Spreadsheets and Cleveland Bond, Release Order, and RNFC Spreadsheets correspond to when monitoring devices were installed, bonds and release orders were entered on Cleveland's public docket, and RNFC dispositions were entered in LERMS, which is not necessarily when CCSD received actual notice of those events. (ECF 50 at 4-5) But as Plaintiffs explained in their Motion for Class Certification, CCSD is responsible for ensuring that it timely receives release records and "[n]othing in [Ohio law] imposes upon the clerk a statutory duty to guarantee that a copy of the . . . judge's order reaches the affected party [or jail]."[8] (ECF 45 at 14-15 (citing *Shorts v. Bartholomew*, 255 F. App'x 46, 59 (6th Cir. 2007), and quoting *Sampson v. City of Xenia,* 108 F. Supp. 2d 821, 831 (S.D. Ohio 1999))).

In light of this binding and persuasive precedent, and the Plaintiffs' allegations that CCSD demonstrated deliberate indifference by relying on third parties—without any written agreements—to provide release notifications, which CCSD was duty-bound to obtain in a timely manner but which the third parties were not similarly obligated to provide (ECF 45 at 6-7, 15),

---

[7] In fact, the Defendant's expert, Dr. Malone, relied on Keller's Time to Release analysis to determine whether the time it took CCSD to release detainees varied based on the time of day they were released. (ECF 50-3 ¶¶ 24-27) The fact that he used her conclusions as the foundation to create his own additional conclusions is a tacit endorsement that the objective Time to Release analysis Keller conducted was both premised on sufficient data and methodologically correct.

[8] Defendant's argument that the release trigger date and time for an RNFC disposition should coincide with the information stamped on a green slip, rather than the RNFC disposition in the LERMS database (ECF 50 at 4-5) presents not only a legal dispute but several factual ones too. Defendant's position ignores that: a green slip does not accompany every RNFC disposition (ECF 45-2, 85:23-86:13); CCSD Jailers are *required* to monitor LERMS to learn of RNFC dispositions (ECF 45-17, 107:13-19); monitoring LERMS is the primary way CCSD becomes aware of RNFC dispositions (ECF 45-19, 21:1-6); CCSD does not require the green slip to process or complete an RNFC release (ECF 45-6, 276:8-15); and the green slip only gets stamped with a receipt date and time by the Records Department, which generally occurs some time after the Jailer delivers the detainee's paper documents to Records at the end of the day, well after the Jailer actually processes the RNFC disposition (ECF 45-19, 46:8-20, 90:6-91:2).

9

Plaintiffs' counsel appropriately instructed Keller to use the above-referenced data as release trigger dates and times. Notably, in opposing Plaintiffs' Motion for Class Certification, Defendant did not address this issue, or the cases Plaintiffs cited. It also fails to acknowledge those cases in its Motion in Limine and relies instead on select language from an out-of-jurisdiction case, which is not binding on this Court, and which does not even directly or indirectly address whether overdetention begins when a jail receives actual notice of a release trigger. (ECF 50 at 4 (citing *Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 515 (7th Cir. 2009))) Defendant selectively cites *Harper*'s reference to "the length of the delay between the time the Sheriff was *notified* that bond had been posted[,]" but ignores the very next line, where *Harper* conversely states that overdetention "will depend on how long each detainee was held after bond was *posted*[.]" 581 F.3d at 515 (emphases added). These conflicting statements, made in passing while the court was addressing an altogether different issue, are not even dicta and should be disregarded. In sum, the Court should reject Defendant's argument that Keller lacked sufficient facts because it concerns a hypothetical analysis she *did not actually conduct*, and Defendant's allusion to arguments in the background of its memorandum concerns legal and factual disputes between the parties that are not a basis to exclude expert testimony.

## II. Keller's Testimony Reflects Reliable Application of Reliable Principles

Defendant also contends that Keller's testimony should be excluded because Keller's calculations "are not reliable" since she failed to conduct her own investigation to determine: whether the data she was provided could be used to "determine the actual time to release based upon all of the relevant facts and circumstances" and "what sources of information should actually be considered." (ECF 50 at 10-11) This argument is self-defeating. A detainee's actual Time to Release is a simple, objective calculation of the time that elapsed between a detainee's release trigger and release. Whatever Defendant means by "time to release based upon all the relevant

10

facts and circumstances" is necessarily something different, presumably, again, the reasonableness of their time to release, which Keller did not seek to analyze. Thus, Keller had no reason to conduct her own investigation to determine whether the data could be used for that purpose or whether other sources of information should be considered.

Defendant also baselessly contends, without explanation or even a suggestion of evidentiary support, that Keller's opinions reflect the opinions of counsel. (ECF 50 at 11-12) This is obviously wrong. The work product that formed the basis of Keller's conclusions—a massive, collated data set of organized Custody Sessions with all applicable Time to Release calculations, along with the underlying data and code—was produced to Defendant, and Defendant's counsel reviewed it with Keller in painstaking detail in Keller's deposition. (*See e.g.*, ECF 50-1, 65:14-67:10 (**Q**. So Exhibit 31 is actually the dataset that you would have utilized in preparing the figures in your report, the analysis in your report. These are the custody sessions that are within the time period that was designated? **A.** That's correct . . .  **Q**. Yeah. [it has] 52 plus [columns] – yeah . . . and then there are 494,919 rows, right? **A** Yes.)) Yet, neither Defendant nor Defendant's rebuttal expert, Dr. Malone, suggest that Keller's conclusions about CCSD's historical Times to Release are inconsistent with her underlying work product. Moreover, Plaintiffs' counsel are not data science experts and do not possess the technical competency to merge and structure voluminous data sets, clean the data, sort it into Custody Sessions, and write code to calculate the Time to Release in order to form an independent opinion about what the data shows.

Defendant, once again, appears to confuse distinct concepts. Providing an expert with *assumptions* about underlying data before the expert undertakes her own complex analysis of that data is common, acceptable, and even explicitly contemplated by Rule 26. *See* Fed. R. Civ. P. 26(b)(4)(C)(iii) (communications between party's attorney and expert witness are not protected to

11

the extent they "identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed"). Doing so does not equate to counsel providing an expert witness with *conclusions*.

Citing their own expert's deposition, and nothing else, Defendant baselessly argues that Keller should have validated the assumptions given to her. (ECF 50 at 11-12) This assertion ignores the evidentiary rule providing that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Case law confirms that "there is no overarching general requirement, applicable in all cases, that [an] expert independently verify each entry or document on which [she] bases [her] opinions," *Minemyer v. B-Roc Representatives, Inc.*, No. 07 C 1763, 2009 WL 3757378, at *7 (N.D. Ill. Oct. 29, 2009); *see also Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566, 568, 570 (E.D. Pa. 2004) (rejecting the defendant's argument that an expert's analysis was unreliable because he "relied excessively on business records provided to him by" the plaintiff's president, as Federal Rule of Evidence 702 does not "require that experts eschew reliance on a [party's] account of factual events that the experts themselves did not observe" (internal quotation marks and citation omitted)). As long as the expert's opinion has a reasonable factual basis, "any remaining challenges merely go to the weight, as opposed to the admissibility, of the expert testimony." *United States v. Ramer*, 883 F.3d 659, 680 (6th Cir. 2018).

Of course, where an expert's specialized knowledge involves *identifying* the correct data to be analyzed, courts may deem the expert's opinion unreliable if the data is not verified. For instance, in *Ellipsis, Inc. v. The Color Works, Inc.*, 428 F. Supp. 2d 752, 754-55 (W.D. Tenn. 2006), a market research expert conducted a lost profit analysis that required him to determine the market of a product by, among other things, predicting the number of potential purchasers of a

12

product. The court held that his opinion was inadmissible, in part, because the prediction he was supposed to make was based on unverified statistics found on the plaintiff's website. *Id*. at 754-55, 761; *see also id.* at 756 n.4 (rebuttal expert "testified that [market research expert] did not conduct an actual 'test market' analysis because . . . [the analysis] should be designed by the researcher in order to eliminate bias and to ensure that the test market is appropriate"). Keller's expertise, in contrast, lies in analyzing the data, not choosing it. Here, counsel requested and received the underlying data from Defendant and non-parties, understood its content, and communicated that information to Keller. Keller appropriately relied on the assumptions provided by counsel about the contents of the spreadsheets, and then undertook the complex task of merging, standardizing, cleaning, and sorting the data, then writing code to perform the Time to Release calculations, which is her area of expertise. Thus, her data analysis and the conclusions derived therefrom have a sound factual basis.

Indeed, Defendant does not outright challenge the factual basis of the analysis underlying Keller's testimony, nor can it. Of the 5,343 Custody Sessions Keller analyzed in her initial report, Defendant's expert identified only eight sessions where Keller was incorrectly instructed to assume a particular event was a Release Triggering Action. (*See* ECF 50-3 ¶¶ 35-42; ECF 50-4 ¶¶ 22-36) Other than its legal disagreement about whether actual notice of the Release Triggering Actions is required, Defendant has no basis to dispute that the hundreds of thousands of other entries in the seven release-triggering information spreadsheets (ECF 45-30 ¶ 20) are Release Triggering Actions, as summarized above, *see supra* at 2-3.

Finally, Defendant misleadingly asserts in the background section of its memorandum (without addressing it in the argument) that Keller's analysis is flawed because using an 11:59 p.m. assumption for the time of a small percentage of Release Triggering Actions that did not

13

include times resulted in nearly 49,988 *rows* (*not Custody Sessions*) in Keller's final collated data set having a negative Time to Release. (ECF 50 at 6-7) This is yet another misunderstanding, or mischaracterization, of Keller's analysis. As she explained at her deposition: "the session number is far fewer than the number of rows that you see because a session includes multiple [rows of data]." (ECF 50-1, 133:23-25) Indeed, only 2,952 of 8,438 Custody Sessions that fit the criteria outlined by counsel were removed because the Time to Release calculation was negative due to the use of an assumed time of 11:59 p.m. (*See* Ex. 2 ¶ 5.f.i) Keller excluded these Custody Sessions from her analysis because it was clear that the unavailability of a time corresponding to the Release Triggering Action did not allow for an accurate calculation of the Time to Release. This is entirely appropriate and does not render her analysis unreliable.

Even assuming *arguendo* that Keller's use of the assumed 11:59 p.m. time was erroneous (which it was not) that still would not be a basis to exclude her reports. *See In re Creekside Sr. Apartments, LP*, 477 B.R. 40, 65 (B.A.P. 6th Cir. 2012) (arguments "that the data used in applying [an accepted] methodology was flawed . . . does not require a court to exclude the testimony or report"); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (rejecting argument that an expert should be excluded because he "used erroneous data and necessarily produced an erroneous conclusion" "because it fundamentally confuses the *credibility and accuracy* of [the expert's] opinions with its *reliability*." (emphasis in original)). After applying the exclusions directed by counsel, Keller conducted an analysis on **all** Custody Sessions for which the available data allowed for a Time to Release calculation, providing a comprehensive view of the durations of time it took CCSD to release detainees with Custody Sessions fitting the specified criteria.

## CONCLUSION

Defendant's motion to preclude the use of Lacey Keller's expert testimony should be denied.

Dated: May 15, 2025               Respectfully submitted,

/s/ *Kate Schwartz*

Drew Legando (0084209)
MERRIMAN LEGANDO WILLIAMS & KLANG, LLC
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
(216) 522-9000
drew@merrimanlegal.com

Kate Schwartz
Caryn Lederer
Emily Brown
HUGHES SOCOL PIERS RESNICK & DYM LTD.
70 W. Madison Street, Suite 4000
Chicago, Illinois 60602
T. (312) 580-0100
kschwartz@hsplegal.com
clederer@hsplegal.com
ebrown@hsplegal.com

Janet Herold
JUSTICE CATALYST LAW
40 Rector Street, Floor 9
New York, New York 10006
(518) 732-6703
jherold@justicecatalyst.org

Akeeb Dami Animashaun
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
(929) 266-3971
dami@animashaun.me

*Counsel for Plaintiffs & Proposed Class*