# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| Alanna Dunn, *et al*. | Case No. 1:23-cv-00364 |
| Plaintiffs | Judge Bridget Meehan Brennan |
| v. | |
| Cuyahoga County, *et al*. | |
| Defendants | |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF
### MOTION TO EXCLUDE EXPERT REPORTS OF DR. SEAN MALONE

**BACKGROUND**

To support their Motion for Class Certification, Plaintiffs retained data analytics expert Lacey Keller ("Keller") to analyze numerous sets of data produced in discovery and assess the Cuyahoga County Sheriff's Department's ("CCSD") historical "Time to Release"[1] detainees who may qualify as putative class members. (ECF 45-30)[2] Keller assessed the Time to Release for over 5,000 Custody Sessions[3] with release dates between February 23, 2021, and December 31, 2023, that satisfied criteria specified by counsel, and presented her findings in a report. (ECF 45-30 ¶¶ 48-49.6) In response, Defendant retained Dr. Sean Malone to review Keller's report "and prepare [his] own expert report that both responds to the Keller Report and sets forth any additional expert opinions . . . ." (ECF 50-3 ¶ 2)

As part of Dr. Malone's assignment, Defendant's counsel provided him with eight months' worth of sample detainee paper files, which included the records of thousands of detainees, and gave him "free rein to rebut" Keller's report. (ECF 50-6, 32:4-9, 96:8-11) With his free rein, Dr. Malone reviewed some number of paper files in excess of 100, though he could not identify how many total files he reviewed because he "didn't keep track of the count." (*Id.*, 27:24-28:17, 96:22-97:1) Curiously, while Dr. Malone represents himself as an expert in "statistical and financial analysis involving large and complex data sets" (ECF 50-3 ¶ 8), the work he performed is largely devoid of statistical methods or analysis. Dr. Malone conceded that his review of an unknown number of paper files was not statistically representative, and he did "no statistical extrapolation"

---

[1] Time to Release refers to the time between a detainee's Release Triggering Action (*e.g.*, posting bond or being ordered released) and their actual release from the Jail.

[2] Herein, all ECF pincites to page numbers refer to the ECF page numbers stamped at the ***top*** of the filed document.

[3] Custody Sessions, as defined in Keller's report, means: "The recorded interactions with the legal and correctional system for a specific individual for specific charges from entry through release from the Jail. Each Custody Session includes a Release Triggering Action and Release for each charge associated with the Custody Session." (ECF 45-30 ¶ 10)

1

from his review of those non-representative paper files to draw conclusions about the over 5,000 Custody Sessions included in Keller's Time to Release analysis. (ECF 50-6, 137:10-22) Thus, his manual document review did not require his statistical expertise and could just as easily have been performed by a member of Defendant's legal team.

Dr. Malone ultimately did not offer any "additional opinions" beyond those that critique Keller's analysis, and most of his opinions do not directly address Keller's Time to Release analysis. Dr. Malone summarized the conclusions of his original report as follows:

> [1] Keller's unreliable methodology is not appropriate for ascertaining the time that it actually took to release each inmate. Due to insufficient data and incomplete methods, it arrives at inaccurate conclusions about individual inmates.
>
> [2] Keller's opinion is based on insufficient facts because it does not take into account the individualized facts and circumstances that may have impacted the timing of each inmate's release. Such an analysis is necessary to determine if any individual was overdetained.
>
> [3] Keller's analysis wrongfully groups together categories of inmates whose individualized facts and circumstances may impact the time necessary to process each inmate's release.
>
> [4] Keller's methods are inappropriate to calculate the number of people released in specific time intervals, as she disregards a large portion of inmates or computes an inaccurate time.

(ECF 50-3 ¶ 5) In a second report, Dr. Malone supplemented his original conclusions with "additional reasons and examples" for why they are purportedly correct. (ECF 50-4 ¶ 5)

Importantly, Dr. Malone did not offer any opinions regarding the data science methods Keller used for her analysis, which are detailed in the Methodology section of her report. Keller's methodology entailed: (1) merging and structuring voluminous data sets, (2) cleaning the data, (3) sorting the data into Custody Sessions, and then (4) calculating the Time to Release for all Custody Sessions fitting specified criteria. (ECF 45-30 ¶¶ 24-47) Dr. Malone did not opine on these steps. (*See* ECF 50-6, 101:2-5, 21-24 (no opinion on how Keller merged and structured data), 102:9-14

2

("didn't render any specific opinions about how [Keller] cleaned the data"), 99:1-25; 104:16-24 ("didn't have any explicit opinions about the exact process [Keller] followed" in creating Custody Sessions), 114:23-115:2 (took no issue with Keller's Time to Release calculation method (only disagreed with some assumptions provided to her by counsel about certain events constituting a Release Triggering Action, *see infra* at 10, note 5)) Thus, while Dr. Malone's first conclusion summarized above—and others throughout his reports—claim to critique Keller's methodology, his deposition testimony demonstrates that characterizing his critiques in those terms is a misrepresentation. Dr. Malone provides nothing to substantiate the hollow assertion that Keller's "methodology" is "unreliable" "inappropriate" or otherwise flawed. (ECF 50-3 ¶ 5)

Dr. Malone's opinions must be excluded because they fail to satisfy all the requirements of Federal Rule of Evidence 702. Dr. Malone's first three opinions are legal conclusions about what is relevant to assessing overdetention and they bear no connection to the Time to Release analysis Keller performed. Thus, they are irrelevant and unhelpful to the Court. Moreover, even if these opinions were relevant, Dr. Malone is unqualified to offer them because they are not based on his expertise in statistics and he has no separate subject matter expertise concerning jail release processes. The opinions comprising Dr. Malone's fourth conclusion must also be excluded because he used no methods or principles, reliable or otherwise, grounded in statistics or anything else, to draw broad conclusions about Keller's analysis as a whole based on his observations from a limited (albeit unknown) number of detainee paper files. Even insofar as Dr. Malone identified two errors impacting eight total Custody Sessions, Dr. Malone provides no basis to conclude that Keller's methods are "inappropriate" because, despite being a statistician, he did not apply any statistical methods or principles to extrapolate findings from his limited review of paper files to the more than 5,000 Custody Sessions included in Keller's analysis that he did not examine.

3

## ARGUMENT

When parties put forth expert testimony that is material to a class certification motion, the expert and his testimony must be sufficiently credible and reliable to satisfy a *Daubert* analysis. *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253 (6th Cir. 2024). Analyzing the admissibility of expert testimony pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) entails assessing the requirements of Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion . . . if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court must perform a *Daubert* analysis of Dr. Malone's proffered testimony, both because it purports to rebut the Time to Release analysis and conclusions proffered by Keller in support of class certification, and because Defendant relies on it to support its argument that individual issues preclude class certification. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812-13 (7th Cir. 2012) (failure to conduct *Daubert* analysis of challenged defense expert was error where defendant's expert report and testimony "laid the foundation" for defendant's argument in opposition to class certification and district court relied on expert's reasoning when making its decision). (*See also* ECF 49 at 17-18 (citing Malone Reports in opposition to Plaintiff's Motion for Class Certification))

4

### A. Most of Dr. Malone's Testimony Is Inadmissible Because It Amounts to Legal Conclusions That He Is Not Qualified to Make and That Will Not Help the Court

Dr. Malone's reports primarily serve as an improper vehicle for Defendant to advance its legal arguments under the guise of expert testimony offered to rebut Keller's analysis. He principally contends—in his first three conclusions and paragraphs supporting those conclusions (*see infra* note 4)—that Keller should have conducted an analysis that considered the "individualized facts and circumstances" of each release to determine whether an individual was overdetained, rather than simply calculating objective historical Times to Release. (ECF 50-3 ¶ 5; *see also id.* ¶ 20 (criticizing Keller for "not consider[ing] any information about the facts and circumstances that *may have impacted the time that it took* to release an inmate"); ¶ 21 (arguing that "various factors . . . may influence *what the Court may find to be a reasonable time to release*") (emphases added))[4] Dr. Malone also criticizes Keller for "group[ing] together categories of inmates whose individualized facts and circumstances may impact the time necessary to process each inmate's release." (*Id.* ¶¶ 5, 27)

As an initial matter, Dr. Malone is not qualified to opine on what should be considered in determining overdetention because he is neither a legal expert nor a subject matter expert in any jail's release policies and practices, much less those of CCSD. (ECF 50-6, 86:2-87:3) His expertise in "statistical and financial analysis involving large and complex data sets" (ECF 50-3 ¶ 8) simply bears no relationship to his opinions about the "diverse" facts and circumstances that should be considered when analyzing an overdetention. (ECF 49-6 ¶ 21). *See Antioch Co. Litig. Tr. v.*

---

[4] In Dr. Malone's initial report (ECF 50-3), the following paragraphs pertain to the "facts and circumstances" that he opines Keller should have considered: ¶¶ 21-23 (availability of beds in treatment facility and whether a detainee was in medical isolation); ¶¶ 24-27 (timing of a release triggering event); ¶ 28 (human error); ¶¶ 43-49 (CCSD's actual notice of Cleveland bonds and GPS installation); ¶¶ 50-55 (the time a green slip indicating an RNFC disposition was received). In his supplemental report (ECF 50-4), Dr. Malone includes the following additional "facts and circumstances": ¶¶ 9-12 (whether detainees were released to home detention or without restrictions); ¶¶ 14-16 (whether detainee subsequently received credit for time served).

*McDermott Will & Emery, LLP*, No. 3:09-CV-218, 2016 WL 4480650, at *2 (S.D. Ohio Aug. 25, 2016) ("An expert witness's proposed testimony must relate directly to the area in which the witness claims expertise. An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." (internal citation and quotation marks omitted)).

Indeed, the sole basis for Dr. Malone's opinion that the "facts and circumstances" of each release are "unique" is his review of approximately 100 to 200 detainees' paper files. (ECF 50-6, 136:12-137:2 ("[I]ts based on my review of those documents . . . the only way I found those was by looking at the paper documents.")) Common sense dictates that manually reviewing detainee paper files does not require any specialized knowledge of a statistician or a financial analyst. A member of Defendant's legal team could just have easily (or perhaps more easily) performed the very same review. And Dr. Malone himself acknowledged that someone else could perform the task. (*See id.*, 139:21-25 ("I can't tell you what the individual circumstances and facts are of the other [detainee paper] files until I actually review the other files, or somebody else does.")

*Twin K Constr., Inc. v. UMA, Geotechnical Constr., Inc.*, 597 F. Supp. 3d 1204 (E.D. Tenn. 2022), is instructive. There, the court sustained objections to portions of an engineering expert's report that were "simply regurgitation of emails between the parties and daily production logs." *Id.* at 1214-15. Noting that, to be helpful, the expert's opinions needed to "be related to his engineering expertise," the court observed that the expert "summarize[d] the documents in this case and render[ed] conclusions based on what he has reviewed" while providing no basis to conclude that his "expertise in engineering has shaped his opinions." *Id.* The same is true here. Dr. Malone's review of paper files, his recitation of their contents, and his opinions regarding which

6

facts and circumstances should be considered in analyzing overdetentions, bears no connection to his specialized knowledge as a statistician or financial analyst.

Even if Dr. Malone was qualified to offer the opinions he asserts, his testimony fails to assist the Court in evaluating class certification and therefore does not satisfy the first requirement of Rule 702. His testimony is unhelpful—and indeed improper—because it amounts to nothing more than legal conclusions about what facts are relevant and necessary to consider as part of an overdetention analysis. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2023 WL 3266877, at *10 (N.D. Ohio May 5, 2023) ("[T]o the extent [the expert] expresses opinions as to what the law requires, or whether Defendants' conduct violated the law, his opinions are not admissible.") In fact, Dr. Malone's assertions mirror Defendant's legal arguments. For example, to support his assertion that Keller should have considered "individualized facts and circumstances that may have impacted the time necessary to process each inmate's release," Dr. Malone cited documents for a detainee who was "waiting for an available bed at a substance abuse treatment center." (ECF 50-3 ¶¶ 20, 22, 56) This echoes Defendant's argument that release "delays may result from . . . the inability to enroll an inmate into a halfway house or drug/alcohol facility" in its opposition to class certification. (ECF 49 at 17) Another example offered by Dr. Malone involved a detainee for whom "Jail staff had a question . . . [about] the continued bond" (ECF 50-3 ¶ 23), which parallels Defendant's argument that "delays due to the need to clarify vague or inconsistent" release paperwork present individualized issues that preclude certification (ECF 49 at 17). Defendant itself recognized that where, as here, "an expert merely offers his client's opinion as his own, that opinion may be excluded." (ECF 50 at 11 (quoting *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014))

7

Dr. Malone's explanations for why he thought Keller should have considered various facts and circumstances specified in his report are telling. As to one, he answered: "I understand it from my experience and discussion with counsel that this may be relevant to the case." (ECF 50-6, 183:24-184:15) As to another, he testified that it is "an issue that could potentially be relevant to the trier of fact." (*Id.*, 247:19-248:4) As to yet another, he acknowledged: "I believe that's a legal issue to determine whether it is [relevant] in this particular case." (*Id.*, 241:9-14) Determining what is *relevant* is a legal question for the Court, not a proper matter for expert testimony. Further, it is particularly suspect that Dr. Malone's opinions about Keller's alleged failures are couched in language about "*individualized* facts" (ECF 50-3 ¶¶ 5, 56; ECF 50-4 ¶ 37) (emphasis added) —the same language used in case law holding class certification is not appropriate. *Cf. Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (finding expert's testimony about City's conduct constituting "deliberate indifference" to be "particularly suspect" because it was "carefully couched in the precise language used in case law" and holding it was improperly received in violation of the Federal Rules of Evidence) For these reasons, Defendant cannot demonstrate that Dr. Malone is qualified to provide the opinions in his report, nor can it demonstrate that Dr. Malone's testimony satisfies the first Rule 702 requirement that expert testimony must help the trier of fact.

### B. Dr. Malone Did Not Utilize Any Reliable Principles and Methods to Conclude That Keller's Analysis Is Flawed

Lack of qualification and helpfulness aside, all of Dr. Malone's opinions must be excluded because they are not the product of any principles and methods whatsoever, much less reliable ones, as required by the third Rule 702 requirement. Of course, without using reliable principles or methods in the first instance, Dr. Malone also could not reliably apply reliable principles and methods to the facts of the case. Thus, Dr. Malone's expert opinions likewise fail to satisfy the

8

fourth Rule 702 requirement. *See Littler v. Ohio Ass'n of Pub. Sch. Emps.*, No. 2:18-cv-1745, 2020 WL 1861646, at *5 (S.D. Ohio Apr. 14, 2020) ("It follows that when an expert's opinions are the product of *no* principles or methods, but instead are based on unsubstantiated conclusions and speculations, they cannot meet the rigors of Rule 702." (emphasis in original)).

As an initial matter, Dr. Malone based his conclusions regarding Keller's analysis of over 5,000 Custody Sessions on his review of over 100 detainee paper files, but he failed to apply reliable principles or methodologies in selecting which paper files to review. For instance, notwithstanding that he is a statistician, Dr. Malone did not develop *any* method to review a statistically representative sample of paper files for the more than 5,000 Custody Sessions that were included in Keller's Time to Release analysis. (ECF 50-6, 137:3-14) He likewise did not endeavor to review a statistically representative sample of the eight months of paper files provided to him by Defendant's counsel. (*Id.*, 29:20-30:1) ("I didn't do any tests to see if [the paper files reviewed] were representative [of the eight months of paper files] or not.") Indeed, Dr. Malone did not even know how many total paper files were in the eight-month sample he was provided, nor did he know how many of the Custody Sessions in Keller's data analysis were represented in the eight-month sample paper files, and he did not take any steps to ascertain that information. (*Id.*, 27:2-14, 29:1-4) Dr. Malone also did not even keep track of how many total paper files he reviewed. (*Id.* 27:24-28:17)

Instead of using statistical principles to develop a meaningful plan for reviewing the paper files, Dr. Malone determined which files to review in much the same way any lay person might. He selected half of the paper files he reviewed on the basis that he deemed the detainees' Custody Sessions to be "outliers" (*id.*, 34:3-34:8), but he did not use any statistical method to determine which custody sessions were outliers, did not review all the outlier custody sessions reflected in

9

the paper files, and did not use any statistical method to determine which outlier paper files to review. (*Id.*, 51:16-20, 47:1-11) Dr. Malone chose the other half of the paper files he reviewed at random, in a lay, non-statistical sense, as he did not use any criteria to choose these files or rely on his statistical expertise in choosing them. (*Id.*, 39:7-40:7; 43:1-3) Thus, even though his opinions criticizing Keller's Time to Release analysis are premised entirely on his review of detainee paper files, his review of an unknown number of paper files for that purpose was not statistically representative. (*Id.*, 137:3-14)

Moreover, after reviewing an unknown number of non-representative paper files, Dr. Malone conducted "no statistical extrapolation" in order to draw conclusions about the over 5,000 total Custody Sessions included in Keller's Time to Release analysis. (*Id.*, 137:15-22) Instead, Dr. Malone made sweeping conclusions about Keller's analysis without utilizing any statistical methods or principles (reliable or otherwise) as a basis to reach his conclusions.

For example, in his original report, Dr. Malone asserted that "Keller identified incorrect Release Triggering Events" (ECF 50-3 ¶ 34) and he discussed two Custody Sessions in support of his assertion (*id.* ¶¶ 35-42 (Devonta Seals and Taye Amneh analyses)). Based on these two examples, Dr. Malone offered broad opinions that Keller's data analysis as a whole is unreliable. (*See id.* ¶ 32 ("Keller's methodology also leads to inaccurate conclusions about length of time to release . . . ."); *id.* ("These flaws mean that estimates of time to release . . . are unreliable."); *id.* ¶ 37 ("Keller's method does not produce reliable release triggering event times . . . ."); *id.* ¶ 41 ("Keller's method is unable to accurately identify the events and times at which the release process begins."))[5]

---

[5] The minor error Dr. Malone identified was caused by counsel providing Keller an incorrect assumption (*see* ECF 45-30 ¶ 40), which was easily corrected (ECF 45-29 ¶ 2.2) and did not occur because Keller's "methodology" is flawed, as Dr. Malone claims, *see supra* at 2-3.

Dr. Malone's sweeping conclusions are inadmissible because he failed to employ any statistical methodology capable of supporting any inference about the thousands of Custody Sessions in Keller's Time to Release analysis based solely on the Seals and Amneh examples.[6] (ECF 50-6, 137:15-22) In fact, he did not even use any *non-statistical* methods either, and could only speculate that Keller's analysis might contain other errors like the one he specifically identified. (*Id.*, 106:3-6 ("There may be more [examples], because I – I didn't do an exhaustive review of the files or those she had records for. It *could* be many more.") (emphasis added)) *See Wells v. GEICO Gen. Ins. Co.*, No. CV 5:19-500-DCR, 2021 WL 3131316, at *13 (E.D. Ky. July 23, 2021) ("Rule 702 requires more than a mere possibility to form the basis of an opinion."). Thus, Dr. Malone's attempt to draw wide-ranging conclusions about the entirety of Keller's analysis based on an error he identified as having impacted two Custody Sessions (only one of which was included in Keller's original analysis, *see supra* note 6) is little more than *ipse dixit*. Dr. Malone wants this Court to *assume* there are more errors in Keller's analysis, but his opinion rests on no scientific or technical principles or methodology and, as such, must be excluded. *See Littler*, 2020 WL 1861646, at *5 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.).

These points apply with equal force to the six Custody Sessions Dr. Malone identified as having an incorrect Time to Release calculation because the underlying release order provided for release at a future time. (ECF 50-4 ¶¶ 22-36) Based on this issue, Dr. Malone opined that Keller's "simplistic method" cannot "reliably do what it claims." (*Id.* ¶¶ 23, 26) But again, because he did not use any method, statistical or otherwise, to extrapolate from the six examples any information

---

[6] Amneh's Custody Session was always properly excluded from Keller's analysis pursuant to the criteria for inclusion in it. (ECF 50-3 ¶ 35 ("Amneh was not included in Keller's analysis."); *see also* ECF 50-6 197:5-198:10)

11

about any of the other thousands of Custody Sessions in Keller's Time to Release analysis (ECF 50-6, 137:15-22) Dr. Malone's conclusion that Keller's method is unreliable is both baseless and meaningless. Keller proved the conclusion to be false by promptly adjusting her analysis to remove all Custody Sessions "in which the release triggering event was a Common Pleas Release Order, and the associated docket text contained information that specified a future release date or time." (ECF 45-29 ¶ 2.1) Keller accomplished this by creating code that, similar to applying search terms, "scanned [the release order docket entry data] for a series of patterns that would indicate a future release date or time." (ECF 50-1, 159:18-160:12)

Ultimately, Keller's updated Time to Release analysis reflects that adjusting it to account for the two types of errors discussed above had an inconsequential impact on her overall conclusions. (*Compare* ECF 45-30 at 24, Figure 1 *with* ECF 45-29 at 4, Figure 1)[7] Dr. Malone's suggestion that the two errors are fatal to her analysis is thus deeply flawed and must be excluded because he did not reach that grandiose conclusion using any reliable (or even unreliable) statistical or other scientific or technical principles or methods. *Cf. Littler*, 2020 WL 1861646, at *6 (holding expert's conclusion unreliable and inadmissible where he "regurgitate[d] information from various data sets and use[d] them to draw speculative conclusions" that amounted to "unfounded extrapolations" without even "purport[ing] to use any specific methodology" and adding that "[c]onclusions based on pure speculation or pure correlation are not accepted in the field of economics and they are not accepted in the courtroom either").

Finally, the same is true of Dr. Malone's conclusion that Keller's methods are inappropriate because her Time to Release analysis excludes a large number of Custody Sessions. (ECF 50-3 ¶¶

---

[7] For instance, in Keller's initial report, 50 percent of No Holds Custody Sessions had a Time to Release of 5.66 hours, while in her supplemental report, this number changed to 5.67 hours, a difference of 0.01 percent of one hour. (ECF 45-30 at 24; ECF 45-29 at 4)

12

29-31) This opinion is little more than an observation. Keller indeed "calculate[d] the time to release for only a fraction of <u>all</u> Custody Sessions in the relevant class period"—specifically, she originally analyzed 5,343 of the 58,097 Custody Sessions she identified from the data. (*Id.* ¶¶ 30-31 (emphasis in original) But as Keller clearly detailed in her report, she intentionally excluded the other Custody Sessions because they did not meet counsel's criteria for analysis.[8] (*See* ECF 45-30 ¶¶ 48-49 (explaining that Custody Sessions were included in analysis only "if they met one of the [No Holds, Booking Holds or GPS Holds group] parameters" and even then, only if the session fulfilled additional specified criteria instructed by Counsel); *see also* ECF 54-2 ¶ 5 (detailing the number of Custody Sessions omitted from analysis by application of each criteria))

Notably, in his deposition Dr. Malone acknowledged being aware of the criteria for Custody Sessions to be included in Keller's analysis but said he took no steps to analyze how many Custody Sessions were excluded based on Keller's application of the criteria. (ECF 50-6, 191:6-25) He also conducted no analysis to determine whether Keller inadvertently excluded any Custody Sessions that fit the criteria she set out to analyze. (*Id.*, 193:7-18) In short, he used no principles or methods to reach his false conclusions that Keller's method "*cannot* identify all individuals released during specific time intervals because it is *incapable* of measuring the time to release for more than 90% of all identified releases." (ECF 50-3 ¶ 31) (emphases added) As such, there is no foundation to support Dr. Malone's overarching conclusion that Keller's method is inappropriate for calculating historical Time to Release, and his unreliable conclusion must be excluded.

---

[8] Plaintiffs only required a Time to Release analysis for a fraction of the Jail population during the relevant period because Plaintiffs only seek to certify a Class of detainees who make up a tiny fraction of the Jail's population. (*See* ECF 44 ¶ 5; ECF 51 at 9, n.6) Analyzing the Time to Release detainees who could not possibly be putative Class Members would do nothing more than incur needless time and expense.

13

**CONCLUSION**

The Court should exclude Dr. Malone's expert reports because they primarily consist of unhelpful legal conclusions and arguments that he is unqualified to assert and his opinions are not grounded in any—let alone reliable—principles or methods.

Dated: May 15, 2025

Respectfully submitted,

/s/ *Kate Schwartz*

Drew Legando (0084209)
MERRIMAN LEGANDO WILLIAMS & KLANG, LLC
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
(216) 522-9000
drew@merrimanlegal.com

Kate Schwartz
Caryn Lederer
Emily Brown
HUGHES SOCOL PIERS RESNICK & DYM LTD.
70 W. Madison Street, Suite 4000
Chicago, Illinois 60602
T. (312) 580-0100
kschwartz@hsplegal.com
clederer@hsplegal.com
ebrown@hsplegal.com

Janet Herold
JUSTICE CATALYST LAW
40 Rector Street, Floor 9
New York, New York 10006
(518) 732-6703
jherold@justicecatalyst.org

Akeeb Dami Animashaun
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
(929) 266-3971
dami@animashaun.me

*Counsel for Plaintiffs & Proposed Class*

14