UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALANNA DUNN, *et al.*, | ) | Case No. 1:23-cv-00364 |
| | ) | |
| Plaintiffs, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| CUYAHOGA COUNTY, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Before the Court is the Motion for Class Certification filed by Plaintiffs Alanna Dunn,

Reginald Haymon, Adam Day, Eric Zeider, Cameron Leonard, and Jason Wilson ("Plaintiffs").

(Doc. 44.)  Defendant Cuyahoga County (the "County") opposed (Doc. 49), and Plaintiffs replied

(Doc. 51).  Relatedly, the County moved to strike the Declaration of A. Dami Animashaun (Doc.

48) and moved in limine to preclude the use of Lacey Keller's Expert Report (Doc. 50).  Both are

fully briefed.  (Docs. 52, 54, 55, 59.)  Plaintiffs also moved to strike Dr. Sean Malone's Expert

Report (Doc. 56), which is also fully briefed (Docs. 60, 61).

For the reasons stated herein, the Motion for Class Certification is GRANTED.  The

County's Motion to Strike the Declaration of A. Dami Animashaun is GRANTED in part and

DENIED in part.  The County's Motion in Limine to Preclude Lacey Keller's Expert Report is

DENIED.  Plaintiffs' Motion to Strike Expert Report of Dr. Sean Malone is DENIED.

I.      **BACKGROUND**

      A.      **Nature of the Claims**

            1.      **Allegations**

Plaintiffs filed this class action pursuant to 42 U.S.C. § 1983 alleging the County's and the Cuyahoga County Sheriff's Department's ("CCSD") deliberate indifference caused them to be over-detained in the Cuyahoga County Jail ("Jail") after the legal basis for detention terminated, in violation of the Fourteenth Amendment.[1]  (Doc. 39.)  As stated in the Complaint, CCSD has a "policy and practice of detaining individuals for an unreasonable period after the legal basis for their detention ends" which is systemic and widespread.  (*Id.* at 289, ¶ 122.) CCSD "failed to provide adequate procedural protections to ensure that people held at the Jail are not detained for an unreasonable period of time."  (*Id.* at 289, ¶ 125-26.)  The named Plaintiffs assert over-detention based on the following facts:

- **Dunn**: Cleveland police arrested Dunn at approximately 1:00 a.m. on March 30, 2021.  (*Id.* at 271, ¶ 5.)  Cleveland police transported her to the Jail.  (*Id.*)  That same day, Cleveland police declined to file criminal charges.  (*Id.*)  Even so, CCSD continued her detention until April 1, 2021.  (*Id.*)

- **Haymon**: On December 8, 2023, Haymon turned himself in and was arraigned the same day.  (*Id.* at 280, ¶¶ 44-46.)  A Cuyahoga County Court of Common Pleas judge allowed release on bond.  (*Id.* at 280, ¶ 47.)  That day, a third-party paid his bond. (*Id.* at 280, ¶¶ 47-48.)  Haymon was not released from the Jail until December 11, 2023.  (*Id.* at 281, ¶ 53.)

- **Day**: On February 10, 2022, Day was arrested and booked shortly after.  (*Id.* at 281, ¶ 59.)  He paid a personal bond that same day.  (*Id.* at 281, ¶ 60.)  Instead of being released, he appeared before a Cleveland Municipal Court judge who ordered him released on a personal bond.  (*Id.* at 281-82, ¶¶ 61-62.)  Day was released at 8:00 p.m. on February 11, 2022.  (*Id.* at 282, ¶ 65.)

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.  Citations to the Complaint are to the individually numbered paragraphs.

- **Zeider**: Police arrested Zeider on April 13, 2022.  (*Id.* at 282, ¶ 69.)  On April 14, 2022, he appeared before a Cleveland Municipal Court judge who ordered released upon payment of a $7,500 bond and the installation of a GPS monitor.  (*Id.* at 282, ¶ 70.)  That day, a family member paid his bond, and a third-party company installed the GPS monitor.  (*Id.* at 282, ¶ 71.)  Instead of being immediately released, Zeider was released the next day at 5:00 p.m.  (*Id.* at 283, ¶ 74.)

- **Leonard**: On July 15, 2022, police arrested Leonard and booked him the same day.  (*Id.* at 283, ¶¶ 76-77.)  Leonard had three unrelated failure to appear charges, none of which carried jail time.  (*Id.* at 283, ¶¶ 78-79.)  After being booked, Cleveland police declined to bring charges.  (*Id.* at 283, ¶ 80.)  Despite having no jailable offenses, Leonard was not released until July 17, 2022.  (*Id.* at 283, ¶ 81.)

- **Wilson**: Police arrested Wilson on May 7, 2022.  (*Id.* at 284, ¶ 85.)  On May 9, 2022, Cleveland police declined to filed charges against Wilson.  (*Id.* at 284, ¶ 87.)  Wilson was nonetheless detained until May 10, 2022, when he appeared before a Cleveland Municipal Court judge.  (*Id.* at ¶ 88.)  Wilson was released that same day.  (*Id.* at 284, ¶ 93.)

Plaintiffs request certification of the following class:

From February 23, 2021, through the present, all pretrial Cleveland and County Detainees who, when the basis for their pretrial detention ended (*i.e.* who had no other pending charges when they: were released with no formal charges, were ordered released, paid or were issued a bond, or were being detained solely on a minor misdemeanor or personal bond eligible charge), either:

1) had no Holds and were not released from the Jail within 12 hours after the basis for their detention ended; or

2) had only a Booking Hold (*i.e.*, a hold for completion of a booking step, such as DNA, photos, or fingerprints) and were not released from the Jail within 12 hours after the basis for their detention ended; or

3) had only a Monitoring Device Hold (*i.e.*, a hold for installation of a GPS or SCRAM monitor) for a Cleveland Municipal Court Case and were not released from the Jail within 12 hours after installation of their monitoring device.

(Doc. 44 at 318.)

### 2.    CCSD's Release Process

CCSD operates the Jail.  (Doc. 39 at 274, ¶ 14.)  The Jail houses detainees who have

cases pending in the Cuyahoga County Court of Common Pleas ("County Detainees").  (Doc. 45

at 323.)  In 2018, the County and the City of Cleveland ("Cleveland") agreed the Jail would also house detainees who have pending charges in the Cleveland Municipal Court ("Cleveland Detainees").[2]  (Doc. 45-1.)

CCSD Criminal Records Clerks "are responsible for processing certain inmate information, paperwork, and files from the time the inmate enters [the Jail], to the time they are released."  (Doc. 45-23 at 1582; Doc. 49-1 at 2027.)  Processing releases begins once a disposition is communicated to the Jail.  (Doc. 45-2 at 406; Doc. 49-1 at 2027.)  Different types of dispositions entitle a detainee to release, including payment of a bond, a court ordered release, no formal charges were filed, a notification that a condition of release has been met such as the installation of a GPS or alcohol monitoring device, or pleas.  (*Id.*)  How dispositions are communicated to Records Clerks depends on the type of detainee and the reason for release. (Doc. 45-2 at 406; Doc. 49-1 at 2029.)

Court-ordered releases for County Detainees are received from the electronic Criminal Justice Information System ("CJIS") database.  (Doc. 45-23 at 1598-99; Doc. 49-1 at 2030.) Once a court order is received through the CJIS database, a Records Clerk assigned to that detainee will begin the release process by creating a paper "book sheet."  (Doc. 45-23 at 1599; Doc. 49-1 at 2030-31.)  The Records Clerk reviews the court order to ensure it orders the release of the detainee.  (Doc. 45-23 at 1599.)  The Records Clerk then reviews the detainee's file to determine if there are any conditions or holds preventing the release from proceeding.  (*Id.*; Doc. 49-1 at 2031.)  Various holds can be placed on a detainee's release, including a photograph needs

---

[2] Per the 2018 agreement, Cleveland wanted to close its city jail and rely instead on the Jail for housing detainees.  (Doc. 45-1 at 343.)  The County similarly contracts with other political subdivisions to provide housing and related services for city detainees.  (Doc. 39 at 275, ¶ 20.) Only County and Cleveland Detainees are relevant here.

to be taken, fingerprints need to be taken, a DNA swab is necessary, GPS or alcohol monitoring device needs to be installed, holds from other municipalities, federal detainers or other arrest warrants, release must be made to a family member, or detainee must be released to a treatment facility.  (Doc. 45-23 at 1584-85.)

Once the Records Clerk determines there are no holds and the release can be processed, the Records Clerk signs a release book sheet and sends the records to a LEADS clerk for a warrant check.  (Doc. 45-23 at 1599; Doc. 45-5 at 725.)  Once cleared by the LEADS clerk, a Records Clerk supervisor must sign off on the release.  (Doc. 45-23 at 1062; Doc. 45-5 at 725.)  Before sending to the Jail, the Records Clerk ensures no holds or other issues prevent release.  (Doc. 45-23 at 1062; Doc. 45-5 at 725.)  Once complete, the Records Clerk emails the release file to the Jail Release Desk.  (Doc. 45-23 at 1062; Doc. 45-5 at 726.)  Then, release desk staff, typically called "Jailers," process and effectuate the release.  Jailers create a release packet, complete a checklist, and hands the release to an escort officer.  The escort officer picks up the detainee for release.

County Detainees who pay their bond follow a similar process.  Once paid, their information is sent to CJIS in a "Sheriff's Bond Posted Queue."  (Doc. 49-1 at 2030.)  The queue refreshes hourly.  (Doc. 45-23 at 1597.)  Records Clerks run a "bonds list" to obtain information on detainees who have posted bond.  (*Id.* at 1604.)  Per CCSD's policies, Records Clerks are required to run a bonds list hourly or at their earliest convenience.  (Doc. 45-23 at 1604.)  Once a bond is posted, Records Clerks follow the same process outlined above.  (*Id.* at 1598.)

Release dispositions for Cleveland Detainees are communicated differently.  While court-ordered releases and posted bonds are docketed on the Cleveland Municipal Court docket, there is no automated system in place similar to CJIS to communicate orders and bond payments

electronically.  Instead, the Clerk of Courts for the Cleveland Municipal Court emails these records to a shared email account monitored by Records Clerks.  (Doc. 45-9 at 935-36.)  The records are then disseminated to an assigned Records Clerk to process the release in a similar manner as County Detainees.

When the Cleveland Municipal Court grants a Cleveland Detainee personal bond, a Court Liaison—a CCSD employee assigned to the Cleveland Municipal Court arraignment room— sends a notification to the Records Clerk shared email account.  (Doc. 49-1 at 2031.)  The Clerk of Courts for the Cleveland Municipal Court may also send notification of a personal bond to the shared email account.  (Doc. 49-1 at 2031.)  Court orders for personal bond are recorded on "bubble sheets," which are hand-written entries signed by the Cleveland Municipal Court judge and provided to CCSD.  (*Id.*)  They are the scanned and sent to the Records Clerk shared email account.  (*Id.*)  When a Cleveland Detainee posts a cash or surety bond, the Cleveland Municipal Court sends a notification to the shared email account.  (Doc. 49-1 at 2031.)  Records Clerks then process releases.

Some Cleveland Detainees are not formally charged after their arrest.  This is called "Release No Formal Charges" ("RNFC").  (Doc. 49-1 at 2029.)  Cleveland police officers enter charging decisions in the "Law Enforcement Records Management System" ("LERMS") database.  (Doc. 45-2 at 406.)  When no charges are being presented, officers note "RNFC" in LERMS and also on a physical copy of the record.  The physical record is called a "green slip." (Doc. 45-2 at 406.)  Prior to 2024, Jailers were required to periodically check LERMS to determine if RNFC notations entitled a Cleveland Detainee to be released.  (Doc. 45-10 at 1034.) Sometimes Cleveland police would deliver green slips to Jailers.  (Doc; 49-1 at 2030.)  Either way, once a Jailer is notified of an RNFC, that information is sent to the Records Clerks via the

shared email to begin the release process. (Doc. 45-1 at 2030.) This process changed in 2024. Cleveland police are now required to send charging decisions to a dedicated group email called "Charging Updates," which is monitored by Records Clerks. (Doc. 45-1 at 2029.)

Other detainees have "holds" tied to release conditions, such as the installation of GPS monitoring equipment. For Cleveland Detainees, Oriana House, a third-party entity with whom Cleveland contracts, installs such monitors. (Doc. 49-1 at 2031.) Once installation is complete, a Court Liaison notifies the Records Clerks through the shared email account. (Doc. 49-1 at 2031.) At the end of each day, Oriana House sends an email to a shared email account identifying all Cleveland Detainees who had devices installed that day. (Doc. 49-1 at 2031-32.) For County Detainees, the County Probation Department installs monitoring devices at the Jail's release desk and notifies Records Clerks through a dedicated shared email account. (Doc. 49-1 at 2032.)

Records Clerks work business days and hours. (Doc. 45-6 at 840.) When Records Clerks are not working, Jailers assigned to the release desk process releases. (Doc. 45-6 at 840.)

### 3. Over-Detention Issues

Plaintiffs allege the County's release process is systemically deficient because it causes detainees to be over-detained long past the point when they are entitled to release. Plaintiffs identify various deficiencies and issues with the release process. First, there is no routine tracking system to ensure each detainee's timely release. (Doc. 45 at 323.) The release system relies on third parties, such as the Clerk of Courts, to notify the County of release-triggering events, but none of those notification systems are formalized in any written agreement or handbook. (Doc. 45 at 325.) Second, there are no failsafe measures in place and the lack of formal policies lead to over-detentions. (Doc. 45 at 326.) Plaintiffs highlight two examples

where the lack of clarity and formal policies lead to unconstitutional detentions: (1) Jailers do not predictably and routinely check LERMS for bond notations, and (2) green slips notifying of RNFC determinations were not delivered to Jailers.  (Doc. 45 at 326-27.)  Plaintiffs identify a host of human errors in the release process, as well as including failing to identify RNFC dispositions in LERMS, failing to process RNFCs, overlooking or deleting emails with release dispositions, improperly processing detainees on the bond list, misplacing records, and failing to distribute release records from the shared email account.  (Doc. 45 at 327-29.)

Plaintiffs allege the County knew its release system was deficient but did nothing to correct the problems.  (Doc. 45 at 328-29.)  Notably, after the County and Cleveland signed the 2018 agreement, costs associated with Cleveland Detainees were routinely examined.  This is because the agreement stated Cleveland would pay the County a set amount for each detainee for each day in custody.  (Doc. 45-2 at 448.)  So, in scrutinizing these bills, Cleveland identified detainees who appeared to be entitled to release but were not released that day.  (Doc. 45-2 at 448-49.)  Starting in 2019, Cleveland began issuing a monthly report.  (Doc. 45-2 at 449.)  CCSD staff attempted to analyze the reports to ascertain a list of detainees that were released later than their documentation suggested.

In 2021, CCSD began paying more attention to these monthly reports, largely so it could determine if over-detention occurred and, if so, which department was at fault.  (Doc. 45-6 at 809.)  CCSD staff testified these monthly checks resulted in changes to the release process.  (Doc. 45-6 at 810-11.)  By way of example, where a detainee was eligible for a personal bond, the clerk's office began automatically sending notice to the Records Clerk's shared email account.  (Doc. 45-6 at 811.)  As another example, because a large number of individuals on the monthly reports were "RNFCs," CCSD changed its practice to require Cleveland police officers

to affirmatively send RNFC decisions instead of waiting for a Jailer could review LERMS. (Doc. 45-6 at 811.)  Changes were also made to processing notices when monitoring devices were installed.  Before, if a detainee required a monitoring device, a correction officer would provide notice that the detainee's device was installed by Oriana House.  (Doc. 45-6 at 811.)  But if that correction officer was not on duty, and therefore not aware of the installation, it could be that no notice was sent.  (Doc. 45-6 at 811.)  Similarly, Oriana House altered its procedures to send the Records Clerk a daily list of detainees for whom installation was completed.  (Doc. 45-6 at 811.)  Throughout the relevant time period, CCSD disciplined employees who caused over-detentions.  (Doc. 45-6 at 813-15.)

The Cuyahoga County Clerk of Court's Office also had a criminal manager, Krystal Lawyer ("Lawyer").  Beginning in January 2022, Lawyer prepared periodic reports (mostly daily reports) and sent them to the CCSD.  These reports were intended to be an added check on the processing bond releases.  (Doc. 45-6 at 819; Doc. 45-7 at 898.)  The list identified County Detainees who were not released the same day they posted bond.  (Doc. 45-7 at 898.)  CCSD employees reviewed the list and would confirm through the databases if another reason or hold prevented release.  (Doc. 45-6 at 819.)  CCSD employees communicated with Common Pleas staff about those identified on this list.  (Doc. 45-6 at 819; Doc. 45-7 at 901.)  Sometimes holds prevented release.  Other times, identified errors in processing resulted in over-detention.  (Doc. 45-7 at 901.)

### 4.     Plaintiffs' Expert Lacey Keller

Plaintiffs retained Lacey Keller ("Keller"), a data scientist, as an expert witness to review and standardize files produced by the County relating to releases occurring between February 23, 2021 and December 31, 2023.  (Doc. 45-30 at 1772.)  These files included datasets with

information on arrests, bookings, bonds, release orders, GPS installation orders, and actual releases.  (*Id.*)  Plaintiffs' counsel asked Keller to conduct a variety of analyses, including calculating the time it took the County to release individuals after a triggering action, among other analyses on the timing of certain events relating to releases.  (*Id.* at 1772-73.)  After creating one standard dataset from the various produced ones, Keller conducted a series of calculations to determine the time it took for CCSD to undertake certain actions.  (*Id.* at 1788.)  Most importantly, Keller calculated the "time to release" by identifying a release triggering event, the time a release notification was sent from a Records Clerk to the Jail's release desk, and the time the detainee was released.  (*Id.*)

For detainees with release triggering event and no holds on their release, Keller found most were released in under 6 hours, and 95% were released in under 10 hours.  (*Id.* at 1792.)  Generally, it took approximately 2.5 hours from the release triggering event to send the release notification email to the Jail, and it took 7.5 hours for 95% of the detainees from the release triggering event to the release notification email.  (*Id.* at 1806.)  For detainees with holds, most were released in under 7 hours, and 95% were released in under 12 hours.  (*Id.* at 1795, 1800.)

In most cases, Keller found a booking hold added an additional 90 minutes to the release time.  Once a booking hold was removed, the release usually occurred within the hour.  (*Id.*)  On average, it took 2.8 hours from the release triggering event to send a release notification to the Jail.  It took 24.8 hours for 95% of such cases.  (*Id.* at 1809.)

Keller also examined the time to release for individuals with GPS holds.  (*Id.* at 1802.)  Keller found that most detainees were released within 7 hours after installation of a GPS monitoring device, and 95% of detainees were released within 13 hours of installation of a GPS monitoring device.  (*Id.*)  It generally took under 3.2 hours to send the release notification to the

jail after the release triggering action for 50% of detainees, and 7.6 hours to send the release notification for 95% of detainees. (*Id.* at 1812.) After receiving the release notification, it typically took approximately 3 hours to release 50% of detainees, and 6.5 hours to release 95% of the detainees. (*Id.* at 1816.) Those times increase to 3.6 hours and 7.6 hours, respectively, for detainees with a hold. (*Id.* at 1819.) And it took 2.9 hours and 5 hours, respectively, for GPS holds. (*Id.* at 1822.)

### 5. County's Expert Dr. Sean Malone

The County retained Dr. Sean Malone ("Dr. Malone"), a consultant who primarily works in statistics, finance, and economics, to rebut Keller's analyses. (Doc. 49-6 at 2172.) Dr. Malone's main conclusions are: Keller's methodology for calculating time to release is unreliable because it is based on insufficient data and incomplete methods; Keller's opinion is based on insufficient facts because it does not consider the individualized facts affecting time to release; Keller wrongfully groups together detainees leading to inaccurate time calculations; and Keller inappropriately excluded detainees which creates inaccurate time calculations. (*Id.* at 2173.)

Dr. Malone criticizes Keller's analysis because, to him, it does not take into consideration variables that can affect release time. For instance, Dr. Malone demonstrated, using the same data sets Keller used, that the time between the release triggering event and notification to the release desk varied greatly depending on the timing of the release triggering event. (*Id.* at 2179.) Release times for detainees with no holds whose release triggering event occurred during business hours (when Records Clerks process releases), releases were processed in 3.73 hours on average, while detainees whose release triggering events occurred outside of regular hours (when release desk staff process releases), releases were processed in 8.27 hours on average. (*Id.*) This

one demonstration, Dr. Malone states, undermines Keller's data which simply combines all detainees into one group.  (*Id.*)

Dr. Malone criticized Keller's dataset more generally, asserting she excluded a significant number of custody sessions (over 90%) because of various issues with the dataset, or exclusions Plaintiffs' counsel instructed Keller to make.  (*Id.* at 2181-82.)  The data Keller analyzed originally contained approximately 58,000 custody sessions, but Keller's report addressed only approximately 5,000 custody sessions.  (*Id.*)  Thus, Keller's analysis is unreliable, Dr. Malone says, because it only reviews a small fraction of custody sessions and extrapolates from there. (*Id.*)

Dr. Malone also finds Keller's statistical analysis inappropriate because an automated data set cannot be used to determine "time to release."  (*Id.* at 2182.)  Instead, an appropriate analysis would include the review of each detainee's file to determine the circumstances of each detainee's release.  (*Id.*)  But according to Dr. Malone, Keller ignored detainees' files and instead used only incomplete datasets to conduct her analysis.  (*Id.*)  This led to incomplete and erroneous results.  For instance, reviewing some custody sessions for detainees reveal mismatches between what actually happened and what Keller's dataset calculates.  (*Id.* at 2183.) And Keller's definition of "release triggering event" is inaccurate because it does not necessarily record when the Records Clerk learned of the release triggering event.  For example, Dr. Malone cites various examples where Keller's dataset pinpoints a release triggering event tied to a disposition, but a further review of the detainee's file shows a disposition was not communicated to the Records Clerk until hours later.  (*Id.* at 2188.)

Based on the flaws discussed above, Dr. Malone opines it would be impossible to determine if specific individuals were members of the proposed class without reviewing each detainees file. (*Id.*)

## B. Procedural History

The complaint contains two claims for relief: a claim under 42 U.S.C. § 1983 for violation of Substantive Due Process under the Fourteenth Amendment (Count One); and a claim under 42 U.S.C. § 1983 for violation of Procedural Due Process under the Fourteenth Amendment (Count Two). (Doc. 1 at 13-14, ¶¶ 63-70.) The County answered on May 8, 2023. (Doc. 17.) After the Court granted leave to file a first amended complaint (Doc. 38), Plaintiff added five additional named plaintiffs (Doc. 39 at 270). Aside from additional allegations relating to the new named plaintiffs, no allegations or claims were modified or added. (*Id.*)

Plaintiffs timely moved for class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure, or, alternatively, Rule 23(c)(4). (Doc. 44 at 316.) The County opposed class certification. (Doc. 49.) Plaintiffs filed a reply in support of their motion. (Doc. 51.)

Shortly thereafter, the County moved to strike attorney A. Dami Animashaun's declaration in support of Plaintiffs' motion for class certification. (Doc. 48.) That motion is fully briefed. (Docs. 52, 55.) The parties also moved to strike the other's expert witness pursuant to Fed. R. Evid. 702. Those motions are fully briefed. (Docs. 54, 59, 60, 61.)

## II. ANALYSIS

### A. Rule 702 Challenges to Keller and Dr. Malone

#### 1. Legal Standard

"If challenged expert testimony is material to a class certification motion, the district court must demonstrate the expert's credibility under *Daubert*." *In re Nissan N.A., Inc. Litig.*,

122 F.4th 239, 253 (6th Cir. 2024).  In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), "the Supreme Court established a general gatekeeping [or screening] obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant."  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (quotations and citations omitted).  Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  *In re Scrap Metal Anti. Litig.*, 527 F.3d 517, 528 (6th Cir. 2008).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b)  the testimony is based on sufficient facts or data;
> c)  the testimony is the product of reliable principles and methods; and
> d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Thus, an expert must first "be qualified by 'knowledge, skill, experience, training, or education.'"  *In re Scrap Metal Anti. Litig.*, 527 F.3d at 529 (citing Fed. R. Evid. 702).  "Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Id.*  "Third, the testimony must be reliable."  *Id.*  "Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'"  *Id.*  Further, "*Daubert* provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony. These factors include: 'testing, peer review, publication, error rates, the existence and

maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community.'" *Id.* (quoting *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)).

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Anti. Litig.*, 527 F.3d at 529-30 (citing Fed. R. Evid. 702). "[T]he requirement that an expert's testimony be reliable means that it must be 'supported by appropriate validation—*i.e.*, good grounds, based on what is known.'" *Id.* at 529 (quoting *Daubert*, 509 U.S. at 590). Exclusion under Rule 702 is not appropriate if there contains "some factual basis" for the expert's opinion, even if that factual basis is "shaky." *Id.* at 532 (quotations and citations omitted). While this is not to say "a significant error in application will never to the admissibility, as opposed to the weight, of the evidence," courts "generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *Id.* at 530. Thus, more typically, "mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)); *see also Babcock Power, Inc. v. Kapsalis*, 854 F. App'x 1, 8 (6th Cir. 2021) ("as long as there is a reasonable factual basis for the expert's opinion, any objections to his testimony go to its weight and not its admissibility)" (citing *In re Scrap Metal Anti. Litig.*, 527 F.3d at 529-31).

### 2. Analysis

Pursuant to Rule 702, the County moved to preclude Keller's report for purposes of class certification.  (Doc. 50.)  Similarly, Plaintiffs moved to preclude Dr. Malone's report for purposes of class certification.  (Doc. 56.)  Both Rule 702 challenges are discussed below.

### a. Keller's Expert Report

The County does not challenge Keller's qualifications.  Instead, it moves to preclude Keller's report because it is not based on "sufficient facts or data" and is therefore unreliable.  (Doc. 50 at 2271.)  The County argues Keller's report is unreliable and cannot be used to either (a) show the average time it took to release a detainee; or (b) ascertain whether a person is a member of the proposed class because the detainee's time to release was greater than 12 hours.  (Doc. 59 at 2753.)

The County asserts two primary arguments.  First, it attacks the data Keller used as insufficient for its intended purposes.  (Doc. 50 at 2272.)  Plaintiffs' counsel provided Keller with two types of spreadsheets from data produced by the County.  (Doc. 54 at 2659.)  The first set of spreadsheets included information about a detainee relating to the booking date and time, charges, release date and time, and holds (if any).  (*Id.*)  The second set of spreadsheets included data produced by various parties that contain release triggering event information.  (*Id.*)  For instance, the data records the time (1) bonds were posted, (2) release orders were issued by the Common Pleas Court and/or Municipal Court, (3) RNFC decisions were entered, and (4) monitoring device were installed.  (*Id.* at 2659-60.)  Keller standardized this data to create one single spreadsheet.  (*Id.* at 2659.)  For the relevant time period, Keller identified 58,091 unique custody sessions.  (*Id.*)  From there, Keller applied a series of exclusions to the data.  (*Id.*)  The first exclusion eliminated custody sessions where there was no release triggering event action

related to a County or Cleveland case, essentially excluding custody sessions that did not involve a County or Cleveland Detainee or where a release triggering even was not included in the data. (*Id.*)  This eliminated almost 40,000 custody sessions.  (*Id.*)  Other exclusions were applied to obtain a group of custody sessions that had a release triggering event that met the proposed class requirements.  (*Id.* at 2661-62.)

The County argues Keller's methodology and opinions are unreliable because they solely rely on limited data not suited for determining release times.  (Doc. 50 at 2263-74.)  To the County, the data alone is insufficient to accurately calculate a time to release and no standardized calculation can be made.  As one example, the County argues the release triggering event in the data is not necessarily accurate because the correct time should be when the Records Clerk received notice of the release triggering event, which is not recorded in the data.  (*Id.* at 2266.) Relying on the data is incomplete because it did not list the date and time for a release triggering event.  (*Id.* at 2268.)  And the data does not account for every reason a person may continue to be detained because the "hold" field does not fully explain why a detainee might be held.  (*Id.* at 2269.)  For these reasons, the data alone is not enough—one would have to sift through the detainee's files to determine an accurate release time.  (*Id.*)  Because the data used by Keller is unreliable, the County argues, it cannot be used to show the time to release nor ascertain class members.  (*Id.* at 2270.)

The County also argues Keller's report is unreliable because Keller failed to conduct any independent investigation herself and solely relied on Plaintiffs' counsel's representations.  (*Id.* at 2272-74.)  The County faults Keller's report for not determining whether the data provided by Plaintiffs' counsel could be used to determine actual time to release.  (*Id.*)  Instead, Keller simply assumed the data to be sufficient for those purposes without validating the data in any way.  (*Id.*)

In response, Plaintiffs argue Keller's report is reliable because Keller conducted an objective analysis on the available data produced by the County and others to determine average times for custody sessions. (Doc. 54 at 2663.) Plaintiffs explain Keller's analysis was limited to determining the average times for releases after a trigger event using the available data. (*Id.*) Keller did not, Plaintiffs say, conduct any subjective analyses regarding whether any over-detention was unreasonable, and therefore unconstitutional, but instead Keller merely provided an analysis of the available data. (*Id.* at 2663-64.) Thus, the County's arguments regarding Keller's failure to consider the individualized nature of releases are not relevant. (*Id.*) Plaintiffs also argue the County's motion is an attack on the weight of the report, not its admissibility. (*Id.* at 2665.) The County's motion challenges the factual basis for Keller's opinion and conclusions, not the data science methods Keller used in conducting her analyses, Plaintiffs urge. (*Id.*) Lastly, Plaintiffs rebut the County's arguments regarding the data Keller used and the exclusions Keller applied to arrive at the dataset used in the analyses. (*Id.* at 2669-71.)

First, information counsel provided to an expert does not render the opinions on which the expert relies insufficient. *United States v. Maga*, No. 08-cr-166, 2010 WL 11519476, 2010 U.S. Dist. LEXIS 160087, at *2 (S.D. Ohio July 8, 2010), *aff'd*, 475 F. App'x 538 (6th Cir. 2012). Second, there is a reasonable factual basis for Keller's opinions. The report explains the sources from which the data came. It explains the exclusions applied to the custody sessions to obtain a sub-dataset that contains only custody sessions where there is an available release triggering event and subsequent release (among other information). Keller then explains how she conducted each calculation to arrive at her stated averages and conclusions. While the County vigorously challenges whether the underlying data can be used to calculate release times,

those criticisms challenge the ultimate conclusions and not the reliability of Keller's methodology or analysis.

Whether the calculations are correct, accurate, or credible, is a separate question. *In re Scrap Metal Anti. Litig.*, 527 F.3d at 529 ("a determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion"). Thus, Keller's methodology is reliable under Rule 702.

### b.      Dr. Malone's Expert Report

Plaintiffs move to preclude Dr. Sean Malone's expert report because it is not proper expert testimony offered to rebut Keller's analysis. (Doc. 57 at 2732.) Plaintiffs argue Dr. Malone is not qualified to opine on how to calculate over-detention of detainees because he is not an expert in release policies. (*Id.*) Specifically, they argue Dr. Malone is an expert in statistics and financial analysis. (*Id.*) Yet this expertise bears little resemblance to his criticisms of Keller's analysis. (*Id.*) While Dr. Malone criticizes Keller for failing to consider the diverse facts and circumstances that should be considered when analyzing individualized claims of over-detention, he is not an expert in jail release policies and his experience as a statistician bears no relation to calculating over-detention claims. (*Id.* at 2733.) Further, the criticisms Dr. Malone offers are based simply on a review of paper jail records requiring no expertise whatsoever. (*Id.*) In support, Plaintiffs cite *Twin K. Constr., Inc. v. UMA, Geotechnical Constr., Inc.*, 597 F. Supp. 3d 1204, 1214-15 (E.D. Tenn. 2022). There, the district court excluded an engineering expert's report because the expert's review required no engineering expertise. *Twin K. Constr.*, 597 F. Supp. 3d at 1214-15.

Second, Plaintiffs argue Dr. Malone's report fails to assist the Court on class certification issues and therefore should be excluded. (Doc. 57 at 2734.) Plaintiffs argue Dr. Malone's expert

opinions amount to "nothing more than legal conclusions about what facts are relevant and necessary" to an over-detention analysis.  (*Id.*)  What Dr. Malone believes is relevant, however, is not appropriate expert testimony.  (*Id.* at 2735.)

Lastly, Plaintiffs move to exclude Dr. Malone's report because it is not the product of any reliable principles or methods.  (*Id.* at 2735.)  For instance, Plaintiffs argue Dr. Malone did not use any statistical principles or conduct any statistical analyses himself.  (*Id.* at 2736.)  And Plaintiffs argue Dr. Malone made sweeping conclusions about Keller's report and the unreliability of the data she relied on based on a small sample of the data.  (*Id.* at 2738.)  Plaintiffs further argue Dr. Malone's opinions are little more than observations about the data and Keller's analysis.  (*Id.* at 2740.)

In opposition, the County argues Dr. Malone's rebuttal report appropriately criticizes Keller's methodology.  (Doc. 60 at 2770.)  For example, Dr. Malone opines Keller's dataset was insufficient, Keller failed to investigate the issues within the dataset, that Keller inappropriately filtered the dataset, and Keller made improper assumptions about the data without becoming familiar with the jail release process.  (*Id.* at 2770-76.)  To the County, all of Dr. Malone's opinions are proper rebuttal.  (*Id.*)

In reply, Plaintiffs differentiate the "time to release" analysis Keller performed with any allegations of over-detentions.  (Doc. 61 at 2784.)  The time to release analysis, Plaintiffs explain, is an objective analysis of when a release triggering event occurred and when the individual was released.  (*Id.*)  In this way, there is no reason to consider the various factors that may affect release times for purposes of an overall over-detention assessment—all Keller did was determine how long it took for a detainee to be released after a release triggering event, nothing more.  (*Id.* at 2784-85.)  That is, Keller did not assess whether any detainee was over-

detained—instead, Keller merely calculated the time it took to release a detainee. (*Id.* at 2785.) Dr. Malone's critiques as it relates to not considering all the variables, therefore, is irrelevant and not helpful. (*Id.* at 2785-86.)

Dr. Malone's criticism of the dataset Keller used and the methods she used to calculate her "time to release" analysis is proper expert rebuttal. Plaintiffs cite *Twin K Constr.*, but the court excluded a portion of an expert report because "it [was] not clear to the Court how [the expert's] expertise in engineering has shaped his opinions[.]" 597 F.Supp.3d at 1215. The expert's opinion did not relate to his engineering experience. *Id.* at 1214. But here, Dr. Malone's experience in statistics plainly relates to his criticisms of Keller's methodology for collecting data and generally perceptions. It is appropriate for an expert in statistical analysis to criticize statistics prepared by another expert witness. And while Plaintiffs argue Keller's analysis is merely an "objective" calculation of the "time to release," Dr. Malone's report properly offers criticism of Keller's underlying data, including her selection and purported manipulation of data. Dr. Malone's criticism of the "limited" dataset Keller used to develop averages for "time to release" is appropriate rebuttal testimony.

Because Dr. Malone is qualified to criticize the statistical analysis performed by Keller, and because his report properly challenges the data and methods used by Keller, his report will not be excluded.

## B. Motion to Strike

As a final preliminary matter, the County moved to strike a declaration filed by Plaintiffs' counsel, A. Dami Animashaun (the "Animashaun Declaration"). (Doc. 48.)

In support of class certification, Plaintiffs filed Animashaun's declaration. (Doc. 45-4.) The Animashaun Declaration purports to include a summary of relevant facts deduced from

voluminous discovery productions.  (*Id.* at 477.)  The summaries include information relating to Bond Reports and investigations of possible over-detentions.  (*Id.*)  The Animashaun Declaration also states when the Bond Reports began, who sent them, for what purpose, and any subsequent investigation undertaken by CCSD employees.  (*Id.*)

The County moves to strike the Animashaun Declaration.  (Doc. 48.)  First, the County argues the Declaration is an improper attempt to circumvent the page limitations.  (*Id.* at 1981.)  Second, Mr. Animashaun was not identified as a witness yet is providing testimony through the Declaration.  (*Id.*)  Third, Mr. Animashaun improperly inserted himself as a witness in this case in violation of Rule 3.7 of the Ohio Rules of Professional Conduct.  (*Id.* at 1982.)  Lastly, the Animashaun Declaration is inadmissible testimony because it is not based on personal knowledge.  (*Id.*)

Plaintiffs oppose.  (Doc. 54.)  They argue it is appropriate for counsel to summarize discovery at the class certification stage through a declaration.  (*Id.* at 2637.)  Plaintiffs cite a string of cases that accepted a declaration from counsel to find certain elements of class certification met.  *See, e.g.*, *McDonald v. Franklin Cnty.*, 306 F.R.D. 548, 556 (S.D. Ohio 2015) (using counsel declaration to find numerosity met); *Refuerzo v. Sw. Airlines Co.*, No. 22-cv-00868, 2024 WL 4177936, 2024 U.S. Dist. LEXIS 164600, at *17-18 (N.D. Cal. Sept. 12, 2024) (overruling objection to declaration in support of class certification because it did not contain legal analysis and only factual statements based on discovery produced by defendants). Plaintiffs assert the Animashaun Declaration is nothing more than a summary of the records produced in this case.  (Doc. 52 at 2637-38.)  Plaintiffs also refute Mr. Animashaun made himself a witness or violated any ethical rules.  (*Id.* at 2640-42.)

It is inappropriate to include legal analyses or conclusions in an affidavit or declaration, especially when doing so presents arguments beyond the page-limited memorandum in support of the motion for class certification.  Under Local Rule 7.1(f), memoranda for non-dispositive motions are limited to fifteen pages, and "[f]ailure to comply . . . may be sanctionable at the discretion of the Judicial Officer."  On April 8, 2025, the Court denied the parties' Joint Motion for Leave to Exceed Page Limitations.  (4/8/2025 Non-document Order.)  The Court may strike a brief that exceeds the page limits of Local Rule 7.1(f).  *See Martinez v. United States*, 865 F.3d 842, 843-44 (6th Cir. 2017) (finding district court appropriately applied Local Rule 7.1 in striking brief that far exceeded page limitations); *Massengale v. Perhacs*, No. 24-cv-1793, 2025 WL 1065386, 2025 U.S. Dist. LEXIS 67530, at *3-4 (N.D. Ohio Apr. 9, 2025) (striking brief that exceeded Local Rule 7.1(f)'s page limits where plaintiff failed to obtain leave to exceed limits and good cause did not exist to do so); *Kovach v. Affinity Whole Health LLC*, No. 21-cv-01817, 2023 WL 11986887, 2023 U.S. Dist. LEXIS 244638, at *1-3 (N.D. Ohio Feb. 17, 2023) (same). But an affidavit or declaration can provide a recitation of the relevant facts in the record.  *See Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, No. 16-cv-02641-JPM-TMP, 2017 WL 11558075, 2017 U.S. Dist. LEXIS 232854, at *9 (W.D. Tenn. Jan. 19, 2017) (striking affidavit that blended "facts, legal citation, and argument of counsel [that] makes it impossible to assess what statements Plaintiffs (and even Declarant) claims are facts and which are not").

To the extent the Animashaun Declaration includes a recitation of facts or summaries of voluminous records, it will not be stricken.  The Court will strike Paragraphs 7, 12, 17, 18, and 27 because these paragraphs include legal analyses or conclusions.  (Doc. 45-4, ¶ 7 ("There is no indication in the Paper Files that any individual issues particular to those detainees caused their overdetentions."); ¶ 12 ("The Queue Sample also confirms that County release orders were not

pulled from Queues and processed After Hours."); ¶ 17 ("There is no indication in any of those Paper Files that any other issue beyond what is stated in the OD Analysis caused their overdetentions."); ¶ 18 ("The Overdetention Report Analyses show that recurring issues caused Cleveland detainees to be overdetained at the Jail."); ¶ 27 ("Several of these coaching documents show that employees received repeated coaching after causing multiple overdetentions.").) Further, the Court will disregard any conclusion that an individual was "overdetained."[3]

### C.      Class Action Certification

#### 1.      Legal Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, 131 S. Ct. 2541, 180 L. Ed.  2d 374 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979)).  A district court has broad discretion to decide whether to certify a class.  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (citing *In re Am. Med. Sys. Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)).  "Before a court may certify a class pursuant to Rule 23, the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012).  The plaintiff must then establish all Rule 23(a) requirements:

1) the class is so numerous that joinder of all members is impracticable;
2) there are questions of law or fact common to the class;

---

[3] The County's arguments regarding Animashaun making himself a witness and violating ethical rules are meritless.  Mr. Animashaun is not an "individual likely to have discoverable information" pursuant to Rule 26 of the Federal Rules of Civil Procedure.  Rule 26 provides no basis for the exclusion of the declaration.  Similarly, the declaration does not violate Ohio ethical rules because Mr. Animashaun is not a "necessary witness."  If necessary, the statements in the declaration could be testified to by other witnesses.

3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

If a plaintiff can demonstrate all Rule 23(a) requirements, the plaintiff then must still show the class fits under one of the subdivisions in Rule 23(b). *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002). Here, Plaintiffs proceed under Rule 23(b)(3), which requires this Court to conclude "that the questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action is "superior to other available methods." *Whirlpool*, 722 F.3d at 850-51 (citation omitted).

In reviewing a Rule 23 motion for class certification, the district court must engage in a rigorous analysis to determine if all Rule 23 prerequisites are met. *Dukes*, 564 U.S. at 350-51. Meaning, the court must do more than apply a deferential standard where it resolves doubts in the movant's favor but requires less than a "dress rehearsal for the trial on the merits." *Whirlpool*, 722 F.3d at 851-52 (citing *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012)). Thus, the court's findings must be supported by evidence adducing Rule 23's requirements. *Id.*; *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013).

The party seeking class certification bears the burden of showing that the requirements for class certification are met. *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). "The plaintiffs must affirmatively 'prove' that the class meets the prerequisites for certification" with "significant proof." *Speerly v. GM, LLC*, 143 F.4th 306, 316 (6th Cir. 2025) (quoting *Dukes*, 564 U.S. at 350). The Court "must 'probe behind the pleadings' and

conduct a 'rigorous' examination to ensure that the class satisfies Rule 23 before transforming the retail disposition of claims into the wholesale disposition of them." *Id.* (quoting *Dukes*, 564 U.S. at 350-51).  A court's certification determination may be revisited at any point before final judgment.  Fed. R. Civ. P. 23(c)(1)(C).

### 2.      Relevant Case Law

This is not the first case in which a set of plaintiffs seek class certification asserting over-detention claims and it is not the first to seek class certification in the context of a *Monell* claim relating to prison policies.  The parties discuss, at length, two cases in particular.  A brief review of each is helpful to understanding the Court's analysis in this case.

### a.      *Healey v. Louisville Metro Government*

In *Healey v. Louisville Metro Gov't*, Plaintiffs sued Louisville-Jefferson County Metro Government which ran the Louisville Metro Department of Corrections ("LMDC").  No. 17-cv-71, 2021 WL 149859, 2021 U.S. Dist. LEXIS 8345, at *1 (W.D. Ky. Jan. 15, 2021).  Plaintiffs sued under 42 U.S.C. § 1983 for violations of the Fourth, Eighth, and Fourteenth Amendments. *Id.*  Plaintiffs alleged they were detained in LMDC after the legal basis for detention ended.  *Id.* In part, plaintiffs asserted their claims under a deliberate indifference theory of *Monell*.  *Id.* at *57-58.

LMDC had a manual, paper release process.  *Id.* at *6-7.  Orders from courts are docketed and the clerk of courts emails a specific LMDC shared email address the release order. *Id.*  LMDC records staff review the files sent to that email address and do a check to determine if it can be further processed.  *Id.*  If there is an issue with the order, LMDC staff may have to communicate with the clerks officer further.  *Id.* at *7.  If not, records staff processes the release. *Id.*  The release process, however, was manual and records staff did not always process releases

quickly.  *Id.* at *8.  Errors occurred because of inexperienced staff, missing files, failing to process the release, misplaced folders, and time credits not being applied properly, among others. *Id.* at *8-9.  Thousands of detainees were held for longer than four hours after a release order, and hundreds were detained for longer than twelve hours after a release order.  *Id.* at *16.

These issues were known by LMDC staff.  *Id.* at *17-29.  The district court summarized deposition testimony from individuals who acknowledged the release system had widespread issues for many years.  *Id.*  As far back as 2011 to 2012, evidence indicated LMDC knew there were over-detention issues associated with its release process.  *Id.*  Employees of LMDC testified that a release should be processed in two to four hours.  *Id.* at *52.  Yet despite this goal, detainees routinely were released well after the four hours it should normally take.  *Id.*  Plaintiffs sought class certification of a class comprised of:

> All persons who, since February 3, 2016, were imprisoned, detained or incarcerated more than four hours after: (a) entry of an order directing their release; and/or (b) satisfaction of their term of incarceration set by prior court order.

*Id.* at *48.

Prior to reaching a decision, the district court reviewed relevant case law where plaintiffs have sought class certification in the over-detention context.  *Id.* at *31-45.  Synthesizing precedent from circuit and district court decisions around the country, the *Healey* court concluded the case law dictated the following general principles:

> First, courts have been reluctant to certify classes based on whether the amount of delay is unreasonable. This theory of over-detention liability is generally not amenable to class treatment because determining whether a given detention rises to the level of a constitutional violation requires individualized determinations about the reason the inmate's release was delayed. Second, courts have been willing to certify over-detention classes where the class can answer questions about whether a municipality's policy (or lack of one) for releasing inmates caused over-detentions. Put differently, an over-detention class may be certified if it alleges a systemic issue—which impacts all inmates—with the municipality's release process. Third, courts that have certified over-detention classes have done so based

on statistical, not anecdotal, evidence. And fourth, the class definitions of over-detention classes premised on a municipal policy, practice, or custom should contain the cause of the over-detention.

*Id.* at *45-46 (citations and quotations omitted).[4]

With these principles in mind, the court turned to plaintiffs' class definition and the ascertainability requirement. The court redefined the class and created two subclasses. *Id.* at *53. The court made three modifications. First, the court included the cause for the over-detention: defendants' failure to implement and maintain an adequate process for timely releasing imprisoned inmates. *Id.* This connects the class member to the deliberate indifference claim asserted. Second, the court created two subclasses to account for the different release process between imprisoned and detained inmates. *Id.* Lastly, the court increased the number of hours of over-detention for a detainee to be included in the class from four to twelve hours. *Id.* The court noted the evidence in the case suggested four hours was the goal to release a detainee, and no evidence was presented that triple that goal, twelve hours, were due to any individualized issues. *Id.* That is, when increased to twelve hours, there was no evidence a detainee's continued detention was due to any individualized issues, and instead, were due to systemic issues plaintiffs identified as part of their deliberate indifference claim. *Id.* The district court thus redefined the class into two subclasses:

> **Subclass A**: All persons who from February 3, 2016 to present were imprisoned in the Louisville Metro Department of Corrections for more than four hours after satisfaction of their term of imprisonment set by prior court order due to the failure of Defendants to implement and maintain an adequate process for timely releasing imprisoned inmates.

---

[4] To arrive at these principles, the *Healey* court examined: *Driver v. Marion Cnty. Sheriff*, 859 F.3d 489, 490 (7th Cir. 2017); *Portis v. City of Chi.*, 613 F.3d 702, 703 (7th Cir. 2010); *Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 512 (7th Cir. 2009); *Wharton v. Coupe*, No. CV 12-1240-LPS, 2015 WL 5768936, 2015 U.S. Dist. LEXIS 132385 (D. Del. Sept. 30, 2015); *Brass v. Cty. of L.A.*, 328 F.3d 1192 (9th Cir. 2003); *Berry v. Baca*, 379 F.3d 764 (9th Cir. 2004); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991).

> **Subclass B**: All persons who from February 3, 2016 to present were detained in the Metro Government Department of Corrections for more than twelve hours after receipt of an order directing their release due to the failure of Defendants to implement and maintain an adequate process for timely releasing detained inmates.

*Id.*

The district court certified the class.  It first addressed the Rule 23(a) factors.  As to commonality, the court found the subclasses could "generate common answers apt to drive resolution of litigation."  *Id.* at *57.  The questions that could be resolved in common were:

> whether LMDC held inmates for more than four hours, or twelve hours, longer than they legally could; whether Defendants failed to implement and maintain an adequate process for timely releasing detained inmates or imprisoned ones; whether Defendants knew that detained and imprisoned inmates were not being timely released; whether Defendants failed to implement the recommendations of the internal audit; whether Defendants' failure to implement and maintain an adequate process constitutes deliberate indifference; and whether Defendants caused the constitutional injuries of the members of the subclasses.

*Id.* at *57-58.  The court found that "Plaintiffs have affirmatively demonstrated that Defendants' failure to implement and maintain an adequate process for timely releasing inmates is the cause of a substantial majority of over-detentions" and that LMDC does not "systematically document over-detention."  *Id.* at *59-60.  It was satisfied that statistical evidence supported the finding that thousands of inmates were over-detained and that the cause of the over-detentions was not "speculation."  *Id.* at *63.

As to typicality, the court held the claims presented "are typical of the respective subclasses because they stem from the same legal theory as the class members: Defendants violated their constitutional rights by over-detaining them."  *Id.* at *56-66.  "If the fact finder determines that Defendants have an inadequate process for timely releasing detained inmates and imprisoned ones, such a determination would further the interest of each member of the subclasses."  *Id.* at *66.  As to the last Rule 23(a) factor, the court found the named plaintiffs

could adequately represent the class because nothing distinguished the named plaintiffs' claims in this case from that of the class as a whole. *Id.* at *66-67.

The court then considered certification of the class under Rule 23(b)(3) and found both predominance and superiority were satisfied. *Id.* at *68. It rejected defendants' argument individualized issues would predominate over common ones because "Plaintiffs' subclasses are not premised on the unreasonableness of each over-detention. Rather, they are based on common questions about whether Defendants' inadequate process for timely releasing inmates caused respective subclass members to be over-detained for four hours or twelve hours." *Id.* at *69. It also found the class action was superior. *Id.* at 72-73.

### b. *Woodall v. Wayne County*

Also relevant is the Sixth Circuit's decision in *Woodall v. Wayne Cnty.*, No. 20-1705, 2021 WL 5298537, 2021 U.S. App. LEXIS 34149 (6th Cir. Nov. 15, 2021). In *Woodall*, plaintiffs sued Wayne County under 42 U.S.C. § 1983 asserting *Monell* claims. *Id.* at *1-3. Wayne County operated the Wayne County Jail in Michigan. *Id.* at *2. As part of its policies, inmates are subjected to a strip search in the registry area and at random in cellblock searches. *Id.* Prior to 2013, the jail had a policy covering searches, which were to prevent weapons and contraband from entering the facility. *Id.* The policy outlined that same gender staff were to conduct the searches and that staff could not use derogatory language during the search. *Id.* Wayne County updated its policy in 2013, which expressly prohibited "any other inmate or person, including a civilian employee, to visually observe the inmate during the entire strip search of the inmate." *Id.*

Plaintiffs sued alleging "pretrial detainees were subjected to unconstitutional strip searches based on the jail's policy or custom to strip search women (1) in the presence, or public

viewing, of male officers; (2) in groups with numerous inmates who didn't share any penological

interest in viewing each other in a state of undress; (3) under unsanitary or unhygienic

conditions; and/or (4) subject to derogatory gender-biased comments." *Id.* at *3.  Plaintiffs

moved to certify a class "as to the common issue of law and fact relative to whether Wayne

County may be liable under *Monell* for maintaining a policy or custom that violated Plaintiffs'

constitutional rights under the Fourth and Eighth Amendments." *Id.* at *4.  The district court

granted class certification and created four subclasses under Rule 23(b)(3):

> **Class No. 1** all females who were housed, detained, and/or incarcerated by the Wayne County Sheriff at any of the three Wayne County Jail Divisions from the period of November 14, 2014 until the date of judgment or settlement of this case, who, without a legitimate penological interest, *were exposed in the nude to members of the opposite sex while being strip searched* pursuant to the Wayne County Sheriff's policies, practices, and/or customs, and who allege they have suffered a compensable injury as a result of the search;

> **Class No. 2** all females who were housed, detained, and/or incarcerated by the Wayne County Sheriff at any of the three Wayne County Jail Divisions from the period of November 14, 2014, until the date of judgment or settlement of this case, who, without a legitimate penological interest, *were stripped searched in a group with other inmates*, pursuant to the Wayne County Sheriff's policies, practices, and/or customs, and who allege they have suffered a compensable injury as a result of the search;

> **Class No. 3** all females who were housed, detained, and/or incarcerated by the Wayne County Sheriff at any of the three Wayne County Jail Divisions from the period of November 14, 2014, until the date of judgment or settlement of this case, who, without a legitimate penological interest, *were stripped searched under unsanitary and/or unhygienic conditions*, including being exposed to the bodily fluids of other inmates who were being strip searched, pursuant to the Wayne County Sheriff's policies, practices, and/or customs, and who allege they have suffered a compensable injury as a result of the search;

> **Class No. 4** all females who were housed, detained, and/or incarcerated by the Wayne County Sheriff at any of the three Wayne County Jail Divisions from the period of November 14, 2014 until the date of judgment or settlement of this case, who, without a legitimate penological interest, *were subject to derogatory gender-based comments by Defendant Graham during strip searches*, and who allege they have suffered a compensable injury as a result of the search.

*Id.* at *4-6.

Defendant appealed pursuant to Rule 23(f), and the Sixth Circuit reversed. *Id.* at *19-20. The Sixth Circuit concluded that a class could not be certified under Rule 23(b)(3) because individual issues predominated over common questions. *Id.* at *12. Under an "inaction theory" of *Monell* liability, a plaintiff must show "(1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation." *Id.* at *16. "A proper analysis," the Sixth Circuit explained, "must consider which of these elements can be established on a class-wide basis and which would require proof for each of the class members." *Id.* While noting that "[p]erhaps the first element—a clear pattern of unconstitutional strip searches—could be established for each of the four subclasses," none of the other elements could be established on a class-wide basis. *Id.* at *16.

"Insurmountable timing issues," would also bar class-wide treatment of the second (notice) and third (deliberate indifference) elements." *Id.* at *17. The court held:

> Wayne County must have had notice of the unconstitutional conduct and been deliberately indifferent to it at the time each class member allegedly suffered the unconstitutional search. Yet what the County did and did not know and what actions it did or did not take in response will almost certainly vary from year to year, month to month, and even day to day. A class member in, say, 2019, might have a stronger or weaker claim of deliberate indifference than a class member in, say, 2014. After all, all of the strip searches that were allegedly unconstitutional and that happened in between those two times perhaps could provide additional evidence to show the County's notice and indifference to the conduct. But that evidence will be irrelevant to a class member's claim in 2014. Deliberate indifference in 2019 is not deliberate indifference in 2014. If anything, these class members have a conflict of interest.

It would not be enough "to show generically that the County had a policy of acting with deliberate indifference toward the four types of unconstitutional strip searches," instead, "a class member must also show that the class member was herself subjected to a 'constitutional deprivation' in the way that she was searched." *Id.* at *17-18.  "And the class member must then show a 'direct causal link' between the County's general policy of deliberate indifference and this constitutional violation." *Id.* at *18.  But "just because a policy exists does not mean it caused the particular class member's harm." *Id.*  "[T]here is an 'analytical distinction' between the general policy and the specific constitutional violation" and that "[a] municipality could be found to have a policy of failing to act in the face of repeated constitutional violations.  But it could also be found to have acted reasonably, or even negligently, in a particular case, thus precluding liability." *Id.* (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).  The Sixth Circuit also held, while damage issues alone will not preclude class certification, in this case, damages "defeat predominance when they are accompanied by significant individualized questions going to liability." *Id.* at *20 (citations and quotations omitted).

The Sixth Circuit found the district court erred when it relied on a First Circuit case, *Tardiff v. Knox Cnty.*, 365 F.3d 1 (1st Cir. 2004), I concluding that individual determinations of each constitutional violation do not defeat predominance. *Id.* at *18.  In *Tardiff*, Knox County strip searched all detainees without an evaluation for individualized suspicion.  365 F.3d at 3.  The plaintiffs there challenged that policy arguing it was unconstitutional, and the court certified a class of detainees. *Id.* at 3-4.  But *Tardiff* was distinguishable from the classes proposed to the district court in *Woodall* because *Tardiff* plaintiffs were challenging whether a blanket strip search policy was constitutional. *Woodall*, 2021 WL 5298537, 2021 U.S. App. LEXIS 34149, at *19.  If it was constitutional, the claims would fail. *Id.*  If it was not, the claims could continue.

*Id.*  But in *Woodall*, "[o]ne plaintiff's success in proving that acquiescence in the violation of the County's policies was a moving force behind her unconstitutional search would not establish the claims of the rest."  *Id.* at *19.  That is, the policy in *Tardiff* was either unconstitutional or constitutional as it applied to all inmates subject to a strip search without individualized suspicion.  But in *Woodall*, each class member would have to show a custom of inaction cause their harm.

### 3.     Analysis

With these decisions in mind, the Court analyzes Plaintiffs' request for class certification.

### a.         Class Definition and Ascertainability

Although not included in Rule 23, ascertainability is an "implied requirement" so that the "putative class members can be readily identified based on the class definition."  *Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101, 1105-06 (6th Cir. 2022) (quoting *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017)).  A "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class."  *Sandusky Wellness Ctr.*, 863 F.3d at 471 (quotations omitted).  If "mini-trials" become necessary to determine who is a member of the class, the class action vehicle imposes inefficiencies rather than ameliorates them.  *Id.* at 471-74.

District courts "must be vigilant to ensure that a certified class is properly constituted."  *Powers v. Hamilton Cnty. Public Defendant Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007).  As such, "district courts have broad discretion to modify class definitions."  *Id.*  A proper class definition specifies a "particular group that was harmed during a particular time frame, in a particular location, in a particular way."  *Carter v. PJS of Parma, Inc.*, No. 15-cv-1545, 2016 WL

3387597, 2016 U.S. Dist. LEXIS 79747, at *6-7 (N.D. Ohio June 20, 2016) (quoting *Givens v. Van Devere, Inc.*, No. 11-cv-666, 2012 WL 4092738, 2012 U.S. Dist. LEXIS 131931, at * 4-5 (N.D. Ohio Sept. 17, 2012)).  Moreover, a "class definition also fails as overbroad if it would include members who have not suffered harm at the hands of the defendant and are not at risk to suffer such harm." *Id.* (quotation and citation omitted); *Powers*, 501 F.3d at 619 (modifying class because proposed definition was overbroad).

Plaintiffs argue ascertainability is met.  (Doc. 45 at 332.)  They contend the class definition is based on objective criteria of being over-detained for longer than 12 hours after the legal basis for doing so has ended.  (*Id.*)  This can be determined analytically because Keller's analysis supports that data and records obtained from CCSD and third parties demonstrate (1) when the legal basis for detention ended and (2) when the detainee was released.  (*Id.*)

The County argues Plaintiffs have not demonstrated there is objective criteria that can be used to reliably determine if an individual falls within the class definition.  (Doc. 49 at 2013.)  First, in keeping with the County's other arguments, it contends the individual issues identified herein preclude finding—on a generalized basis—if a person is a member of the class.  (*Id.*)  It would require the manual review of individual files to determine if a person is a member of the proposed class, which would be time consuming and may require further factual development.  (*Id.*)  While acknowledging the *Healey* court found a similarly proposed class ascertainable, the difference was the volume of evidence.  There, the significant evidence of detentions unlawfully exceeding 12 hours was solely the result of the systemic issues.  Yet here, the County argues, there is no significant evidence legitimate individual caused detentions to exceed 12 hours.  (*Id.* at 2014.)

The County presents limited examples where releases were extended (*e.g.*, medical issues (*see* Doc. 49-1, and 49-4)), and that a *per se* rule that detentions exceeding 12 hours is unlawful—even at the class certification stage—would be unreasonable under these facts.  (Doc. 49 at 2014.)  The County also discounts Keller's expert analysis because it relies on limited data in concluding a detainee's "time to release" was greater than 12 hours.  (*Id.*)  To the County, the report sweeps too broadly and does not connect any alleged over-detention with any cause.  (*Id.*) If the class definition does not include the cause of the over-detention, that being alleged deliberate indifference to maintain adequate release policies, it may include detainees whose release time exceeded 12 hours for wholly legitimate reasons.  (*Id.* at 2014-15.)  To support its point, the County relies on the district court's modification of the proposed class in *Healey*. *Healey*, 2021 WL 149859, 2021 U.S. Dist. LEXIS 5345, at *53 (modifying class definition to include "Defendants' failure to implement and maintain an adequate process for timely releasing detained inmates").

Plaintiffs do not dispute a modification to the class definition might be necessary, although they do maintain anything exceeding 12 hours is likely the result of systemic issues causing unconstitutional detentions.  (Doc. 51 at 2581 n.7.)  They also recognize *Healey*, and that the cases *Healey* relied on, determined "class definitions of over-detention classes premised on a municipal policy, practice, or custom should contain the cause of the over-detention."  *Healey*, 2021 WL 149859, 2021 U.S. Dist. LEXIS 5345, at *46 (citing *Driver*, 859 F.3d at 494).  A class member only has a potential deliberate indifference claim against the County if they were over-detained and that over-detention was because of a policy of deliberate indifference.  This is also a critical point in understanding the *Woodall* decision.  *Monell* claims are unique in that there must

be a custom or policy causing the deprivation of a constitutional right.  Any class based on a *Monell* claim must be tailored to the elements of the underlying class claim.

The Court finds the reasoning in *Healey* persuasive here, largely because that reasoning is consistent with the Sixth Circuit's decision in *Woodall*.  To avoid potential overbreadth issues, and to properly address the causation element of *Monell* claims, the cause of the alleged over-detention should be included in the class definition.

It is also necessary to redefine the time period for over-detention.  The *Healey* court settled on 12 hours as "a 'practical compromise' between the rights of detained inmates and the realities of processing release orders for detained inmates in LMDC."  *Healey*, 2021 WL 149859, 2021 U.S. Dist. LEXIS 5345, at \*52.  Under the facts in *Healey*, the court found that tripling the time asserted by defendants as the "goal" for releasing inmates, there, 4 hours, a class definition requiring 12 hours provided sufficient time for the release of detained inmates considering individual issues.  *Id.*  In this way, the new definition aligned with what "Plaintiffs have affirmatively demonstrated is the cause of a substantial majority of over-detentions: Defendants' failure to implement and maintain an adequate process for timely releasing detained inmates and imprisoned inmates."  *Id.* at \*53.

Again, the Court finds *Healey* persuasive.  But the number of hours must be increased to account for the facts here.  Specifically, Plaintiffs have affirmatively shown, pursuant to Keller's analysis, the release process broadly takes on average less than 6 hours.  (Doc. 45-30 at 1792-1824.)  And the warden testified that the release process ideally would not exceed 6 hours.  (Doc. 45-10 at 973.)  With these facts in mind, as in *Healey*, the Court finds triple the amount of time the County releases most detainees is a "practical compromise," and accounts for the substantial majority of all over-detentions.  Accordingly, the class definition will be increased from 12 hours

to 18 hours.  Plaintiffs do not oppose increasing the time for release from 12 to 18 hours.  (Doc.

45 at 337.)

Thus, the proposed class definition is modified as follows:

From February 23, 2021, through the present, all pretrial Cleveland and County
Detainees who, when the basis for their pretrial detention ended (*i.e.* who had no
other pending charges when they: were released with no formal charges, were
ordered released, paid or were issued a bond, or were being detained solely on a
minor misdemeanor or personal bond eligible charge), either:

1)  had no Holds, and were not released from the Jail within 18 hours after the
basis for their detention ended; or

2)  had only a Booking Hold (*i.e.*, a hold for completion of a booking step, such
as DNA, photos, or fingerprints), and were not released from the Jail within
18 hours after the basis for their detention ended; or

3)  had only a Monitoring Device Hold (*i.e.*, a hold for installation of a GPS or
SCRAM monitor) for a Cleveland Municipal Court Case, and were not
released from the Jail within 18 hours after installation of their monitoring
device;

AND

were over-detained for longer than 18 hours because of the County's failure to
implement and maintain an adequate process for timely releasing detained
inmates.

This class definition satisfies the ascertainability requirement and is consistent with

*Woodall* and *Tardiff*.  To explained further, *Woodall* explained that the *Tardiff* class was

appropriate because the potentially unconstitutional strip search policy applied to every inmate.

Accordingly, the claims would all succeed or fail together.  In contrast, plaintiffs in *Woodall*

needed to show the deliberate indifference caused each illegal strip search.  That is, not every

strip search conducted was *per se* illegal, as it was alleged in *Tardiff*.

The County's other objections to the class definition and ascertainability fall short.  Much

of the County's arguments relate to whether it will ultimately be liable for each alleged over-

detention.  That is, the County disputes whether they are ultimately liable, not whether a detainee is a member of the class.  To the extent the County argues the class definition is not administratively feasible, its arguments are misplaced.  "For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria."  *Young*, 693 F.3d at 539.  This does not require "100% accuracy," but instead, "reasonable accuracy."  *Id.*  The County points to purported flaws in Keller's analysis for which Plaintiffs mostly rely on for determining who will be, and who will not be, members of the class.  The County argues the data analysis conducted is not entirely accurate and cannot determine, with pinpoint accuracy, the time it took to release after a "release triggering event" or after the legal basis for detention ended.  To the County, it might require the review of each person's file to determine the actual time it took to release a detainee.

But "[s]everal other courts have found that the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification."  *Id.* at 539-40 (collecting cases).  In affirming certification of a class, the Sixth Circuit found the district court's rationale compelling: "[T]he need to manually review files is not dispositive.  If it were, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained."  *Id.* at 540.  Thus, the Sixth Circuit held "[t]o allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies."  *Id.*

This is true here.  The County cannot use its own lack of recordkeeping (which Plaintiffs claim is part of the reason over-detentions occur in the first place) as a reason to defeat class certification.  While Keller's analysis may not be 100% accurate, it is "reasonably accurate" even

in light of Dr. Malone's expert report.  Though this still may require some manual review to determine if a detainee fits into the class, this cannot defeat the class action.

### b.       Numerosity

The proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  In *Whirlpool*, the Sixth Circuit held "no strict numerical test exists to define numerosity under Rule 23(a)(1)," but that the class must be a "substantial" number of effected individuals.  722 F.3d at 852 (citation omitted).  Although no set number must be reached for numerosity, courts have held that "a class of 40 or more members raises a presumption of impracticability."  *Zehentbauer Fam. Land LP v. Chesapeake Expl., L.L.C.,* No. 15-cv-2449, 2018 WL 3496089, 2018 U.S. Dist. LEXIS 121728, at *7-8 (N.D. Ohio July 20, 2018), *aff'd*, 935 F.3d 496 (6th Cir. 2019).

Plaintiffs submitted evidence that the class would likely contain more than 40 members. According to Keller, there are at least 277 detainees who fit into the proposed class definition. (Doc. 45-45 at 1910.)  The County does not dispute the proposed class would contain more than 40 members.  (Doc. 49 at 2016.)  Even with the Court's 18-hour modification, the information before the Court establishes the numerosity requirement.[5]

### c.       Commonality

Commonality requires there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). A plaintiff's claim "must depend upon a common contention . . . which is of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one

---

[5] To the extent the Court's redefinition of the class creates a numerosity issue, the parties may submit subsequent briefing discussing whether this requirement is still satisfied.

stroke." *Dukes*, 564 U.S. at 350.  Class relief is particularly appropriate when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1982) (citation omitted).  "To be common, a question must (1) yield a common answer with common evidence and (2) meaningfully progress the lawsuit." *Speerly*, 143 F.4th at 316.

"The decisionmaker must be able to resolve the question with 'a yes-or-no answer for the class in one stroke.'" *Id.* (quoting *Doster v. Kendall*, 54 F.4th 398, 430-31 (6th Cir. 2022)).  "If a reasonable decisionmaker left with the evidence may answer 'yes' to a question for some class members and 'no' for others, the class has not shown that it is common." *Id.*  Not every question that can be answered in common is contemplated by Rule 23(a)—instead, the "plaintiffs must also show that the question affects at least one disputed element of the class claims." *Id.* (quotation and citation omitted); *see also Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (explaining that plaintiffs must demonstrate one question common to the class, so long as the resolution of that question "will advance the litigation").  The "rigorous analysis" requires the court to "walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common answers." *Nissan*, 122 F.4th at 246-47.

Under a *Monell* deliberate indifference claim, a plaintiff must show:

(1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the moving force or direct causal link in the constitutional deprivation.

*Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018) (quotations omitted).  The common questions presented by Plaintiffs in this case are:

- Whether CCSD maintained a release system that was inadequate and routinely led to illegal over-detentions;
- Whether CCSD had notice or knowledge it maintained an inadequate release process;
- Whether CCSD was deliberately indifferent to the over-detention issues despite having notice of its inadequate release process by not acting to implement and maintain a sufficient release process; and
- Whether CCSD's release process caused Plaintiffs' injuries.

Plaintiffs argue each element is subject to generalized, class-wide proof.  (Doc. 51 at 2575.)  As to the first two elements, Plaintiffs identify the OD Reports and Bond Reports showing evidence of illegal activity and CCSD's awareness of it.  (*Id.*)  The third element, Plaintiffs argue, can be shown by offered evidence CCSD failed to: "(a) track or confirm transmission of release records allowed records to routinely get overlooked or stalled; (b) enter agreements or provide guidelines to third parties on whom it relied allowed release notifications to routinely be delayed; (c) implement adequate policies or any policies at all routinely caused needless release delays; (d) require periodic checks or institute failsafe measures caused errors to not be timely identified and resolved the same day detainees became entitled to release; and (e) issue Corrective Action relating to overdetentions allowed release errors to recur."  (*Id.*)  The last element, Plaintiffs say, can be proven by class-wide proof because Plaintiffs have shown individuals who are over-detained for longer than 12 hours were over-detained because of the systemic issues identified by Plaintiffs.  (*Id.* at 2577-78.)  Accordingly, Plaintiffs argue commonality is satisfied because all Plaintiffs "assert CCSD's inadequate release policies constitute deliberate indifference and caused them to be over-detained" and that Plaintiffs all assert the "same injury—hours or days deprived for their liberty."  (Doc. 45 at 333.)

The County argues commonality is not met because Plaintiffs only identified a generally applicable pattern and practice.  Since the "crux of the inquiry" turns on individualized facts, commonality cannot be met.  (Doc. 49 at 2016.)  That is, the County argues each class member's

specific circumstances preclude a finding that the claims are in common.  (*Id.*)  The County

identifies various issues that it says would require a case-by-case analysis.  (*Id.*)

First, the County says there is no way to prove on a class-wide basis whether any

particular class member was harmed by the County's tolerance of unconstitutional conduct.  (*Id.*)

In support, the County provides a few examples of detainees that would be part of the class (*i.e.*,

allegedly over-detained by longer than 12 hours), but whose individual files and circumstances

demonstrate they not actually detained for longer than 12 hours after the authority to release was

provided.  (Doc. 49-1.)  Thus, the policy of indifference leading to over-detention is not

sufficiently common because individualized facts preclude class action.  (*Id.*)

Plaintiffs' retort that the County misunderstands its arguments.  Plaintiffs are not

challenging each over-detention as unreasonable.  (Doc. 51 at 2576.)  Instead, as in *Healey*, they

contend the system in place is the source of their over-detentions.  (*Id.*)  That is, the systemic

issues relating to CCSD's release policies is something that affects all inmates and has caused the

over-detentions at issue.  Plaintiffs are not seeking to certify a class relating to whether each

detention is unreasonable.

The County heavily relies on *Woodall*.  A commonality analysis requires courts to review

which elements can be established on a class-wide basis and which would require proof for each

of the class members.  2021 WL 5298537, 2021 U.S. App. LEXIS 34149, at *16.  *Woodall* found

the first element could be proven on a class-wide basis but the remaining elements of a *Monell*

claim could not.  *Id.* at *16-17.  Timing issues would preclude class-wide proof of the second

(notice) and third (deliberate indifference) elements.  *Id.* at *17.

As the court explained, the county "must have had notice of the unconstitutional conduct

and been deliberately indifferent to it at the time each class member allegedly suffered the

unconstitutional search." *Id.* What the county knew and did not know along with what actions it took, or did not take, may vary from year to year, month to month, or even day to day. *Id.* In this way, a class member in 2019 might have a stronger claim than a class member in 2014. *Id.* Evidence of notice and deliberate indifference between those two dates might help the class member in 2019 but would be irrelevant to a class member in 2014. *Id.* The *Woodall* court further explained causation issues in relation to each proposed class member undercut commonality. *Id.* at *18. Each member would have to prove they were subjected to an unconstitutional search. *Id.* Accordingly, a class could not be certified.

*Woodall* does not foreclose class action. Plaintiffs challenge the County's release policy—a policy that applies to every detainee. Plaintiffs' claim does not, like the claim in *Woodall*, relate to the release of each individual detainee and whether that release was constitutionally unreasonable. That is, the class claim does not suggest the County's policy was generally constitutional but sometimes violated by untimely releases. Instead, Plaintiffs allege the policy as a whole is deficient. Further, Plaintiffs have presented evidence that if a detainee was over-detained by longer than 18 hours, their detention could reasonably be attributed to the systemic issues they challenge. In this way, the release policy that applied to every detainee "could be expected to be the proximate cause" of a detainee's over-detention if they were over-detained for longer than 18 hours. The timing issues identified in *Woodall* thus do not apply here.

In short, the deliberate indifference claims presented here are subject to common resolution. A factfinder can decide whether, from 2021 to present, the County exhibited a clear and persistent pattern of unconstitutional activity relating to its release system. An answer to this question resolves the claim common to the class. A fact finder can also decide whether the

County was on notice of the inadequacy of its policies in 2021.  Again, an answer to this question resolves the claim for all class members.  A factfinder could then determine if the County has been deliberately indifferent to unconstitutional activity from 2021 to present.  The factfinder can weigh the evidence and determine if the County was indeed deliberately indifferent.  *See Humphrey v. LeBlanc*, No. 20-233, 2025 WL 2694604, 2025 U.S. Dist. LEXIS 185604, at *128-29 (M.D. La. Sept. 22, 2025) (finding commonality satisfied and certifying class in over-detention case and explaining that policy changes made over time to "mitigate" over-detention issues "further underscores that there are issues common to the class" because a factfinder may determine, for the class as a whole, whether defendants conduct was deliberate indifferent or not).

The modified class eliminates the County's challenges to commonality.

### d.    Typicality

The claims or defenses asserted by the representatives must be typical of the claims or defenses asserted by the class.  Fed. R. Civ. P. 23(a)(3).  "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class."  *Sprague*, 133 F.3d at 399.  A claim may be typical where "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *In re Am. Med. Sys.*, 75 F.3d at 1082 (citation omitted).  A claim is not typical if "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim."  *Sprague*, 133 F.3d at 399 (citation omitted).

Typicality is necessary to ensure that "the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members."  *Whirlpool*, 722 F.3d at 852-53

(citation omitted).  However, "a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law."  *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n. 31 (6th Cir. 1976)).  Typicality and commonality "tend to merge" because both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Dukes*, 564, U.S. at 349 n.5.  Because of this, courts have found typicality "if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct."  *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 509 (6th Cir. 2015).

Plaintiffs and the County essentially rehash their arguments regarding commonality with respect to typicality.  Each relies on *Healey* and *Woodall* to argue typicality.  Plaintiffs argue the named class members' claims "fairly encompass" the class members' claims.  (Doc. 45 at 333.)  The County, on the other hand, argues the named Plaintiffs' claims are not typical of that of the class.  (Doc. 49 at 2017.)  In fact, the County asserts the named Plaintiffs are subject to a number of unique defenses, attributable to the individualized review necessary for over-detention claims, that preclude a typicality finding.  (*Id.*)  While the County discusses each named Plaintiff and the nature of their claim, it focuses on the lack of causation Plaintiffs have asserted to prove their *Monell* claim.  (*Id.* at 2017-18.)

Plaintiffs have shown the claims of the class representatives are typical of the potential class members.  As explained above, the systemic issues Plaintiffs challenge "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members" and their claims "are based on the same legal theory."  *In re Am. Med. Sys.*, 75 F.3d at 1082.  If

Plaintiffs show the County had an unconstitutional release policy which the County was deliberately indifferent to and caused the over-detentions exceeding 18 hours, the class claims succeed.  *See Healey*, 2021 WL 149859, 2021 U.S. Dist. LEXIS 5345, at *65 ("If the fact finder determines that Defendants have an inadequate process for timely releasing detained inmates and imprisoned ones, such a determination would further the interest of each member of the subclasses.").

Therefore, typicality is satisfied.

### e.       Adequacy

The court must determine if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Sixth Circuit has set forth a two-pronged test for determining adequacy of representation: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel."  *In re Am. Med. Sys.*, 75 F.3d at 1083 (quotation and citations omitted).  In conducting this inquiry, the court "reviews the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation, and consider whether the class members have interests that are not agnostic to one another."  *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (citation omitted).  "The adequacy of representation requirement can merge with the commonality and typicality requirements of Rule 23(a)."  *Woodall*, 2021 WL 5298537, 2021 U.S. App. LEXIS 34149, at *11.

Plaintiffs argue they have no claims antagonistic to class members and have common interests with the unnamed members of the class.  (Doc. 45 at 333.)  Further, Plaintiffs argue they have adequate counsel who has ample experience representing plaintiffs in class actions.  (*Id.*)

The County reasserts its arguments about commonality and typicality of the class, arguing the individual nature of the claims undermine the adequacy of class representatives. (Doc. 49 at 2018.)  Essentially, the County argues the adequacy of the class fails because the commonality and typicality requirements fail.  (*Id.*)

As an initial matter, there is no question class counsel is qualified.  The only dispute is whether the representatives have common interests with unnamed members of the class.  Here, they do.  The named Plaintiffs are adequate to represent the class because each have the same interests as potential members of the class.  Each named Plaintiff was detained for longer than 18 hours after the legal basis for their detention ended.  No class member has a claim that is antagonistic to the other members.

### 2.      Rule 23(b)(3) Requirements

#### a.      Predominance

A class under Rule 23(b)(3) requires the court to find "questions of law or fact common to the class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) contains a list of non-exhaustive factors courts should consider when making this determination: "[1] the class members' interest in individually controlling the prosecution or defense of separate actions; [2] the extent and nature of any litigation concerning the controversy already begun by or against class members; [3] the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [4] the likely difficulties in managing a class action."

A court has a "duty to take a 'close look' at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S. Ct. 2231, 138 L.

Ed. 2d 689 (1997)). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "To satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Beattie*, 511 F.3d at 564 (internal quotation and citation omitted). Where common issues predominate, the class members "will prevail or fail in unison." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013). A question is individual if the plaintiffs "will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Woodall*, 2021 WL 5298537, 2021 U.S. App. LEXIS 34149, at *13 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016)). The court must "put the common issues on one side, the individual issues on the other, then qualitatively evaluate which side predominates." *Nissan*, 122 F.4th at 252 (quotation omitted).

Relying on *Healey*, Plaintiffs argue predominance is satisfied "when plaintiffs: [1] sufficiently allege a systemic issue—which impacts all inmates—with the municipality's release process that caused them to be overdetained, and [2] identify a point at which it becomes more than likely that the systemic release process issue, rather than individual issues affecting particular releases, caused most of the overdetentions." (Doc. 45 at 334.) Plaintiffs allege they have identified at least five systemic issues with CCSD's release process that caused over-detentions. (Doc. 45 at 334-36; Doc. 51 at 2574.) Plaintiffs argue their class definition, starting at 12 hours after detention, is sufficient to eliminate individual issues and that after the 12-hour

mark, the systemic issues it has identified is the cause of the over-detentions. (Doc. 45 at 336.) Plaintiffs' expert found that 95% of detentions were released before 12 hours, indicating only the systemic issues remain. (*Id.*) Plaintiffs cite to *Healey* which found individualized issues did not remain after 12 hours. That is, the court found by setting the time limit at 12 hours, it removed any potential over-detention that had specific individualized issues. What remained were solely cases that were likely due to systemic issues.

Not surprisingly, the County argues predominance is not satisfied because individual issues predominate. (Doc. 49 at 2008.)

For the same reasons already addressed, common issues predominate over individual ones. This is especially true in light of the Court's redefinition of the class. As it is now defined, the County's liability arises from common questions of over-detention exceeding 18 hours and stemming from the County's alleged deliberate indifference to unconstitutional conduct. While the County focuses on the individual issues relative to each detention, that does not address Plaintiffs challenge. Plaintiffs challenge the release system as a whole and that those systemic deficiencies deliberately caused their damages.

The County's argument that individual damages calculations preclude class certification is not persuasive. (Doc. 49 at 2010.) Each member of the class will require separate individualized determinations as it relates to damages. But "individual damages determinations *alone* do not make individual issues predominate over common ones." *Woodall*, 2021 WL 5298537, 2021 U.S. App. LEXIS 34149, at *19 (emphasis in original) (citation omitted). That said, "damages are at least relevant to the predominance inquiry and can 'defeat predominance when they are accompanied by significant individualized questions going to liability.'" *Id.* (citing *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1240 (11th Cir.

2016)).  But this is not the case, as it was in *Woodall*, where "[s]ome elements for proving the general policy under a *Monell* inaction theory" would "all have to be proven on an individual basis."  *Id.*  Instead, as explained above, the systemic challenges Plaintiffs allege raises common issues that predominate over any individualized issues.  The damages calculation Plaintiffs propose—a simple one at that—does not effect predominance.

In sum, common issues predominate over individual ones.

### b.    Superiority

A class under Rule 23(b)(3) also requires the court to find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This requirement "aims to 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  *Martin*, 896 F.3d at 415 (quoting *Amchem Prods.*, 521 U.S. at 615).  The Sixth Circuit has explained:

> To determine whether a class action is the superior method for fair and efficient adjudication, the district court should consider the difficulties of managing a class action. The district court should also compare other means of disposing of the suit to determine if a class action is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court. Additionally, the court should consider the value of individual damage awards, as small awards weigh in favor of class suits.

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630-31 (6th Cir. 2011) (citations and internal quotation marks omitted).

Plaintiffs argue a class is superior to individual claims because hundreds of small individual suits will burden the courts, particularly where the certain common issues predominate.  (Doc. 45 at 336; Doc. 51 at 2587.)  Further, individual claims would result in small damages awards, which favors class action resolution.  (*Id.*)

The County argues superiority is not met, mainly because of the purported complexities the individual issues present in this case.  (*Id.* at 2011.)  Instead, the County proposes the named plaintiffs continue with their claims, and if they are successful, other individuals who would be class members can decide if they want to bring suit.  (*Id.* at 2012.)  To the County, this method would both promote judicial economy and allow for individualized determinations as necessary. (*Id.*)

First, there are inherent difficulties in managing class actions, to be sure, but those are not greater in this case than any other class action.  Second, disposing of the suit as a class action is the superior method as compared to individual resolution.  Individual resolution would require the filing of potentially hundreds of separate lawsuits each alleging similar fact patterns.  The influx of so many individual claims would delay resolution in each.  Third, it is unlikely individual suits will result in large damage awards, perhaps not even meeting the cost to file a complaint in federal court or state court.  For these reasons, a class action enhances efficient and timely processing of claims and promotes judicial economy.

III.    CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Class Certification (Doc. 44) is GRANTED with the modification to the class definition.  Defendant Cuyahoga County's Motion to Strike the Declaration of A. Dami Animashaun (Doc. 48) is GRANTED in part and DENIED in part.  The County's Motion in Limine to Preclude Lacey Keller's Expert Report (Doc. 50) is DENIED.  Plaintiffs' Motion to Strike Expert Report of Dr. Sean Malone (Doc. 56) is DENIED.

It is further ORDERED:

Counts One and Two shall be maintained as a class action under Fed. R. Civ. P. 23(b)(3), with the class defined as:

From February 23, 2021, through the present, all pretrial Cleveland and County Detainees who, when the basis for their pretrial detention ended (*i.e.* who had no other pending charges when they: were released with no formal charges, were ordered released, paid or were issued a bond, or were being detained solely on a minor misdemeanor or personal bond eligible charge), either:

1) had no Holds and were not released from the Jail within 18 hours after the basis for their detention ended; or

2) had only a Booking Hold (*i.e.*, a hold for completion of a booking step, such as DNA, photos, or fingerprints) and were not released from the Jail within 18 hours after the basis for their detention ended; or

3) had only a Monitoring Device Hold (*i.e.*, a hold for installation of a GPS or SCRAM monitor) for a Cleveland Municipal Court Case and were not released from the Jail within 18 hours after installation of their monitoring device;

AND

were over-detained for longer than 18 hours because of the County's failure to implement and maintain an adequate process for timely releasing detained inmates.

**IT IS SO ORDERED.**

**Date**:  March 31, 2026

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE