UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALANNA DUNN, *et al.*, | ) | Case No. 1:23-cv-00364 |
| | ) | |
| Plaintiffs, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| CUYAHOGA COUNTY, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Before the Court is the Motion for Summary Judgment submitted by Defendant Cuyahoga County (the "County"). (Doc. 66.) Plaintiffs Alanna Dunn, Reginald Haymon, Adam Day, Eric Zeider, Cameron Leonard, and Jason Wilson ("Plaintiffs") opposed (Doc. 67), and the County replied (Doc. 71). Relatedly, Plaintiffs filed a Motion to Strike to preclude the use of the County's expert, Jeff Eiser. (Doc. 68.) That Motion is fully briefed. (Docs. 72, 75.) For the reasons stated herein, the County's Motion for Summary Judgment is GRANTED. Plaintiffs' Motion to Strike is DENIED.

## I. BACKGROUND

Plaintiffs filed this class action pursuant to 42 U.S.C. § 1983 alleging the County's and the Cuyahoga County Sheriff's Department's ("CCSD") deliberate indifference caused them to be overdetained in the Cuyahoga County Jail ("Jail") after the legal basis for detention terminated, in violation of the procedural and substantive due process clauses of the Fourteenth

Amendment.[1] (Doc. 39.) Plaintiffs allege CCSD has a policy and practice of systemically detaining individuals for an unreasonable period after the legal basis for their detention ends. (Doc. 67 at 3227.) And Plaintiffs allege CCSD failed to provide adequate procedural protections to ensure that people held at the Jail are not detained for an unreasonable period of time. (*Id.*) With the full record now before the Court at summary judgment, the County challenges those allegations. (Doc. 66.)

### A. Undisputed Facts

#### 1. CCSD's Release Process

This case involves CCSD's pre-trial detainee release policies. The applicable policies and operation of the release system are undisputed.[2]

CCSD operates the Jail. (Doc. 66 at 2817; Doc. 67 at 3227.) The Jail houses detainees who have cases pending in the Cuyahoga County Court of Common Pleas ("County Detainees"). (Doc. 45 at 323; Doc. 49-1 at 2022; Doc. 66 at 2817.) In 2018, the County and the City of Cleveland ("Cleveland") agreed the Jail would also house detainees who have pending charges in the Cleveland Municipal Court ("Cleveland Detainees"). (Doc. 45-1; Doc. 66 at 2817.)

CCSD Criminal Records Clerks "are responsible for processing certain inmate information, paperwork, and files from the time the inmate enters [the Jail], to the time they are released." (Doc. 45-23 at 1582; *see also* Doc. 49-1 at 2027.) Processing releases begins once a disposition is communicated to the Jail. (Doc. 45-2 at 406; Doc. 49-1 at 2027.) Different types

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

[2] In their briefing, the parties cite to the summary judgment record and exhibits as well as the record and exhibits before the Court at the class certification stage. Since both parties rely on the record from each, the Court does the same.

of dispositions entitle a detainee to release, including payment of a bond, a court-ordered release, a decision not to file formal charges, a notification that a condition of release has been met such as the installation of a GPS or alcohol monitoring device, or a plea. (Doc. 45-2 at 406; Doc. 49-1 at 2027.) How dispositions are communicated to Records Clerks depends on the type of detainee and the reason for release. (Doc. 45-2 at 406; Doc. 49-1 at 2029.)

Court-ordered releases for County Detainees are received from the electronic Criminal Justice Information System ("CJIS") database. (Doc. 45-23 at 1598-99; Doc. 49-1 at 2030.) Once a court order is received through the CJIS database, a Records Clerk assigned to that detainee will begin the release process by creating a paper "book sheet." (Doc. 45-23 at 1599; Doc. 49-1 at 2030-31.) The Records Clerk reviews the court order to ensure it orders the release of the detainee. (Doc. 45-23 at 1599.) The Records Clerk then reviews the detainee's file to determine if there are any conditions or holds preventing the release from proceeding. (*Id.*; Doc. 49-1 at 2031.) Various holds can be placed on a detainee's release, including the need to take a photograph, fingerprints, or a DNA swab; the need to install a GPS or alcohol monitoring device; holds from other municipalities; federal detainers or other arrest warrants; or a requirement for release to be made to a family member or to a treatment facility. (Doc. 45-23 at 1584-85.)

Once the Records Clerk determines there are no holds and the release can be processed, the Records Clerk signs a release book sheet and sends the records to a LEADS clerk for a warrant check. (Doc. 45-23 at 1599; Doc. 45-5 at 725.) Once cleared by the LEADS clerk, a Records Clerk supervisor must sign off on the release. (Doc. 45-23 at 1062; Doc. 45-5 at 725.) Before sending the release to the Jail, the Records Clerk ensures no other issues prevent release. (Doc. 45-23 at 1062; Doc. 45-5 at 725.) Once complete, the Records Clerk emails the file to the Jail Release Desk. (Doc. 45-23 at 1062; Doc. 45-5 at 726.) Then, Release Desk staff, typically

called "Jailers," process and effectuate the release. Jailers create a release packet, complete a checklist, and hand the release to an escort officer. The escort officer picks up the detainee for release.

County Detainees who pay their bond follow a similar process. Once paid, their information is sent to CJIS in a "Sheriff's Bond Posted Queue." (Doc. 49-1 at 2030.) The queue refreshes hourly. (Doc. 45-23 at 1597.) Records Clerks run a "bonds list" to obtain information on detainees who have posted bond. (*Id.* at 1604.) Per CCSD's policies, Records Clerks are required to run a bonds list hourly or at their earliest convenience. (*Id.*) Once a bond is posted, Records Clerks follow the same process outlined above. (*Id.* at 1598.)

Release dispositions for Cleveland Detainees are communicated differently. While court-ordered releases and posted bonds are filed on the Cleveland Municipal Court docket, there is no automated system in place similar to CJIS to communicate orders and bond payments electronically. Instead, the Clerk of Courts for the Cleveland Municipal Court emails these records to a shared email account monitored by Records Clerks. (Doc. 45-9 at 935-36.) The records are then disseminated to an assigned Records Clerk to process the release in a similar manner as for County Detainees.

When the Cleveland Municipal Court grants a Cleveland Detainee personal bond, a Court Liaison—a CCSD employee assigned to the Cleveland Municipal Court arraignment room—sends a notification to the Records Clerk shared email account. (Doc. 49-1 at 2031.) The Clerk of Courts for the Cleveland Municipal Court may also send notification of a personal bond to the shared email account. (*Id.*) Court orders for personal bond are recorded on "bubble sheets," which are hand-written entries signed by the Cleveland Municipal Court judge and provided to CCSD. (*Id.*) They are then scanned and sent to the Records Clerk shared email account. (*Id.*)

When a Cleveland Detainee posts a cash or surety bond, the Cleveland Municipal Court sends a notification to the shared email account. (*Id.*) Records Clerks then process releases.

Some Cleveland Detainees are not formally charged after their arrest. This is called "Release No Formal Charges" ("RNFC"). (*Id.* at 2029.) Cleveland police officers enter charging decisions in the "Law Enforcement Records Management System" ("LERMS") database. (Doc. 45-2 at 406.) When no charges are being presented, officers note "RNFC" in LERMS and also on a physical copy of the record. The physical record is called a "green slip." (*Id.*) Prior to 2024, Jailers were required to periodically check LERMS to determine if RNFC notations entitled a Cleveland Detainee to be released. (Doc. 45-10 at 1034.) Sometimes Cleveland police would deliver green slips to Jailers. (Doc. 49-1 at 2030.) Either way, once a Jailer is notified of an RNFC, that information is sent to the Records Clerks via the shared email to begin the release process. (*Id.*) This process changed in 2024. Cleveland police are now required to send charging decisions to a dedicated group email called "Charging Updates," which is monitored by Records Clerks. (*Id.* at 2029.)

Other detainees have "holds" tied to release conditions, such as the installation of GPS monitoring equipment. For Cleveland Detainees, Oriana House, a third-party entity with whom Cleveland contracts, installs such monitors. (*Id.* at 2031.) Once installation is complete, a Court Liaison notifies the Records Clerks through the shared email account. (*Id.*) At the end of each day, Oriana House sends an email to a shared email account identifying all Cleveland Detainees who had devices installed that day. (*Id.* at 2031-32.) For County Detainees, the County Probation Department installs monitoring devices at the Jail Release Desk and notifies Records Clerks through a dedicated shared email account. (*Id.* at 2032.)

Records Clerks work business days and hours. (Doc. 45-6 at 840.) When Records Clerks are not working, Jailers assigned to the Release Desk process releases. (*Id.*)

**2. Identification of Detention Issues**

Per the 2018 agreement, Cleveland agreed to pay the County a per diem for each calendar day a Cleveland Detainee was held at the Jail. (Doc. 45-1 at 347.) That agreement also contained a clause prohibiting the County from charging the per diem for Cleveland Detainees where the detainee was entitled to release. (*Id.* at 348.) For instance, the agreement provided:

> The County shall not charge the City for any [Cleveland Detainee] the day following the date: a court of competent jurisdiction has ordered the City Prisoner released; a City Prisoner is Bound Over to the County; municipal charge(s) will not be brought or have been dismissed or withdrawn against a City Prisoner[]; or a City Prisoner otherwise ceases to qualify as a City Prisoner under this Agreement.

(*Id.*)

Soon after the County and Cleveland signed the 2018 agreement, Cleveland began validating the per diem charges the County billed. (Doc. 45-2 at 448-49.) The County sent Cleveland a list of all Cleveland Detainees. (*Id.* at 449.) Using that list, and the available information Cleveland had access to, Cleveland began analyzing whether the detainees listed were "detainees" under the agreement, and therefore, subject to the per diem charge. (*Id.* at 448-49.) In doing this analysis, Cleveland identified some detainees no longer qualified as a "detainee" under the agreement because the records indicated the detainees were entitled to release the previous calendar day or earlier. (*Id.*) As a result, Cleveland began disputing the applicable per diem accounting charge for these detainees. (*Id.* at 449.)

Cleveland compiled the disputed detainees in "held beyond release" reports.[3] (*Id.*) Additionally, beginning in early 2019, Cleveland sent these Reports to CCSD employees to notify them of potential overdetention issues. (Doc. 67-7 at 3275.) For instance, in January 2019, Cleveland identified 30 individuals who were held beyond their release dates, making them no longer "detainees" under the agreement, for a total of 108 jail days. (*Id.*) The Reports listed the detainees and provided shorthand commentary regarding the potential discrepancies. (*Id.*) Cleveland continued sending these Reports to the County throughout 2019. (*Id.* at 3275-309.) Cleveland and the County discussed the issues throughout the year. (Doc. 67-3 at 3260-61.) At the same time, internally, the County began questioning the Reports and appeared to be investigating the root causes for overdetention. (Doc. 67-4 at 3263-64; Doc. 67-5 at 3266-67; Doc. 67-6 at 3269-73.) Nonetheless, Cleveland continued sending Reports, noting increasing issues. (Doc. 67-7 at 3302 (noting "no improvement" regarding September 2019 Report).) In late 2019, the issues seemed to have abated. (*Id.* at 3306-09.)

Cleveland continued sending the Reports to the County throughout 2020. (Doc. 67-8 at 3311.) Each Report contained at least a few detainees Cleveland believed were "held beyond release." (*Id.* at 3311-33.) In May 2020, Cleveland noticed the issue started to uptick again. (*Id.* at 3319.) That trend continued throughout the rest of 2020 with some exceptions. (*Id.* at 3325-28.) In late 2020, Cleveland employees met with County employees to discuss the issue and how Cleveland was identifying some of the problems with the County's release system. (*Id.* at 3329.) At that time, Cleveland believed the issue related to "training and staffing." (*Id.*)

---

[3] Plaintiffs use the term "Over-Detention Reports." The County objects to the naming convention as a mischaracterization and instead calls them "held beyond release reports." For simplification purposes, the Court refers to these documents as "Reports."

In 2021, CCSD began paying more attention to these monthly reports, largely so it could determine if overdetention occurred and, if so, which department was at fault. (Doc. 45-6 at 809.) CCSD staff assigned a supervising Records Clerk, Leah Palagyi, to specifically assess the Reports, which included reviewing all relevant files to determine what occurred and how. (Doc. 45-5 at 748; Doc. 45-6 at 795; Doc. 45-10 at 1011.) Palagyi worked with another supervisor, Lieutenant Russell Jaenke, to work these assessments. (Doc. 45-5 at 748.) The analyses included a brief review of when the detainee was booked, the process relating to the detainee's release, and identification of the root cause for overdetention, if any. (Doc. 45-33 at 1849.) CCSD employees routinely met to discuss this root cause analysis. (Doc. 45-5 at 748; Doc. 45-10 at 1011.)

CCSD staff testified in depositions that these monthly assessments resulted in changes to the release process. (Doc. 45-6 at 810-11.) So, for example, where a detainee was eligible for a personal bond, the clerk's office began automatically sending notice to the Records Clerk shared email account. (*Id.* at 811.) As another example, because a large number of individuals on the monthly reports were RNFCs, CCSD changed its practice to require Cleveland police officers to affirmatively send RNFC decisions instead of waiting for a Jailer to review LERMS. (*Id.*) Changes were also made to processing notices when monitoring devices were installed. Before, if a detainee required a monitoring device, a correction officer would provide notice that the detainee's device was installed by Oriana House. (*Id.*) But if that correction officer was not on duty, and therefore not aware of the installation, it could be that no notice was sent. (*Id.*) Similarly, Oriana House altered its procedures to send the Records Clerk a daily list of detainees for whom installation was completed. (*Id.*) Further, the assessments allowed CCSD to identify

staff errors and issue discipline to those employees who caused overdetentions. (*Id.* at 832-39; Doc. 45-10 at 991.)

The Cuyahoga County Common Pleas Clerk of Court's Office also began sending reports. A criminal manager for the County, Krystal Lawyer, began sending reports in January 2022. Lawyer prepared these periodic reports (mostly daily reports) and sent them to CCSD. These reports were intended to be an added check on the processing of bond releases. (Doc. 45-6 at 819; Doc. 45-7 at 898.) The list identified County Detainees who were not released the same day they posted bond. (Doc. 45-7 at 898.) CCSD employees reviewed the list and would confirm through the databases if another reason or hold prevented release. (Doc. 45-6 at 819.) CCSD employees communicated with Common Pleas staff about those identified on this list. (*Id.*; Doc. 45-7 at 901.) Sometimes holds prevented release, other times identified errors in processing resulted in overdetention. (Doc. 45-7 at 901.)

**3. Named Plaintiffs**

The six named Plaintiffs in this suit allege they were unconstitutionally overdetained as a result of the above-described issues. (Doc. 39.)

**i. Alanna Dunn**

Dunn was arrested on March 30, 2021, and booked at 1:59 a.m. that day on menacing and burglary charges. (Doc. 45-32 at 1839.) According to Cleveland Police Department ("CPD") records, Dunn was officially charged with burglary, but CPD entered RNFC as to the menacing charge. (*Id.*) At 4:00 p.m. that day, CPD decided to not charge Dunn with burglary and filled out a "green slip" indicating the RNFC decision. (*Id.* at 1841.) However, at 5:01 p.m., the LERMS system still showed Dunn was being charged with burglary. (*Id.* at 1844.) When the Jailer checked LERMS for updates regarding Dunn, it showed a burglary charged preventing her

release. (Doc. 49-2 at 2138.) Per the usual practice of periodically picking up green slips, a Jailer picked up the green slip for Dunn on April 1 at 10:23 a.m. (Doc. 45-32 at 1842.) At that time, the Jailer updated the appropriate database and began processing Dunn's release. (*Id.* at 1840, 1845-47.) Dunn was released on April 1, at 2:37 p.m. (Doc. 45-9 at 922.)

**ii. Cameron Leonard**

Leonard was arrested on July 14, 2022, at 9:15 p.m. on domestic violence charges. (Doc. 45-38 at 1875.) At the time of his arrest, Leonard had a warrant for his arrest from a separate contempt of court charge. (*Id.*) On July 15, 2022, Leonard was booked into the Jail. (*Id.*) By 1:34 p.m. that day, CPD entered RNFC regarding Leonard's domestic violence charge. (*Id.*) This left only Leonard's misdemeanor charge for contempt of court.

Pursuant to Cleveland Municipal Court administrative orders, detainees with eligible minor misdemeanor charges may be released on personal bonds. (Doc. 45-2 at 446-47; Doc. 49-1 at 2086-98.) However, before being released, the detainee must execute a "Court Release Agreement." (Doc. 45-2 at 446-47; Doc. 49-1 at 2086-98.) Therefore, a detainee is not entitled to release until the Jail receives the signed agreement from the Cleveland Municipal Court. (Doc. 45-2 at 446-47; Doc. 49-1 at 2086-98.)

In Leonard's case, although the domestic violence charge was entered as RNFC, he still had a misdemeanor for contempt of court. This meant that after his domestic violence charge was entered as RNFC, Leonard would be entitled to release on personal bond immediately. But to do so, the Jail must first receive an executed Court Release Agreement. Leonard executed such an agreement on July 17, 2022. (Doc. 49-1 at 2097.) That agreement was sent to the Jail that day at 3:58 p.m. (*Id.*) Leonard was released on July 17 at 5:09 p.m. (Doc. 45-39 at 1884.)

**iii. Adam Day**

Day was arrested February 10, 2022, at 4:07 a.m. on driving under the influence charges. (Doc. 49-1 at 2106.) He was booked into the Jail hours later at 6:37 a.m. (*Id.* at 2105.) During the booking process, Day indicated he had suicidal thoughts. (*Id.* at 2103.) Therefore, he was put on suicide precautions when being booked. (*Id.* at 2115.) That precaution remained until February 11, 2022, at 10:10 a.m. (*Id.*)

Meanwhile, the Cleveland Municipal Court granted Day release on personal bond on February 10, 2022. (*Id.* at 2112.) The Court sent an executed Court Release Agreement to the Jail at 10:18 p.m. (*Id.*) Day was released from the Jail on February 11, 2022, at 7:57 p.m. (Doc. 45-35 at 1853.)

**iv. Jason Wilson**

Wilson was arrested on May 7, 2022, at 6:00 p.m. on one fresh charge relating to drug possession and traffic offenses. (Doc. 45-36 at 1858.) Wilson also had three prior contempt of court charges. (*Id.*) He was booked into the Jail at 6:33 p.m. the same day. (*Id.* at 1855.) At an unknown time, on May 9, 2022, CPD entered RNFC on the fresh charge relating to drug possession. (*Id.* at 1864.) Because the remaining charges were misdemeanors, Wilson was eligible for release upon the issuance of personal bond. (Doc. 45-17 at 1422.) The following day on May 10, 2022, Wilson appeared in court. (Doc. 45-36 at 1865-69.) The court appearance resolved all remaining charges. (*Id.*) He was released 6:43 p.m. that day. (Doc. 45-37 at 1872.)

**v. Eric Zeider**

On April 12, 2022, Zeider was arrested on domestic violence, criminal damaging and endangering, and menacing. (Doc. 66-5 at 3056.) He was booked into the Jail on April 13, 2022. (Doc. 45-40 at 1886.) Zeider was held until his arraignment on April 14, 2022. (*Id.*; Doc.

66-5 at 3086.) At his arraignment, he was ordered released upon the payment of a $7,500 bond and the installation of a GPS monitor. (Doc. 45-40 at 1886.) Zeider posted bond at 1:22 p.m. that day. (*Id.*) And at 3:11 p.m., a GPS monitor was installed. (*Id.*) The next day, on April 15, 2022, at 5:49 a.m., the Jail was notified of the installation of the GPS monitor. (*Id.*) Zeider was released at 4:36 p.m. that day. (*Id.*)

**vi. Reginald Haymon**

On December 8, 2023, at 8:30 a.m., Haymon was arrested on felonious assault charges. (Doc. 67-13 at 3359-60.) He was booked into the Jail the same day at 12:09 p.m. (*Id.* at 3359.) Also on December 8, Haymon was granted released upon payment of a bond. (*Id.* at 3361.) He posted bond that same day. (Doc. 45-17 at 1454.) The Jail did not process Haymon's release until December 11, 2023, at 9:23 a.m. (Doc. 67-13 at 3363.)

**B. Procedural History**

On February 23, 2023, Plaintiff Dunn, on behalf of herself and others similarly situated, filed a class action complaint against the County. (Doc. 1.) The complaint contained two claims for relief: a claim under 42 U.S.C. § 1983 for violation of Substantive Due Process under the Fourteenth Amendment (Count One); and a claim under 42 U.S.C. § 1983 for violation of Procedural Due Process under the Fourteenth Amendment (Count Two). (*Id.* at 13-14, ¶¶ 63-70.) After the Court granted Plaintiff leave (Doc. 38), Plaintiff filed a first amended complaint adding five additional named plaintiffs (Doc. 39 at 270). Aside from additional allegations relating to the new named plaintiffs, no allegations or claims were modified or added. (*Id.*)

Plaintiffs moved for class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure, or, alternatively, Rule 23(c)(4). (Doc. 44 at 316.) The Court granted class certification. (Doc. 77). The County timely petitioned to the Sixth Circuit Court of Appeals for

authorization to appeal class certification. *See In re Cuyahoga Cnty.*, No. 26-0302 (6th Cir. filed on Apr. 14, 2026). That remains pending.

The County now moves for summary judgment against the individual claims brought by the named Plaintiffs. (Doc. 66.) Plaintiffs timely opposed (Doc. 67), and the County replied (Doc. 71). In addition, Plaintiffs moved to strike the expert testimony of Jeff Eiser. (Doc. 68.) That motion is fully briefed. (Docs. 72, 75.)

## II. ANALYSIS

### A. Rule 702 Challenge to Expert Jeff Eiser

In support of its Motion for Summary Judgment, the County submitted Eiser's expert report. (Doc. 66-10.) Plaintiffs seek to have the report stricken from the record, so the Court will address this issue first.

Per his report, Eiser was retained to "review records and analyze the policies, procedures, and practices of the Cuyahoga County Corrections Center ('CCCC') administration regarding the release procedures utilized by the CCCC for lawfully incarcerated pre-trial detainees." (*Id.* at 3184.) He disclaims reviewing any one specific detainee, but instead, was asked "whether the policies, procedures, and practices of the CCCC administration and their staff are consistent with [his] training, education, and professional experience . . . and applicable state regulatory standards and contemporary corrections industry standards and practices." (*Id.*) He concluded that the Jail's release policies were adequate and consistent with applicable law and that employee discipline relating to release errors was adequate and consistent with applicable law. (*Id.* at 3211-12.)

Plaintiffs challenge his report pursuant to Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). (Doc. 68.)

Specifically, Plaintiffs challenge the relevancy and reliability of Eiser's opinions. (Doc. 69 at 3369, 3375.) Resolution of the Motion to Exclude Eiser, however, is not necessary to resolve the Motion for Summary Judgment. The County references Eiser's opinions only once in relation to Plaintiffs' failure-to-train theory of liability. Neither party argues that Eiser's opinions are dispositive. Meaning, neither party argues that either the exclusion of his opinions (or the consideration of his opinions) determines whether the County's dispositive motion fails or succeeds. And the Court does not view Eiser's opinions on this point as necessary at all. Simply stated, Eiser's opinions are not essential to resolving the County's Motion for Summary Judgment. *See Serrano v. Menard, Inc.*, 671 F. Supp. 3d 877, 883 (N.D. Ill. 2023) (denying as moot *Daubert* motion not essential to resolve a motion for summary judgment). The Motion to Strike is denied as moot.

**B. Motion for Summary Judgment**

**1. Legal Standard**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that no genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted). A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[A] genuine dispute of material fact exists if the evidence is

such that a reasonable jury could return a verdict for the non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005). A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c) & (e). Rule 56 further provides "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quotation and citation omitted). The Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*

**2. Legal Framework Applicable to Plaintiffs' Claims**

Plaintiffs' Fourteenth Amendment claims are analyzed pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Under *Monell*, a municipality cannot be held liable under Section 1983 "for an injury inflicted solely by its employees or agents." *Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1038 (6th Cir. 2024) (quoting *Monell*, 436 U.S. at 694). "Instead, a municipality may be held liable 'only for its *own* illegal acts.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)). "[A] municipality is liable under [Section] 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (third alteration in original) (quoting *Monell*, 436 U.S. at 692).

To prevail, a plaintiff must show (1) violation of a constitutional right; and (2) the municipality's policy or custom caused the violation. *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007). Because "[t]here is no liability under *Monell* without an underlying constitutional violation," Plaintiffs must first show they suffered a constitutional violation. *Zucker v. City of Farmington Hills*, 643 F. App'x 555, 570 (6th Cir. 2014) (citing *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). Then, "[a] plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal

rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

Here, Plaintiffs assert violations of their substantive and procedural due process rights. (Doc. 67 at 3233-39.) In doing so, they present three theories of *Monell* liability: inaction; failure to train, supervise, or discipline; and ratification. (*Id.* at 3239.) The Court need not and does not reach the parties' arguments about whether each Plaintiff was overdetained in contravention of a constitutional right because, even assuming a constitutional violation, the undisputed facts refute Plaintiffs' assertion that the County was deliberately indifferent as a matter of law. This means Plaintiffs' inaction and insufficient training, supervision, and discipline theories fail as a matter of law. Further, Plaintiffs' ratification theory fails because Plaintiffs cannot show the County ratified any unconstitutional conduct at the time of Plaintiffs' injuries.

### 3. *Monell* Liability Analysis

#### i. Deliberate Indifference

Deliberate indifference is a necessary element to *Monell* claims premised on inaction or inadequacy of training, supervision, or discipline. Deliberate indifference is a high bar. *Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005).

**Inaction.** "To succeed on a municipal-liability claim under an 'inaction' theory, a plaintiff must show . . . the municipality's 'tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction.'" *Franklin v. Franklin County*, 115 F.4th 461, 472 (6th Cir. 2024) (alterations accepted) (quoting *Thomas*, 398 F.3d at 429). The evidence must show that the "need to act is so obvious" that the County's "conscious decision not to act can be said to amount to a 'policy' of

deliberate indifference." *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996). Merely "sloppy, or even reckless oversights" are not enough; the evidence must "show[] an obvious, deliberate indifference" to, in this case, overdetention. *Id.* "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of its action." *Miller*, 408 F.3d at 815 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)).

Cleveland began sending the Reports to the County in 2019. (Doc. 67-7 at 3275.) Cleveland and the County discussed issues identified in these Reports throughout the year. (Doc. 67-3 at 3260-61.) At the same time, the County began meeting to discuss the Reports. (Doc. 67-4 at 3263-64; Doc. 67-5 at 3266-67; Doc. 67-6 at 3269-73; Doc. 45-5 at 747.) In August 2019, Lieutenant Miguel Caraballo received the July 2019 Report. He then emailed Palagyi, a CCSD Release Clerk, to "[p]lease review and research the inmates that were not RNFC so that we can further determine where any other holes need to be plugged. [] I am authorizing OT [overtime] to complete this for me asap." (Doc. 67-4 at 3263.) Palagyi was the individual leading the review of the Reports, at least on an ad hoc basis, along with Lieutenant Jaenke who oversaw the review. (Doc. 45-5 at 717.) Moving to November 2019, then-Sheriff David Schilling received the September 2019 Report. In response, he sent an email to CCSD staff asking what was being done to address overdetention concerns in the Reports. (Doc. 67-5 at 3266.) In response, Sergeant John Jerman noted that Palagyi was "looking into the specifics of these individuals and will provide an update as soon as possible." (*Id.*) Though not identified specifically, Sergeant Jerman reported to Sheriff Schilling that some changes to the release process had been made and he was "optimistic that we will see improvement." (*Id.*)

As it relates to County Detainees, a CCSD employee reported to the Clerk of Courts on August 29, 2019, that the County "held an important meeting in June [2019] to discuss" overdetentions and noted jail staff was "immediately" asked to "review each case, identify any reason or review for accuracy, and if necessary what the immediate solution is and a timeline." (Doc. 67-6 at 3269.)

There is no dispute these internal meetings appear to have had some effect on overdetentions. (Doc. 67-7 at 3306-09.) In the February 2020 email attaching the December 2019 Report, Cleveland employees wrote, "Thank you to everyone who has worked very hard to resolve this issue." (*Id.* at 3308.) The December 2019 Report showed "significant improvement over the past months." (*Id.*) While the parties here acknowledge there was a period of improvement, overdetention concerns returned.

In July 2020, Cleveland provided the May 2020 Report to the County. This communication showed overdetentions increasing. (Doc. 67-8 at 3319.) That trend continued throughout the rest of 2020 with some exceptions. (*Id.* at 3325-28.) But again, it is undisputed the County took some actions in response to the rise in overdetentions. For its part, the County identified CCSD staff meetings to address the overdetention issues. (Doc. 66 at 2833.)

On August 1, 2020, Warden Michelle Henry replaced Warden Gregory Croucher. (Doc. 45-10 at 969.) When she first received the Report, she attended a meeting with CCSD staff, including the associate warden and other administrative staff who oversaw the release of detainees. (*Id.* at 978.) The purpose of the meeting was to "look at what was going on and what we could do to dive deeper and find out exactly where in the process there was a glitch and correct it." (*Id.*) The meeting was characterized as a "brainstorming process" to identify issues in the release process and present potential solutions. (*Id.*) Approximately two months later,

Cleveland employees met with County employees to discuss the September 2020 Report. This report showed an increase in overdetentions. (Doc. 67-8 at 3329.) During the meeting, Cleveland employees shared their observations as to why the County continued to face overdetention problems. (*Id.*) In December 2020, in response to a Report, Warden Henry asked CCSD employees for an "action plan" "in light of the recent release problems." (Doc. 45-10 at 1007.) Warden Henry re-requested an action plan in January 2021. (*Id.*)

The parties here acknowledge that, in 2021, the County took additional steps to identify and correct overdetentions at the Jail. Specifically, the County began internally analyzing the Reports. (Doc. 45-6 at 796.) Lieutenant Jaenke and Jail Administrator Ronda Gibson asked Palagyi, newly promoted to a supervisor role, to review and analyze the Reports and to assess the particular circumstances for each listed detainee, this time on a regular basis unlike the ad hoc reviews in the past. (Doc. 45-5 at 748; Doc. 45-6 at 795; Doc. 45-10 at 1011.) Palagyi's individualized assessments were to include a review for each identified detainee that determined whether an error occurred and, if so, why the overdetention happened and the person or entity responsible. (Doc. 45-6 at 809; Doc. 45-5 at 748.) Though the record is unclear on the exact date Palagyi was tasked with analyzing the Reports, there are analyses beginning in January 2021 through 2022, with the exception of March and April 2021. (Doc. 45-5 at 482, 592-675.) Palagyi shared her analyses with CCSD staff, who then held regular meetings to address the assessments. (Doc. 45-5 at 747; Doc. 45-6 at 810; Doc. 45-10 at 1011.) It is undisputed that assessing the Reports was a significant part of Palagyi's job responsibilities. They also became the responsibility of her supervisor Lieutenant Jaenke. (*See* Doc. 45-5 at 747; Doc. 45-6 at 810.)

Again, still undisputed, Palagyi's assessments generated changes to the release system. By way of example, the clerk's office began automatically sending notice to the Records Clerk

shared email account when a detainee became eligible for a personal bond. (Doc. 45-6 at 811.) As another example, because a large number of individuals on the monthly reports were RNFCs, CCSD changed its practice to require Cleveland police officers to affirmatively send RNFC decisions instead of waiting for a Jailer to review LERMS. (*Id.*) Changes were also made to processing notices when monitoring devices were installed. Before, if a detainee required a monitoring device, a correction officer would provide notice that the detainee's device was installed by Oriana House. (*Id.*) But if that correction officer was not on duty, and therefore not aware of the installation, it could be that no notice was sent. (*Id.*) Similarly, Oriana House altered its procedures to send the Records Clerk a daily list of detainees for whom installation was completed. (*Id.*) CCSD also began disciplining employees identified as the cause for overdetention. (*Id.* at 832-39 (discussing coaching given to Records Clerks who made an error identified in a Report and confirmed in CCSD analysis); Doc. 45-10 at 991 (discussing employee discipline relating to identified overdetentions which were traced back to Records Clerk errors).)

The County urges its actions for the entire time period preclude a finding it was deliberately indifferent as a matter of law. Not surprisingly, Plaintiffs dispute this and urge the Court to conclude a general issue of material fact precludes summary judgment. While they do not dispute the County took action or the pertinent timeline of events, Plaintiffs urge the Court to conclude that overdetentions occurring after action was taken sufficiently demonstrates a question of fact as to whether the County's actions were ineffective to the point of deliberate indifference. There is no dispute that overdetentions went down in 2019 and increased in 2020. But there is also no dispute that, in early 2021, the County tasked a supervisor (and her supervisor) with addressing each month's Report to make individualized detention assessments and identify offending personnel. The parties acknowledge these assessments spurred meetings

and institutional changes. With these facts undisputed, January 2021 marks the point in time at which the County had taken action sufficient to defeat Plaintiffs' assertion of deliberate indifference.

Consider *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011). In *Barnes*, a group of plaintiffs representing a class of prisoners alleged they were overdetained. *Id.* at 266. Plaintiffs challenged the defendant's entire release system as unconstitutional in violation of the Fourth, Fifth, and Eighth Amendments. *Id.* at 272. Like Plaintiffs here, plaintiffs presented an inaction theory of liability under *Monell*. *Id.* For purposes of the court's inaction analysis, the court analyzed three periods of time: September 2005 through December 2006; January 2007 through February 2008; and March 2008 onwards. *Id.* First, the court found defendants were on notice of unconstitutional overdetentions because of an earlier, separate class action involving similar claims. *Id.* at 267 (citing *Bynum v. District of Columbia*, 412 F. Supp. 2d 73 (D.D.C. 2006)). That action was resolved in 2006. *Id.* Yet, despite that litigation, the defendant did not implement any changes to the release system until 2008 when defendant adopted new policies. Undisputed between the parties and supported by significant amounts of incarceration and release data, was that these later actions resulted in a decrease in overdetentions. But because defendant failed to show it undertook sufficient action between September 2005 through December 2006, plaintiffs were granted summary judgment on their *Monell* claim for that period of time. *Id.* at 285. Relating to the January 2007 through February 2008 time period, the court denied both parties' motion for summary judgment because it found a dispute of material fact regarding the defendant's alleged inaction. *Id.* at 285-86. Specifically, the court stated:

> [T]he [defendant] has provided some evidence that could lead a reasonable jury to conclude that it had intervened in a substantial way during this period to address the problems resulting in overdetentions. On the other hand, a jury could

> reasonably conclude that such efforts were so clearly inadequate as to indicate that the [defendant] continued its policy of deliberate indifference.

*Id.* at 286. Lastly, for the time period after March 2008, the court held the defendant was entitled to judgment as a matter of law because of the new policies implemented, which undisputedly led to fewer overdetentions. *Id.* at 281.

Like *Barnes*, there is some evidence that actions taken during 2019 and 2020 may not have been sufficient. The record is not fully developed to assess this time period. But, like the defendant in *Barnes*, there came a time when the County implemented measures demonstrating, as a matter of law, that it was not deliberately indifferent to overdetentions. That began in 2021 when the County specifically assigned an employee with responsibility to review, analyze, and provide root cause analyses regarding alleged overdetentions in the Reports, which resulted in modifications to the release system and employee coaching. *See Woodall v. Wayne County*, 590 F. Supp. 3d 988, 1011 (E.D. Mich. 2022) (finding a change in policy was an "act[] in response to the alleged prior constitutional violations" and therefore could no longer support a deliberate indifference claim); *but cf. Shorts v. Bartholomew*, 255 F. App'x 46 (6th Cir. 2007) (reversing summary judgment in favor of the municipality on an overdetention claim where the municipality failed to present any policies or procedures to address overdetention). After 2021, no reasonable juror could conclude the County made a "conscious decision not to act." *Doe*, 103 F.3d at 508.

As applicable to Plaintiffs here, the challenged overdetentions occurred in either March 2021 (Dunn), 2022 (Day, Leonard, Wilson, Zeider), or 2023 (Haymon). But as explained above, the undisputed timeline of events demonstrates as a matter of law that the County was not deliberately indifferent after January 2021 when it affirmatively assigned two supervisors to review, report, and address overdetention problems at the Jail.

To be sure, Plaintiffs argue the County could have and should have done more. (Doc. 67 at 3230-31.) Plaintiffs assert CCSD has done nothing to address the real issues and failed to operate with basic safeguards. (*Id.* at 3231.) It faults the County for not hiring an outside consultant or specialist to assist in the issues or more comprehensively address overdetention. (*Id.* at 3232.) But that more could have been done is not deliberate indifference under binding precedent. The Sixth Circuit has cautioned that Plaintiffs' "could have" argument is available in every case: "In virtually every instance where a person has had his or her constitutional rights violated . . . a Section 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Hanson v. Madison Cnty. Detention Ctr.*, 736 F. App'x 521, 542 (6th Cir. 2018). As the party opposing summary judgment, Plaintiffs are required by Rule 56 to present facts, like the plaintiffs in *Barnes*, to support their argument that actions taken were ineffective to such a degree that they amounted to no action at all. Plaintiffs have not done so.

**Inadequacy of Training or Supervision.** To succeed on a municipal-liability claim premised on inadequate training or failure to supervise, a plaintiff must show the inadequacy or failure was "the result of the municipality's deliberate indifference." *Franklin*, 115 F.4th at 474 (quoting *Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018)). "There are 'at least two situations in which inadequate training could be found to be the result of deliberate indifference.'" *Ouza v. Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)). "[M]ost commonly, a plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act 'in response to repeated complaints of constitutional violations by its officers.'" *Id.* (quoting *Cherrington*, 344 F.3d at 646). "Under this approach, a plaintiff must show that the defendant

was aware of 'prior instances of unconstitutional conduct' such that it 'was clearly on notice that the training in this particular area was deficient and likely to cause injury' and yet 'ignored a history of abuse.'" *Id.* (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). In a "narrow range of circumstances," a plaintiff can show a municipality was deliberately indifferent if, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious [that] the inadequacy [is] likely to result in the violation of constitutional rights." *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).

For the same reasons Plaintiffs' inaction theory fails, so too does its inadequate training or supervision theory. Plaintiffs argue a jury could find clerical errors and staff failures led to overdetentions and "speak to the incompetency of training programs and supervision." (Doc. 67 at 3244.) Plaintiffs list potential actions that were not taken, including periodic checks on detention, end-of-shift reports indicating releases completed (or not), and more periodic training in light of the overdetention issues. (*Id.* at 3244-45.) For its part, the County presented evidence that Records Clerks were trained for three-to-six months on their job responsibilities, the computer systems they would need to use, and the release process generally. (Doc. 66 at 2834-35.) The County provided further evidence that employees received on-the-job training. (*Id.* at 2835.) And, as discussed above, the County used coaching to correct employee mistakes. (*Id.*)

In the end, Plaintiffs argue that they can succeed on their claim if they show that the County's "training program and supervision were inadequate for the tasks [their employees] were required to perform." (Doc. 67 at 3244 (citing *Shadrick v. Hopkins County*, 805 F.3d 724, 738 (6th Cir. 2015)).) But that is not enough. Plaintiffs must not only show inadequate training and supervision but must also show that "the inadequacy resulted from [the County's] deliberate

indifference." *Shadrick*, 805 F.3d at 738. This requires a showing of "[a] pattern of similar constitutional violations by untrained employees" and "continued adherence to an approach that [the County] knows or should know has failed to prevent tortious conduct by employees." *Id.* at 738-39. But the County did not adhere to its same approach. Instead, at least by early 2021, the County directed more resources and attention to overdetentions. This is not a case where no training was provided at all. *Ouza*, 969 F.3d at 289 (finding that the failure to provide any training at all constituted deliberate indifference in light of repeated constitutional violations). And, at least with respect to 2021 and beyond, it is also not a case where the County ignored potentially unconstitutional conduct and failed to train or supervise employees in the face of those repeated constitutional violations. *Burgess*, 735 F.3d at 478 (explaining that a failure-to-train claim requires a showing of prior unconstitutional conduct the municipality ignored).[4]

**Inadequate Discipline.** To successfully demonstrate a failure to discipline theory for *Monell* liability, Plaintiffs must show deliberate indifference through "a history of widespread abuse that has been ignored." *Berry v. Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (citing *Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412). But again, as described above, it is undisputed that the County did not categorically ignore widespread overdetention issues. While Plaintiffs recognize staffing changes in early 2021 and other corrective measures, they assert staffing errors remained with no coaching or training offered to address those errors.

---

[4] The cases Plaintiffs rely on do not directly support their arguments. Plaintiffs rely on *Hicks v. LeBlanc*, 832 F. App'x 836 (5th Cir. 2020), for the proposition that processing delays and errors demonstrate failure to train or supervise. The persuasiveness of this case is limited given the court was assessing overdetention in the qualified immunity context on a motion to dismiss. But even the proposition the case stands for is not on all fours with Plaintiffs' theory here. While the court found defendant could be liable for "incompetent over-detention" for "failure to process a prisoner's release or immediately compute an inmate's sentence after being sentenced to time served," simply being on notice of employee incompetencies does not support the proposition that defendant was "purposely disregarding sentencing orders." *Id.* at 842.

Plaintiffs point to March 2022 and claim that because no documentation supports training or coaching occurred prior to that month, a genuine issue of fact remains. They also point to the fact that overdetentions continued in 2023. The County directs the Court to competing facts in the record. County employees testified that after the County began analyzing the Reports, Records Clerks who made errors received verbal warnings or coaching. (Doc. 45-6 at 832-39.) When issues arose that required more severe discipline, discipline resulted. (Doc. 45-10 at 991.) Two employees were fired for consistent errors leading to overdetentions. (*Id.*)

Again, though, the Court must adhere to the required analysis—deliberate indifference. Drawing all reasonable inferences in Plaintiffs favor, the Court concludes that the facts Plaintiffs urge the Court to consider do not amount to deliberate indifference.

**ii. Ratification**

Under a ratification theory, a plaintiff may "demonstrate a policy or custom by showing that an official with final decision-making authority ratified the conduct." *Mosier v. Evans*, 90 F.4th 541, 549 (6th Cir. 2024) (citing *Thomas*, 398 F.3d at 429). As applicable here, Plaintiffs pursue a failure to investigate theory of ratification. (Doc. 67 at 3241.) "Ratification may take the form of a failure to investigate, provided there have been 'multiple earlier inadequate investigations that concern comparable claims.'"[5] *Mosier*, 90 F.4th at 549 (quoting *Pineda v. Hamilton County*, 977 F.3d 483, 495 (6th Cir. 2020)). In this context, "there must be a 'link

---

[5] It is unclear whether Plaintiffs' ratification theory applies as argued. Typically, a ratification failure to investigate claim arises where a plaintiff alleges the harm they suffered was inadequately investigated. In that way, a plaintiff claims an official with decision making authority ratified the harm-causing conduct through the inadequate investigation. But the Sixth Circuit has explained that, to show such a claim, one needs to show prior inadequate investigations and cannot rely simply on their own inadequate investigation. *Pineda*, 977 F.3d at 495. Here, Plaintiffs do not argue the County inadequately investigated their own overdetention. Instead, they argue more broadly that the County inadequately investigated overdetention issues and thereby ratified the unconstitutional conduct.

between' the local entity's failure to investigate and the plaintiff's injury." *Pineda*, 977 F.3d at 495 (quoting *Meirs v. Ottawa County*, 821 F. App'x 445, 453 (6th Cir. 2020)). Thus, "[a] series of investigative failures before the plaintiff's injury . . . might at least suggest that the local entity's custom led to the employee's harmful action in the plaintiff's own case." *Id.* (citing *Brown*, 520 U.S. at 407).

In light of the above, Plaintiffs' ratification theory is less supported than its other theories of *Monell* liability. The County's overdetention inquiries date as far back as 2019. Plaintiffs challenge the effectiveness of those investigations and all investigations that have since followed. It is clear overdetention numbers improved in 2019 only to increase again in 2020. So, while there may be evidence to suggest investigative efforts were insufficient during 2019 and 2020, assigning Palagyi in 2021 to investigate this very issue defeats Plaintiffs' ratification theory. Moreover, Plaintiffs do not dispute the findings of Palagyi's analyses. Plaintiffs rely on them to substantiate their claims. Plaintiffs readily recognized this but say the County consistently failed to conduct more comprehensive investigations to such an extent their ratification theory survives summary judgment. (Doc. 67 at 3241.) Plaintiffs fault the County for failing to track overdetentions because doing so would have prevented recurring errors. (*Id.*) Construing all facts in Plaintiffs' favor, the undisputed early 2021 designation of Palagyi, a supervisor, and her supervisor, to assess the Reports and the subsequent measures taken by the County forecloses Plaintiffs' argument that individuals with final decision-making authority ratified unconstitutional conduct at the time of their alleged constitutional deprivation.

## III. CONCLUSION

For the reasons stated herein, Defendant Cuyahoga County's Motion for Summary Judgment (Doc. 66) is GRANTED.

**IT IS SO ORDERED.**

Date: August 21, 2026

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE